## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT WINCHESTER

| | | |
|---|---|---|
| **BIANCA CLAYBORNE,** individually and as parent and next friend of minors J.C., D.W., L.W., A.C., and P.C., | ) ) ) ) ) | |
| **Plaintiff,** | ) ) ) | |
| **v.** | ) ) ) | |
| **RUBEN BASALDUA, in his individual capacity, DONNIE CLARK, in his individual capacity, DOUGLAS FOSTER, in his individual capacity, JAMES THOMPSON, in his individual capacity, KATLYN PELHAM, in her individual capacity, MONTANA MEDINA, in her individual capacity, ERICA WRIGHT-GILLIAM, in her individual capacity, COFFEE COUNTY, TENNESSEE, a political subdivision acting by and through the Coffee County Sheriff's Department, OFFICER CRABTREE F/N/U, in his individual capacity, and COFFEE COUNTY SHERIFF'S DEPARTMENT JOHN DOES 1-10, in their respective individual capacities,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Case No.:** _____<br><br>**Judge** _____<br>**Magistrate Judge** _____<br><br>**JURY DEMANDED** |
| **Defendants.** | | |

## COMPLAINT

## INTRODUCTION

1.      Bianca Clayborne is a Georgia resident and caring mother of five children. On February 17, 2023, she got her children (ages 4 months to 7 years old) up early, loaded the family into her car, and headed out with their father from Atlanta to Chicago for a funeral. What started out as a family road trip turned into a nightmare as they passed through Coffee County, Tennessee.

2.      There, Tennessee Highway Patrol Troopers pulled her car over and kept her whole family in custody for two-and-half-hours in near-freezing temperatures, cited her for simple possession of a small amount of marijuana, illegally refused to let her and her children leave, and illegally escorted the entire family in a police caravan to the Coffee County Jail to deliver them to the Tennessee Department of Children's Services ("DCS") at the jail.

3.      DCS then illegally detained and interrogated the whole family, illegally forced Clayborne to try to provide a urine sample (forcing her to disrobe in the presence of DCS and her children), and illegally had officers place spike strips around the car while DCS secretly and improperly obtained an *ex parte* order to take Clayborne's children away from her.

4.      DCS did not tell Clayborne about the hearing, did not give her a chance to tell the judge why the family should not be separated, and obtained the order without presenting any proof. DCS and local officers then literally ripped the children from Clayborne's arms, placed them in foster care apart from each other, and did not return the children to Clayborne for 55 days.

5.      These public officials illegally tore apart and terrorized Clayborne's family. They acted outrageously and unlawfully. Their actions caused severe emotional trauma to Clayborne and each of her five children.

6.      Clayborne and the children bring this lawsuit to vindicate their rights against the people that harmed them, though the full extent of the harm to their family may never be undone.

# PARTIES

## I.    Plaintiffs

7.     Plaintiff Bianca Clayborne ("Clayborne") is a resident of Georgia.

8.     Plaintiffs J.C., D.W., L.W., A.C., and P.C., are minor children.

9.     Clayborne is their mother, and Deonte Williams ("Williams") is their father.

10.     At the time of the incident in question, J.C. was 7 years old, D.W. was 5, L.W. was 3, A.C. was 2, and P.C. was 4 months old.

## II.    Defendants

### A. The THP Trooper Defendants

11.     Defendant Ruben Basaldua is a Trooper with the Tennessee Highway Patrol ("THP"). He is being sued in his individual capacity.

12.     Defendant Donnie Clark is a Trooper with the THP. He is being sued in his individual capacity.

13.     Defendant Douglas Foster is a Trooper with the THP. He is being sued in his individual capacity.

14.     Defendant James Thompson is a Trooper with the THP. He is being sued in his individual capacity.

15.     Basaldua, Clark, Foster, and Thompson are collectively referred to as the "Troopers" or the "Trooper Defendants."

### B. The DCS Defendants

16.     Defendant Katlyn Pelham is a Case Manager within the Tennessee Department of Children's Services ("DCS"). She is being sued in her individual capacity.

17.     Defendant Montana Medina is a Case Manager within DCS. She is being sued in her individual capacity.

18.     Defendant Erica Wright-Gilliam is an Investigator with DCS. She is being sued in her individual capacity.

19.     Pelham, Medina, and Wright-Gilliam are collectively referred to as the "DCS Defendants."

### C. The Coffee County Defendants

20.     Defendant Coffee County, Tennessee ("Coffee County") is a governmental entity organized under the laws of the State of Tennessee and located in Coffee County, Tennessee. The Coffee County Sheriff's Department ("CCSD") is an instrumentality of Coffee County.

21.     Defendant Crabtree (full name unknown) is believed to be a CCSD officer. He is being sued in his individual capacity.

22.     CCSD John Does 1-10 include unidentified CCSD officers who, as described below, (1) surrounded Ms. Clayborne's car at the Coffee County jail, and (2) surrounded Ms. Clayborne on a bench inside the jail and took her kids away. These individuals (the "John Does") are being sued in their individual capacities.

### JURISDICTION AND VENUE

23.     This action arises under the laws of the United States, and jurisdiction is conferred on this Court under 28 U.S.C. § 1331 because this case arises under a federal statute, 42 U.S.C. § 1983, seeking relief for violations of Plaintiffs' federal constitutional rights. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy.

