# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT WINCHESTER

| | | |
|---|---|---|
| **BIANCA CLAYBORNE, individually and as** | ) | **Case No. 4:24-cv-00012** |
| **next friend of J.C., D.W., L.W., A.C., and P.C.,** | ) | |
| | ) | **District Judge Corker** |
| **Plaintiff,** | ) | **Magistrate Judge Lee** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RUBEN BASALDUA, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## RESPONSE IN OPPOSITION TO MOTION TO DISMISS

On February 17, 2023, what started as a routine traffic stop of Bianca Clayborne and her children (ages 4 months to 7 years old) turned into a nightmare. After Tennessee Highway Patrol ("THP") officers detained her and her family for over two hours in the freezing cold and threatened to take her children away, they cited her with simple possession of marijuana (a charge that was later dropped), illegally kept her in custody even though she should have been free to leave, and then delivered her to Tennessee Department of Children's Services ("DCS") social workers who had responded to the local jail. A THP trooper told the DCS workers that Clayborne was a good mother, there was no indication of abuse or neglect, and the family should not be separated.

Nevertheless, the DCS workers illegally detained Clayborne and the children and illegally demanded a urine sample from Clayborne in her car. Their actions were unlawful and outrageous. The DCS workers lacked any arrest authority in the first place. On top of that, they had no cause to investigate (let alone detain) Clayborne and her children. To the contrary, they had just been told that there was no cause for concern. To make matters worse, the DCS workers then illegally immobilized Clayborne and her family at the jail by having spike strips placed around the car while, in secret, they procured an *ex parte* order from a court three miles up the road to separate Clayborne from her children. They purposely did not tell her about this hearing and purposely deprived her of notice and an opportunity to be heard. The children were separated from their parents for 55 days. The DCS workers did all this in violation of the U.S. Constitution and Tennessee law. Plaintiffs have alleged violations of their federal and state civil rights.

Recognizing the sufficiency of Plaintiffs' claims, the THP Defendants and County Defendants answered the Complaint. In contrast, the DCS Defendants have moved to dismiss, asserting that they are immune to Plaintiffs' claims. The Sixth Circuit has held that immunity rarely should be granted at the pleadings stage. This exemplifies why: Plaintiffs have alleged plausible claims and, taking the allegations as true, the immunity defenses by DCS are without merit.

## FACTS

### I.      The Plaintiffs Are a Loving Family Who Were on a Family Trip for a Funeral.

Bianca Clayborne is a Georgia resident. (¶ 7.) Her children are J.C., D.W., L.W., A.C., and P.C. (¶ 8.) Deonte Williams is their father. (¶ 9.) At the time of the incident in question, J.C. was 7 years old, D.W. was 5, L.W. was 3, A.C. was 2, and P.C. was 4 months old. (¶ 10.) Clayborne was actively breastfeeding the 4-month-old baby. (¶ 41(a).) They all live together in Atlanta. (¶ 25.) In February 2023, after Mr. Williams' uncle passed away in Chicago, Williams and Clayborne loaded their five children into their car to travel to Chicago for the funeral. (¶ 27.) Their route to Chicago ran through Tennessee. (¶ 28.) During the first few hours of the journey, the children played and laughed with each other, and the whole family was happy. (¶ 29.)

### II.      During a Traffic Stop, THP Troopers Cite Clayborne for Simple Possession of Marijuana, But Illegally Keep Her in Custody to Deliver Her to DCS for an Illegal Detention and Interrogation.

At about 9:38 am that morning, the family was driving on I-24 through Coffee County when they passed Tennessee Highway Patrol ("THP") trooper Ruben Basaldua's patrol vehicle. (¶ 31.) Basaldua pulled the car over for a potential "slow poke" violation and possible tint violation. (¶ 32.) The family slowly pulled the car over to the next gas station, remained in the car, and calmly waited for Basaldua to approach. (¶ 35.) Basaldua called in additional THP Troopers Donnie Clark, Douglas Foster, and James Thompson. (¶¶ 36, 37, and 40.) The temperature outside was near freezing – with gusty winds making it even colder. (¶ 34.) Over the next two-and-a-half hours, the THP Troopers held the family at the gas station, conducting extensive searches of the car and its belongings, and repeatedly interrogated both Williams and Clayborne. (¶ 39.) They did this while Clayborne was breastfeeding her four-month-child. (¶¶ 41 and 44.) Despite these circumstances, Clayborne cooperated fully with the Troopers at all times (¶ 43.)

The Troopers found less than 5 grams of marijuana in the car. (¶ 45.) Under Tennessee law, subject to exceptions that were not applicable here, simple possession of marijuana is a citation-only offense. (¶ 46.) For this type of offense, instead of keeping the person in custody, law enforcement are required to issue the person a citation and let them go. (¶ 47.) Nonetheless, the Troopers initially decided to arrest both Williams and Clayborne. (¶ 48.) They told Clayborne and Williams that they would be calling the Tennessee Department of Children's Services (DCS) about the children. (¶ 50.) Clayborne pleaded with the officers not to do this. (¶ 51.) Her children began screaming and crying to the Troopers, asking not to be separated from their parents. (¶¶ 52, 55-62.) The Troopers contacted DCS to respond to the jail. (¶ 65.)

After over two hours of detaining Williams, Clayborne, and the children, the Troopers changed their mind and decided to issue a ***citation*** to Clayborne for simple possession of marijuana (rather than arrest her for that offense). (¶ 77.) At that point, under Tennessee law, Clayborne and her children should have been free to leave. (¶ 78.)[1] Nevertheless, the Troopers illegally kept the family in custody to bring them to the jail to meet with DCS. (¶¶ 79-83.) The Troopers directed Clayborne to follow them to the jail with her children. (¶¶ 88-92.)

### III. At the Jail, DCS Workers Are Told that the Children Are Safe with Clayborne, that She a is a Good Mother, that there is No Indication of Abuse or Neglect, and that the Family Should Not be Separated.

