# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT WINCHESTER

| | |
|---|---|
| BIANCA CLAYBORNE, individually and as parent and next friend of minors J.C., D.W., L.W., A.C., and P.C., | ) ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| RUBEN BASALDUA, in his individual capacity, DONNIE CLARK, in his individual capacity, DOUGLAS FOSTER, in his individual capacity, JAMES THOMPSON, in his individual capacity, KATLYN TAYLOR (NEE PELHAM), in her individual capacity, MONTANA MEDINA, in her individual capacity, ERICA WRIGHT-GILLIAM, in her individual capacity, DALE LYNN, in his individual capacity, COFFEE COUNTY, TENNESSEE, a political subdivision acting by and through the Coffee County Sheriff's Department, OFFICER ALAN CRABTREE, in his individual capacity, OFFICER ALEX WEBB, in his individual capacity, CHIEF DEPUTY FRANK WATKINS, in his individual capacity, SERGEANT STEPHEN SHARKETTI, in his individual capacity, and LIEUTENANT JAMES SHERRILL, in his individual capacity. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Case No.: 4:24-CV-00012-DCLC-SKL

JURY DEMANDED

## FIRST AMENDED COMPLAINT

1. This case involves abuses of power, process, and professional responsibility by law enforcement officers and by workers for the Tennessee Department of Children's Services ("DCS").

2. It involves knowingly baseless threats by a State Trooper to retaliate against a family by separating a mother from her children; the illegal detention and separation of a family by County officials and DCS employees with no court hearing, no court order, no evidence, and no cause; false statements by DCS officials; secret *ex parte* communications with a General Sessions Judge (including midnight *ex parte* texts during an ongoing case); and intentional efforts by DCS employees and other public officials to conceal their involvement in improperly separating the family.

3. Bianca Clayborne is a Georgia resident and loving mother of five. On February 17, 2023, she woke her children (ages 4 months to 7 years old) up early, loaded the family into her car, and headed out with their father (Deonte Williams) from Atlanta to Chicago for a funeral. What started out as a family road trip turned into a nightmare as they passed through Coffee County, Tennessee.

4. There, Tennessee Highway Patrol Troopers pulled her car over and detained her whole family for two-and-half-hours in near-freezing temperatures, illegally kept the family in custody after citing her for simple possession, and (despite having determined that Clayborne was a good mother and her children were safe in her care) illegally delivered the entire family to DCS at the Coffee County Jail.

5. That was just the beginning of the nightmare. At the jail, one of the Troopers told DCS case workers that Clayborne was not being arrested, that there were no issues of abuse or neglect, that Clayborne was a good mother, and that the family should not be separated. Despite

that, the Troopers delivered physical custody at the Coffee County Jail of her and her family to DCS employees, who in turn illegally detained and interrogated the family, illegally forced Clayborne to try to provide a urine sample (forcing her to disrobe in the presence of DCS personnel and her children), and illegally had officers place spike strips around her car to keep her and her children from leaving.

6.     The DCS Defendants had no factual or legal basis to remove these five children from their mother. Nevertheless, in flagrant violation of the law and its own policies, they decided to take Clayborne's children away and to punish Clayborne for validly exercising her First Amendment right to stop answering their baseless questions and for refusing to let them take her children away and place them in foster care for no reason.

7.     To accomplish that unlawful objective, the DCS Defendants acted outside the law. In spite of the law and DCS's own policies, a DCS manager (who was not even present) called a General Sessions Court Judge (Judge Greg Perry) directly and *ex parte*. What was said during that call is not recorded and there is no mention of its existence on the Court's docket or in any subsequent filing by DCS. In violation of the law, before removing the children, the DCS Defendants did not present testimony or proof to Judge Perry, or file any pleadings with the Court. Instead, after that secret call (the contents of which remain a mystery), the DCS Defendants enlisted County officers to separate the family at the jail.

8.     No one told Clayborne about these interactions with Judge Perry. No one gave her a chance to defend her family. No one even created a document or public record that she could point to later.

9.     The actions by the DCS Defendants were illegal. Tennessee does not permit children to be taken from their parents based on a private telephone call to a judge. Instead, when

DCS believes a child should be removed from their home, DCS must file a proper petition and make factual allegations under oath to support the drastic relief of removing a child from their family – and the law requires that removal can only happen **after** procuring a valid court order.

10. The Coffee County Sheriff's Department ("CCSD") initially recognized that it should take no part in this fiasco. Its Chief Deputy (Frank Watkins) tried to call the District Attorney to figure out if a law had changed that allowed the CCSD to take the children from their mother without a court order (it hadn't).

11. Then, in a remarkable and as-yet-unexplained turn of events, Judge Perry called a County official (James Sherrill) on his cell phone regarding the case – without any representative for Plaintiff involved. In the presence of CCSD Chief Deputy Watkins, Sherrill told Judge Perry: "If we get involved, there's going to be a damn lawsuit for sure." In response, Judge Perry told Sherrill to arrest Clayborne for disorderly conduct, remove her children from her, and not to worry about getting sued because "I've got judicial immunity."

12. Apparently unsatisfied with Sherrill's initial resistance, Chief Deputy Watkins asked Judge Perry if an oral order was "good enough." After Judge Perry incorrectly stated "absolutely," the Chief Deputy directed various County officials to separate the family without a valid order.

13. One County official took a baby stroller carrying Clayborne's four-month-old away from her and wheeled it away over her cries. Another watched while DCS employees "coaxed" the children away from their mother and into one or more white trucks.

14. It got even worse from there. In an effort to cover their tracks, **after** the children had been removed, a DCS attorney (at the behest of the DCS Defendants) submitted a proposed blank template *ex parte* removal order to Judge Perry that was facially false and inaccurate. One

of the DCS Defendants served that document to Clayborne without a time stamp to obscure the fact that the Order did not issue until *after* the DCS Defendants had removed the children. Then, to backfill the record, one of the DCS Defendants (after communicating with other DCS Defendants about the matter) filed a petition the following Monday filled with lies and material omissions to try to justify their unlawful removal of the children. This included falsely representing in the filing that certain events had occurred *before* the DCS Defendants removed the five children – when in fact they had occurred *after* the removal.

15.    If that were not enough, DCS lawyer Sheila Younglove then had illegal direct *ex parte* communications with the Court to keep the family separated. This included:

      **a.**  Sending emails to Judge Perry's chambers *ex parte* (copying all five DCS Defendants) with inflammatory accusations about Clayborne and Williams to prejudice the Judge the day before the family had its first hearing;

      **b.**  Speaking to Judge Perry *ex parte* about key evidence that mysteriously went missing (after Clayborne's lawyers had asked for that evidence to be preserved); and

      **c.**  After Clayborne's lawyers threatened to file a federal lawsuit, texting back and forth with Judge Perry *ex parte* after 11pm at night, including telling him how to keep the family from suing in federal court, minimizing the family's valid concerns, and belittling their lawyers.

16.    Furthermore, evidence that would help prove malfeasance by the DCS Defendants and by the County (including the identities of the officials involved) has gone missing.

5

17.     The combined actions of the Defendants in this case resulted in five small children (ranging from a nursing four-month-old to seven years old) being separated from their mother for 55 days.

18.     The children also initially were separated from *each other* in different foster homes for two weeks, and one set of children were shuffled through four different foster homes – including one that had a domestic violence incident – despite having a friend available to house all of them together.

19.     These public officials illegally tore apart and terrorized Clayborne's family. They acted outrageously and unlawfully. Their actions caused severe emotional trauma to Clayborne and each of her five children.

20.     Clayborne and the children bring this lawsuit to vindicate their rights against the people that harmed them, though the full extent of the harm to this family may never be undone.

<u>**PARTIES**</u>

I.     <u>**Plaintiffs**</u>

21.     Plaintiff Bianca Clayborne ("Clayborne") is a resident of Georgia.

22.     Plaintiffs J.C., D.W., L.W., A.C., and P.C., are minor children.

23.     Clayborne is their mother, and Deonte Williams ("Williams") is their father.

24.     At the time of the incident in question, J.C. was 7 years old, D.W. was 5, L.W. was 3, A.C. was 2, and P.C. was 4 months old.

II.     <u>**Defendants**</u>

   **A.  The THP Trooper Defendants**

25.     Defendant Ruben Basaldua is a Trooper with the Tennessee Highway Patrol ("THP"). He is being sued in his individual capacity.

26.     Defendant Donnie Clark is a Trooper with the THP. He is being sued in his individual capacity.

27.     Defendant Douglas Foster is a Trooper with the THP. He is being sued in his individual capacity.

28.     Defendant James Thompson is a Trooper with the THP. He is being sued in his individual capacity.

29.     Basaldua, Clark, Foster, and Thompson are collectively referred to as the "Troopers" or the "Trooper Defendants."

### B. The DCS Defendants

#### i. Katlyn Taylor

30.     On February 17, 2023, Defendant Katlyn Taylor (nee' Pelham) was a Case Manager within the Tennessee Department of Children's Services ("DCS").

31.     Taylor is being sued in her individual capacity.

32.     Taylor began working for DCS on May 31, 2022.

33.     Taylor joined DCS as a case manager in a training-level position.

34.     In that position, Taylor was on probation with DCS for 1 year.

35.     Accordingly, on February 17, 2023, Taylor (whose last name at the time was Pelham) had been on the job for under 8 months and was still in her probationary period.

36.     Taylor is no longer employed by DCS.

#### ii. Montana Medina

37.     Defendant Montana Medina is a Case Manager within DCS.

38.     She is being sued in her individual capacity.

#### iii. Erica Wright-Gilliam

39.     Defendant Erica Wright-Gilliam is an Investigator with DCS. She is being sued in her individual capacity.

### iv. Kathleen Velez

40.     Defendant Kathleen Velez is a Case Manager within DCS.

41.     She is being sued in her individual capacity.

### v. Dale Lynn

42.     Defendant Dale Lynn is a "Team Leader" for DCS.

43.     Lynn is being sued in his individual capacity.

44.     Taylor, Medina, Wright-Gilliam, Velez, and Lynn are collectively referred to as the "DCS Defendants."

## C. The Coffee County Defendants

### i. Coffee County

45.     Defendant Coffee County, Tennessee ("Coffee County") is a governmental entity organized under the laws of the State of Tennessee and located in Coffee County, Tennessee. The Coffee County Sheriff's Department ("CCSD") is an instrumentality of Coffee County.

### ii. Alan Crabtree

46.     Defendant Alan Crabtree is a CCSD officer.

47.     He is being sued in his individual capacity.

### iii. James Sherrill

48.     Defendant James Sherrill is a former officer for the CCSD.

49.     He is being sued in his individual capacity.

### iv. Frank Watkins

50.     Defendant Frank Watkins is the current Chief Deputy of the CCSD.

51.     He is being sued in his individual capacity.

### v. Stephen Sharketti

52.     Defendant Stephen Sharketti is a former officer for the CCSD.

53.     He is being sued in his individual capacity.

### vi. Alex Bell

54.     Defendant Alex Bell is a former officer for the CCSD.

55.     He is being sued in his individual capacity.

56.      The original complaint in this action listed additional defendants CCSD John Does 1-10 as unidentified CCSD officers who, as described below, (1) surrounded Ms. Clayborne's car at the Coffee County jail, and (2) surrounded Clayborne on a bench inside the jail and took her kids away. Plaintiff has now identified those John Does and listed them by name above.

## JURISDICTION AND VENUE

57.     This action arises under the laws of the United States, and jurisdiction is conferred on this Court under 28 U.S.C. § 1331 because this case arises under a federal statute, 42 U.S.C. § 1983, seeking relief for violations of Plaintiff's federal constitutional rights. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy.

58.     Venue in the Eastern District of Tennessee is proper under 28 U.S.C. § 1391(b), because a substantial portion of the events or omissions giving rise to the claims occurred within this District.

## FACTS

### I.    The Traffic Stop

59.     Williams and Clayborne live in Atlanta with their five children.

60.     In February 2023, Williams's uncle passed away in Chicago.

61.     On the morning of February 17, 2023, Williams and Clayborne loaded their five children into the car to travel to Chicago for the funeral.

62.     Their route to Chicago ran through Tennessee.

63.     During the first few hours of the journey, the children played and laughed with each other, and the whole family was happy.

64.     That happiness came to an abrupt end in Tennessee.

65.     At about 9:38 a.m. that morning, they were driving on I-24 through Coffee County when they passed THP Trooper Basaldua's patrol vehicle (which was parked on the highway median).

66.     At the time that they passed his vehicle, they were driving in the left lane with another car traveling just a few feet ahead of them in the right lane.

67.     After the family's vehicle passed Basaldua, three more vehicles passed Basaldua driving in the left lane with no cars in the right lane.

68.     Each of those three vehicles (the three vehicles traveling in the left lane behind the family's car) committed a slow poke violation.

69.     Trooper Basaldua chose not to pursue those three vehicles.

70.     Trooper Basaldua drove out to pull over the family's car (which Williams was driving) allegedly for a "slow poke" violation and possible tint violation.

71.     By the time Basaldua pulled onto the highway, Clayborne's vehicle was (at a minimum) hundreds of feet further down the highway.

72.     Basaldua initially did not have his lights or his siren on.

73.     Inside the car, Clayborne's infant child had a "blowout," requiring the family to take a rest stop to change the infant's diaper.