24.     Venue in the Eastern District of Tennessee is proper under 28 U.S.C. § 1391(b), because a substantial portion of the events or omissions giving rise to the claims occurred within this District.

## FACTS

### I.     The Traffic Stop

25.     Williams and Clayborne live in Atlanta with their five children.

26.     In February 2023, Williams's uncle passed away in Chicago.

27.     On the morning of February 17, 2023, Williams and Clayborne loaded their five children into the car to travel to Chicago for the funeral.

28.     Their route to Chicago ran through Tennessee.

29.     During the first few hours of the journey, the children played and laughed with each other, and the whole family was happy.

30.     That happiness came to an abrupt end in Tennessee.

31.     At about 9:38 a.m. that morning, they were driving on I-24 through Coffee County when they passed THP Trooper Basaldua's patrol vehicle.

32.     Trooper Basaldua drove out to pull over the car (which Williams was driving) allegedly for a "slow poke" violation and a possible tint violation.

33.     After Basaldua turned on his emergency lights and siren, Williams, who was getting off the interstate at Exit 114, slowly pulled the car to a stop at the next gas station.

34.     The temperature that morning was about 36 degrees (*i.e.*, near freezing), with high and gusty winds making the air even colder.

35.     After pulling over, Williams, Clayborne, and their family remained in the car and waited calmly for Trooper Basaldua to approach.

36.     For some unexplained reason, Trooper Basaldua called in two other troopers to assist, even though Clayborne and Williams had shown no resistance.

37.     Trooper Clark and Trooper Foster quickly arrived at the gas station.

38.     These three Troopers remained at the gas station with Williams, Clayborne, and their five small children for the next two-and-a-half hours.

39.     During that time, Basaldua, Clark, and Foster conducted extensive searches of the car and its belongings, and repeatedly interrogated both Williams and Clayborne.

40.     Trooper Thompson arrived later and assisted Basaldua, Clark, and Foster in detaining Clayborne and the children.

41.     During this prolonged stop:

   a.   The children were scared, crying, hungry, and increasingly agitated;

   b.   The 4-month-old child (P.C.) alternated between sleeping and breastfeeding; and

   c.   At the Troopers' direction, the children were shuffled back and forth between the car and the gas station.

42.     The children recognized that something was wrong. However, the children did not understand what was happening to them or their parents. They became increasingly upset.

43.     Despite these circumstances, Clayborne cooperated fully with the Troopers.

44.     This even included cooperating when the Troopers asked for her assistance while she was breastfeeding the baby.

45.     The Troopers discovered a small amount of marijuana in the car – less than five grams.

46.     Under Tennessee law, subject to exceptions that were not applicable here, simple possession of marijuana is a citation-only offense.

47.     For a citation-only offense like simple possession of marijuana, instead of keeping the person in custody, the police are required to issue the person a citation and let them go.

48.     Nonetheless, the Troopers decided to ***arrest*** both Williams and Clayborne for simple possession, without explanation to them.

49.     The Troopers informed Clayborne of this decision.

50.     The Troopers also told Clayborne that because they were arresting her, they would be calling DCS about her children.

51.     After being told that DCS was being summoned for her children, Clayborne pleaded with the officers not to do it.

52.     The children began screaming and crying to the Troopers.

53.     In response to Clayborne's pleas, the Troopers told her that it was "already past that" (meaning past the point of showing any leniency).

54.     Trooper Foster walked away to call DCS.

55.     Clayborne continued to beg and plead to keep her children.

56.     The children kept screaming and crying.

57.     D.W., who was five years old at the time, recognized that something was wrong.

58.     D.W. got into the passenger seat, wrapped his arms around Clayborne, and through tears pleaded: "Can mom not be arrest[ed]? Can my dad come? Please! . . . I want my mom!!! Can I have my dad?!"

59.     Clayborne tried to comfort her screaming child while also speaking to Trooper Clark in an effort to get the Troopers to reconsider.

60. D.W. kept crying and said "I want my daddy! Can my daddy come?"

61. Through tears, Clayborne continued to try to comfort D.W.

62. Clayborne's child, still crying and holding his arms around his mother, pleaded with Trooper Clark to "Stop! Please! I don't want to go! How are we going to eat?"

63. During this time, Trooper Thompson assisted Foster and Clark in keeping Clayborne in custody and preparing to have her transported to the jail with the rest of her family.

64. The Troopers relayed to dispatch that they would be arresting both parents and would be contacting DCS.

65. The Troopers also contacted DCS to indicate that they were arresting both parents and to ask that DCS respond to the jail.

66. In Basaldua's patrol vehicle (where Basaldua had placed Williams shortly after the initial stop), Basaldua told Williams that both he and Clayborne were under arrest.

67. Williams asked what would happen to his children.

68. Basaldua told Williams that the Troopers were calling DCS.

69. Williams became upset and asked to call his mother.

70. Basaldua told Williams to "hang tight" and did not allow him to make a call.

71. Williams became even more upset about what would happen to his children.

72. Williams asked to speak with Basaldua's supervisor. Basaldua said no.

73. The Troopers then cuffed Williams, whom they had already detained in the back seat of Basaldua's car.

74. The Troopers removed the children from the car and had them wait in the gas station shop while they searched the area of the car where the children had been seated.