At about 12:07 p.m., THP Troopers, Clayborne, and her children arrived at the jail. (¶ 93.) Trooper Clark directed Clayborne to park in a particular parking spot and wait with the car running. (¶ 95.) DCS social workers were waiting at the jail. A few feet from Clayborne's car, Trooper Clark spoke with DCS Defendants Katlyn Taylor (nee Pelham) and Montana Medina. (¶ 101.) Clark told Taylor and Medina that there had been an "adjustment to our plan." (¶ 102.) He told

---

[1] *See* T.C.A. § 40-7-118(e)(1)(C) ("In issuing a citation, the officer ***shall*** . . . (C) Release the cited person from custody.") (emphasis added).

them that the Troopers were only issuing a misdemeanor ***citation*** to Clayborne (rather than arresting her). (¶ 103.) He also told them Clayborne was a good mother, that she should be released so that she would not be separated from her children, that the kids were not being neglected or abused, and that it would be best for everyone for Clayborne to stay with the children. (¶ 104.) Trooper Clark also reiterated that the children were fine and were being cared for. (¶ 105.)

The THP Troopers were the only officials who had interacted with Clayborne and her children that morning. Accordingly, Taylor and Medina were informed by the only people with knowledge of the situation that: (1) Clayborne had been cited for simple possession of marijuana (for which she was free to leave under Tennessee law); and (2) the children were ***not*** being neglected or abused, the children were "fine" and "being cared for," Clayborne was a "good mother," and that the children should ***not*** be separated from her.

IV.    **Despite Having No Authority Over the Family, No Arrest Authority Despite, and No Basis to Investigate, DCS Illegally Detains the Family and Illegally Tries to Search Clayborne.**

The family's ordeal should have ended there. Unfortunately, it did not. Despite Trooper Clark's report, Taylor and Medina stated that they still intended to question Clayborne and the children inside the jail (¶ 106) – *i.e.*, they wanted to conduct a custodial seizure and interrogation. Trooper Clark stated that, to avoid further disruption to the children, DCS should do the questioning at the car instead of in the jail. (¶ 107.)

The Troopers then left the parking lot to drive about 1.5 miles up the road to eat lunch. (¶ 108.) As the Troopers left, Taylor, Medina, and another social worker (Erica Wright-Gilliam) (collectively, the "DCS Defendants") approached Clayborne's vehicle, entered the vehicle, and proceeded to interrogate her. (¶ 109.) They demanded that Clayborne enter the jail to take a urine test in the women's restroom, while leaving her children in the car with a DSC worker. (¶ 110.) After Clayborne stated that she was not comfortable leaving her children with a stranger, DCS

demanded that she take a urine test inside the car. (¶ 112.) Under the gaze of a DCS worker, with her children in the car, and with County officers a few feet away around the car, Clayborne had to remove her pants and underwear and then attempt to urinate into a small cup. (¶ 113.) She was unable to provide a urine sample under these conditions. (¶ 115.) The DCS workers told her that her failure to provide a urine sample had "made matters worse" for her. (¶ 116.)

DCS had no legal basis to detain Clayborne. (¶ 117.) DCS had no legal basis to demand a urine sample, either. (¶ 118.) The DCS Defendants had no authority over Clayborne or her children. (¶ 231.) It had no power to arrest them (¶ 261.) It also had no probable cause to conduct a search and lacked any lawful basis to perform a search. (¶¶ 276-277) Nevertheless, DCS illegally detained the entire family, searched Clayborne without legal process and continued to interrogate her. (¶¶ 119 and 239.) The questions included whether Clayborne was breastfeeding and whether she had relatives in Tennessee. (¶ 120.) When Clayborne asked why having relatives in Tennessee would matter, the DCS workers told her it mattered because they were taking her children away. (¶ 121.) At this point, Clayborne and her children had been in custody for about 4 hours, and her children were scared, crying, hungry, and increasingly agitated. (¶¶ 122-124.) Clayborne became upset and asked the DCS workers to leave her car. (¶¶ 126-127.) She locked the car doors and waited in the car to decide what to do. (¶ 128.)

**V. The DCS Workers Purposely Restrain Clayborne and Her Children at the Jail While DCS Illegally and Secretly Procures an *Ex Parte* Order to Separate the Family**

While Clayborne remained in the parked car, the DCS workers enlisted officers from the Coffee County Sheriff's Department ("CCSD") to immobilize the car (with the children inside it) using spike strips and by surrounding the car with CCSD officers. (¶¶ 129-130.) The DCS workers did this to ensure that Clayborne and the children could not leave the premises. (¶¶ 129-130.) After a period of time, Clayborne decided that she needed to enter the jail to pay Williams' bond. (¶ 134.)

Inside the jail, DCS and the CCSD officers directed Clayborne to sit on a bench with her five children inside the facility and wait. (¶ 135.) At the direction of the DCS Defendants, Clayborne continued to be held against her will and was not free to leave. (¶ 136.)

Meanwhile, at some point before 3 p.m., DCS held an emergency *ex parte* hearing with Judge Greg Perry in Coffee County General Sessions Court to get an order to take Clayborne's children away. (¶ 137.) This hearing took place during regular business hours, on a regular business day, when the Court was open. (¶ 138.) The Court was located just four miles away from the jail where Clayborne and Williams were located. (¶ 139.) The children were not in any immediate danger. (¶ 140.) The DCS Defendants did not tell Clayborne about the hearing or offer her an opportunity to participate. (¶ 141.) If Clayborne had been told about it, she would have attended the hearing and argued to the Judge why DCS should not be allowed to tear her family apart given the facts of the situation. (¶ 142.) Instead, the DCS Defendants concealed the existence of the hearing from Clayborne and directed County officials to immobilize her car with spike strips so that she and her children could not leave the jail. (¶ 143.)

What exactly happened at this *ex parte* hearing remains a mystery; there was no court reporter and no transcript. (¶ 144.) Based on this "hearing," the Judge issued an *Ex Parte* Protective Custody Order, even though "no formal proof or witnesses was entered" at the hearing. (¶ 145.) Trooper Clark and Clayborne were within a few miles of the Courthouse and able to testify, but DCS did not call them. (¶ 146.) At about 3 p.m., in secret, DCS procured an *Ex Parte* Protective Order to take the children into DCS custody. (¶¶ 151-152.)

Upon entry of this Order, CCSD officers physically restrained Clayborne while they took her children away. (¶ 153.) When Clayborne tried to hold onto her 4-month-old's baby basket (with her infant, breastfeeding daughter in it), an officer took it from her and told her to get away. (¶ 156.) The officers placed all five children in a white truck and drove away. (¶ 157.)