74.     The family pulled the vehicle into the right lane and began the process of taking Exit 114.

75.     Basaldua drove his car forward at a high speed and continued to drive faster than the family's car after the family had pulled into the right lane.

76.     Basaldua did not turn on his lights until the family's vehicle was already in the process of taking the exit.

77.     His siren remained off at that time.

78.     By the time that the family's car was more than halfway onto the ramp, Basaldua still did not have his siren on.

79.     As the car was approaching the intersection to take a right turn, Basaldua flickered his siren.

80.     The family then slowly pulled into a BP gas station.

81.     Basaldua did not know if the family knew that he was trying to pull them over at that point.

82.     The family slowly pulled beside a pump at the gas station.

83.     After slowly pulling over, Williams, Clayborne, and their family remained in the car and waited until Trooper Basaldua approached the driver's side window.

84.     The family made no effort to speed away, escape, or outrun Basaldua.

85.     However, on the radio Basaldua reported that he was "not sure if he is going to stop or not" (referring to the family's car) and that the car was "cruising around the parking lot."

86. The temperature that morning was about 36 degrees (*i.e.*, near freezing), with high and gusty winds making the air even colder.

87. Trooper Clark and Trooper Foster responded to the gas station within about two to three minutes of the stop.

88. Thompson later joined Basaldua, Clark, and Foster.

89. These Troopers remained at the gas station with Williams, Clayborne, and their five small children for about two-and-a-half hours.

90. During that time, all four Troopers participated in thorough searches of the car and its belongings.

91. During that time, the Troopers also interrogated Williams and Clayborne multiple times.

92. Trooper Thompson arrived later and assisted Basaldua, Clark, and Foster in detaining Clayborne and the children.

93. Trooper Thompson also assisted Basaldua, Foster, and Clark in searching the vehicle.

94. During this prolonged stop:

   **a.** The children were scared, crying, hungry, and increasingly agitated;

   **b.** The 4-month-old child (P.C.) alternated between sleeping and breastfeeding; and

   **c.** At the Troopers' direction, the children were shuffled in and out of the car.

95. The children recognized that something was wrong. However, the children did not understand what was happening to them or their parents. They became increasingly upset.

96. Despite these circumstances, Clayborne cooperated fully with the Troopers.

97.	This even included cooperating when the Troopers asked for her assistance while she was breastfeeding the baby.

**II.	The Troopers Unlawfully Arrest Clayborne**

98.	Basaldua, Foster, and Clark then searched the car, including removing the family's bag, a diaper, and baby strollers (which they placed behind the car in near-freezing temperatures), searching the inside of the car, and searching under the front hood.

99.	The Troopers discovered a small amount of presumed marijuana in the car – less than five grams.

100.	Under Tennessee law, subject to exceptions that were not applicable here, simple possession of marijuana is a citation-only offense.

101.	For a citation-only offense like simple possession of marijuana, instead of keeping the person in custody, the police are required to issue the person a citation and let them go.

102.	The Troopers removed the substance from the car.

103.	The officers found a gun in Clayborne's purse.

104.	The gun belonged to Clayborne.

105.	It is presumptively legal in Tennessee for a person to own and carry a handgun – even without a permit.

106.	Clayborne told the officers that gun was hers.

107.	The Troopers called the District Attorney's office about the gun.

108.	An Assistant District Attorney told the Troopers "Personally, I don't know if we have probable cause to charge him [Williams] with the gun."

109.    Basaldua knew that it was legal for Clayborne to possess that gun, that she had a right to carry that gun, that he was not aware of Clayborne doing anything illegal with respect to the gun at the time.

110.    Despite this, the Troopers confiscated the gun at the gas station anyway, booked it into property, and sent it off to be tested to see if Williams' fingerprints were on it.

111.    The Troopers also decided to custodially ***arrest*** (not cite) both Williams and Clayborne for simple possession.

112.    If the Troopers had cited Clayborne and Williams in lieu of arrest at that point (as applicable law required), the incident would have ended there.

### III.    The Troopers Continue to Detain the Family Illegally and Call DCS to Take the Children Away From their Mother

113.    The Troopers informed Clayborne of their decision to arrest her.

114.    The Troopers also told Clayborne that because they were arresting her, they would be calling DCS about her children.

115.    After being told that DCS was being summoned for her children, Clayborne pleaded with the officers not to do it.

116.    She said this while cradling her infant child in her arms.

117.    The children began screaming and crying to the Troopers.

118.    In response to Clayborne's pleas, the Troopers told her that it was "already past this."

119.    Trooper Foster walked away to call DCS.

120.    Clayborne continued to beg and plead with Trooper Clark to keep her children.

121.    The children kept screaming and crying.

122.    D.W., who was five years old at the time, recognized that something was wrong.

123.     D.W. got into the passenger seat, wrapped his arms around Clayborne, and through tears pleaded: "Can mom not be arrest[ed]? Can my dad come, please, I want my ..., can you get me my dad?"

124.     D.W. kept crying and said: "Daddy! Daddy! I want my dad! I want my daddy! Can my daddy come?"

125.     Clayborne tried to comfort her screaming child while also speaking to Trooper Clark in an effort to get the Troopers to reconsider.

126.     Through tears, Clayborne continued to try to comfort D.W.

127.     Clayborne's child, still crying and holding his arms around his mother, pleaded with Trooper Clark: "I don't want to go! How are we going to eat stuff?"

128.     Trooper Thompson then assisted Foster and Clark in keeping Clayborne in custody and preparing to have her transported to the jail with the rest of her family.

129.     One of the children continued to plead with Trooper Thompson, saying while sobbing "Are you arresting my mom? Are you arresting my mom? . . . What are they doing to do daddy"?"

130.     Clayborne began repeating to the children, through sobs and while caressing one of her children: "It's okay. It's okay. I'm okay. I'm okay. I'm okay. It's ok."

131.     She said this again and again.

132.     While she was saying this, one of the children told her: "I love you."

133.     Through sobs, Clayborne said to her children: "It's okay. It's okay. We're not going to get separated, okay?"

134.     She then tried to comfort her children by telling them: "We're not going to think like movies, okay? Okay? Okay?  We're not going to think like movies. I know it's real life. It is. It's okay, baby. It's okay."

135.     In other words, Clayborne was trying to reassure her children that a nightmare like this (in which her children would all be taken from their mother) would only occur in a movie – but this was real life and things like this do not happen in real life.

136.     While Clayborne and her children said these things, Thompson stood there and said nothing back.

137.     The Troopers relayed to dispatch that they would be arresting both parents and would be contacting DCS.

138.     The Troopers also contacted DCS to indicate that they were arresting both parents and to ask that DCS respond to the jail.

139.     In Basaldua's patrol vehicle (where Basaldua had placed Williams shortly after the initial stop), Basaldua told Williams that both he and Clayborne were under arrest.

140.     Basaldua read Williams his Miranda rights and told them he had a right to speak with an attorney.

141.     Williams asked what would happen to his children.

142.     Basaldua told Williams that the Troopers were calling DCS.

143.     Williams became upset.

144.     Basaldua told Williams to "hang tight."

145.     Williams became even more upset about the Troopers taking his children away.

146.     Williams asked to speak with Basaldua's supervisor.

147.     Basaldua said no.

16

148. Williams asked to call his lawyer in order to tell his lawyer that he was being illegally detained.

149. Basaldua told Williams no.

## IV. The Troopers Decide to Cite Clayborne for Simple Possession So that the Children Will Not Be Separated From Her

150. After about two hours of detaining Williams, Clayborne, and the children, the Troopers changed their mind and decided to issue a *citation* to Clayborne for simple possession of marijuana (rather than arrest her for that offense).

151. Nevertheless, the Troopers agreed that they would conduct another search of Clayborne's car at the gas station, and if they did not find anything else, then they would write a ticket to Clayborne so that the children would not be separated from her.

152. The Troopers concluded that the children were safe in Clayborne's custody and that there was no indication that her children were abused or neglected.

153. At about 11:17 a.m., the Troopers directed the children out of the car and had them wait in the gas station shop while they searched the area of the car where the children had been seated.

154. They spent at least 20 minutes doing this additional search of the car.

155. During this additional search, they found nothing illegal.

156. The Troopers entered the gas station where Clayborne and her family were located.

157. Clayborne and her family were not free.

158. The entire time he was observing the children, Basaldua never had any concerns that there was abuse or neglect that would require intervention by DCS.

159. Inside the gas station, Trooper Clark told Clayborne that she was being nice and respectful.

160.     Trooper Clark also commended Clayborne for breastfeeding her infant child because it was healthier for the baby.

161.     Based on all of his observations and interactions with Clayborne that day, Trooper Clark did not have any information that Clayborne's children were suffering from abuse or neglect.

162.     At about 11:42 a.m., Basaldua and Clark spoke together at Basaldua's vehicle and agreed that they were going to cite Clayborne and "let her go" so that she and the children could stay together.

163.     The Troopers agreed on that course of action because they thought that it was best for children to stay with their mother.

164.     Clark re-entered the station and told Clayborne that she was going to be issued a citation rather than be arrested.

165.     Clark said that the Troopers were doing that to avoid getting DCS involved.

166.     Clark said that because he believed that it was in the best interest of the children and Clayborne to stay together.

167.     He believed that the children were safe with Clayborne, that she was giving them appropriate care, and that the children should stay with their mother.

168.     The Troopers accordingly issued a citation to Clayborne at the gas station.

169.     Once the Troopers cited Clayborne and chose not to arrest her, she and her children should have been free to leave. (*See* T.C.A. § 40-7-118(e)(1)(C) ("In issuing a citation, the officer shall . . . (C) Release the cited person from custody.").)

170.     However, the Troopers still did not release Clayborne and her children from their custody.

171.     Trooper Clark believed that Clayborne had not received the citation yet and that the Troopers would issue her a citation at the jail.

172.     Trooper Clark was incorrect – Clayborne had received the citation at the gas station.

## V.     Basaldua Threatens to Take the Children Away and the Troopers Order Clayborne and the Children to Go to the Jail to Meet with DCS.

173.     In Basaldua's patrol car at about 11:49 a.m., Williams continued to complain to Basaldua about the unfairness of his arrest and Clayborne's continued detention.

174.     Williams complained that the substance that the officers had found (which they presumed was marijuana) was a legal substance in Georgia and should not have led to charges against (or an arrest of) either of them.

175.     Williams also complained (correctly) that the gun belonged to Clayborne and that she had a constitutional right to carry that gun with her.

176.     Rather than engage with Williams' valid concerns, Basaldua retaliated.

177.     At 11:50 a.m., Basaldua responded to Williams: "Man, you want to be quiet? Because I could take her to jail and get the kids in DCS . . . So you need to be quiet, okay? Because you want her to go to jail too, if you keep your mouth up, all right?"

178.     In other words, Basaldua threatened Williams that if he did not stop talking about what Williams (validly) considered to be an improper detention, Basaldua would arrest Clayborne and separate the children from their mother by placing them with DCS.

## VI.     The Troopers Switch Course and Decide that they Must Bring Clayborne and the Family to Meet with DCS

179.     Just before 12 p.m., the Troopers helped Clayborne load the children and the car seats back into the family's car.

180. The Troopers then concluded (incorrectly) that they had to bring Clayborne to the jail for DCS to determine if the five small children should be taken from their mother and placed into DCS custody.

181. Trooper Clark initially suggested that because Clayborne would be cited rather than arrested, the Troopers should not be involving DCS at that point.

182. However, Trooper Foster told Clark that he (Clark) was incorrect and that, to the contrary, a THP "General Order" required the Troopers to bring Clayborne and the children to the jail for questioning by DCS.

183. That was incorrect.

184. Trooper Foster maintained (and convinced the other Troopers) that because Clayborne had been issued a citation for "charges like that" (referring to simple possession of marijuana) and "there were children in the car," Clayborne still had to speak with DCS at the jail.

185. Clark does not know what General Order Foster was talking about.

186. No THP General Order said that.

187. Nevertheless, the Troopers collectively concluded that they *did* have to bring Clayborne and her family to the jail so that DCS could question her.

188. At 12:00 pm, Trooper Clark stated "then let's get her down there to the jail," referring to Clayborne.

189. Clark then approached Basaldua's vehicle to speak with him.

190. Clark told Basaldua that Clayborne had to follow the Troopers to the jail because of DCS.

191. Clark then told Basaldua: "I'll have her follow me."

192.    Based on the collective decision by the Troopers, Trooper Clark approached Clayborne's vehicle and told her "Just follow me down to the jail."

193.    Clark also told Clayborne that there was additional paperwork she needed to finish at the jail, including the citation that Clark did not realize she had already received.

194.    At the time Trooper Clark directed Clayborne to do that, there were four patrol vehicles parked within feet of Clayborne's car, along with all four Troopers present in full uniform.

195.    The uniforms for each officer included a weapon, baton, handcuffs, and pepper spray.

196.    Clark told Trooper Thompson (who was seated in his patrol vehicle with his lights flashing) "we're moving down to the jail."

197.    At least one vehicle kept its blue lights flashing throughout this lengthy encounter.

198.    At no point did any of the Troopers tell Clayborne that she and her children were free to leave.

199.    The Troopers escorted Clayborne and her children to the jail.

200.    Basaldua left first with Williams in the backseat.

201.    Trooper Clark left next and Clayborne followed his car to the jail in her car (with her children inside it).

202.    At least one of the Trooper's SUVs (either Thompson's or Foster's) still had its lights flashing when Clayborne left the gas station to follow behind Clark.