75.     The Troopers removed all the car seats from the car and placed them outside the vehicle in near-freezing temperatures.

76.     During this additional search, they found nothing illegal.

## II.     The Troopers Decide to Cite Bianca for Simple Possession So that the Children Will Not Be Separated From Her

77.     After over two hours of detaining Williams, Clayborne, and the children, the Troopers changed their mind and decided to issue a ***citation*** to Clayborne for simple possession of marijuana (rather than arrest her for that offense).

78.     Once the Troopers cited Clayborne and chose not to arrest her, she and her children should have been free to leave. (*See* T.C.A. § 40-7-118(e)(1)(C) ("In issuing a citation, the officer shall . . . (C) Release the cited person from custody.").

79.     However, the Troopers did not release Clayborne from custody.

80.     Instead, the Troopers decided that they were required by policy to bring Clayborne to the jail to meet with the DCS workers who were waiting for her.

81.     Trooper Foster maintained (and convinced the other Troopers) that because Clayborne had been issued a citation for "charges like that" (referring to simple possession of marijuana) and "there were children in the car," Clayborne had to meet with DCS at the jail.

82.     Pursuant to Tennessee and federal law, Clayborne should have been free to leave, but the Troopers kept her in custody anyway.

83.     The Troopers' continued detention of Clayborne and her children was illegal.

## III.     Basaldua Threatens to Take the Children Away and the Troopers Order Clayborne and the Children to Go to the Jail to Meet with DCS.

84.     Meanwhile, in Basaldua's patrol car, Williams complained to Basaldua about the unfairness of his arrest and Clayborne's continued detention.

85.     Basaldua responded to Williams: "Man, you want to be quiet? ***Because I could take her and get the kids in DCS***, so you need to be quiet . . . ."

86.     In other words, Basaldua threatened Williams that if he did not stop complaining about what he considered an improper detention, Basaldua would arrest Clayborne and ensure that DCS took their children away.

87.     At about 12 p.m., the Troopers loaded the children and the car seats back into the family's car.

88.     The Troopers directed Clayborne to follow them to the jail.

89.     There were four patrol vehicles parked within feet of Clayborne's car, along with all four Troopers.

90.     One vehicle kept its blue lights flashing throughout this lengthy encounter.

91.     At Clark's direction, Basaldua also turned his vehicle's blue lights on.

92.     The Troopers escorted Clayborne as they caravaned to the jail.

**IV.     The Troopers Continue to Detain Clayborne Illegally, and DCS Indicates That It Intends to Take Custody of Clayborne's Children, Even After Trooper Clark Tells Them That There Was No Reason to Separate the Children from Her**

93.     The Troopers, Clayborne, and her children arrived at the jail at about 12:07 p.m.

94.     Trooper Clark directed Clayborne to park in a spot next to his patrol vehicle.

95.     Clayborne complied with that order and calmly parked in the directed spot.

96.     Clark told her to wait there with the car running.

97.     Clayborne complied.

98.     Justifiably confused about what was going on and why she was still in custody, Clayborne asked Trooper Clark if she was going to jail.

99. Clark told Clayborne that she was not going to jail and that she was only getting a "ticket."

100. At this point, Clayborne and her five children had been in police custody for two and a half hours.

101. In the parking lot a few feet from Clayborne's car, Trooper Clark spoke with DCS Defendants Pelham and Medina.

102. Trooper Clark told Pelham and Medina that there had been an "adjustment to our plan."

103. Trooper Clark informed Pelham and Medina that the Troopers were only issuing a misdemeanor citation to Clayborne (rather than arresting her).

104. Trooper Clark told Pelham and Medina that Clayborne was a good mother, that she should be released so that she would not be separated from her children, that the kids were not being neglected or abused, and that it would be best for everyone for Clayborne to stay with the children.

105. Trooper Clark reiterated that the children were fine and being cared for.

106. Notwithstanding this report and the fact that Clayborne had only been *cited* for simple possession of marijuana, DCS said that they still intended to question Clayborne and the children inside the jail.

107. Trooper Clark requested that DCS do the questioning at the car to avoid further disruption to the children.

108. The Troopers then left the parking lot to eat lunch at Zaxby's about 1.5 miles up the road from the jail.

### V.    DCS Illegally Detains Clayborne and Her Children Without Cause

109.    As the Troopers left the scene, DCS workers (including Pelham, Medina, and Wright-Gilliam) approached Clayborne's vehicle and entered her vehicle to interrogate her.

110.    The DCS workers demanded that Clayborne enter the jail to take a urine test in the women's restroom, while leaving her children in the car with a DCS worker.

111.    Clayborne stated that she did not feel comfortable leaving her children alone in the car with a stranger.

112.    The DCS workers then demanded that Clayborne attempt to take a urine test inside the vehicle (which still had her five children in it).

113.    While in the front seat of car and under the gaze of a DCS worker (and with other officers believed to be Sheriff's deputies surrounding her car), Clayborne had to remove her pants and underwear, and then attempt to urinate into a small cup.