## VI.    DCS Acted Illegally at Every Step.

In sum: the Defendants detained Clayborne illegally and tried to force her to conduct a urine sample to find an excuse to separate her and her children. (¶ 285) After being unsuccessful, they intentionally had the car immobilized so that they could hold the family captive while DCS secretly procured an *ex parte* order to separate the family. (¶ 285.) The DCS Defendants had no reasonable cause to believe that there was an immediate threat of harm to the children, there were no exigent circumstances, and there was no evidence of any immediate danger to the children (or any danger at all). (¶¶ 313-317.) To the contrary, the children were safe with their mother together at the jail (first in the car, then on a bench inside the jail). (¶ 317.)

Nevertheless, the DCS Defendants purposely ***prevented*** Clayborne from having notice and opportunity to be heard: they declined to tell her about the hearing, restrained her car using spike strips, and restrained her inside the jail so that she would not participate in the *ex parte* proceeding – which she easily could have attended without risk to the children. (¶ 285.)

## VII.    DCS Separates the Children from their Parents for 55 Days

From February 17, 2023 through approximately March 3, 2023 (14 days), DCS not only separated Clayborne's children from her, but (as of the second night) also separated the children from each other and placed them into separate foster homes. (¶¶ 158-162.) On approximately March 3, 2023, DCS placed the children with a family friend in Nashville. (¶ 164.) By that point, the children had been separated from each other (and their mother) for 14 days. (¶ 165.)

DCS did not return custody of the children to Clayborne until April 13, 2023, after Clayborne obtained a court order to get them back. (¶ 166.) This was 55 days after DCS took her children on February 17, 2023. (¶ 167.)[2]

---

[2] On August 15, 2023, the citation against Clayborne for simple possession of marijuana was dismissed. (¶ 168.)

These 55 days were the worst days that Clayborne and her children have ever experienced. (¶ 169.) Clayborne experienced severe emotional trauma from being separated from her children, including anxiety, depression, and mental anguish. (¶¶ 170-171) Her breasts became engorged and painful from not breastfeeding, her breastmilk dried up, and she developed a breast infection. (¶ 173.) During these 55 days, the children experienced severe emotional trauma from being separated from each other and from their parents. (¶ 181.) Even after the separation, Clayborne's children continue to suffer trauma from the experience. (¶ 188.) All this for simply possessing a small amount of marijuana in her car during a family trip that happened to pass through Tennessee.

## PLAINTIFFS' CLAIMS

Plaintiffs assert claims against the DCS Defendants for: (1) violating their Fourth Amendment rights through an unlawful seizure (Count III); (2) falsely arresting or imprisoning them in violation of Tennessee common law (Count IV); (3) violating their Fourth Amendment rights via an unlawful search (Count V); (4) violating their substantive due process rights (Count VI); and (5) violating Plaintiffs' due process rights under the Fourteenth Amendment (Count VIII).

## ANALYSIS

### I. DCS Is Not Entitled to Qualified Immunity on the Fourth Amendment Claims.

#### A. Plaintiffs Have a Low Bar to Defeat the DCS Defendants' Immunity Claims at the Pleading Stage

##### 1. The Sixth Circuit Has Repeatedly Held that Qualified Immunity Generally is Inappropriate to Resolve at the Motion to Dismiss Stage

In *Wesley v. Campbell* and an unbroken line of published precedent since, the Sixth Circuit has repeatedly held that "it is generally inappropriate for a district court to grant a 12(b)(6) motion

to dismiss on the basis of qualified immunity."[3] As explained recently by the Sixth Circuit in *Hart v. Hillsdale Cnty., Mich.*:

> As we have repeatedly cautioned, ***it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity***. Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12. It is often perilous to resolve a Rule 12(b)(6) motion on qualified immunity grounds because development of the factual record is frequently necessary to decide whether the official's actions violated clearly established law.[4]

The Sixth Circuit also reinforced this principle in *Guertin v. State*:

> The reasoning for our general preference is straightforward: Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is obvious or squarely governed by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not for purposes of determining whether a right is clearly established.[5]

In light of these principles, Plaintiffs' burden here is light. As explained by the Sixth Circuit in *Marvaso v. Sanchez*, a plaintiff's burden at the motion to dismiss stage to overcome a qualified immunity challenge "is a low bar, given that granting qualified immunity at the motion to dismiss stage is usually disfavored."[6] The Sixth Circuit therefore "generally denies qualified immunity at

---

[3] *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015); *see also Hart v. Hillsdale Cnty., Mich.*, 973 F.3d 627, 635 (6th Cir. 2020) (same); *Marvaso v. Sanchez*, 971 F.3d 599, 605–06 (6th Cir. 2020) (same); *Courtright v. City of Battle Creek*, 839 F.3d 513 (6th Cir. 2016) (same); *Guertin v. State*, , 912 F.3d 907, 917 (6th Cir. 2019); *see also Peach v. Hagerman*, 675 F. Supp. 3d 755, 768 (W.D. Ky. 2023) ("The Sixth Circuit has noted that it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity, because even though a an officer's or social worker's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, this is typically done at the summary judgment phase and not by dismissal under Rule 12.") (cleaned up).

[4] *Hart*, 973 F.3d at 635 (cleaned up).

[5] *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019) (cleaned up) (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)).

[6] *Marvaso*, 971 F.3d at 605–06.

the motion to dismiss stage in order for the case to proceed to discovery, so long as the plaintiff states a plausible claim for relief."[7]

> 2. <u>Where a Constitutional Violation is Obvious, Egregious, or Outrageous, Qualified Immunity Provides No Shield Even Without a Factually Similar Precedent.</u>

Ultimately, the question is whether a case worker in the social worker's position objectively would have understood that she was under an affirmative duty to have refrained from the conduct in which she engaged.[8]

In determining whether a right is "clearly established," in *Safford v. Unified Sch. Dist. No. 1. v. Redding*, 557 U.S. 364 (2009), the U.S. Supreme Court explained that "[t]o be established clearly . . . there is no need that the very action in question have previously been held unlawful. The unconstitutionality of outrageous conduct obviously will be unconstitutional" because "the easiest cases don't even arise."[9] Also, the Court held that "even as to action less than an outrage, officials can still be on notice that their conduct violates clearly established law in novel factual circumstances."[10] This followed from an earlier Supreme Court decision in *Hope v. Pelzer*, where the Supreme Court held that "[a]lthough earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of 'materially similar' facts."[11] This remains the law in the Sixth Circuit.[12]

---

[7] *Id.* (emphasis added); *see also Colson v. City of Alcoa*, 2017 WL 3452353, at *5 (E.D. Tenn. Aug. 10, 2017) ("[T]he qualified immunity defense involves a fact-intensive analysis, and because of its fact-intensive nature, it is typically unsuitable for deliberation at the pleading stage.")