203.    Troopers Thompson and Foster left next and also headed to the jail, traveling in their patrol SUVs behind Clayborne's vehicle.

204.    Under Tennessee and federal law, Clayborne and her children should have been free to leave at that time.

205.    However, the Troopers again kept them in custody anyway.

**VII.  The Troopers Continue to Detain Clayborne Illegally, and DCS Indicates That It Intends to Take Custody of Clayborne's Children, Even After Trooper Clark Tells Them That There Was No Reason to Separate the Children from Her**

206.    The Troopers, Clayborne, and her children arrived at the jail at about 12:07 p.m.

207.    Trooper Clark parked his car just across from the entrance to the jail and Clayborne drove right up behind Clark as he had instructed.

208.    Clark said Clayborne: "Just park on – You can park right here in this handicap zone" – referring to the handicap spot to the right of Clark's vehicle (and directly across from the entrance to the jail).

209.    Clayborne pulled her car into that handicapped spot as Clark had told her to do.

210.    Clark also told Clayborne to keep her car running.

211.    Clayborne complied.

212.    Clayborne asked Trooper Clark if she was going to jail.

213.    Clark told Clayborne that she was not going to jail and that she was only getting a "ticket."

214.    At this point, Clayborne and her five children had been in police custody for two and a half hours.

215.    Clark began taking pictures of the vehicle while Clayborne stayed inside it with her children.

216.    In the parking lot a few feet from Clayborne's car, two DCS employees (Taylor and, upon information and belief, Velez or Medina) walked towards the back of the car.

217.    Trooper Clark approached Taylor and the other case worker to speak with them.

218. They spoke behind Clayborne's car – standing in the middle of the driving lane just outside the entrance to the jail.

219. Trooper Clark told Taylor and the other case worker that there had been an "adjustment to our plan."

220. Trooper Clark informed Taylor and the other case worker that the Troopers would only be issuing a misdemeanor citation to Clayborne for possession of marijuana (rather than arresting her).

221. Trooper Clark told Taylor and the other case worker that they were giving Clayborne a misdemeanor citation for marijuana and going to let her go so that they didn't have to separate her and the kids, that she seemed like a good mother, that there were no problems with neglect, and that it would be best for everyone involved for Clayborne to stay with the kids and not be booked in.

222. Specifically, Clark said the following:

"So I think for everybody's best interest, she is just going to get a misdemeanor citation for marijuana, and let her go. That way we don't have to separate her and the kids . . . . So I'm not sure that you [DCS] really need to do anything."

223. Taylor, joined by the other case worker, responded: "Yeah, we have to talk to mom in here, and see the kiddos, and stuff."

224. Trooper Clark then pushed back, stating as follows:

"She's a good mom, seems like. She breastfeeds one of the infants. . . . And there's no problem, as far as neglect, or anything like that . . . . I just think it would be best for everybody involved for her to stay with the kids and not be booked in . . . ."

225.    Taylor continued to insist that DCS needed to interrogate Clayborne and the children.

226.    Trooper Clark reiterated that the children "are fine" and "being cared for."

227.    After Taylor said "Okie Dokie," Trooper Clark stated that he did not have a problem with Clayborne as a mom.

228.    Nevertheless, Taylor said that DCS workers still intended to question Clayborne and the children inside the jail.

229.    Trooper Clark requested that DCS workers do the questioning at the car to avoid further disruption to the children.

230.    Foster, who had arrived at the jail shortly after Clark, then joined Clark in speaking with the DCS case workers behind Clayborne's car.

231.    Foster told the DCS case workers that it was "a different, unique situation."

232.    The other case worker stated that she would "go grab Erica" — referring to DCS case worker Erica Wright-Gilliam – and walked into the jail.

233.    A few seconds later, Taylor also walked into the jail.

234.    Upon information and belief, Taylor, Wright-Gilliam, Velez, Medina, and Dale Lynn communicated together about what to do next.

235.    Just after the DCS case workers went into the jail, Clark told Foster that he did not believe that Basaldua had issued a citation to Clayborne yet.

236.    Clark asked Clayborne at her car if she had received the citation and she said yes.

237.    Clark then told Clayborne that a DCS worker was going to have a chat with her.

238.    He added that this was "because we're [THP Troopers] required to call them" – referring to DCS.

239. Clark stated again to Clayborne that "she" (referring to a DCS case worker) "is going to talk to you."

240. Clark asked if Clayborne had any issue with someone from DCS sitting in her car to do the questioning.

241. Clayborne responded that there was nowhere in her car for anyone at DCS to sit.

242. In other words, Clayborne resisted Clark's request to have DCS interrogate her in the vehicle.

243. However, Trooper Clark stated: "We'll move stuff around."

244. Trooper Clark then directed Clayborne to unlock her door.

245. Clayborne complied.

246. Trooper Clark then manipulated various items in the front seat, including placing items in Clayborne's purse and moving the bag to the center console on top of a baby seat.

247. Trooper Clark did this so that DCS could interrogate Clayborne in the car.

248. While Trooper Clark did this, Clayborne stared forward in silence.

249. When Trooper Clark was done clearing space on the Clayborne's passenger seat, he left open Clayborne's passenger door and turned back towards the jail.

250. During this whole time, Clayborne and her children were boxed in on all sides.

   a. A cement pole blocked the front of the car.

   b. Trooper Clark's marked SUV was parked on the driver's side.

   c. A UPS truck was parked on the passenger side.

   d. Just a few feet behind the car in the middle of the driving lane, Trooper Foster was standing in full uniform with a holstered gun, badge, and black jacket, while Trooper Foster was standing in full uniform with his hand sitting on the top of his holstered gun.

251.    Under the circumstances, Clayborne reasonably believed that she and her children were not free to leave at that time.

252.    Clark then returned to Clayborne's car (where the door was still wide open as Clark had left it) and told that her that a DCS worker will be back out in a minute.

253.    Clark closed the passenger door and pivoted back to the jail, from which a DCS case worker (Taylor) was approaching.

254.    At this point, Troopers Foster and Thompson were still standing behind Clayborne's car and Thompson still had his hand resting on his gun.

255.    Taylor approached Trooper Clark and told him that, after speaking with a supervisor to figure out what to do, "I'll talk to mom."

256.    Taylor then walked towards the car to begin interrogating Clayborne.

257.    Foster, Clark, and Thompson convened behind Clayborne's while Taylor began her interrogation.

258.    At that point, Foster, Taylor, and Thompson were all standing behind Clayborne's car and Thompson still had his hand resting on his gun.

259.    Having transferred physical custody of Clayborne to DCS, they decided to eat lunch about 1.5 miles up the road and drove away.

260.    Clayborne had been in custody since before 10am. She remained in custody (for DCS questioning) after the Troopers left.

**VIII.   DCS Defendants Illegally Detain Clayborne and Her Children Without Cause**

261.    As the Troopers left the scene, DCS workers (at least including Taylor, Velez, and Wright-Gilliam) participated in interrogating Clayborne and seeking to remove the children from her custody at the scene.

262. Upon information and belief, they did so in communication with, at the direction of, and with the approval of Medina and Lynn.

263. The DCS Defendants had no lawful authority to search or seize Clayborne or her children.

264. The DCS Defendants had no factual basis to believe that Clayborne had abused or neglected her children.

265. The DCS Defendants had no factual basis to believe that emergent circumstances existed.

266. The DCS Defendants had no basis to believe that the gun posed any danger to the children because the Troopers had removed it from the vehicle.

267. The DCS Defendants had no basis to believe that the green leafy substance posed any danger to the children because the Trooper had removed it from the vehicle.

268. The DCS Defendants had no right to force Clayborne to answer their questions – and Clayborne had a right to refuse to answer.

269. Nevertheless, the DCS Defendants began a forced interrogation and began punishing Clayborne for validly exercising her rights.

270. Upon information and belief, the DCS workers at the scene did so with the input, knowledge, and blessing of their supervisors including Lynn and Medina.

271. In the car, DCS workers demanded that Clayborne enter the jail to take a urine test in the women's restroom, while leaving her children in the car with a DCS worker.

272. Clayborne stated that she did not feel comfortable leaving her children alone in the car with a stranger.

273.     DCS workers then demanded that Clayborne attempt to take a urine test inside the vehicle (which still had her five children in it).

274.     While in the front seat of car and under the gaze of a DCS worker (and with other officers believed to be Sheriff's deputies surrounding her car along with other DCS workers), Clayborne had to remove her pants and underwear, and then attempt to urinate into a small cup.

275.     All the while, her children were moving around and distressed.

276.     Clayborne was unable to provide a urine sample under these conditions.

277.     DCS workers told Clayborne that her failure to provide a urine sample had "made matters worse" for her.

278.     The DCS Defendants had no legal basis to detain Clayborne and her children.

279.     The DCS Defendants had no legal basis to demand that Clayborne provide a urine sample, either.

280.     Nonetheless, the DCS workers (supervised by Medina and Lynn) continued to interrogate Clayborne and detain her children.

281.     The questions that the DCS workers posed to Clayborne included whether she was breastfeeding the child and whether she had family in Tennessee.

282.     When Clayborne asked why having relatives in Tennessee would matter, the DCS workers told her that they needed that information because they were taking her children away.

283.     DCS's statement was both confusing and distressing to Clayborne because it flatly contradicted what the Troopers had just told her.

284.     The Troopers had given her a citation in lieu of arrest, told her that she was not under arrest, and told her that she would not be separated from her children.

285.     By this point, it had been about 3 hours since the initial traffic stop.

286.     Clayborne's children were scared, crying, hungry, and increasingly agitated.

287.     Unsurprisingly, when the DCS worker told her that she was taking her children away, Clayborne became upset.

288.     Clayborne asked the DCS worker to leave her car.

289.     Clayborne then locked the doors and remained in the parking lot while she contemplated what to do in this situation.

290.     Clayborne had a constitutional right under the First Amendment to refuse to answer further questions from the DCS Defendants.

291.     The DCS Defendants retaliated against Clayborne for exercising her constitutional rights, including her First Amendment rights.

## IX.     The DCS Workers Enlist County Officers to Keep Detaining the Family Illegally

292.     At some point before 12:59 p.m, the DCS Defendants demanded that CCSD remove the children from Clayborne's custody.

293.     The DCS Defendants made this demand without a court order, without having filed anything with the Juvenile Court, and without any exigent circumstances.

294.     At 12:59 p.m., a County employee at the jail called County dispatch to report that "I have DCS here trying to remove the children from the mother of the family that the troopers brought in. And they need an officer to assist."

295.     The County official further reported to dispatch that "DCS is trying to remove the five children, and I guess THP did not arrest the female, and she's refusing to allow the female to go with them."

296.     Per that report, CCSD understood at that time that THP had not custodially arrested Clayborne, but that DCS was still trying to remove the children from Clayborne at the jail and wanted the County to assist.

297.     At 1 p.m. (a minute later), the County dispatched Deputy Alan Crabtree to the jail.

298.     Crabtree arrived at the jail at 1:10 p.m.

299.     When Crabtree arrived at the jail, there were three DCS case workers in the parking lot.

300.     They told Crabtree that they were obtaining or had obtained a court order to remove Clayborne's children from her.

301.     At that time, Crabtree was not sure what was going on.

302.     At 1:11 p.m., DCS Team Leader Dale Lynn called Sherrill on his cell phone.

303.     At the time of that call, Sherrill was traveling in a Ford-150 with Bell and Sharketti.

304.     On that call, Lynn requested that Sherrill come to the jail to assist DCS in removing children.

305.     Lynn acknowledged that DCS had not obtained a court order yet.

306.     Sherrill told Lynn that the County could not assist DCS without a court order.

307.     Nevertheless, Sherrill, Sharketti, and Bell headed to the jail in the Ford-150.

308.     They arrived at the jail about a minute after Crabtree had gotten there (approximately 1:11 p.m.).

309.     Sharketti directed Crabtree to retrieve Crabtree's spike strips and place them across the back of Clayborne's car.

310.     They did this to keep Clayborne from leaving.

311. Bell, Sherrill, Sharketti, and Crabtree all assisted DCS in keeping in detaining Clayborne and her children at the jail.

312. They did so without probable cause.

## X. The DCS Defendants Act *Ultra Vires*

313. For reasons that remain unknown, the DCS Defendants committed to taking the children away from Clayborne without any factual or legal basis, and without following any type of legal process.

314. There were no emergent circumstances.

315. Even if there were emergent circumstances, Tennessee law requires that to obtain an *ex parte* removal order, a sworn petition must be filed with the Court (thereby presenting sworn evidence to support the removal), a signed written order must be obtained from a judge, and then that written order may only be enforced based on the sworn petition.

316. Before removing the children, the DCS Defendants did none of these things.

317. Before removing the children:

   a. They did not file an *ex parte* petition with the Court.

   b. They did not file an affidavit.

   c. They did not contact Judge Perry through a DCS lawyer.

   d. They did not obtain a written order from Judge Perry.

   e. They did not follow the process for obtaining an *ex parte* removal order as required by T.C.A. § 37-1-114(a).