114.    All the while, her children were moving around and distressed.

115.    Clayborne was unable to provide a urine sample under these conditions.

116.    DCS told Clayborne that her failure to provide a urine sample had "made matters worse" for her.

117.    DCS had no legal basis to detain Clayborne.

118.    DCS had no legal basis to demand that Clayborne provide a urine sample, either.

119.    Nonetheless, the DCS workers continued to interrogate Clayborne.

120.    The questions that DCS posed to Clayborne included whether she was breastfeeding the child and whether she had family in Tennessee.

121.    When Clayborne asked why having relatives in Tennessee would matter, the DCS workers told her that they needed that information because they were taking her children away.

122. DCS's statement was both confusing and distressing to Clayborne because it flatly contradicted what the Troopers had just told her.

123. The Troopers had given her a citation in lieu of arrest, told her that she was not under arrest, and told her that she would not be separated from her children.

124. By this point, it had been about 4 hours since the initial traffic stop.

125. Clayborne's children were scared, crying, hungry, and increasingly agitated.

126. Unsurprisingly, when the DCS worker told her that she was taking her children away, Clayborne became upset.

127. Clayborne asked the DCS worker to leave her car.

128. Clayborne then locked the doors and remained in the parking lot while she contemplated what to do in this situation.

129. Upon information and belief, DCS contacted Officer Crabtree and other Sheriff's Deputies (John Does 1-10) for assistance to ensure that Clayborne and family could not leave the premises.

130. Officer Crabtree placed spike strips around Clayborne's car – with the children inside it.

131. In addition to laying spike strips, at least 6 other John Doe officers surrounded Clayborne's car (John Does 1-10).

132. Clayborne still needed to post bond for Williams, who was ready to be bonded out.

133. In order to post bond for Williams, Clayborne had to enter the jail.

134. To do so, Clayborne got her kids out of the car, guided them over the spike strips (while holding her infant child), entered the jail, and paid Williams' bond.

135.    While inside the jail to post the bond, DCS and Sheriff's Deputies instructed Clayborne to sit on a bench with her five children inside the facility and wait.

136.    Clayborne was held against her will and was not free to leave.

**VI.    DCS Obtains an *Ex Parte* Protective Order to Take Clayborne's Children Away**

137.    Meanwhile, at some point before 3 p.m., DCS held an emergency *ex parte* hearing with Judge Greg Perry in Coffee County General Sessions Court to get an order to take Clayborne's children away.

138.    This hearing took place during regular business hours, on a regular business day, when the Court was open.

139.    The Court was located just four miles away from the jail where Clayborne and Williams were located.

140.    The children were not in any immediate danger.

141.    Nevertheless, DCS did not tell Clayborne about the hearing or offer her an opportunity to participate.

142.    If Clayborne had been told about it, she would have attended the hearing and argued to the Judge why DCS should not be allowed to tear her family apart given the facts of the situation.

143.    Instead, DCS concealed the existence of the hearing from Clayborne, surrounded her car with spike strips so that she and her children could not leave the jail.

144.    What exactly happened at this *ex parte* hearing remains a mystery; there was no court reporter and no transcript.

145.    Based on this "hearing," the Judge issued an *Ex Parte* Protective Custody Order, although "no formal proof or witnesses entered" at the hearing.

146.    This is surprising, given that Trooper Clark and Clayborne were within a few miles of the Courthouse and able to testify.

**VII.    The Children are Taken From Clayborne for the Next Two Months**

147.    Meanwhile, at the jail, with officers all around her, Clayborne kept her children close to her to protect them.

148.    D.W., the five-year-old child who had unsuccessfully pleaded with the Troopers at the gas station not to separate the family, kept hugging Clayborne.

149.    Clayborne's children asked her what was happening.

150.    Clayborne told them that the family would be staying together and that she would not let anyone take them away from her.

151.    Clayborne was unaware of the *Ex Parte* Protective Order that DCS had just obtained in secret.

152.    At about 3 p.m., upon entry of the *Ex Parte* Protective Order, at least six uniformed John Doe officers surrounded Clayborne and her children on the bench at the jail.

153.    These officers physically restrained Clayborne while they took her children away.

154.    Clayborne began shaking and did not know what to do.

155.    When one of the babies began crying and Clayborne reached out, the deputy restrained her and told her not to touch her baby because "he's getting taken away from you."

156.    Clayborne tried to hold onto her infant's baby basket (in which her son was crying), but an officer took it from her and told her to get away.

157.    These officers loaded the five children into a white truck and took them away.

158. From February 17, 2023 through approximately March 3, 2023 (14 days), DCS not only separated Clayborne's children from her, but (as of the second night) also separated the children from each other and placed them into separate foster homes.

159. The children were of tender age, between 4 months and 7 years old.

160. The children included the 4-month-old child that Clayborne was breastfeeding and the child who (just that morning) had been pleading with the Troopers at the gas station not to take his mommy and daddy away.

161. DCS initially placed two children in one foster home and three in another.

162. DCS later placed the children in new foster homes in a different combination, but did not tell Clayborne this.

163. Clayborne was prevented from visiting any of her children and was limited to just two audiovisual calls per week while the children were in foster care.

164. On approximately March 3, 2023, DCS placed the children with a family friend in Nashville.

165. By that point, the children had been separated from each other (and their mother) for 14 days.

166. DCS did not return custody of the children to Clayborne until April 13, 2023, after Clayborne obtained a court order to get them back.