[8] *Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 698 (6th Cir. 2013).

[9] *Safford*, 557 U.S. at 377 (cleaned up).

[10] *Id.*

[11] *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

[12] *See Baynes v. Cleland*, 799 F.3d 600, 611 (6th Cir. 2015) ("We have confirmed these principles in our own jurisprudence as well."); *see also id.* at 611 n.3 ("The Supreme Court has confirmed *Hope*'s continuing vitality and reaffirmed the principle for which it stands on multiple occasions.").

For example, in 2019, the Sixth Circuit explained in *Guertin v. State* that, where "some personal liberties are so fundamental to human dignity as to need no specific explanation in our Constitution to ensure their protection against government invasion," "[t]he lack of comparable . . . precedent does not grant defendants a qualified immunity shield. Rather, it showcases the grievousness of their alleged conduct."[13] Similarly, in *Moderwell v. Cuyahoga County, Ohio* that a plaintiff can state a claim even without identifying a direct analog.[14] Citing to the United States Supreme Court decision in *Taylor v. Riojas*, 141 S. Ct. 52 (2020), it explained that in an "obvious case," the unlawfulness of an official's conduct can be sufficiently definite "even though existing precedent does not address similar circumstances."[15] It also cited scholarly authority for the proposition that, in light of recent Supreme Court precedent, (a) lower courts can deny qualified immunity without a prior case on point;[16] and (b) on "egregious facts," qualified immunity should be denied regardless whether there are factually similar precedents.[17] These principles apply with equal force to social workers.[18]

### B. Plaintiffs Have Pleaded Plausible Fourth Amendment Claims

---

[13] *Guertin v. State*, 912 F.3d 907, 933 (6th Cir. 2019).

[14] *Moderwell v. Cuyahoga County, Ohio*, 997 F.3d 653 (6th Cir. 2021).

[15] *Moderwell*, 997 F.3d at 660.

[16] *Id.* (citing Joanna C. Schwartz, *Qualified Immunity and Federalism All the Way Down*, 109 Geo. L.J. 305, 351 (2020)).

[17] *Id.* (citing Lawrence Rosenthal, *Defending Qualified Immunity*, 72 S.C. L. Rev. 547, 593 & n.193 (2020)).

[18] *See Curry v. Ky. Cabinet for Health & Family Servs.*, 2020 WL 4820718, at *5 (W.D. Ky. Aug. 19, 2020) (finding that social worker's warrantless strip search of children was " 'so clearly' unconstitutional under Supreme Court precedent that we don't need to find that the very actions in question have previously been held unlawful in this circuit.") (cleaned up).

The Fourth Amendment protects against unreasonable searches and seizures.[19] A social worker, like other state officers, is governed by the Fourth Amendment's warrant requirement.[20] Fourth Amendment standards apply to them "just like any other government official."[21]

1. Plaintiffs Allege a Fourth Amendment Claim for an Unlawful Seizure

*The DCS Workers Seized Plaintiffs*: A "seizure" occurs when, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave."[22] Here, Plaintiffs allege that DCS seized Plaintiffs at the jail from the moment they arrived. DCS does not dispute that Plaintiffs' allegations satisfy this element.

*The Seizure Was Unreasonable*: If a seizure occurs, the seizure must be reasonable.[23] This requires probable cause, unless there is consent, exigent circumstances, or special needs that make the warrant and probable cause requirements impracticable.[24] Here, Plaintiffs allege that there was no consent and that there were no exigent circumstances to seize the mother or the children. Furthermore, based on Plaintiffs' allegations, there were no "special needs" that would have obviated the Fourth Amendment's requirements. To the contrary, there was nothing to investigate because Clayborne was a good mother, the children were safe with her, she had complied with every directive not to leave, and THP (the only people with knowledge) told DCS *not* to separate the family. It is undisputed that Plaintiffs have alleged that the search was not reasonable.

On top of this, DCS had no authority under Tennessee law to arrest (*i.e.*, seize) Clayborne or her children. At the time they arrived at the jail, they were legally free to leave because Clayborne had only been cited for simple possession of marijuana. Moreover, DCS had no legal

---

[19] *Schulkers v. Kammer*, 955 F.3d 520, 533 (6th Cir. 2020).
[20] *Kovacic*, 724 F.3d at 695.
[21] *Schulkers*, 955 F.3d at 533 ("[T]he Fourth Amendment's warrant requirement governs social workers just like any other government official.").
[22] *Schulkers*, 955 F.3d at 537.
[23] *Schulkers*, 955 F.3d at 537.
[24] *Id.*

12

power under Tennessee law to arrest or detain Clayborne. DCS workers have authority under T.C.A. § 37-1-406 to *investigate* potential violations (and petition a court to force compliance) and under T.C.A. § 37-1-113 can take a *child* into custody if exigent circumstances in T.C.A. § 37-1-114(a)(2) exist. But nothing gives them arrest authority over a parent.

As to the children, under T.C.A. § 37-1-114(a)(2), DCS can only take custody of child before a detention hearing where, the child is (a) neglected, dependent or abused; (b) the child is subject to an immediate threat to health or safety such that delay for a hearing would likely to result in severe or irreparable harm, or the child might abscond; and (c) there is no less drastic alternative to removal of the child from the parent that would reasonably and adequately protect the child's health or safety or prevent the child's removal form the jurisdiction of the court pending a hearing. Here, based on Plaintiffs' allegations, *none* of these criteria were satisfied. Accordingly, DCS had no power under Tennessee law to detain the children pending a hearing either.

None of this is disputed. Plaintiffs have plausibly alleged unlawful seizure.

2.  <u>Clayborne Alleges an Unlawful Search Under the Fourth Amendment</u>

Fourth Amendment principles establish that government officials must obtain a warrant to conduct a search or seizure on private property, absent exigent circumstances or another recognized exception.[25] Also, urine tests are "indisputably searches within the meaning of the Fourth Amendment." [26] That is because "the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable[.]" [27] Also, under the

---

[25] *Kovacic*, 724 F.3d at 698.
[26] *Ferguson v. City of Charleston*, 532 U.S. 67 (2001); *see Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 618 (1989).
[27] *Skinner*, 489 U.S. at 617.

circumstances alleged here, Clayborne had a reasonable expectation of privacy in the car.[28]

Warrantless searches by social workers are presumptively unreasonable.[29]

Here, the DCS Defendants forced Clayborne to attempt to take a urine sample in her car (in front of her children and under the gaze of at least one DCS Defendant). Per *Skinner* and *Ferguson*, this was "indisputably a search." The Defendants did not obtain a warrant for the search, they lacked probable cause to conduct a search, and they had no legal power to force Clayborne to take a urine test. It is undisputed that Clayborne alleges an unlawful search.