318. Instead, at some point before 1:35 p.m., Dale Lynn simply called a Coffee County General Sessions Court Judge (Judge Greg Perry) directly at least once.

319. Lynn is not a lawyer.

320.    Lynn's call with Judge Perry took place during regular business hours, on a regular business day, when the Court was open.

321.    That day, Lynn was not present at the jail and had not personally observed Clayborne or her children.

322.    DCS has no records reflecting contemporaneous communications (whether by email, phone call, or text) between Lynn and any of the other DCS Defendants.

323.    Nevertheless, Lynn was the only person at DCS who communicated with Judge Perry before the children were removed.

324.    This call between Lynn and Judge Perry was not recorded or transcribed.

325.    The Juvenile Court docket contains no reference to this call.

326.    The General Sessions Court has no record of this call either.

327.    The Juvenile Court docket contains no reference to Lynn's involvement in removing the children.

328.    Upon information and belief, on that undocketed and unrecorded call, Lynn asked that Judge Perry issue an *ex parte* order to remove the children.

329.    Since Lynn had no first-hand knowledge of any facts related to this situation, whatever he conveyed to Judge Perry on this call had to be false, materially incomplete, or insufficient to justify an *ex parte* order.

330.    The Court was located just four miles away from the jail where Clayborne and Williams were located.

331.    At the time of this phone call, the Troopers, Clayborne, and the DCS Defendants were all within a few miles of the Courthouse and able to testify, had they been called.

332.    The children were not in any immediate danger.

333.    There was no objectively reasonable basis for the DCS Defendants to believe that the conditions set forth in T.C.A. § 37-1-114(a)(2) to obtain an emergency order existed at that time.

334.    Nevertheless, the DCS Defendants purposely did not tell Clayborne about this call with Judge Perry, offer her an opportunity to participate or to call a lawyer to advocate for her and her children.

335.    To the contrary, the DCS Defendants chose not to follow any lawful process to seek a removal order – not even the *ex parte* petition process set out by Tennessee statute (T.C.A. § 37-1-114(a)(2).).

336.     No written order was issued at that time.

337.    If Clayborne had been told that DCS was communicating with a judge, she would have attended any hearing, participated in any call, or otherwise argued to a judge why DCS should not be allowed to tear her family apart given the facts of the situation.

338.    Instead, the DCS Defendants concealed the existence of this communication from Clayborne, had the County immobilize her car with spike strips and placed officers around her so that she and her children could not leave the jail, and had Lynn make a secret, unrecorded, undocumented call to Judge Perry about her and her children.

339.    In so doing, the DCS Defendants acted *ultra vires* – outside the law.

## XI.    <u>The County Defendants Decide to Remove the Children Without a Valid Written Order</u>

340.    Even as they were assisting the DCS Defendants in detaining the family at the jail, at least some of the County Defendants were concerned about physically separating the family for DCS without a court order.

341.    At some point before 1:35 p.m., Sherrill entered the office of Chief Deputy Watkins (located inside the jail) to discuss what to do next.

342.    Sherrill talked to Watkins about assisting DCS with removing the children in the parking lot and expressed concern that, without a court order, the County would be sued for a civil rights violation.

343.    Watkins and Sherrill decided to call the Coffee County District Attorney, Craig Northcutt, to seek guidance.

344.    At 1:35 p.m., Watkins called DA Northcutt from Watkins' office phone.

345.    Watkins initially spoke with an assistant to DA Northcutt, who placed Watkins on hold to locate DA Northcott and get him on the line.

346.    While on hold, Judge Perry called Sherrill on Sherrill's cell phone at 1:36pm.

347.    The County made a recording that included both this call to DA Northcutt and the call from Judge Perry (the "County Call Recording").

348.    A transcript of the County Call Recording is attached as **Exhibit A** hereto.

349.    Judge Perry told Watkins and Sherrill that he (Judge Perry) had "just" gotten off the phone with DCS, that DCS can "do what they want for 72 hours on their own," and that DCS was "going to go ahead and draft an order."

350.    Judge Perry then told Watkins and Sherrill to "go ahead and let DCS have them" – referring to removing Clayborne's children.

351.    In other words, Judge Perry acknowledged to Watkins and Sherrill that he only had a phone call with someone at DCS (not a hearing or a sworn petition) and that he had not even received or reviewed a proposed order yet.

352.     Sherrill told Judge Perry his concern about this approach: "Well, the momma is not going to give them up without a fight. If we get in the middle of this, there's going to be a damn lawsuit for sure."

353.     In response, Judge Perry told Watkins and Sherrill to "[a]rrest her for disorderly conduct."

354.     At this point, Judge Perry had not held a hearing, received a sworn petition, reviewed any documentation, taken any testimony, or issued an *ex parte* removal order (a copy of which he said he was waiting on).

355.     In response to Sherrill's stated concern (which was valid) that the County would get sued for civil rights violations by assisting the DCS Defendants in this posture, Judge Perry's initial response was to purport to direct the County to arrest Clayborne for disorderly conduct.

356.     Sherrill (correctly) was not satisfied by this response from Judge Perry.

357.     Sherrill said to Judge Perry: "I mean, DCS is the one that's going to have to take the kids."

358.     In response, Judge Perry told Sherrill: "You won't get in a lawsuit . . . because I've got judicial immunity."

359.     Watkins then intervened.

360.     In a leading manner, Watkins asked Judge Perry: "Is a verbal order enough, Judge? … Verbal order good enough"?

361.     Judge Perry responded "Absolutely."

362.     Watkins thanked the Judge, told him "That's all I need, buddy!" (referring to the judge), and thanked him again.

363.     Watkins and Sherrill are not lawyers.

364.    In this conversation, Judge Perry did not say (nor did Watkins and Sherrill ask):

a.  The names of the children.

b.  The names of their parents.

c.  The birthdates of the children.

d.  The ages of the children.

e.  How many children were involved.

f.  Whether the County was to remove all of the children from Clayborne or only some of them.

g.  The children's location.

h.  The basis for the removal.

i.  That the Judge was acting on a sworn petition, sworn evidence, or a hearing.

j.  How the County was supposed to remove the children.

k.  What the County was supposed to do with the children after it took them.

365.    After the call with Judge Perry ended (at about 1:39 p.m.), Watkins told Sherrill to go out to tell everyone that the County had "verbal authorization" to remove the children from Clayborne.

366.    Watkins expected Sherrill to follow that instruction (from Watkins) and that the other Sheriff's deputies would carry it out.

367.    DA Northcutt then joined the line and spoke briefly with Watkins.

368.    The recorded call started at 1:35 pm and ended just under five-and-a-half minutes later – at about 1:40 p.m.

369.    Tennessee law does not recognize an "oral order" from a judge to remove children from a parent's custody *ex parte*.

370. To be valid and enforceable under Tennessee law, a removal order must be in writing.

371. This verbal exchange with Judge Perry did not comply with the requirements of Tennessee law to issue an order removing children from their parent.

372. It was objectively unreasonable for the County officers to rely on that verbal exchange as legally authorizing them to seize the children and separate the family.

373. Nevertheless, the County officers proceeded to assist the DCS Defendants (who knew that there was no petition and no signed order) in physically removing the children from Clayborne's custody.

## XII. DCS and the County Officers Illegally Seize and Separate the Family

374. Clayborne, who was at the time unaware of the interactions with a judge and the decision to remove her children even though there was no court order, still needed to post bond for Williams (who was ready to be bonded out).

375. In order to post bond for Williams, Clayborne had to enter the jail.

376. To do so, Clayborne got her kids out of the car, guided them over and around the spike strips (while holding her infant child), entered the jail, and paid Williams' bond.

377. Inside the jail lobby, DCS workers and Sheriff's deputies instructed Clayborne to sit on a bench with her five children inside the facility and wait.

378. Clayborne and her children were again held against their will and were not free to leave.

## XIII. The Children are Taken From Clayborne for the Next Two Months

379. Inside the jail lobby, with officers all around her, Clayborne kept her children close to her to protect them.

380.    D.W., the five-year-old child who had unsuccessfully pleaded with the Troopers at the gas station not to separate the family, kept hugging Clayborne.

381.    Clayborne's children asked her what was happening.

382.    Clayborne told them that the family would be staying together and that she would not let anyone take them away from her.

383.    Several officers, at least including Sharketti, Crabtree, Bell, Sherrill, and Watkins, assisted in keeping Clayborne in custody inside the jail.

384.    Those officers also physically removed or otherwise assisted in removing the children from Clayborne.

385.    They did so in collaboration with the DCS Defendants who were present, along with other County employees and officials.

386.    To remove the children, certain DCS Defendants coaxed the children away from their mother.

387.    Upon information and belief, DCS Defendants also physically removed (or assisted in physically removing) the children from Clayborne.

388.    The DCS Defendants did this knowing that (1) DCS had not filed a petition, affidavit, or sworn testimony reduced to writing; (2) DCS had not actually commenced an *ex parte* Court proceeding; and (3) DCS had not yet obtained an order from any judge.

389.    The DCS Defendants also knew that there is no such thing as a "verbal order" of removal from a Court: by statute and by rule, all orders must be in writing and signed by a judge to be valid, effective, and enforceable.

390.    Any verbal "order" from Judge Perry was a legal nullity.

391.    Even if Judge Perry's telephone discussion could be considered an order (which it was not), the DCS Defendants (1) purported to execute it themselves; and (2) did so knowing that they had supplied information to Judge Perry that was false or materially incomplete to procure that order.

392.    Clayborne began shaking and did not know what to do.

393.    When one of the babies began crying and Clayborne reached out, a deputy restrained her and told her not to touch her baby because "he's getting taken away from you."

394.    Clayborne tried to hold onto her infant's baby basket (in which her son was crying), but an officer (believed to be Sherrill) took it from her and told her to get away.

395.    Sherrill physically took the infant away from Clayborne and rolled the stroller over to a white DCS truck.

396.    These officers and a combination of DCS Defendants loaded all the children into a white truck and took them away.

397.    The children would remain separated from their mother and father for the next 55 days.

## XIV.    The DCS Defendants Begin to Whitewash the Record

398.    Presumably aware that they had not followed any legal "process", the DCS Defendants immediately began to paper over the record to make it look like they had followed the law — when in fact they had not.

399.    Sheila Younglove was the DCS attorney responsible for handling DCS cases in Coffee County Juvenile Court.

400.    Younglove had known Judge Perry from before the time he became a judge in 2020.

401.    At some point after the children had been removed, Lynn called Younglove.

402.    Lynn told Younglove that he had called Judge Perry about removing the children from Clayborne.

403.    Lynn told Younglove that the children had already been removed from Clayborne.

404.    Lynn, on behalf of himself and the other DCS Defendants, asked Younglove to submit a proposed *ex parte* order for Judge Perry to sign.

405.    In other words, Lynn acknowledged to Younglove that the DCS Defendants removed the children **before** obtaining an order and without even filing a petition.

406.    The facts that Lynn conveyed to Younglove did not justify an *ex parte* removal.

407.    Younglove believed that Lynn had acted improperly by contacting Judge Perry directly.

408.    Juvenile court jurisdiction in Tennessee is solely based on statute.

409.    Among the areas in which Juvenile Courts have exclusive jurisdiction are dependency and neglect cases – which requires the filing of a sworn petition, an affidavit, or sworn testimony reduced to writing before a court obtains jurisdiction.

410.    DCS did none of those things on February 17, 2023 regarding Clayborne and her children.

411.    DCS Defendants did not validly open a dependency and neglect proceeding.

412.    The Juvenile Court never validly acquired subject matter jurisdiction over the case.

413.    Judge Perry had no lawful authority to issue an *ex parte* order or, for that matter, to exercise any authority over Clayborne, Williams, or their children under the circumstances presented that day.

414.    Judge Perry was acting in the clear absence of any subject matter jurisdiction.

415.     Presumably recognizing this, the DCS Defendants and Younglove collaborated after the fact to try to make it look like they had followed legal procedures – when they knew that they had not.

416.     In furtherance of this scheme, at 2:56pm, Ms. Younglove emailed a proposed *ex parte* order to Judge Perry.

417.     Younglove sent this email to Judge Perry **after** DCS and the County Defendants had already removed the children from Clayborne.

418.     The caption of the proposed *ex parte* order that Younglove sent was blank because Younglove did not know the children's names.

419.     The proposed order that Younglove submitted on behalf of the DCS Defendants was a pre-filled template document, not specific to the facts of this matter in any way.

420.     It consisted of boilerplate, pre-filled factual and legal representations.

421.     The DCS Defendants (and Younglove) had no good faith basis to make these allegations and representations, which the DCS Defendants knew were false or materially incomplete in relation to Clayborne and her children.

422.     The proposed order falsely represented that the *ex parte* removal order was based on a verified petition already filed by DCS (when in fact DCS had not filed a verified petition).

423.     The proposed order made no mention of Lynn supplying information to Judge Perry *ex parte*.

424.     The proposed order did not contain any facts establishing the children had been abused or neglected.

425.     The proposed order did not even contain the children's names.

426.    At an unknown point thereafter, one or more DCS Defendants texted with Younglove and provided her the children's names.

427.    On information and belief, those texts no longer exist.

428.    At 3:47 p.m., the Court issued an *ex parte* order (in Judge Perry's name) containing the names of the children, and sent it to Younglove and two other DCS employees.