167. This was 55 days after DCS took her children on February 17, 2023.

168. On August 15, 2023, the citation against Clayborne for simple possession of marijuana was dismissed.

**VIII.  The Trauma Caused by the Family's Separation**

169.     These 55 days were the worst days that Clayborne and her children have ever experienced.

170.     Clayborne experienced severe emotional trauma from being separated from her children.

171.     Clayborne suffered from anxiety, depression, and mental anguish.

172.     Clayborne's breasts became engorged and painful from not breastfeeding.

173.     Over time, Clayborne's breastmilk dried up and she developed a breast infection.

174.     Clayborne could hardly get out of bed and could barely sleep – and when she did, she cried herself to sleep.

175.     Clayborne knew that her children were suffering from being without her.

176.     The only thing that kept Clayborne going was her desire to reunite her family.

177.     Upon being separated from her children, Clayborne rented a hotel room in order to stay in Tennessee to be close to them and to fight to get them back.

178.     Clayborne was depressed, in shock, and started having panic attacks.

179.     She went to a doctor who prescribed her an anti-depressant.

180.     She also had to see a therapist.

181.     During these 55 days, the children experienced severe emotional trauma from being separated from each other and from their parents.

182.     The children cried for their mother and father and each other.

183.     They worried about whether their parents were okay.

184.     They worried about whether their parents had abandoned them.

185.     They wondered whether what had happened was their own fault.

186.     They feared that they would never see their parents again.

187.    They did not understand what had happened and if they would ever be given back to their parents again.

188.    Even after being reunited, Clayborne's children continue to suffer trauma from this experience.

189.    L.W., who is now four years old, asks whether her daddy and mommy are going to jail.

190.    D.W., who is now six years old, says that he doesn't want DCS to take them away, pleads that DCS "can't take us," and begs his mom "Please don't let them come back and take us."

191.    D.W. also has nightmares and, despite being potty trained before the incident, now wets the bed.

192.    Another child has a visceral reaction to seeing police.

193.    The children have problems sleeping.

194.    The children are still suffering the effects of the family's prolonged separation – and may never fully recover.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Fourth Amendment
### Actionable Under 42 U.S.C. § 1983
### *By All Plaintiffs Against the THP Trooper Defendants*

195.    Plaintiffs hereby re-allege and incorporate the preceding and subsequent allegations as if fully set forth herein.

196.    The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. A Fourth Amendment violation occurs where (1) a person is seized; and (2) the seizure is unreasonable.

197.    A seizure occurs where there is a physical force or a show of authority that in some way restrains the liberty of the person, and (as to a show of authority) that the person submits to the officers' show of authority. A person has been seized within the meaning of the Fourth Amendment if, in view of the all the circumstances surrounding the incident, a reasonable person would have believed that she was not free to leave.

198.    Once a seizure occurs, the seizure must be reasonable. An arrest is "unreasonable" where it is not based on probable cause to believe that the individual has committed or intends to commit a crime.

199.    By law, once the Troopers decided to cite Clayborne for simple possession of marijuana, she and her children were legally free to leave.

200.    Nevertheless, the Troopers told Clayborne that she and her children were not free to leave and instead had to remain in custody and accompany them to the jail.

201.    The Troopers illegally restrained Clayborne and the children against their will, pending transfer of custody to DCS at the jail.

202.    The Troopers' patrol vehicles and the Troopers were all within feet of Clayborne and her children, two vehicles flashed their blue lights, and the Troopers told her that she had to go with them to the jail.

203.    A reasonable person under the circumstances would have believed (as Clayborne did) that she and her children were not free to leave.

204.    Clayborne submitted to this show of force as the Troopers escorted her to the jail in their marked vehicles as part of a caravan.

205.    The Troopers therefore seized Clayborne and her children.

206.    The seizure was unreasonable because it lacked probable cause.

207. The Troopers also had no legal basis to hold Clayborne and her children for transfer to (and further investigation by) the DCS Defendants.

208. As a result of these actions, Plaintiffs suffered damages as identified above.

209. The THP Trooper Defendants were the cause in fact and proximate cause of those damages.

210. These Defendants acted intentionally, maliciously, or with callous disregard for Plaintiffs' rights.

**COUNT II**
**False Arrest/False Imprisonment**
**Tennessee State Law**
*By All Plaintiffs Against the THP Trooper Defendants*

211. Plaintiffs hereby re-allege and incorporate the preceding and subsequent allegations as if fully set forth herein.

212. To show a state law claim for false arrest and imprisonment, the plaintiff must prove: (1) a detention or restraint against her will; and (2) the unlawfulness of such detention or restraint. False imprisonment requires that the defendant must have acted without probable cause.

213. For substantially the reasons stated above as to the Fourth Amendment claim, the Troopers falsely arrested and falsely imprisoned Plaintiffs.

214. Upon citing Clayborne for simple possession of marijuana, Clayborne and her children should have been free to leave.

215. Nevertheless, the Troopers told Clayborne that she and her children were not free to leave and instead had to remain in custody and accompany them to the jail.

216. The Troopers illegally restrained Clayborne and the children against their will, pending transfer of custody to DCS at the jail.