## C. The DCS Defendants' Motion to Dismiss Based on Qualified Immunity is Premature and Without Merit

### 1. Plaintiffs Have Met Their "Low Bar" to Overcome the Qualified Defense at the Pleadings Stage

As explained above, per *Marvaso*, Plaintiffs have a "low bar" to defeat the DCS' Defendants qualified immunity defense – and that claim should proceed "so long as [Plaintiffs] state a plausible claim for relief."[30] Plaintiffs' Complaint easily satisfies that low bar. In fact, the DCS Defendants do not dispute that Plaintiffs have pleaded plausible Fourth Amendment claims.

### 2. The DCS Defendants' Qualified Immunity Defense is Based on Flawed Premise.

DCS Defendants nevertheless argue that they are entitled to qualified immunity because it was not "clearly established" that the Fourth Amendment applies to social workers other than (a) entrances into the home, (b) removal of children from a home, or (c) in-school interviews of

---

[28] *United States v. Dunson*, 940 F.2d 989, 995 (6th Cir. 1991), *abrogated on other grounds by United States v. Ferguson*, 8 F.3d 385 (6th Cir. 1993)); *United States v. Cunnagin*, 2011 WL 4072817, at *2 (E.D. Ky. Sept. 13, 2011) (borrower); *Gov't of Virgin Islands v. Williams*, 739 F.2d 936, 939 (3d Cir. 1984) (owner).

[29] *Curry v. Ky. Cabinet for Health & Family Servs.*, 2020 WL 4820718, at *3 (W.D. Ky. Aug. 19, 2020) (citing *Andrews*, 700 F.3d at 854).

[30] *Id.* (emphasis added); *see also Colson v. City of Alcoa*, 2017 WL 3452353, at *5 (E.D. Tenn. Aug. 10, 2017) ("[T]he qualified immunity defense involve a fact-intensive analysis, and because of its fact-intensive nature, it is typically unsuitable for deliberation at the pleading stage.")

children. (Br. at 10-11.) DCS appears to take the position that DCS workers reasonably could believe that the Fourth Amendment has **no application whatsoever** outside a person's home or their children's school. That position is contrary to law. The Fourth Amendment **applies to social workers** just as it does to all state officials.[31] *Kovacic*, a case on which DCS relies extensively, makes this clear:

> With respect to the Fourth Amendment right, basic Fourth Amendment principles establish that government officials must obtain a warrant to conduct a search or seizure on private property, absent exigent circumstances or another recognized exception. As a general matter, these requirements apply to all searches and seizures investigating criminal activity conducted under official sanction, not just police officers. The text of the Fourth Amendment makes no distinctions, instead invoking a generalized "right of the people to be secure ... against unreasonable searches and seizures." U.S. Const. amend. IV. For this reason, the presumption appears to be that **any state officer should operate with the default understanding that the Fourth Amendment applies to her actions, unless a specific exception to the requirements of the Fourth Amendment has been found to apply**.[32]

DCS cites cases for the proposition that **how** the Fourth Amendment applies in particular contexts is not always clearly established. But every case it cites involves circumstances in which a reasonable social worker could have believed that their conduct was constitutional in a particular context. For example, in *Clark v. Stone*, a social worker reasonably relied on two court orders pertaining to a particular family who (purportedly due their Christian beliefs) were beating their children with a wooden stick and a belt so hard that it was leaving marks. DCS does not cite any case for the proposition that social workers are unbound by the Fourth Amendment outside a home or school – or that they can do searches without cause. If that were the law, then outside home or a school DCS could unlawfully search and arrest **anyone** it wants, **anywhere**, for **any** reason – even without cause. They could snatch children at a playground, a public pool, or on the street.

---

[31] *See Kovacic*, 724 F.3d at 698-99.
[32] *Id.* at 688 (emphasis added).

They could walk up to a couple eating ice cream at a food truck with their children and force the parents to take a urine test.

No reasonable social worker would believe this is the law. Indeed, as the Defendants admit, they are already on notice that, absent exigent circumstances, the Fourth Amendment bars warrantless searches of a home (where someone has a reasonable expectation of privacy) and in-school interviews of a child unless that seizure of the child is reasonable. (Br. at 10-11.) Social workers *are not law enforcement officers*. Under Tennessee law, they have no legal authority to arrest a parent and, under the circumstances alleged here, Tennessee statutory law barred them from detaining the children.[33]

Would any reasonable social worker apprised of the text of the Fourth Amendment, the Supreme Court's longstanding Fourth Amendment precedent, the Sixth Circuit's holding in *Kovacic* and *Schulkers*, and their own lack of arrest authority under Tennessee state law think: "You know what? I am not bound by the Fourth Amendment *at all*. Unless I am entering a parent's home or doing an in-school interview I can undertake warrantless searches and seizures of parents and children without cause and without any exigency. And I can do that even though Tennessee law bars me from making these types of arrests." Of course not.[34]

### D. DCS's Conduct Was Otherwise So Egregious that the Claims Should Proceed Even Without an Exact Analog

The conduct of the DCS workers in detaining the family and searching Clayborne are otherwise so egregious that the claims should proceed. DCS workers are on notice that, as with the

---

[33] *See* T.C.A. § 37-1-406 (authorizing DCS merely to investigate potential violations); T.C.A. § 37-1-113 (authorizing temporary custody of a child only where exigent circumstances in T.C.A. § 37-1-114(a)(2) exist).

[34] *See, e.g.*, *Wendrow v. Mich. Dep't of Human Servs.*, 524 F. App'x 516 (6th Cir. 2013) (finding no immunity where prosecutors interviewed children without consent during school hours, because the brief interviews constituted a "seizure" under the Fourth Amendment and it was "objectively unreasonable" for prosecutors to interview the children without consent).

police, they are bound by the Fourth Amendment.[35] Here, DCS is reduced to stating there is no case in the Sixth Circuit specifically holding that detaining an entirely family (without cause) in a jail parking lot and forcing the mother take a urine test (without cause) is unconstitutional. But this merely "showcases the egregiousness" of DCS's conduct.[36] The actions of the DCS workers here were indefensible. They had no legal authority to detain Clayborne or her children. They lacked any power under Tennessee law to arrest Clayborne under any circumstances. And they had no cause to believe that she was abusing or neglecting her children, or that the children were in any danger. To the contrary, they had been told by the responding officers *not* to separate the family because Clayborne was as "good mother." And yet, without cause, without legal authority, and without a warrant, they unlawfully detained the entire family and tried to force Clayborne to take a urine test. This is a case in which the constitutional violation is so "obvious," "egregious," or "outrageous" that it does not matter whether there is a factually similar precedent.