429.    The Order was the same as what Younglove had filed, except to add the children's names/birth dates/ages, to add the names of Clayborne and Williams, and to set a preliminary hearing for February 23, 2023 at 8:30 a.m.

430.    Consistent with what Younglove had filed, the Order falsely stated that it was based on a verified petition – which was not true because DCS had not in fact filed a petition.

431.    The Court issued that Order after the children had already been removed.

432.    In the 3:47 pm email transmitting the signed order, a Court Clerk acknowledged that there was no petition yet.

433.    In other words, in the same email in which one arm of the Court was transmitting a signed *ex parte* order stating that it was based on a verified petition, another arm of the Court simultaneously acknowledged that no such petition existed yet.

## XV.    **The Children are Removed**

434.    Meanwhile, after the children were placed in one or more white trucks, DCS workers (including some combination of DCS Defendants) took them away from the jail.

435.    At some point, two of the children were placed with one foster family, and three of the children were placed with a different foster family.

## XVI.    **Various Records Concerning the Events of February 17, 2023 Episode Are Concealed, Lost, Deleted, or Otherwise Shielded from Public View**

### A.  County Records

### i. The February 17, 2023 Recording Reflecting the Involvement of Watkins and Sherrill

436. The County maintained a recording of the calls among Watkins, Sherrill, DA Northcutt, and Judge Perry on February 17, 2023.

437. On those calls, Watkins and Sherrill used their names.

438. The recording identifies Watkins and Sherrill and shows that they were involved in CCSD's detaining Plaintiff and her family at the jail and then separating the family.

439. The County preserved the recording.

440. As described below, the recording was responsive to a pre-Complaint public records request by Clayborne's attorneys, but was not produced in response to that request.

### ii. The Surveillance Footage of the Parking Lot and Jail Lobby Reflecting the Involvement of the DCS Defendants and the County Defendants

441. On February 17, 2023, CCSD had surveillance video of the jail lobby and surveillance footage from cameras in the parking lot (the "Jail Surveillance Video").

442. CCSD typically maintains its surveillance footage for an average of 45 days or longer before recording over it.

443. That day, CCSD anticipated that separating the children from Clayborne at the jail would likely lead to litigation. As Sherrill had just told Judge Perry himself (with Watkins present), once the County intervened to remove the children from Clayborne there was "going to be a damn lawsuit for sure."

444. CCSD was also on notice that the Jail Surveillance Video footage was relevant to ongoing juvenile court proceedings involving Clayborne, Williams, and the children.

445. CCSD was further on notice that the information was potentially relevant at least to ongoing criminal proceedings involving Clayborne and Williams.

446. CCSD was also asked to provide extra security at the courthouse in connection with the juvenile court case.

447. In March 2023, attorneys for Clayborne and Williams also issued subpoenas seeking this footage.

448. CCSD had a duty to preserve these records.

449. However, CCSD did not preserve the footage and allowed it to be deleted before this lawsuit was filed.

450. As described below, on February 28, 2023 Clayborne's attorneys in the Juvenile Court proceeding asked DCS to take measures to preserve all evidence related to the February 17, 2023 incident, including any CCSD surveillance footage.

451. DCS made no efforts to preserve the surveillance footage.

452. DCS did not ask CCSD to preserve the surveillance footage.

453. This now-deleted footage would have reflected the involvement of, and the identities of, the DCS Defendants and the County Defendants in the incidents that form the basis for this lawsuit.

### iii. Cell Phone Logs Reflecting the Officers Involved

454. The County supplies cell phones to its officers.

455. Those logs (the "County Phone Logs") contain the names and numbers of the officers involved in arresting and separating the family at the jail.

456. The County has possession, custody, or control of those phone logs.

### iv. The County Does Not Produce Any of those Records in Response to a Pre-Complaint Public Records Request

457. The County Call Recording, Jail Surveillance Video, and the phone logs contained the only CCSD records of the officers (other than Crabtree) who participated in detaining Plaintiff

and her family at the jail, separating the family, and otherwise assisting DCS in the events that form the basis for this lawsuit.

458.　On January 23, 2024, Clayborne's attorney served a public records request to the County, seeking records that reflected the County officers involved. Watkins handled responding to it for the County and said there was nothing to produce.

459.　At the time of this request, the County Call Recording existed and was responsive to the public records request.

460.　However, the County did not produce the County Call Recording (or identify its existence) in response to the public records request.

461.　The County Phone Logs also still existed and were responsive to the public records request.

462.　However, the County did not search for or produce those phone logs in response to the public records request.

463.　As to the Jail Surveillance Video, that footage would have been responsive, but the County could not produce the footage because the County had not preserved it.

464.　Because of CCSD's actions, Clayborne had no reasonable way of knowing within the limitations period the identities of those four officers and their involvement.

465.　Clayborne only learned about the involvement of these officers through discovery in this case, including deposition testimony and County document productions.

## B.　County Court Records

466.　Under Tenn. Juvenile Court Rule 106(e), the Juvenile Court is required to stamp all filings with the "date and hour of the filing."

467. The Juvenile Court (including Judge Perry directly) received the *ex parte* order at 2:56 p.m. via email.

468. The proposed order was not docketed, nor was the transmittal email reflecting the time that DCS sent it.

469. The transmittal email to Judge Perry referenced the matter that "Dale Lynn called you on."

470. That email was not docketed.

471. The proposed order was not docketed.

472. At no point that day or thereafter did the Court indicate anywhere on the docket or otherwise inform Clayborne, Williams, or their lawyers that Lynn had supplied information to Judge Perry that day.

473. At no point that day or thereafter did DCS file any document, state at any hearing, or otherwise inform Clayborne, Williams, or their lawyers that Lynn had supplied information to Judge Perry.

474. The Juvenile Deputy Clerk had multiple subsequent emails with Younglove on February 17, 2023 about the matter.

475. This included an email acknowledging that the Court had not actually received a written petition and an email by DCS stating that it would not be filing the petition until the following Tuesday.

476. The Court issued the *ex parte* Order around 3:47 p.m. – well after the children had been removed.

477. On the Juvenile Court docket, the document is stamped "Filed FEB 17, 2023."

478.   There is a space for the "TIME" of the filing as well, but the Court left that section blank.

479.   Accordingly, no one reviewing the Court's docket would know:

   a.   the time that the Court received the proposed *ex parte* order (which was after the children had been removed);

   b.   the time that the Court issued the *ex parte* order (which was even later after the children had been removed);

   c.   that DCS's lawyer and the Court both acknowledged that DCS had not actually filed a petition with the Court before the Court issued the *ex parte* order;

   d.   that the Court's *ex parte* order was based entirely on an undocketed, unrecorded, telephone call from Lynn (not a verified petition as stated in the order);

   e.   that Lynn had any involvement in the matter; or

   f.   that the Court knew that DCS would not even be filing a petition until Tuesday – four days after the removal had occurred.

**C.  DCS Records**

   i.   Taylor's Folder and Notes from February 17, 2023 are Missing

480.   When Clark spoke with Taylor at the jail on February 17, 2023, Taylor was holding a stack of paper in a folder.

481.   During that discussion, Taylor took notes on top of the folder with a pen.

482.   After Clark cleared the passenger seat of Clayborne's car, Taylor took that stack of paper and her notes with her to Clayborne's vehicle.

483.   Upon information and belief, those notes no longer exist

47

484.    Taylor also presumably took notes of her interactions with Clayborne.

485.    Upon information and belief, those notes no longer exist.

ii.    <u>February 17, 2023 Texts with Younglove are Missing</u>

486.    Younglove texted with at least one DCS Defendant about the Clayborne family matter on February 17, 2023

487.    Upon information and belief, those texts no longer exist.

iii.    <u>Notes of the Supposed Interviews with the Children Are Missing</u>

488.    In additional to Taylor, several other DCS case workers (at least including Wright-Gilliam, Velez, Medina, and Lynn) were also involved in interrogating and separating Clayborne and her family on February 17, 2023.

489.    Upon information and belief, to the extent that those individuals took notes that date, all their notes no longer exist.

490.    In particular, in the 2/21/23 Petition, Taylor claimed that she and Medina had interviewed the children and taken down incriminating statements that the children supposedly made about Clayborne and Williams on the date of the incident or over the weekend.

491.    Upon information and belief, Taylor and Medina took notes of those interactions (assuming they actually occurred) but the notes no longer exist.

## XVII.    <u>Whitewashing and Backfilling the Record Continues through a False and Materially Incomplete Amended Petition</u>

492.    The DCS Defendants immediately should have terminated their illegal detention of the children and returned them to their mother.

493.    They did not.

494.    Instead, on February 21, 2023, Taylor and Younglove submitted an *Ex Parte* Petition for Temporary Legal Custody and *Ex Parte* Order to the Juvenile Court (the "2/21/23 Petition").

495.    This was the first petition that DCS (with input from at least four of the five Defendants and in Taylor's name) had filed with the Court regarding these children.

496.    This was not until four days after the children had been removed.

497.    Taylor signed the 2/21/23 Petition and attached a verification page swearing that everything in it was true.

498.    By this point, the DCS Defendants had already (a) removed the children, (b) executed an unlawful order that they had procured without process and through false or materially incomplete representations; and (c) held the children in DCS custody for four days.

499.    The 2/21/23 Petition was supposed to include only facts justifying the original *ex parte* removal of the children.

500.    However, the 2/21/23 Petition included supposed "facts" acquired by Taylor and Medina from interviews with the children ***after*** they had been removed.

501.    The 2/21/23 Petition was also written to read as if the DCS Defendants had acquired those supposed facts ***before*** removing the children.

502.    This was not a mistake.

503.    On February 21, 2023, before DCS filed this petition, Younglove had a series of communications with the DCS Defendants (at least including Wright-Gilliam, Medina, and Taylor).

504.    After having those communications, Younglove sent Taylor a draft petition for signature that included the deceptively worded facts.

505.     DCS had no right to force Clayborne to answer their questions or take a drug screen.

506.     Nevertheless, in the 2/21/23 Petition, Taylor cited (as a basis to remove the children into DCS custody) the fact that Clayborne could not take a drug screen and that Clayborne locked herself in the vehicle.

507.     The facts alleged in the Petition, even if taken at face value, did not meet either the standard for dependent and neglected under T.C.A. § 37-1-102(b)(13).

508.     The facts alleged in the Petition, even if taken face value, also did not meet the standard for "severe abuse" under T.C.A. § 37-1-102(b)(27).

509.     Younglove and the DCS Defendants knew this at the time.

510.     Nevertheless, the 2/21/23 Petition asserted that all five children were dependent and neglected within the meaning of T.C.A. § 37-102(b)(13) and may have been victims of severe abuse under T.C.A. § 37-1-102(b)(27).

511.     The 2/21/23 Petition also included multiple boilerplate paragraphs and phrases that had not been edited for purposes of the Petition regarding these children.

512.     This included:

   **a.**  Multiple references to "child(ren)" without specifying the singular ("child") or the plural ("children")'

   **b.**  A paragraph about reasonable efforts to remove the children ending with the words "[add facts]";

   **c.**  Inclusion of the term "[and/or"] multiple times without circling the "and" or the "or," making it impossible to tell which assertions DCS was actually making on material elements of the Petition;

   **d.**  An entire section about child abandonment that had no relationship to the case.

513.  T.C.A. § 37-1-117(b)(1) requires that a preliminary hearing be set no later than 84 hours (*i.e.*, 3.5 calendar days) from removal.

514.  The children were removed from Clayborne at some point before 3 p.m. on February 17, 2023.

515.  Accordingly, even conservatively assuming a 3 p.m. removal time, a preliminary hearing was required by statute to be set no later than 3 a.m. on Tuesday, February 21, 2023 (84 hours after removal).

516.  However, the hearing on the (non-existent) petition was set for 8:30 a.m. on Thursday, February 23, 2023 – at least 53 hours beyond the statutory requirement.

517.  Consistent with T.C.A. § 37-1-117, the 2/21/23 Petition purported to demand that DCS hold a hearing within 84 hours of removing the children.

518.  Taylor said that in the 2/21/23 Petition even though she (and the other DCS Defendants with whom she communicated the day of filing the Petition) knew that the hearing was set over 50 hours beyond the 84-hour limit.

519.  Neither Taylor nor the other DCS Defendants made any effort to move up the hearing to comply with the law.

520.  The DCS Defendants knew that that Court was acting in the clear absence of statutory jurisdiction.

### XVIII. The DCS Defendants Continue to Act Outside the Law Before the Preliminary Hearing, Including Secret *Ex Parte* Communications to Chambers

521.  The initial hearing was set for 8:30 a.m. on February 23, 2023.

522.  That hearing was the first time that Clayborne and Williams would have the opportunity to argue for their five small children to be released from foster care and reunited with their parents.

523. Just before noon on February 22, 2023 (less than 24 hours before the preliminary hearing), and despite having actual knowledge that both Clayborne and Williams were then represented by counsel, DCS sent at least three *ex parte* emails to the Court containing allegations about Clayborne and Williams.

524. This included two emails from Younglove to Judge Perry's Secretary, along with a third email from Younglove to the Judge Perry's Secretary copying the Deputy Court Clerk, all five DCS Defendants, and a DCS worker named Amy Batts – but not counsel for either Williams or Clayborne.