217.   The Troopers' patrol vehicles and the Troopers were all within feet of Clayborne and her children, two vehicles flashed their blue lights, and the Troopers told her that she had to go with them to the jail.

218.   A reasonable person under the circumstances would have believed (as Clayborne did) that she and her children were not free to leave.

219.   Clayborne submitted to this show of force as the Troopers escorted her to the jail in their marked vehicles as part of a caravan.

220.   The Troopers therefore seized Clayborne and her children.

221.   The seizure was unreasonable because it lacked probable cause.

222.   The Troopers also had no legal basis to hold Clayborne and her children for transfer to (and further investigation by) the DCS Defendants.

223.   As a result of these actions, Plaintiffs suffered damages as identified above.

224.   The THP Trooper Defendants were the cause in fact and proximate cause of those damages.

225.   These Defendants acted intentionally, maliciously, or with callous disregard for Plaintiffs' rights.

**COUNT III**
**Violation of the Fourth Amendment**
**Actionable Under 42 U.S.C. § 1983**
***By All Plaintiffs Against the DCS Defendants, Officer Crabtree, and John Doe Coffee County Deputies***

226.   Plaintiffs hereby re-allege and incorporate the preceding and subsequent allegations as if fully set forth herein.

227.   As addressed above, a Fourth Amendment violation occurs where (1) a person is seized; and (2) the seizure is unreasonable.

228.    On February 17, 2023, Clayborne was cited for simple possession of a small amount of marijuana.

229.    Clayborne was not charged with any other crimes.

230.    Accordingly, she and her children should have been free to leave.

231.    DCS had no authority over her or her children at that point.

232.    Nor did DCS have any right to detain Clayborne.

233.    Nevertheless, when Clayborne arrived at the jail, the DCS Defendants illegally detained both her and her children.

234.    DCS entered Clayborne's car and forced her to answer questions.

235.    A reasonable person in Clayborne's circumstances would not have felt free to leave.

236.    Clayborne submitted to this show of authority.

237.    The DCS Defendants therefore seized Clayborne at the jail.

238.    The seizure was unreasonable because the DCS Defendants had no authority to make an arrest.

239.    Clayborne and her children were not afforded legal process before this arrest.

240.    Furthermore, to keep Clayborne and her children in custody during this time, Officer Crabtree (in concert with the DCS Defendants) placed spike strips around the car and numerous officers (believed to be Sheriff's Deputies) surrounded the car.

241.    These actions were both a physical restraint and a show of authority and show of force.

242.    A reasonable person in Clayborne's position would not have felt free to leave.

243.    With respect to this show of authority, Clayborne submitted to it.

244.    This seizure was made without probable cause and without legal process.

245.     As a result of these actions, Plaintiffs suffered damages as identified above.

246.     These Defendants were the cause in fact and proximate cause of those damages.

247.     These Defendants acted intentionally, maliciously, or with callous disregard for Plaintiffs' rights.

### COUNT IV
### False Arrest/False Imprisonment
**Tennessee State Law**
***By All Plaintiffs Against the DCS Defendants, Officer Crabtree, and John Doe Coffee County Deputies***

248.     Plaintiffs hereby re-allege and incorporate the preceding and subsequent allegations as if fully set forth herein.

249.     To show a state law claim for false arrest and imprisonment, the plaintiff must prove: (1) a detention or restraint against her will; and (2) the unlawfulness of such detention or restraint. False imprisonment requires that the defendant must have acted without probable cause.

250.     For substantially the same reasons stated above as to the preceding Fourth Amendment claim, these Defendants falsely arrested and falsely imprisoned Plaintiffs.

251.     Upon citing Clayborne for simple possession of marijuana, Clayborne and her children should have been free to leave.

252.     Clayborne was not charged with any other crimes.

253.     Accordingly, she and her children should have been free to leave.

254.     DCS had no authority over her or her children at that point.

255.     Nor did DCS have any right to detain Clayborne.

256.     Nevertheless, when Clayborne arrived at the jail, the DCS Defendants illegally detained both her and her children.

257.     DCS entered Clayborne's car and forced her to answer questions.

258.   A reasonable person in Clayborne's circumstances would not have felt free to leave.

259.   Clayborne submitted to this show of authority.

260.   The DCS Defendants therefore seized Clayborne at the jail.

261.   The seizure was unreasonable because the DCS Defendants had no authority to make an arrest.

262.   Clayborne and her children were not afforded legal process before this detention.

263.   Furthermore, to keep Clayborne and her children in custody during this time, Officer Crabtree (in concert with the DCS Defendants) placed spike strips around the car and numerous officers (believed to be Sheriff's Deputies) surrounded the car.

264.   These actions were both a physical restraint and a show of authority and show of force.

265.   A reasonable person in Clayborne's position would not have felt free to leave.

266.   With respect to this show of authority, Clayborne submitted to it.

267.   This seizure was made without probable cause and without legal process.

268.   As a result of these actions, Plaintiffs suffered damages as identified above.

269.   These Defendants were the cause in fact and proximate cause of those damages.

270.   These Defendants acted intentionally, maliciously, or with callous disregard for Plaintiffs' rights.

**COUNT V**
**Violation of the Fourth Amendment**
**Unlawful Search**
**Actionable Under 42 U.S.C. § 1983**
***By Clayborne Against DCS Defendants Pelham, Medina, and Wright-Gilliam***

271.   Plaintiffs hereby re-allege and incorporate the preceding and subsequent allegations as if fully set forth herein.