## II.      Fourteenth Amendment Procedural Due Process

The DCS Defendants contend that Plaintiffs cannot maintain a procedural due process claim stemming from their purposeful decision to *prevent* Plaintiffs from getting notice and an opportunity to be heard before they were separated. DCS lost this argument in recent decisions in this District.[37] It should lose the argument here too.

### A.  Plaintiffs Allege Straightforward Procedural Due Process Claims

Under the Fourteenth Amendment, no State shall deprive any person of life, liberty, or property, without due process of law. U.S. Const. amend XIV, § 1. To establish a due process violation, plaintiffs must show: (1) that they were deprived of a protected liberty or property

---

[35] *See Moderwell*, 997 F.3d at 660; *Safford*, 557 U.S. at 377; *Hope v. Pelzer*, 536 U.S. at 739; *Baynes*, 799 F.3d at 611.
[36] *Guertin v. State*, 912 F.3d 907, 933 (6th Cir. 2019);
[37] *See, e.g., Barnett v. Hommrich*, 2018 WL 10195923 (E.D. Tenn. Mar. 27, 2018); *Barnett v. Smithwick*, 2019 WL 7290475 (E.D. Tenn. May 30, 2019).

interest; and (2) that such deprivation occurred without the requisite due process of law.[38] Plaintiffs' allegations meet both elements.

First, there is no dispute here that Clayborne and her children allege that they were deprived of life, liberty, or property. As the Sixth Circuit held in *Doe v. Staples*, "it is axiomatic that a parent has a liberty interest in the freedom of personal choice in matters of family life in which the State cannot interfere. This liberty interest in family integrity has been labeled an essential or fundamental interest."[39] This includes parents' rights to make decisions about the care, custody, and management of their children.[40] This fundamental right to family integrity extends to all family members, both parents and children.[41] A parent's decision to make decisions concerning the care, custody, or control of their children without arbitrary government interference is clearly established at the time of the DCS Defendants' conduct.[42] Plaintiffs allege that the DCS workers violated their family integrity. This meets the first element of a procedural due process claim.

Second, Clayborne and the children also squarely alleged a lack of due process. In the child removal context, due process requires at least three things:

(1) Parents must be given notice before the child's removal.[43]

(2) The parents must be given a pre-deprivation hearing before a neutral and detached hearing officer and be given a full opportunity at the hearing to present witnesses and evidence on their behalf.[44] and

---

[38] *Peach*, 675 F. Supp. 3d at 774 (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 296 (6th Cir. 2006)); *Schulkers*, 955 F.3d at 545.
[39] 706 F.2d 985, 988-989 (6th Cir. 1983).
[40] *O'Donnell v. Brown*, 335 F. Supp. 2d 787, 820 (W.D. Mich. 2004) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)).
[41] *O'Donnell*, 335 F. Supp. 2d at 820.
[42] *See Peach*, 675 F. Supp. 3d at 771 (citing *Schulkers*, 955 F.3d at 540).
[43] *Barnett*, 2019 WL 7290475, at *6 (citing *Staples*, 706 F.2d at 987).
[44] *Barnett*, 2019 WL 7290475, at *6 (citing *Staples*, 706 F2d 987)

(3) The parents must be permitted to bring an attorney to the hearing if they have retained one.[45]

However, "if there is an exigency involving an immediate danger to the child's safety, . . . a child be removed from a parent's custody if the parents are later provided a prompt post-deprivation hearing."[46] Tennessee law has statutory procedures (including T.C.A. § 37-1-114) that attempt to track the constitutional requirements.[47] Here, Plaintiffs allege that they were not given notice of the February 17 hearing, did not have an opportunity to be heard, and that no exigency existed. DCS does not dispute this. Indeed, in *Barnett v. Hommrich* (where DCS was represented by the same counsel here), the district court found that a procedural due process claim against a social worker survived a motion to dismiss where there was no pre-deprivation hearing and the plaintiff alleged that there was no exigency.[48]

### B. *Pittman* is Inapplicable Here

DCS counters that, in light of the Sixth Circuit decision in *Pittman*, Plaintiffs cannot maintain a procedural due process claim because the constitutional violation was "perpetrated the juvenile court," not the DCS workers. But this misreads *Pittman*, which is nothing alike.

In *Pittman*, the biological father (Pittman) of a child was involved in juvenile court proceedings over custody of the child over a two-year span.[49] The father wanted custody but became uncooperative with the social workers, who ultimately moved the juvenile court (upon notice to the father) in an existing proceeding to transfer temporary custody to another relative (which the court did after a hearing).[50] Months later, after the father had continued to be non-

---

[45] *Barnett*, 2019 WL 7209475, at *6 (citing *Lassiter v. Dep't of Social Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 31 (1981)).
[46] *Id.* at *8.
[47] *Id.*
[48] *Barnett*, 2018 WL 72019195923, at *8.
[49] *Pittman v. Cuyahoga Cnty. Dept. of Children & Family Servs.*, 640 F.3d 716, 718-722 (6th Cir. 2011).
[50] *Id.* at 718-19.

compliant and neglectful, the department sought to move the juvenile court to grant permanent custody to the other relative.[51] The department tried repeatedly to serve notice to Pittman, but was unsuccessful, after which the juvenile court held a hearing and placed the child with that relative. Pittman sued, asserting both substantive due process and procedural due process violations challenging the child's placement.[52] He complained that the social worker should have kept him apprised of developments in the proceeding and that the social worker supplied inaccurate information in connection with the final hearing. The Sixth Circuit held that the social worker could not be liable for a substantive due process violation of depriving family integrity because it was the juvenile court that was tasked with independently determining the best interests of the child and had the "ultimate decision-making power."[53] As to procedural due process, the Sixth Circuit held that, under Ohio law, Pittman could have challenged the child's placement at any time and therefore had notice and an opportunity to be heard.[54] It also found that, where Pittman was already on notice of the ongoing placement proceedings and was represented by counsel for most of those proceedings, the social worker had no independent duty to keep Pittman apprised of ongoing developments in the case.[55]

Here, the circumstances are nothing alike for two reasons. First, here the DCS workers ***actively deprived*** Plaintiffs of notice and an opportunity to be heard. For no valid reason, they purposely did not tell Plaintiffs about the upcoming *ex parte* hearing and actively prevented them from attending the hearing by having the car immobilized with spike strips and the family surrounded at the jail. Second, *Pittman* did not involve emergency *ex parte* proceedings. As it related to the Ohio court's responsibility to keep parties notified, that notification obligation sprung

---

[51] *Id.* 720-721.