525. Collectively, these emails included information characterizing Clayborne and Williams as racists, as violent and aggressive people, as putting DCS workers in physical danger.

526. Younglove did not include Clayborne, Williams, or their lawyers on those communications, and the communications do not appear anywhere on the Court's docket.

527. No one at DCS or the Court ever made Clayborne, Williams, or their lawyers aware of these communications.

528. On February 23, 2023, Judge Perry held a preliminary hearing.

529. Even though the Court had lacked subject matter jurisdiction and had no authority to issue orders to Clayborne, Williams, or the children, at least two of the DCS Defendants (Taylor and Medina) attended the hearing to support continuing the family's separation.[1]

530. Medina, Taylor, Batts, and Younglove were present at the hearing for DCS.

531. However, no one testified at the hearing.

532. None of the DCS Defendants disclosed to Clayborne and Williams:

---

[1] Because this pleading is being publicly filed, Plaintiffs are not including specifics about the proceeding in light of the Rules governing the secrecy of Juvenile Court proceedings.

a. that there was no original petition to justify the *ex parte* removal order (despite what the face of the *ex parte* order said);

b. that Lynn had called Judge Perry *ex parte* on February 17, 2023 to supply information (or what the information was);

c. that DCS had communicated *ex parte* with chambers at least three times the day before to convey inflammatory allegations about Clayborne and Williams.

533. Instead, entering that hearing, the only evidence before the Court of which Clayborne and Williams were aware was the 2/21/23 Petition itself.

534. At the hearing, the Court ordered that the children remain in DCS custody.

535. The Court set the matter for adjudication on March 20, 2023 (25 days later).

536. The Court allowed Clayborne and Williams only 2 calls per week with their five children and ordered that, if Clayborne and Williams became "disrespectful," the calls would be terminated.

537. The Court issued its Order without having validly acquired jurisdiction to act.

**XIX.  DCS Files an "Amended" *Ex Parte* Petition on February 24, 2023**

538. At this point, the DCS Defendants knew that:

a. the Court lacked authority;

b. the Court was acting on unspecified information that Lynn had improperly conveyed to Judge Perry on an undisclosed phone call on February 17 (the existence of which the DCS Defendants continued to conceal), and

c. that DCS (with the knowledge and ratification of all five DCS Defendants) had influenced the proceeding by sending inflammatory allegations about Clayborne and Williams to chambers *ex parte* just before the first hearing.

539. The DCS Defendants were obligated by law (and ethics) to dismiss the petition and reunite the family. *See, e.g.*, T.C.A. 37-1-139 ("[A]n or of the court shall be aside set aside if it appears that: (1) it was obtained by fraud or mistake . . . .; (2) The court lacked jurisdiction . . . of the subject matter").

540. Instead, they continued to further the family's separation.

541. On February 24, 2023, the day after the February 23 hearing, DCS filed an Amended *Ex Parte* Petition (the "2/24/23 Amended Petition").

542. Taylor verified the 2/24/23 Amended Petition.

543. That petition included the same false and misleading representations as the 2/21/23 Petition.

## XX. The Cover-Up Continues Though Deception and *Ex parte* Communications with Judge Perry

544. On February 27 and 28, Clayborne's lawyers sent preservation letters to the Court and to DCS, collectively requesting all petitions with time stamps, other filings, all evidence supplied to the Court, audio and video of the court proceedings, traffic stop, and jail interactions, and (from DCS) records of any interactions with Clayborne, Williams, and the children.

545. Despite those letters, neither DCS nor (upon information and belief) the DCS Defendants made efforts to preserve the requested evidence or ask anyone else to do so.

546. On February 28, 2023, Clayborne's lawyer also emailed Younglove to state that a "lot of things are odd about this case," requested that DCS provide copies of time-stamped filed documents, and asked whether there had been a petition filed on February 17, 2023 that was not already in the record.

547. Between February 28 and March 9, Clayborne's lawyers followed up multiple times asking for copies of the original petition (as referenced in the 2/17/23 *ex parte* order), for

DCS to disclose all evidence it had supplied to Judge Perry (which unbeknownst to Clayborne's lawyers would have included the information supplied by Lynn and the *ex parte* information supplied just before the preliminary hearing), and all records that DCS had about the incident (which would have included notes taken by the DCS Defendants before and after removing the children).

548.    These were valid questions that, if answered, would have exposed that the DCS Defendants had: (1) collaborated to remove the children illegally on February 17 (without a sworn petition, without a hearing, and without an *ex parte* removal order); (2) papered things to make it look like they had followed legal procedures (when in fact they had not); and (3) exposed that the DCS Defendants had supplied false or materially incomplete information.

549.    Clayborne's lawyers never received a clear answer to these questions or the requested information from Younglove or anyone else at DCS.

550.    Then, on March 9, Clayborne's lawyers learned that Younglove had communicated with Judge Perry *ex parte* about evidence in the Juvenile Court case that had never been provided to Clayborne and had been discarded despite the preservation letters. Clayborne's lawyers immediately raised concerns to Younglove about due process, spoliation, and DCS communicating with the Court *ex parte*, and threatened to file a state or federal lawsuit.

551.    Incredibly, at 11 p.m. that night, Younglove began an *ex parte* text string with Judge Perry, in which she told him about Clayborne's threat to file a federal lawsuit, advised on how to dissuade Clayborne from doing that, belittled the quality of Clayborne's lawyers and the merits of her due process concerns, and texted back and forth with Judge Perry about these issues.

552.     Clayborne did not receive a copy of that text string until after DCS terminated Younglove in October 2024 for (as in this case) helping a DCS case worker submitted a sworn petition falsely alleging that a child was drug exposed to justify an *ex parte* removal of that child.

## XXI.     The Family Remains Separated for 55 Days

553.     From February 17, 2023 through approximately March 3, 2023 (14 days), DCS not only separated Clayborne's children from her, but (as of the second night) also separated the children from each other and placed them into separate foster homes.

554.     The children were of tender age, between 4 months and 7 years old.

555.     The children included the 4-month-old child that Clayborne was breastfeeding and the child who (on the morning of the incident) had been pleading with the Troopers at the gas station not to take his mommy and daddy away.

556.     DCS initially placed two children in one foster home and three in another.

557.     DCS later placed the children in new foster homes in a different combination, but did not tell Clayborne this.

558.     Some of the children were shuffled from foster home to foster home.

559.     In one of the foster homes, the children had to be removed from the home after a domestic dispute between the foster parents.

560.     The children also later told their parents that they had been mistreated in foster care.

561.     Clayborne was prevented from visiting any of her children and was limited to just two audiovisual calls per week while the children were in foster care.

562.     On approximately March 3, 2023, DCS placed the children with a family friend in Nashville.

563. By that point, the children had been separated from each other (and their mother) for 14 days.

564. At the April 13, 2023 hearing, Judge Perry finally ordered DCS to return custody of the five children back to Clayborne.

565. This was 55 days after DCS had taken her children on February 17, 2023.

566. On August 15, 2023, the citation against Clayborne for simple possession of marijuana was dismissed.

## XXII. The Trauma Caused by the Family's Separation

567. These 55 days of forced separation were the worst days that Clayborne and her children have ever experienced.

568. Clayborne experienced severe emotional trauma from being separated from her children.

569. Clayborne suffered from anxiety, depression, and mental anguish.

570. Clayborne's breasts became engorged and painful from not breastfeeding.

571. Over time, Clayborne's breastmilk dried up and she developed a breast infection.

572. Clayborne could hardly get out of bed and could barely sleep – and when she did, she cried herself to sleep.

573. Clayborne knew that her children were suffering from being without her.

574. The only thing that kept Clayborne going was her desire to reunite her family.

575. Upon being separated from her children, Clayborne rented a hotel room in order to stay in Tennessee to be close to them and to fight to get them back.

576. Clayborne was depressed, in shock, and started having panic attacks.

577. She went to a doctor who prescribed her an anti-depressant.

57

578. She also had to see a therapist.

579. During these 55 days, the children experienced severe emotional trauma from being separated from each other and from their parents.

580. The children cried for their mother and father and each other.

581. They worried about whether their parents were okay.

582. They worried about whether their parents had abandoned them.

583. They wondered whether what had happened was their own fault.

584. They feared that they would never see their parents again.

585. They did not understand what had happened and if they would ever be given back to their parents again.

586. Even after being reunited, Clayborne's children continue to suffer trauma from this experience.

587. L.W., who is now five years old, asks whether her daddy and mommy are going to jail.

588. D.W., who is now seven years old, says that he doesn't want DCS to take them away, pleads that DCS "can't take us," and begs his mom "Please don't let them come back and take us."

589. D.W. also has nightmares and, despite being potty trained before the incident, now wets the bed.

590. Another child has a visceral reaction to seeing police.

591. The children have problems sleeping.

592. The children are still suffering the effects of the family's prolonged separation – and may never fully recover.

## XXIII. The State Continues to Conceal Lynn's Involvement

593.    Judge Perry also presided over the criminal case against Williams for simple possession.

594.    In late May 2023 (after the children had been returned to Clayborne and Williams), Williams moved to disqualify Judge Perry on the basis that Judge Perry had learned unspecified information about Williams *ex parte*.

595.    As of May 2023, both Clayborne and Williams had been led to believe that on February 17, 2023: (a) DCS had filed a verified petition (as stated in the *ex parte* order itself); and (b) that the Juvenile Court presumably had held an *ex parte* hearing on the referenced petition.

596.    Specifically, in the Motion to Disqualify, Williams asserted that Judge Perry had obtained knowledge "during an ex parte hearing he conducted on February 17, 2023 (the date of this incident)", and that this hearing took place "with representatives of the State of Tennessee, which is also a party to this matter."

597.    The Motion to Disqualify also noted that "[t]he ex parte order entered after this hearing recites that Judge Perry's findings were based on facts stated in a verified petition filed with the Court. This petition has never been produced to Williams or Clayborne, and they do not know what Judge Perry was told about them or the facts involved in this case during that hearing."

598.    Judge Perry in fact had received *ex parte* information about Clayborne and Williams from DCS Defendant Lynn on February 17, 2023.

599.    That information had come from an undisclosed phone call by Lynn, of which Clayborne and Williams were still unaware.

600.    Judge Perry had also had at least two other sets of *ex parte* communications with DCS about the family: one with Younglove concerning the missing evidence and the near-midnight text string with Younglove.

601.    Judge Perry may also have received highly prejudicial information that DCS had sent to chambers in three *ex parte* emails on February 22, of which Clayborne and Williams also were unaware.

602.    Once again, an attorney for the family was asking the right questions.

603.    Once again, those questions did not elicit straight answers.

604.    Judge Perry issued a brief order declining to recuse. As justification, Judge Perry stated as follows:

> *The Court obtained ex parte information from petition only. There was no formal proof or witnesses entered in the Dependency and Neglect proceeding.*

605.    This Order did not disclose Lynn's involvement or acknowledge that Lynn had supplied information *ex parte* to the Court on February 17, 2023 that was not part of a petition.

606.    This Order did not disclose the existence of the other *ex parte* communications about the case.

607.    The Order also did not disclose that there was no petition filed on February 17, 2023, that the face of the *ex parte* order falsely stated that it was based on a verified petition, or that the Court had not held an *ex parte* hearing on that date.

608.    In addition, the order did not disclose any of the other instances in which the Court had received information from DCS *ex parte*.

609.    The State of Tennessee still did not come forward to correct the record or inform Clayborne, Williams, and the public about what had actually happened.

## TOLLING

610.    Clayborne's claims against Lynn, Velez, Watkins, Sherrill, Sharketti, and Bell are subject to tolling in equity, based on fraudulent concealment, or based on relation back.

### I.    Tolling as to Lynn and Velez

611.    As to Lynn, because of the deceptive and unlawful actions of DCS and the DCS Defendants, Plaintiff had no way of knowing about Lynn's involvement in this matter within the limitations period.

612.    Lynn's identity and involvement should have been a matter of public record.

613.    However, DCS and the DCS Defendants kept Lynn's role a secret and did not mention his involvement in any subsequent filing in the case.

614.    DCS and the DCS Defendants did not disclose this information even though it was responsive to repeated requests from the family's lawyers.

615.    That fact did not come to light until deep into discovery in this case.

616.    Because of the actions of DCS and the Defendants, Clayborne could not reasonably have known about Lynn's involvement within the limitations period.

617.    As to Kathleen Velez, Plaintiff reasonably believed that the social worker who was working with Taylor and on Trooper Clark's bodycam footage was Montana Medina.

618.    No filings in the juvenile court case referenced Velez.

619.    Instead, the 2/21/23 Petition and the 2/24/23 Amended Petition were written deceptively to make it seem like, *before* the children were removed from Clayborne, it was Taylor and Medina (not Velez) who had interacted with the children at the jail (and that the children had made pre-removal statements to Taylor and Medina).

620.    The Petition's description was misleading and materially incomplete.

621. The person that Plaintiff was led to believe was Medina was in fact Kathleen Velez.

622. Furthermore, to the extent that Velez took notes and otherwise documented her February 17 (or other pre-petition) interactions related to Clayborne and her family, DCS did not provide them to Clayborne despite multiple pre-Complaint requests and (upon information) those records no longer exist.

623. Plaintiff accordingly made a reasonable mistake in identifying Medina rather than Velez in the original Complaint, supporting relation back.