272.    The collection and analysis of a urine sample is a "search" within the meaning of the Fourth Amendment. *See Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 618 (1989).  A search is unlawful if made without probable cause.

273.    The DCS Defendants forced Clayborne to provide a urine sample.

274.    This demand required Clayborne to remove her pants and underwear to attempt to provide the sample.

275.    The DCS Defendants therefore effectuated a search of Clayborne.

276.    For the same reasons stated above, the DCS Defendants had no probable cause to search Clayborne.

277.     The DCS Defendants also did not have any lawful basis to demand that Clayborne submit to a search.

278.    As a result of this search, Clayborne suffered the injuries outlined above, including but not limited to emotional distress, anguish, anxiety, and humiliation.

279.    The Defendants were the cause in fact and proximate cause of those damages.

280.    These Defendants acted intentionally, maliciously, or with callous disregard for Plaintiffs' rights.

### COUNT VI
### Substantive Due Process Under the Fourteenth Amendment
### Actionable Under § 1983
### *By All Plaintiffs Against All Defendants*

281.    Plaintiffs hereby re-allege and incorporate the preceding and subsequent allegations as if fully set forth herein.

282.    Clayborne and her children have a constitutional right to family integrity. Clayborne has a fundamental constitutional right to maintain custody and care of her children. Her children correspondingly have a constitutional right to remain with their mother.

283. Defendants each took actions directed at breaking up and/or unreasonably interfering with the family relationship between Clayborne and her children.

284. First, at various points during the February 17, 2023 traffic stop, the Troopers took actions that illegally would separate Clayborne from her children without probable cause. For example:

     a. They decided to arrest her for simple possession because they were not satisfied with Clayborne's reticence to answer questions after being *Mirandized*, even though Tennessee law required them only to cite her.

     b. They used the threat of taking her children away to force her into allowing a further search of the car, and to answer additional questions.

     c. After deciding to cite Clayborne for simple possession of marijuana instead of physically arresting her, they illegally continued to hold her and her small children in custody in order to deliver them to DCS workers at the jail.

     d. Before departing for the jail, Trooper Basaldua threatened Williams that, if he did not stop complaining about the Troopers' misconduct, they would make sure that DCS took the children away from both parents.

These actions reflected a culpable state of mind directed at the family relationship between Clayborne and her children.

285. Second, the DCS Defendants took actions that illegally separated Clayborne from her children without probable cause. For example:

     a. Even though Clayborne had not been physically arrested for the simple possession charge and was a free citizen at that point, the DCS Defendants illegally detained Clayborne and her family at the jail.

     b. The DCS Defendants illegally forced Clayborne to try to provide a urine sample, which DCS plainly did to find a reason to separate Clayborne from her children.

     c. The DCS Defendants told Clayborne that because she was unable to provide a urine sample (which they had demanded illegally), it "made things worse for her" and therefore supported taking her children away.

d. The DCS Defendants, facilitated by Officer Crabtree and other officers, held Clayborne and her children captive in the car using spike strips while they secretly procured an *ex parte* order to take the children away.

e. The DCS Defendants prevented Clayborne from having notice and opportunity to be heard at the hearing to take away her children (which took place less than 4 miles up the road) by declining to tell her about the hearing, restraining her car using spike strips so that she could not leave, and proceeding *ex parte* even though Clayborne easily could have attended without risk to the children.

286. Third, Officer Crabtree and the John Doe Officers also took actions to break up the family, including:

a. Placing spike strips around Clayborne's vehicle to restrain Clayborne from leaving while DCS surreptitiously procured an *ex parte* protective order.

b. Surrounding Clayborne's car in the parking for that same purpose; and

c. Surrounding Clayborne inside the jail, holding her in detention there, and then taking her children away from her.

287. These illegal actions by all Defendants were deliberate, outrageous, and shocking to the conscience.

288. These actions caused Clayborne and the children to suffer the damages outlined above.

289. These Defendants were a cause in fact and proximate cause of those damages.

290. These Defendants acted intentionally, maliciously, or with callous disregard for Plaintiffs' rights.

## COUNT VII
### *Monell* Claim Against Defendant Coffee County Under § 1983
### *By All Plaintiffs Against Coffee County*

291. Plaintiffs hereby re-allege and incorporate the preceding and subsequent allegations above as if fully set forth herein.

292.   At all times relevant, Officer Crabtree and the John Doe Deputies were acting under the color of state law and within the scope of their employment with Coffee County.

293.   Under § 1983, local governments are responsible for their own illegal acts.

294.   Inadequate training can be the basis for *Monell* liability if it amounts to deliberate indifference to the rights of persons with whom the local government's officers come into contact. To show inadequate training, a plaintiff must show (1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the local government's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury.

295.   Coffee County had an unconstitutional policy or custom of inadequate training amounting to deliberate indifference of the rights of persons with whom its officers come into contact.