[52] *Id.* at 721.

[53] *Id.* at 729.

[54] *Id.* at 729-730.

[55] *Id.* at 730.

from traditional notice requirements in an ongoing court case. It did not speak to a situation in which the department purposely tells a court (as DCS did here in flagrant violation of the law) that giving notice of a deprivation hearing was not possible because the children were in imminent danger. Simply put, *Pittman* does not speak to the circumstances presented here.

This is presumably why, in *Barnett v. Homrich*, another judge of this District permitted procedural due process claims to proceed against a social worker and a DCS attorney, finding (twice) that qualified immunity did not apply.[56] In fact, the case proceeded to trial on the procedural due process claim to determine (among other issues) whether exigent circumstances existed – and the Sixth Circuit (in 2020) affirmed the jury's verdict for the defendant on that point.[57] The Sixth Circuit had no issues with the plaintiff pursuing procedural due process claims against DCS officials there. The same is true here. Indeed, it is disingenuous for the DCS Defendants to deflect "responsibility" here to the juvenile court to have notified Plaintiffs, when ***DCS told the Court that it had to act <u>without</u> giving notice***.[58] Moreover, the DCS Defendants facilitated the due process violation by working with local officials to ensure that the family would not know about the hearing and (even if they learned of it) could not participate in it. Again, DCS is taking a position that would place social workers outside the U.S. Constitution. But they are bound by the Constitution just like all other state actors.

### C. The Violations Were Obvious and Egregious

---

[56] *See Barnett v. Hommrich*, 2018 WL 10195923 (E.D. Tenn. Mar. 27, 2018); *Barnett v. Smithwick*, 2019 WL 7290475 (E.D. Tenn. May 30, 2019).

[57] *Barnett v. Smithwick*, 835 F. App'x 31 (6th Cir. 2020).

[58] Indeed, it appears that, under T.C.A. § 37-1-114, DCS could not have obtained the *ex parte* order without representing to the juvenile court that the children were neglected, dependent, or abused, and that the risk to them (or the risk of flight) was so great that there was no less drastic alternative than separating the family before a deprivation hearing could be conducted

As with the Fourth Amendment violations, the procedural due process violations were obvious, egregious, or outrageous. Without any legitimate justification, the DCS Defendants purposely prevented Clayborne from getting due process. They did this for no reason. There was no exigency. The children were safe and secure with their mother. No one was in danger. Clearly, they perceived no danger because they **kept Clayborne with her children** while they procured the order. Even if *Barnett v. Hommrich* – a factually analogous case that went to trial in this District just a few years ago – were not enough to put DCS social workers in this District on notice that the due process clause binds them too, the violation here is so obvious and egregious that qualified immunity should be denied regardless of factually similar precedent.

### III.    Substantive Due Process

Substantive due process ("SDP") provides that, irrespective of the constitutional sufficiency of the processes afforded, government may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose.[59] Substantive due process claims are loosely divided into two categories: (1) deprivations of a particularly constitutional guarantee; and (2) actions that "shock the conscience."[60] Where a social worker acts in "bad faith" or uses "investigation tactics that shock the conscience," an investigation into child implicates the right to familial association.[61] A social worker's investigative actions are not subject to absolute immunity.[62] Accordingly, as explained in *Heithcock v. Tenn. Dep't of Human Servs.*,

---

[59] *Pittman*, 640 F.3d at 728-729.

[60] *Id.*

[61] *Peach*, 675 F. Supp. 3d at 772 (citing *Kolley v. Adult Protective Servs.*, 725 F.3d 581, 585 (6th Cir. 2013)); *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006) (finding that the right to familial association is implicated where "there is evidence that the investigation was undertaken in bad faith or with a malicious motive or if tactics used to investigate 'shock the conscience'").

[62] *Acherhof v. Selvaggio*, 886 F.2d 826, 830-31 (6th Cir. 1989); *see also Peach*, 675 F. Supp. 3d at 767 ("Because a social worker's decision to open or conduct an investigation is not protected by absolute immunity, Plaintiffs can challenge Defendants' decision to investigate him.") (cleaned up).

2016 WL 11786416 (6th Cir. Oct. 4, 2016), the Sixth Circuit held that this operates as an exception

to the rule articulated in *Pittman*.[63]

Here, Plaintiffs challenge DCS's ***investigative*** actions, not their judicial actions.

Specifically, Plaintiffs allege that DCS:

- Illegally detained the entire family at the jail despite lacking any arrest powers and despite the fact that the family should have been free to leave;

- Pursued the investigation despite being specifically told by law enforcement officers involved in the incident that there was ***no reason to investigate*** and that the children ***should not be separated from their mother*** because they were safe, secure, not being neglected or abused, and called the mother a "good mom");

- Illegally entered Clayborne's car and illegally forced her to take a urine sample (including forcing her to disrobe in front of her children and a DCS worker);

- Told Clayborne that her inability to provide this urine sample (which DCS was illegally forcing her to do despite having no lawful authority to do so) somehow "made things worse for her" and justified taking her children away;

- Directed CCSD officers to hold the entire family captive in the car by placing spike strips to hold the family there illegally while DCS secretly procured an *ex parte* order to take the children away;

- Had CCSD officers surround the family at the jail to keep them there despite having no lawful authority to do so;

- Purposely prevented Clayborne from having notice and opportunity to be heard at the hearing by declining to tell her about it, immobilizing her car so that she could not leave and could not attend the hearing, and proceeding *ex parte* even though Clayborne easily could have attended the hearing without risk to the children.

DCS is not entitled to qualified immunity so long as Plaintiffs plead facts showing a bad faith

investigation or investigatory tactics that "shock the conscience." Plaintiffs allege facts supporting

both exceptions. This is sufficient at this stage.[64]

---

[63] *See also Peach*, 675 F. Supp. 3d at 772.