624. Also, for purposes of equitable tolling as to Lynn and Velez:

    **a.** Clayborne has been pursuing her rights diligently against the individuals at DCS who violated her rights. She used all available information from publicly available sources, the Juvenile Court docket, and dashcam/bodycam footage to identify the right parties.

    **b.** Extraordinary circumstances prevented her from filing claims against these additional defendants within the limitations period.

    **c.** None of these Defendants are prejudiced here. All have known about their involvement and been the subject of discovery in this case all along.

625. For purposes of fraudulent concealment as to the DCS Defendants:

    **a.** DCS Defendants affirmatively concealed the involvement of Lynn and Velez;

    **b.** DCS Defendants affirmatively concealed material facts about the involvement of Lynn and Velez;

    **c.** Clayborne could not reasonably have known about the involvement of (or nature of the involvement of) Lynn and Velez despite exercising reasonable care and diligence.

**d.** DCS Defendants (including Lynn and Velez) knew that they had injured Clayborne and her family and knew which individuals did it;

**e.** DCS Defendants (including Lynn and Velez) concealed material information and/or used other means to mislead Clayborne and exclude suspicion or prevent injury.

**II.** **The Additional County Defendants**

626.   As to Sherrill, Sharketti, Watkins, and Bell, CCSD had multiple sources of information that identified them or that could have been used to identify them, including the Call Recording, Surveillance Videos, and CCSD Phone Logs.

627.   CCSD should have preserved all those records and produced them in response to Clayborne's January 23, 2024 public records request.

628.   For purposes of fraudulent concealment as to the County Defendants:

**a.** County Defendants had a duty to disclose their involvement in response to Plaintiff's public record request, but concealed the involvement of Watkins and Sherrill by declining to produce the Call Recordings, CCSD Call Logs, and the responsive surveillance footage that they should have preserved.

**b.** Clayborne could not reasonably have known about the involvement of (or nature of the involvement of) Watkins, Sherrill, Sharketti, and Bell despite exercising reasonable care and diligence.

**c.** The County Defendants knew that they were involved in the injury-causing events at issue and the identities of the other officers involved;

**d.** The County Defendants concealed (or destroyed) material information to exclude suspicion or prevent injury.

629. For purposes of equitable tolling as to the County:

    **a.** Clayborne has been pursuing her rights diligently against the individuals at the County who violated her rights. She used all available information from publicly available sources, the Juvenile Court docket, and dashcam/bodycam footage to identify the right parties.

    **b.** Extraordinary circumstances prevented her from filing claims against each of these defendants within the limitations period.

    **c.** None of these Defendants are prejudiced here. All have already been listed as witnesses with knowledge by existing Defendants and been deposed already.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of the Fourth Amendment
### Actionable Under 42 U.S.C. § 1983
### *By All Plaintiffs Against the THP Trooper Defendants*

630. Plaintiff hereby re-alleges and incorporates the preceding and subsequent allegations as if fully set forth herein.

631. The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. A Fourth Amendment violation occurs where (1) a person is seized; and (2) the seizure is unreasonable.

632. A seizure occurs where there is a physical force or a show of authority that in some way restrains the liberty of the person, and (as to a show of authority) that the person submits to the officers' show of authority. A person has been seized within the meaning of the Fourth Amendment if, in view of the all the circumstances surrounding the incident, a reasonable person would have believed that she and her children was not free to leave.

633.    Once a seizure occurs, the seizure must be reasonable. An arrest is "unreasonable" where it is not based on probable cause to believe that the individual has committed or intends to commit a crime.

634.    The Troopers initially placed Clayborne under arrest for simple possession.

635.    However, under Tennessee law, they should only have cited Clayborne – not placed under custodial arrest.

636.    Also, by law, once the Troopers cited Clayborne for simple possession of marijuana, she and her children should have been free to leave.

637.    Nevertheless, the Troopers told Clayborne that she and her children were not free to leave and instead had to remain in State custody and accompany them to the jail.

638.    The Troopers illegally restrained Clayborne and the children against their will, pending transfer of physical custody to DCS at the jail.

639.    The Troopers also collectively kept Clayborne and her children in custody because Trooper Clark believed that she had not yet been issued a citation and instead would be issued the citation at the jail.

640.    The Troopers' patrol vehicles and the Troopers were all within feet of Clayborne and her children, two vehicles flashed their blue lights, and the Troopers told her that she had to go with them to the jail.

641.    A reasonable person under the circumstances would have believed (as Clayborne did) that she and her children were not free to leave.

642.    Clayborne (and her children) submitted to this show of force as the Troopers escorted them to the jail in their marked vehicles as part of a caravan.

643.    The Troopers illegally seized Clayborne and her children.

644.    The seizure was unreasonable because it lacked probable cause.

645.    The Troopers also had no legal basis to hold Clayborne and her children for transfer to (and further investigation by) the DCS Defendants.

646.    As a result of these actions, Clayborne and her children suffered damages as identified above.

647.    The THP Trooper Defendants were the cause in fact and proximate cause of those damages.

648.    These Defendants acted intentionally, maliciously, or with callous disregard for Clayborne's rights and those of her children.

**COUNT II**
**False Arrest/False Imprisonment**
**Tennessee State Law**
***By All Plaintiffs Against the THP Trooper Defendants***

649.    Plaintiff hereby re-alleges and incorporates the preceding and subsequent allegations as if fully set forth herein.

650.    To show a state law claim for false arrest and imprisonment, the plaintiff must prove: (1) a detention or restraint against her will; and (2) the unlawfulness of such detention or restraint. False imprisonment requires that the defendant must have acted without probable cause.

651.    For substantially the reasons stated above as to the Fourth Amendment claim, the Troopers falsely arrested and falsely imprisoned Clayborne and her children.

652.    Upon citing Clayborne for simple possession of marijuana, Clayborne and her children should have been free to leave.

653.    Nevertheless, the Troopers told Clayborne that she and her children were not free to leave and instead had to remain in custody and accompany them to the jail.

654. The Troopers illegally restrained Clayborne and the children against their will, pending transfer of custody to DCS at the jail.

655. The Troopers' patrol vehicles and the Troopers were all within feet of Clayborne and her children, two vehicles flashed their blue lights, and the Troopers told her that she had to go with them to the jail.

656. A reasonable person under the circumstances would have believed (as Clayborne did) that she and her children were not free to leave.

657. Clayborne (and her children) submitted to this show of force as the Troopers escorted them to the jail in their marked vehicles as part of a caravan.

658. The Troopers illegally seized Clayborne and her children.

659. The seizure was unreasonable because it lacked probable cause.

660. The Troopers also had no legal basis to hold Clayborne and her children for transfer to (and further investigation by) the DCS Defendants.

661. As a result of these actions, Clayborne and her children suffered damages as identified above.

662. The THP Trooper Defendants were the cause in fact and proximate cause of those damages.

663. These Defendants acted intentionally, maliciously, or with callous disregard for the rights of Clayborne and her children.

## COUNT III
### Violation of the Fourth Amendment
### Actionable Under 42 U.S.C. § 1983
*By All Plaintiffs Against the DCS Defendants and the Individual County Defendants*

664. Plaintiff hereby re-alleges and incorporates the preceding and subsequent allegations as if fully set forth herein.

665. As addressed above, a Fourth Amendment violation occurs where (1) a person is seized; and (2) the seizure is unreasonable.

666. On February 17, 2023, Clayborne was cited for simple possession of a small amount of marijuana.

667. Clayborne was not charged with any other crimes.

668. Accordingly, she and her children should have been free to leave.

669. DCS had no authority over her or her children at that point.

670. Nor did DCS have any right to detain Clayborne and her children.

671. Nevertheless, when Clayborne arrived at the jail, the DCS Defendants illegally detained both her and her children.

672. Some combination of DCS Defendants entered Clayborne's car and forced her to answer questions.

673. Some combination of DCS Defendants (at least including Taylor, Wright-Gilliam, and Velez) physically were present at the jail and assisted in seizing Clayborne and her children.

674. A reasonable person in Clayborne's circumstances would not have felt the she or her children were free to leave.

675. Clayborne and her children submitted to this show of authority.

676. The DCS Defendants illegally seized Clayborne and her children at the jail.

677. The seizure was unreasonable because the DCS Defendants had no authority to make an arrest.

678. Clayborne and her children were not afforded legal process before this arrest.

679. Upon information and belief, DCS supervisors (including Medina and Lynn) authorized, approved, directed, and ratified the DCS workers at the scene in seizing Clayborne and her family at the jail.

680. Furthermore, to keep Clayborne and her children in custody during this time, Officer Crabtree (in concert with the DCS Defendants and at the direction of Sharketti) placed spike strips around the car.

681. Also, to keep Clayborne and her children in custody during this time, Crabtree, Bell, Sharketti, and Sherrill participated in keeping Clayborne and her family at the jail for DCS without probable cause and without a valid court order.

682. They did so with the knowledge of, ratification by, and per an order issued by Watkins.

683. These actions were both a physical restraint and a show of authority and show of force.

684. A reasonable person in Clayborne's position would not have felt that she or her children were free to leave.

685. With respect to this show of authority, Clayborne and her children submitted to it.

686. This seizure was made without probable cause and without legal process.

687. As a result of these actions, Clayborne and her children suffered damages as identified above.

688. These Defendants were the cause in fact and proximate cause of those damages.

689. These Defendants acted intentionally, maliciously, or with callous disregard for the rights of Clayborne and her children.

## COUNT IV
## Violation of the Fourth Amendment

*By All Plaintiffs Against the DCS Defendants and the Individual County Defendants*

690.    Plaintiff hereby re-alleges and incorporates the preceding and subsequent allegations as if fully set forth herein.

691.    As addressed above, a Fourth Amendment violation occurs where (1) a person is seized; and (2) the seizure is unreasonable.

692.    DCS and the County Defendants seized and removed the children from Clayborne without a valid court order.

693.    As to the DCS Defendants, they had the children removed before filing a petition, before the Court had even issued an order, and without a hearing.

694.    The DCS Defendants had no objectively reasonable basis to believe that there was an exigency that justified this action.

695.    To the extent that the DCS Defendants purported to execute a "verbal" order from Judge Perry, the DCS Defendants knew that (a) there is no such thing as a verbal order of removal under the Tennessee Code; and (b) any order from Judge Perry that day had been procured by false or materially incomplete representations conveyed to Judge Perry in one or more *ultra vires* communications by Lynn.

696.    DCS's pre-petition, pre-order seizure of the children was unreasonable.

697.    Similarly, the Individual County Defendants unlawfully removed the children from Clayborne's custody without a valid court order.

698.    Even after being told by Judge Perry that he had not signed an order yet, Watkins directed Sherrill to have CCSD take the children from Clayborne.

699.    All of the Individual County Defendants participated in separating the children from their mother.

700. That seizure of the children was unreasonable.

701. As a result of these actions, Clayborne and the children suffered damages as identified above.

702. These Defendants were the cause in fact and proximate cause of those damages.

703. These Defendants acted intentionally, maliciously, or with callous disregard for the rights of Clayborne and her children.

## COUNT IV
### False Arrest/False Imprisonment
### Tennessee State Law
*By All Plaintiffs Against the DCS Defendants and the Individual County Defendants*

704. Plaintiff hereby re-alleges and incorporates the preceding and subsequent allegations as if fully set forth herein.

705. To show a state law claim for false arrest and imprisonment, the plaintiff must prove: (1) a detention or restraint against her will; and (2) the unlawfulness of such detention or restraint. False imprisonment requires that the defendant must have acted without probable cause.

706. For substantially the same reasons stated above as to the preceding Fourth Amendment claim, these Defendants falsely arrested and falsely imprisoned Clayborne and her children.

707. Upon citing Clayborne for simple possession of marijuana, Clayborne and her children should have been free to leave.

708. Clayborne was not charged with any other crimes.

709. Accordingly, she and her children should have been free to leave.

710. DCS had no authority over her or her children at that point.

711. Nor did DCS have any right to detain Clayborne and her children.

71

712. Nevertheless, when Clayborne arrived at the jail, the DCS Defendants illegally detained both her and her children.

713. DCS entered Clayborne's car and forced her to answer questions.

714. A reasonable person in Clayborne's circumstances would not have believed that she or her children were free to leave.

715. Clayborne (and her children) submitted to this show of authority.

716. The DCS Defendants illegally seized Clayborne and the children at the jail.

717. The seizure was unreasonable because the DCS Defendants had no authority to make an arrest.

718. Clayborne and her children were not afforded legal process before this detention.

719. Furthermore, to keep Clayborne and her children in custody during this time, Officer Crabtree (in concert with the DCS Defendants) placed spike strips around the car and numerous officers (believed to be Sheriff's Deputies) surrounded the car.

720. These actions were both a physical restraint and a show of authority and show of force.

721. A reasonable person in Clayborne's position would not have felt that she or her children were free to leave.

722. With respect to this show of authority, Clayborne and her children submitted to it.

723. This seizure was made without probable cause and without legal process.

724. The DCS Defendants also unlawfully arrested and imprisoned the children by removing them from Clayborne without a valid court order and without following any of the procedures set out by Tennessee law for procuring an *ex parte* removal order.