296.   Coffee County failed to train or inadequately trained its officers (including Officer Crabtree and the John Doe Deputies) in how to know when seizures are appropriate and when they are not, including training on the law that an individual cited merely for simple possession of marijuana in Tennessee is free to leave.

297.   To establish a claim for failure to supervise, a plaintiff must show that the local government acted with deliberate indifference to the risk of the constitutional violation and that its deliberate indifference was the moving force behind the assault.

298.   Coffee County failed to supervise these officers in the performance of their duties – including a failure to supervise or monitor their behavior to ensure that they were not falsely arresting individuals without probable cause – out of deliberate indifference for the constitutional violations that would result from this failure.

299. Coffee County also had a custom, policy, or practice of permitting false arrests in the DCS context, and of tolerating or acquiescing to this type of federal civil rights violations. To establish this claim, Plaintiff must show (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of Coffee County; (3) Coffee County's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that Coffee County's custom was the moving force or direct causal link in the constitutional deprivation.

300. CCSD officers improperly restrained parents and individuals for transfer to (or interrogation by) DCS investigators where there is no probable cause to hold them and no right of DCS to detain those individuals. CCSD is aware of this misconduct, such that its deliberate indifference in its failure to act to stop these violations amounts to an official policy of inaction; and Coffee County's custom had a direct causal link to Plaintiffs' constitutional deprivations.

301. These acts and omissions on the part of Coffee County constitute a violation of Plaintiffs' constitutional rights, and played a substantial part in causing Plaintiffs' damages, including physiological injury, mental and emotional anguish, and monetary damages.

302. These acts and omissions of Coffee County were a cause in fact and proximate cause of Plaintiffs' injuries.

## COUNT VIII
### Procedural Due Process Under the Fourteenth Amendment
### Actionable Under § 1983
### *By All Plaintiffs Against the DCS Defendants*

303. Plaintiffs hereby re-allege and incorporate the preceding and subsequent allegations above as if fully set forth herein.

304. Under the Fourteenth Amendment, no State shall deprive any person of life, liberty, or property, without due process of law. U.S. Const. amend XIV, § 1.

305. A parent has a liberty interest in the freedom of personal choice in the matters of family life in which the State cannot interfere without good cause. A parent's desire for and right to the companionship, care, custody, and management of his or her children is an important interest that warrants deference and, absent a powerful countervailing interest, protection.

306. The fundamental due process liberty interest is also shared by the parent's child.

307. In the child removal context, procedural due process requires three things:

    a. Parents must be given notice before the child's removal.

    b. The parents must be given a pre-deprivation hearing before a neutral and detached hearing officer and be given a full opportunity at the hearing to present witnesses and evidence on their behalf.

    c. The parents must be permitted to bring an attorney to the hearing if they have retained one.

308. In emergency situations, where a child's safety is immediately threatened with irreparable harm, officials can seize a child without a pre-deprivation hearing.

309. State officials need reasonable cause of an "immediate threat" of irreparable harm to the child.

310. The mere possibility of harm or speculation that harm could occur do not provide a sufficient basis to support an exigency.

311. Here, the DCS Defendants deprived Clayborne and the children of due process of law.

312. The DCS Defendants did not give Clayborne or the children notice of the hearing, an opportunity to be heard, or the opportunity to defend themselves.

313. Furthermore, there were no exigent circumstances requiring the DCS Defendants to seek an *ex parte* hearing to break up the family and seize the children without notice and an opportunity to be heard.

314.     The DCS Defendants had no reasonable cause to believe that there was immediate threat of irreparable harm to the children.

315.     The children were safe with their mother together at the jail (first in the car, then waiting on a bench with her inside the facility), as a Trooper specifically advised the DCS Defendants – where the DCS Defendants were (illegally) detaining them.

316.     As Trooper Clark himself had told the DCS Defendants, Clayborne was a good mother, the children were not neglected or abused, the children were safe and cared for by Clayborne, and she had merely been cited for simple possession of small amount of marijuana, and it was in the best of interest of Clayborne and the children to remain together.

317.     There was no evidence that the children were in any immediate danger.

318.     Indeed, the children were in no danger at all.

319.     Clayborne had just driven from the gas station to the jail with her children at the direction of the Troopers.

320.     Clayborne and the children easily could have driven together to the courthouse, which was less than 4 miles away.

321.     These actions caused Clayborne and the children to suffer the damages outlined above.

322.     These Defendants were the cause in fact and proximate cause of Plaintiffs' injuries.

323.     These Defendants acted intentionally, maliciously, or with callous disregard for Plaintiffs' rights.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

A.     Declare that the acts and omissions of the Defendants violated Plaintiffs' rights;

B.      Award compensatory damages;

C.      Award nominal damages;

D.      Award punitive damages;

E.      Pre- and post-judgment interest as permitted by law;

F.      Award fees and costs under § 1988; and

G.      Grant such other and further relief as the Court deems just and proper.

Plaintiffs demand a jury trial on all issues other than the issue of attorney's fees and costs.

DATED:  February 8, 2024.                 Respectfully submitted,

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI
AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

Abby R. Rubenfeld
**Rubenfeld Law Office, PC**
202 South Eleventh Street
Nashville, TN 37206
Telephone: (615) 386-9077
arubenfeld@rubenfeldlaw.com