[64] *See Peach*, 675 F. Supp. 3d at 772. DCS cites the analysis of a federal district court in *Arsan v. Keller*, but that case has little persuasive value because it was effectively affirmed on other grounds in *Arsan v. Keller*, 784 F. App'x 900, 910 (6th Cir. 2019), where the Sixth Circuit did not even analyze the "shock the conscience" standard.

## IV.    State Law Claims

Plaintiffs allege that the DCS Defendants falsely arrested or imprisoned them. (*See* Compl., Count V.) To show a state law claim for false arrest and imprisonment, the plaintiff must prove: (1) a detention or restraint against her will; and (2) the unlawfulness of such detention or restraint.[65] False imprisonment requires that the defendant must have acted without probable cause.[66]

Here, Plaintiffs squarely allege false imprisonment and false arrest against the DCS workers. First, Plaintiffs allege that DCS workers restrained Clayborne and the children at the jail against their will, a reasonable person would not have felt free to leave under the circumstances, and they submitted to this show of authority. (¶¶ 253-258.) Second, Plaintiffs allege that their detention by the DCS workers was unlawful because DCS lacked probable cause, had no authority over them, and had lacked legal authority to make an arrest. (¶¶ 254, 255, 261, 267.)

The DCS Defendants nevertheless assert qualified immunity under Tennessee state law. Tennessee law provides a qualified or "good faith" immunity of government employees for state law torts.[67] The court must determine whether a state actor committed a clearly established state tort violation.[68] The DCS Defendants are not entitled to state qualified immunity for two reasons. First, the DCS Defendants could not have seized Clayborne in good faith because they had no authority under Tennessee law to arrest her (*i.e.*, the acted *ultra vires*). Similarly, under the circumstances alleged, they had no authority to seize the children at the jail before the hearing because T.C.A. § 37-1-113's criteria were not satisfied. Second, even if they had arrest authority (which they did not), the DCS Defendants concede that a "reasonable social worker would have

---

[65] *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990).

[66] *Zelaya v. Hammer*, 516 F. Supp. 3d 778, 811 (E.D. Tenn. 2021) (citing *Brown v. Christian Brothers Univ.*, 428 S.W.3d 38, 54 (Tenn. Ct. App. 2013)).

[67] *Willis v. Neal*, 247 F. App'x 738, 745 (6th Cir. 2007) (citing *Youngblood v. Clepper*, 856 S.W.2d 405, 407-408 (Tenn. Ct. App. 1993)).

[68] *Hammond-Beville v. Landis*, 2022 WL 910569, at *5 (6th Cir. Mar. 29, 2022).

understood the general proposition that the intentional restraint or detention of another without just cause constitutes false and imprisonment." (Br. at 19.) That concession precludes a Tennessee qualified immunity defense. Plaintiffs allege that DCS Defendants intentionally detained Plaintiffs without cause. Plaintiffs allege that the DCS Defendants unlawfully arrested Plaintiffs after being told specifically by Trooper Clark (the only person they spoke to with personal knowledge of the interactions with the family) that there was no cause to investigate and that the family should not be separated because the children were safe and secure with their mother.

Finally, as with their federal qualified immunity defense, the DCS Defendants try to skirt liability by placing themselves outside the law. They default to the notion that they cannot be on "fair notice" that it was unlawful to detain the entire family without *any* cause and without *any* arrest authority (*i.e.,* to make a false arrest) because a Tennessee court has never held that it is illegal to do so in a jail parking lot. (Br. at 19-20.) By that logic, DCS social workers could exceed their statutory powers by arresting people (which they lack authority to do), making arrests anywhere and everywhere, and doing so without cause – unless until a court says that it is illegal in a particular place. And even then, DCS workers could continue to act lawlessly everywhere but that one place. Plaintiffs urge the Court not to adopt DCS's position.

## CONCLUSION

This case involves egregious civil rights violations by the DCS Defendants. Their Motion to Dismiss essentially argues that, except in the narrowest of circumstances, they are unbound by constitutional law. But that is not the law. This is government overreach. All state actors, including DCS social workers, are bound by the U.S. Constitution and its guarantees of due process and the right to be free from unreasonable searches and seizures. For these reasons and the reasons explained above, Plaintiffs urge the Court to deny the DCS Defendants' motion to dismiss and permit Clayborne and her children to pursue justice against the people who wronged them.

Respectfully submitted,

/s/ *Anthony A. Orlandi*
TRICIA R. HERZFELD, BPR #26014
ANTHONY A. ORLANDI, BPR #33988
Herzfeld, Suetholz, Gastel, Leniski & Wall, PLLC
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
(615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

ABBY R. RUBENFELD, pro hac vice
Rubenfeld Law Office, PC
810 Dominican Drive, Ste. 215
Nashville, TN 37228
(615) 386-9077
arubenfeld@rubenfeldlaw.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served via CM/ECF notification and electronic mail on this 10th day of June 2024 on the following:

| | |
|---|---|
| Jeffrey R Thompson<br>Gina Sarli Vogel<br>**Lewis Thomason, P.C.**<br>900 South Gay St., Ste. 300<br>P.O. Box 2425<br>Knoxville, TN 37901<br>865-546-4646<br>Fax: 865-523-6529<br>jrthompson@lewisthomason.com<br>gvogel@lewisthomason.com<br><br>***Attorneys for Coffee County Tennessee and Officer Crabtree*** | Jordan Crews<br>Katherine P. Adams<br>**Office of the Tennessee Attorney General**<br>P.O. Box 20207<br>Nashville, Tennessee 37202<br>(615) 532-7913 phone<br>(615) 532-5683 fax<br>jordan.crews@ag.tn.gov<br>Katherine.adams@ag.tn.gov<br><br>***Attorneys for Erica Wright-Gilliam, Katlyn Taylor and Montana Medina*** |
| Meghan Murphy<br>Peako Jenkins<br>**Office of the Tennessee Attorney General**<br>P.O. Box 20207<br>Nashville, Tennessee 37202<br>Phone (615) 253-3890<br>meghan.murphy@ag.tn.gov<br>Peako.Jenkins@ag.tn.gov<br><br>***Attorneys for Ruben Basaldua, Donnie Clark, Douglas Foster, and James Thompson*** | |

*/s/ Anthony A. Orlandi*
Anthony A. Orlandi