725. As a result of these actions, Clayborne and her children suffered damages as identified above.

726. These Defendants were the cause in fact and proximate cause of those damages.

727. These Defendants acted intentionally, maliciously, or with callous disregard for the rights of Clayborne and her children.

**COUNT V**
**Violation of the Fourth Amendment**
**Unlawful Search**
**Actionable Under 42 U.S.C. § 1983**
***By Clayborne Against the DCS Defendants***

728. Plaintiff hereby re-alleges and incorporates the preceding and subsequent allegations as if fully set forth herein.

729. The collection and analysis of a urine sample is a "search" within the meaning of the Fourth Amendment. *See Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 618 (1989). A search is unlawful if made without probable cause.

730. The DCS Defendants forced Clayborne to provide a urine sample.

731. Upon information and belief, DCS supervisors (including Medina and Lynn) authorized, approved, directed, and ratified the DCS workers at the scene in making this demand.

732. This demand required Clayborne to remove her pants and underwear to attempt to provide the sample.

733. The DCS Defendants effectuated a search of Clayborne.

734. For the same reasons stated above, the DCS Defendants had no probable cause to search Clayborne.

735. The DCS Defendants also did not have any lawful basis to demand that Clayborne submit to a search.

736. As a result of this search, Clayborne suffered the injuries outlined above, including but not limited to emotional distress, anguish, anxiety, and humiliation.

737. The Defendants were the cause in fact and proximate cause of those damages.

738. These Defendants acted intentionally, maliciously, or with callous disregard for Plaintiff's rights.

**COUNT VI**
**Substantive Due Process Under the Fourteenth Amendment**
**Actionable Under § 1983**
***By All Plaintiffs Against All Defendants***

739. Plaintiff hereby re-alleges and incorporates the preceding and subsequent allegations as if fully set forth herein.

740. Clayborne and her children have a constitutional right to family integrity. Clayborne has a fundamental constitutional right to maintain custody and care of her children. Her children correspondingly have a constitutional right to remain with their mother.

741. Defendants each took actions directed at breaking up and/or unreasonably interfering with the family relationship between Clayborne and her children.

742. First, at various points during the February 17, 2023 traffic stop, the Troopers took actions that illegally would separate Clayborne from her children without probable cause. For example:

    a. They decided to arrest her for simple possession because they were not satisfied with Clayborne's reticence to answer questions after being *Mirandized*, even though Tennessee law required them only to cite her.

    b. They used the threat of taking her children away to force her into allowing a further search of the car, and to answer additional questions.

    c. After deciding to cite Clayborne for simple possession of marijuana instead of physically arresting her, they illegally continued to hold her and her small children in custody in order to deliver them to DCS workers at the jail.

d. Before departing for the jail, Trooper Basaldua threatened Williams that, if he did not stop complaining about the Troopers' misconduct, they would make sure that DCS took the children away from both parents.

These actions reflected a culpable state of mind directed at the family relationship between Clayborne and her children.

743. Second, the DCS Defendants took actions that illegally separated Clayborne from her children without probable cause. For example:

a. Even though Clayborne had not been physically arrested for the simple possession charge and was a free citizen at that point, the DCS Defendants illegally detained Clayborne and her family at the jail.

b. The DCS Defendants illegally forced Clayborne to try to provide a urine sample, which DCS plainly did to find a reason to separate Clayborne from her children.

c. The DCS Defendants told Clayborne that because she was unable to provide a urine sample (which they had demanded illegally), it "made things worse for her" and supported taking her children away.

d. The DCS Defendants, facilitated by Officer Crabtree and the Individual County Defendants, held Clayborne and her children captive at the jail using spike strips while Lynn called Judge Perry directly.

e. The DCS Defendants, in flagrant violation of the law and applicable procedures, did *not* file a petition with a judge, did *not* provide testimony or an affidavit, did *not* hold a hearing, and did *not* obtain an *ex parte* removal order before taking the children.

f. Instead, acting *ultra vires*, Dale Lynn simply called Judge Perry in an undisclosed, undocketed, unrecorded call, after which DCS took the children from their mother.

g. The DCS Defendants then submitted a proposed order to the Court that falsely stated that it was based on a verified petition filed that day (which was not true).

h. The DCS Defendants then actively concealed their misconduct from Clayborne, including (a) refusing to come clean that there was no original petition; (b) concealing that the children had been removed *before* the Court had been issued an order (even after being asked what time the order had issued); and (c) concealing the involvement of Lynn in supplying information to Judge Perry.

       **i.**   Acting in concert, the DCS Defendants essentially kidnapped the five small children from their parents and tried to paper it over after the fact.

These actions shock the conscience.

744.    Third, Officer Crabtree and the County Defendants also took actions to break up the family, including:

       **a.**   Placing spike strips around Clayborne's vehicle to restrain Clayborne and her children from leaving while the DCS Defendants surreptitiously called Judge Perry.

       **b.**   Surrounding Clayborne's car in the parking lot for that same purpose; and

       **c.**   Surrounding Clayborne and her children inside the jail, holding her in detention there, and then taking her children away from her.

       **d.**   Physically separating the children from their mother and otherwise assisting DCS in removing the children from their mother without a valid court order.

745.    These illegal actions by all Defendants were deliberate, outrageous, and shocking to the conscience.

746.    These actions caused Clayborne and the children to suffer the damages outlined above.

747.    These Defendants were a cause in fact and proximate cause of those damages.

748.    These Defendants acted intentionally, maliciously, or with callous disregard for the rights of Clayborne and her children.

<h2 style="text-align:center"><u>COUNT VII</u><br><i><u>Monell Claim Against Defendant Coffee County Under § 1983</u></i><br><i><u>By All Plaintiffs Against Coffee County</u></i></h2>

749.    Plaintiff hereby re-alleges and incorporates the preceding and subsequent allegations above as if fully set forth herein.

750. At all times relevant, Officer Crabtree and the other Individual County Defendants were acting under the color of state law and within the scope of their employment with Coffee County.

751. Under § 1983, local governments are responsible for their own illegal acts.

### a. Inadequate Training

752. Inadequate training can be the basis for *Monell* liability if it amounts to deliberate indifference to the rights of persons with whom the local government's officers come into contact. To show inadequate training, a plaintiff must show (1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the local government's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury.

753. Coffee County had an unconstitutional policy or custom of inadequate training amounting to deliberate indifference of the rights of persons with whom its officers come into contact.

754. Coffee County failed to train or inadequately trained its officers (including Officer Crabtree and the other Individual County Defendants) in how to know when seizures are appropriate and when they are not, including training on the law that an individual cited merely for simple possession of marijuana in Tennessee is free to leave.

755. Coffee County also failed to train its officers that verbal *ex parte* removal orders are invalid because orders must be in writing to be effective.

### b. Failure to Supervise

756.     To establish a claim for failure to supervise, a plaintiff must show that the local government acted with deliberate indifference to the risk of the constitutional violation and that its deliberate indifference was the moving force behind the assault.

757.     Coffee County failed to supervise these officers in the performance of their duties – including a failure to supervise or monitor their behavior to ensure that they were not falsely arresting individuals without probable cause or removing children from their parents without a valid court order – out of deliberate indifference for the constitutional violations that would result from this failure.

### c.     Unconstitutional Custom, Policy, or Practice

758.     Coffee County also had a custom, policy, or practice of permitting false arrests in the DCS context, and of tolerating or acquiescing to this type of federal civil rights violations. To establish this claim, Plaintiff must show (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of Coffee County; (3) Coffee County's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that Coffee County's custom was the moving force or direct causal link in the constitutional deprivation.

759.     CCSD officers also improperly purport to execute "verbal" *ex parte* removal orders even though they are invalid. CCSD is aware of this misconduct, such that its deliberate indifference in its failure to act to stop these violations amounts to an official policy of inaction; and Coffee County's custom had a direct causal link to Plaintiffs' constitutional deprivations.

760.     These acts and omissions on the part of Coffee County (referring to the failure to train, failure to supervise, and unconstitutional custom, policy, or practice) constitute a violation of the constitutional rights of Clayborne and her children, and played a substantial part in causing

their damages, including physiological injury, mental and emotional anguish, and monetary damages.

761.    These acts and omissions of Coffee County were a cause in fact and proximate cause of injuries to Clayborne and her children.

**COUNT VIII**
**Procedural Due Process Under the Fourteenth Amendment**
**Actionable Under § 1983**
***By All Plaintiffs Against the DCS Defendants***

762.    Plaintiff hereby re-alleges and incorporates the preceding and subsequent allegations above as if fully set forth herein.

763.    Under the Fourteenth Amendment, no State shall deprive any person of life, liberty, or property, without due process of law. U.S. Const. amend XIV, § 1.

764.    A parent has a liberty interest in the freedom of personal choice in the matters of family life in which the State cannot interfere without good cause. A parent's desire for and right to the companionship, care, custody, and management of his or her children is an important interest that warrants deference and, absent a powerful countervailing interest, protection.

765.    The fundamental due process liberty interest is also shared by the parent's child.

766.    In the child removal context, procedural due process requires three things:

   **a.**    Parents must be given notice before the child's removal.

   **b.**    The parents must be given a pre-deprivation hearing before a neutral and detached hearing officer and be given a full opportunity at the hearing to present witnesses and evidence on their behalf.

   **c.**    The parents must be permitted to bring an attorney to the hearing if they have retained one.

767.    In emergency situations, where a child's safety is immediately threatened with irreparable harm, officials can seize a child without a pre-deprivation hearing.

768.     State officials need reasonable cause of an "immediate threat" of irreparable harm to the child.

769.     The mere possibility of harm or speculation that harm could occur do not provide a sufficient basis to support an exigency.

770.     Here, the DCS Defendants deprived Clayborne and the children of due process of law.

771.     Before removing the children, the DCS Defendants did not file an *ex parte* petition with the Juvenile Court, hold a hearing, supply testimony, or submit written evidence to the Court.

772.     Nor did the DCS Defendants procure a court order before removing the children.

773.     Instead, the DCS Defendants unilaterally removed the children from Clayborne **before** filing a petition and **before** receiving a written court order (which the Court did not issue until hours after the children were removed).

774.     There were no exigent circumstances justifying a pre-petition, pre-order removal.

775.     The DCS Defendants had no reasonable cause to believe that there was an immediate threat of irreparable harm to the children.

776.     The children were safe with their mother together at the jail (first in the car, then waiting on a bench with her inside the facility), as a Trooper specifically advised the DCS Defendants – where the DCS Defendants were (illegally) detaining them.

777.     As Trooper Clark himself had told the DCS Defendants, Clayborne was a good mother, the children were not neglected or abused, the children were safe and cared for by Clayborne, and she had merely been cited for simple possession of small amount of marijuana, and it was in the best of interest of Clayborne and the children to remain together.

778.     There was no evidence that the children were in any immediate danger.

779. Indeed, the children were in no danger at all.

780. These actions caused Clayborne and the children to suffer the damages outlined above.

781. These Defendants were the cause in fact and proximate cause of injuries to Clayborne and her children.

782. These Defendants acted intentionally, maliciously, or with callous disregard for the rights of Clayborne and her children.

### COUNT IX
### Retaliation for Exercise of Constitutional Rights
### Actionable Under § 1983
### By all Plaintiffs Against the DCS Defendants

783. Plaintiff hereby re-alleges and incorporates the preceding and subsequent allegations above as if fully set forth herein.

784. The DCS Defendants had no right to compel Clayborne to answer their questions or to speak with them.

785. To the contrary, Clayborne had a First Amendment right to refuse to speak to DCS workers at the scene (*i.e.*, the DCS Defendants could not compel her to speak).

786. However, because Clayborne exercised her constitutional right to refuse to speak, the DCS Defendants decided to (1) illegally seize her family at the jail; and (2) to remove the children from her and into DCS custody.

787. By the same token, Clayborne also had a constitutional right to tell the DCS workers (who were communicating with their supervisory DCS Defendants) that they should not take her children away.

788.    However, because Clayborne exercised her constitutional right to (validly) tell the DCS workers that her children should not be taken from her, the DCS Defendants decided to (1) illegally seize her family at the jail; and (2) to remove the children from her and into DCS custody.

789.    The DCS Defendants did not have probable cause to seize the children and did not have any reasonable basis to believe that the circumstances otherwise justified an exigent removal of the children from her custody.

790.    Instead, they retaliated against her (and her children) for exercising her constitutional rights, including her First Amendment rights.

791.    As a result of these actions, Clayborne and her children suffered the injuries outlined above.

792.    The Defendants were the cause in fact and proximate cause of those damages.

793.    These Defendants acted intentionally, maliciously, or with callous disregard for the rights of Clayborne and her children

## RELIEF REQUESTED

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

A.    Declare that the acts and omissions of the Defendants violated Plaintiffs' rights;

B.    Award compensatory damages;

C.    Award nominal damages;

D.    Award punitive damages;

E.    Pre- and post-judgment interest as permitted by law;

F.    Award attorney fees and costs under § 1988; and

G.    Grant such other and further relief as the Court deems just and proper.

Plaintiffs demand a jury trial on all issues other than the issue of attorney's fees and costs.

83

DATED:  January 13, 2025              Respectfully submitted,

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

Abby R. Rubenfeld
**Rubenfeld Law Office, PC**
810 Dominican Drive, Suite 215
Nashville, TN 37228
Telephone: (615) 386-9077
arubenfeld@rubenfeldlaw.com