# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE
# AT WINCHESTER

| | |
|---|---|
| BIANCA CLAYBORNE, et al., | ) |
| | ) |
|    Plaintiff, | ) |
| | ) Case No.: 4:24-cv-00012 |
| v. | ) |
| | ) Judge Clifton L. Corker |
| RUBEN BASALDUA, et al., | ) |
| | ) JURY DEMANDED |
|    Defendants. | ) |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

Plaintiffs respectfully request leave to file an Amended Complaint. When Plaintiffs filed the original Complaint, Plaintiff Bianca Clayborne had been led to believe that the Department of Children's Services ("DCS") had removed her five children from her custody based upon a sworn petition and an *ex parte* order of removal signed by a General Sessions Judge. In discovery, Plaintiffs learned that this was not true. Instead, DCS case workers and their supervisors collaborated with employees of the Coffee County Sheriff's Department to remove the children ***before*** filing a petition and ***before*** obtaining the *ex parte* order. Discovery has also revealed the identities of additional individuals at DCS and the "John Doe" County officials who participated in these actions – and whose identities had been concealed before Plaintiffs filed suit.

In light of these developments and new facts learned in discovery, Plaintiffs' First Amended Complaint ("FAC") would (1) revise claims against the existing DCS Defendants and County Defendants based on the newly discovery evidence (including revised due process claims); (2) add a new retaliation claim against the DCS Defendants; and (3) add new defendants including the "John Does."

Plaintiff's request for leave to amend meets the liberal Rule 15 amendment standard.

## **BACKGROUND**

Summarizing the background facts is more difficult than in a typical case. There are two versions: (1) the first version is the one Plaintiffs and the public were led to believe occurred (including who was involved); and (2) the second version is what actually happened (and who else did it).

I. **Version 1: Plaintiffs' Original Understanding and Original Complaint**

    A. **The Original Allegations**

This lawsuit concerns a harrowing set of events that began on February 17, 2023. On that day, Plaintiff Bianca Clayborne got her children (ages 4 months to 7 years old) up early, loaded the family into her car, and headed out with their father from Atlanta to Chicago for a funeral. (D.E. 1, Original Complaint ("Compl.") ¶ 1.) What started out as a family road trip turned into a nightmare as they passed through Coffee County, Tennessee. (*Id.*) There, four Tennessee Highway Patrol Troopers ("THP") pulled her car over and kept her whole family in custody for two-and-half-hours in near-freezing temperatures, illegally kept the family in custody after citing her for simple possession of marijuana, and illegally delivered the entire family to DCS workers at the Coffee County Jail. (Compl. ¶ 3.) At the jail, one of the Troopers told DCS workers that Clayborne was not being arrested, that there were no issues of abuse or neglect, that Clayborne was a good mother, and that the family should not be separated. (Compl. ¶¶ 102-105.) Despite that, the Troopers delivered physical custody of her and her children to DCS workers at the Coffee County Jail, and DCS workers in turn illegally detained and interrogated the family, illegally forced Clayborne to try to provide a urine sample (forcing her to disrobe in the presence of DCS and her children), and illegally had officers place spike strips around her car to keep her from leaving. (Compl. ¶ 3.) There was no factual or legal basis to remove these five children from their mother. (Compl. ¶¶ 313-320.) Nevertheless, DCS workers and County officers physically removed her children from her (including one officer taking her infant child's baby carriage out of her arms). (Compl. ¶ 4.) The children remained separated from their mother for 55 days (including 14 days separated from each other in different foster families). (Compl. ¶¶ 4, 158.)

At the time this lawsuit was filed, Clayborne had been led to believe that DCS Defendants had filed a verified petition with the Coffee County Juvenile Court to seek a removal order, participated in an *ex parte* hearing, and obtained an *ex parte* removal **before** removing the children

from her and into DCS custody. As alleged in the proposed FAC, that is what the face of the *ex parte* order removal said (FAC ¶ 422, 428-430), what the law requires (FAC ¶¶ 9, 315), and what Clayborne had been led to believe all along. (*See* FAC ¶¶ 398-433, 467-553.) Also, on February 21, 2023, DCS filed a petition that was written to indicate that the two individuals who interrogated Clayborne and her children at the jail that day (before the removal) were Katlyn Taylor (neè Pelham) and Montana Medina (¶ 620). Based on all available information – including court dockets, THP dashcam and bodycam videos, and other information – Plaintiffs reasonably believed that the only DCS employees (other than DCS's lawyer) who were involved separating her family were Katlyn Taylor (whose name was on the 2/21/23 Petition), Montana Medina (whom the 2/21/23 Petition represented had questioned the family at the jail before the children were removed), and Erica Wright-Gilliam (whose first name was mentioned on THP Trooper Donnie Clark's dashcam video).[1]

As to the officers who assisted the DCS workers in detaining Clayborne and removing her children at the jail, the 2/21/23 Petition mentioned an "Officer Crabtree," but Clayborne had no way of identifying anyone else at the County. Clayborne's attorneys accordingly served a pre-Complaint public records request to the County for any records reflecting who those officers were. The County had responded that it had no responsive records. (FAC ¶¶ 457-465; 626-629.)

### B. The Original Claims and Defendants

---

[1] Before filing the Complaint, Plaintiffs' attorneys obtained copies of dashcam and bodycam videos from THP Troopers who were involved that day. One of the videos contained just over five minutes of footage of Trooper Clark's interaction with two social workers at the jail before the Troopers all left the scene.

On February 8, 2024, Plaintiffs filed their Complaint.[2] The Complaint included the Defendants that Clayborne, through all available records and information, had reasonably identified as having violated her rights and those of her children. This included:

(1) DCS workers Taylor (nee Pelham), Medina, and Wright-Gilliam (the "DCS Defendants");[3]

(2) Four THP Troopers: Ruben Basaldua, Donnie Clark, Douglas Foster, and James Thompson (the "THP Defendants"); and

(3) Officer Alan Crabtree, Coffee County, and several "John Doe" Defendant officers (the "County Defendants").

Plaintiffs asserted federal claims for Fourth Amendment, substantive due process, and procedural due process violations, along with related state law claims. The DCS Defendants moved to dismiss.[4] Based on the allegation that DCS had filed a petition, held a hearing, and procured an *ex parte* order before the children were removed, the Court dismissed Plaintiffs' substantive and procedural due process claims against the DCS Defendants. All other claims proceeded.

II. **Version 2: What Actually Happened (Which Plaintiffs Learned in Discovery)**

In discovery, Plaintiffs have learned that the sequence of events was significantly different than what they (and the public) had been led to believe.[5] The facts as Plaintiffs now understand them are set out in the proposed Amended Complaint. Plaintiffs incorporate them here.

Among other things, Plaintiffs learned that (a) a previously unidentified DCS worker named Kathleen Velez was one of the social workers at the scene who participated in questioning and detaining Clayborne (¶¶ 216, 234, 261); (b) before obtaining a court order or filing a petition,

---

[2] Clayborne filed suit on her own behalf and on behalf of her children.
[3] Taylor and Wright-Gilliam no longer work for DCS.
[4] The other Defendants answered the Complaint.
[5] To date, Plaintiffs have taken 9 depositions, issued 12 third-party subpoenas for records, served interrogatories and requests for production to defendants, and reviewed over 16,000 pages of records produced by the Defendants (and DCS) collectively.

4

DCS workers demanded that County officials remove the children from Clayborne (FAC ¶¶ 287-296); (c) there was no petition filed on February 17, 2023 and no hearing (FAC ¶¶ 315-317); and (d) DCS workers and County officials removed the children from Clayborne *without* a petition, *without* a hearing, and *without* a Court order (¶¶ 372-373, 379-397). In discovery, Plaintiffs also learned that, before the children were removed, a DCS worker named Dale Lynn was involved in the decision to detain and interrogate Clayborne and the children. (FAC ¶¶ 234, 262, 280, 679.) Plaintiffs also learned that Lynn had called a General Sessions Judge (Judge Gregory Perry) to ask that the Judge issue an *ex parte* order to remove the children from Clayborne. (FAC ¶ 318.)

Also, before the children were removed, Judge Perry called County official James Sherrill on his cell phone and spoke to Sherrill and Chief Deputy Frank Watkins (who also participated in the call). (FAC ¶ 346.) The County had recorded that phone call, in which Judge Perry acknowledged that he had not received a petition, had not held a hearing, and had not issued an order yet. (FAC ¶¶ 349-351.) Nevertheless, Judge Perry said that the County could "go ahead and let DCS have them" – referring to Clayborne's children. (FAC ¶ 349.) Sherrill feared that this would violate the family's civil rights. (FAC ¶ 352.) He told Judge Perry: "Well, the momma is not going to give them up without a fight. If we get in the middle of this, there's going to be a damn lawsuit for sure." (*Id.*) In response, Judge Perry told Sherrill to arrest Clayborne for disorderly conduct. (FAC ¶ 353.) When Sherrill pushed back again, Judge Perry told him that the County would not get in a lawsuit "because I've got judicial immunity." (FAC ¶¶ 355-358.) Watkins then intervened to ask Judge Perry, imploringly, whether a "verbal order" was "good enough." Judge Perry responded: "Absolutely." Watkins thanked Judge Perry and told him: "That's all I need, buddy!" (referring to the Judge) (FAC ¶¶ 358-362.) At 1:39 p.m., Watkins then ordered Sherrill to tell the County officers to remove the children based on "verbal authorization"

from Judge Perry. (FAC ¶¶ 365-366.)[6] Per that directive from Watkins, County officials at the scene helped the DCS workers remove the children from Clayborne, while DCS workers "coaxed" the children away from Clayborne and into a white truck. (FAC ¶¶ 373, 379-397.)

### III. Efforts to Hide Version 2 from Clayborne

#### A. DCS Workers Paper Over the Record and Conceal Material Information

Presumably aware that they had not followed any legal "process," DCS workers began to paper over the record. (FAC ¶ 398.) *After* DCS had removed the children from their parents, a DCS attorney (Sheila Younglove) sent an *ex parte* order to Judge Perry to sign (FAC ¶ 416.) This proposed order was a pre-filled template document that had a blank caption (because Younglove did not know the names of the parents or children involved). (FAC ¶¶ 416-418.) This template consisted of boilerplate, pre-filled factual and legal representations that had no relation to the matter and that were false or materially incomplete. (FAC ¶¶ 419-421.) In particular, the proposed order falsely represented that the *ex parte* order was based on a "verified petition" already filed by DCS. (FAC ¶ 442.) It also made no mention of Lynn's involvement in the detention of the family or speaking to Judge Perry. (FAC ¶ 423.)

At 3:47 p.m., the Court issued a proposed order in Judge Perry's name, which simply added (handwritten) names of the children and their parents and set a hearing date. (FAC ¶¶ 428-429.)[7]

---

[6] He did this even though, in the call with Judge Perry, Judge Perry had not said (nor had Watkins or Sherrill asked) the names of the children, how many children there were or their birthdates/ages, the basis for the removal, the location of the children, or what the County was supposed to do with the children upon removing them. (¶ 364.)

[7] As explained in the Amended Complaint, Judge Perry (a) had not validly acquired jurisdiction to issue any orders concerning Clayborne or her children; and (b) even if Judge Perry had jurisdiction, the preliminary hearing date was set more than two days beyond the statutory limit set forth in T.C.A. § 37-1-117. (FAC ¶¶ 408-414, 515-518.)

The Order falsely stated that it was based on a verified petition. (FAC ¶ 430.) The transmittal email for this Order acknowledged that no verified petition had been filed yet. (FAC ¶¶ 432-433.)

On February 21, 2023 (four days later), DCS Defendant Katlyn Taylor filed the first *ex parte* petition. (*See* FAC ¶¶ 494-512.) The petition made no reference to Lynn's involvement in the detention of the family at the jail or in speaking with Judge Perry. The petition was also written deceptively to (1) give the impression that Taylor and Medina had obtained statements from the children at the jail **before** they were removed from their mother; and (2) that Medina (rather than Velez) was the third social worker (in addition to Taylor and Wright-Gilliam) who was present at the jail on February 17. The Petition made no mention of Velez's involvement at the scene.[8]

Between February 28 and March 9, Clayborne's lawyers followed up multiple times asking for copies of the original petition (referenced in the 2/17/23 *ex parte* order), for DCS to disclose all evidence it had supplied to Judge Perry (which unbeknownst to Clayborne's lawyers would have included any information supplied by Lynn on February 17), and all records that DCS had about the incident (which would have included notes taken by the DCS Defendants before and after removing the children). (FAC ¶¶ 545-553.) DCS never answered these questions. (FAC ¶ 550). In fact, when Clayborne's attorney threatened to bring a federal lawsuit to seek extraordinary relief and complained about DCS continuing to communicate *ex parte* with the

---

[8] On top of this, despite Juvenile Court Rule 106(e) (which requires date stamps on all filings), the Court left the "TIME" stamp blank when (on February 22) it docketed the February 17 *ex parte* order. (FAC ¶¶ 467-480.) Nor did the Court docket any of the *ex parte* email communications between DCS and the Court on February 17, including communications that would have shown (a) that the *ex parte* order was issued **after** the children had been removed; and (b) that, despite what the *ex parte* order said, DCS had **not** filed a petition before the DCS Defendants' procedure that (belated) *ex parte* order.

Judge, DCS's lawyer **texted back and forth with Judge Perry ex parte** that night about how to dissuade Clayborne's lawyers from suing. (¶¶ 550-552.)[9]

### B. The County Conceals Its Involvement

On the date of the incident, the County had surveillance video of the jail lobby and surveillance footage from cameras in the parking lot. (FAC ¶¶ 441.) The County normally maintains the video for at least 45 days. (FAC ¶ 442.) On the date of that incident and at other times within that 45-day period, the County recognized that (a) it would likely face litigation for removing the children; and (b) the footage was also relevant to ongoing court proceedings. (¶¶ 443-447.) The footage would have shown the officers involved in detaining Clayborne and her family and in removing the children from her custody at the jail. (¶ 457.) However, despite a duty to preserve, CCSD allowed this footage to be deleted before this lawsuit was filed. (¶¶ 448-449.)[10] The County also provides cell phones to its officers. (FAC ¶ 454.) Logs of their calls reflect the officers involved in the incident. (¶ 454.)[11] Also, on the date of the incident, Watkins and Sherrill had calls about Clayborne and her family with (1) District Attorney Craig Northcutt, and (2) Judge Perry (who called Sherrill on his cell phone). (FAC ¶¶ 343-368.) The County recorded these calls, on which Watkins and Sherrill used their names. (*See* FAC ¶¶ 436-440.) Collectively, these records reflected the involvement of Watkins, Sherrill, Sharketti, and Bell. (FAC ¶ 457.)

---

[9] Judge Perry and the State also did not disclose Lynn's involvement in response to a motion to disqualify. (*See* FAC ¶¶ 594-610.)
[10] Clayborne's attorneys asked DCS to preserve all evidence related to the incident, including footage from the jail. DCS made no efforts to preserve that footage or ask CCSD to do so. (¶¶ 450-452.)
[11] For example, they include officers calling each other at the jail, Watkins calling the Coffee County District Attorney about what to do, and multiple calls involving Sherrill (including Judge Perry calling Sherrill).

On January 23, 2024, Clayborne's attorney sent a public records request to the County. (FAC ¶ 458.) Watkins (who had recorded the call and was otherwise aware of all the County officers involved) handled responding to it. (FAC ¶ 458.) The video footage would have been responsive, but the County had already deleted it. (¶ 463.) As to the call logs and audio recording of the calls with the District Attorney and Judge Perry, they were responsive but the County did not produce them. (FAC ¶¶ 459-462.) Instead, Watkins (on behalf of the County) told Clayborne's counsel that there were no records showing who was involved. (¶ 458).

IV.   **Plaintiffs' Proposed First Amended Complaint**

The proposed FAC would, in substance, include the following amendments:

(1) Updated factual allegations that incorporate information learned in discovery;

(2) Revised claims and theories of liability against the existing DCS Defendants, County Defendants, and THP Defendants.

(3) Add Lynn and Velez as DCS Defendants.

(4) Add a retaliation claim against the DCS Defendants.

(5) Add Watkins, Sherrill, Sharketti, and Bell as County Defendants (replacing the original "John Does").

## **LEGAL STANDARD**

Under Rule 15, the Court "should freely give leave when justice so requires." The Sixth Circuit has expressed a strong preference in favor of granting leave to amend.[12] In deciding whether to grant a motion to amend, courts should consider undue delay in filing, lack of notice to

---

[12] *See, e.g., United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003).

the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment.[13]

**ARGUMENT**

I. **The Rule 15(a) Factors are Satisfied**

*Plaintiffs Have Not Unduly Delayed in Bringing the Motion*: Plaintiffs have not unduly delayed in bringing the Motion. Through discovery, Plaintiffs have identified the County "John Does," identified additional individuals at DCS who participated in the incident that forms the basis for this lawsuit, and identified additional facts concerning the claims against all existing Defendants. Plaintiffs are bringing this Motion within weeks of ascertaining that information.

*The Opposing Parties Have Had Adequate Notice*: Defendants have been on notice all along that Plaintiffs were seeking to identify and question the individuals involved on February 17, 2023 at the jail in interrogating, seizing, and separating the family. As it relates to the three existing DCS Defendants, the amended pleading corrects the factual allegations to match the truth about the sequence of events (which had been concealed from Clayborne) and amends certain claims in light of those facts.[14] These three DCS Defendants also were aware of the involvement of Velez and Lynn on the date of the incident (which was similarly concealed from Clayborne). As to the County Defendants, Officer Crabtree and the County have known all along about the involvement of Watkins, Sherrill, Sharketti, and Bell in detaining Clayborne and her family at the jail and in assisting DCS by separating the children from their mother.

---

[13] *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005).
[14] Plaintiffs' allegations are based on the current factual record. In particular, to date, Plaintiffs have only been able to depose one witness for DCS (former DCS lawyer Sheila Younglove), which took place via subpoena on December 11.

*Good Faith*: Plaintiffs seek leave to file an amended pleading in good faith to update the factual allegations, claims, and Defendants in light of intervening discovery (including discovery showing that DCS had not actually filed a petition or received an *ex parte* removal order when the children were removed).

*There Are No Repeated Failures to Cure*: This would be Plaintiffs' first amendment. Amending here will not cause undue prejudice to the Defendants, who have known all along who was involved in the events that form the basis for Plaintiffs' Complaint.

*There is No Undue Prejudice to Existing Defendants from the Amendment*: None of the existing Defendants will be unduly prejudiced by Plaintiffs' proposed amendment. They have known all along who was involved in the events that form the basis for Plaintiffs' Complaint, and the subject matter of this case and the scope of discovery remains the same.

## II.     The Rule 15(a) Motion Should Not Be Denied Based on Futility

Certain Defendants intend to argue that the amendment would be futile because it would not survive a motion to dismiss. As a matter of procedure and substance, Plaintiffs maintain that those issues are better addressed (and in some cases must be addressed) at the Rule 12 stage.

### A. Rule 15 is an Improper Vehicle to Resolve These Issues

1. Arguments as to Proposed New Defendants

Plaintiffs' FAC would add 6 new defendants, including (a) Velez and Lynn from DCS; and (b) four County officials (Watkins, Sherrill, Sharketti, and Bell). The current Defendants do not have standing to assert futility arguments on behalf of these proposed new defendants. As explained in *Clark v. Hamilton Mortg. Co.*, 2008 WL 919612, at *2 (W.D. Mich. Apr. 2, 2008), "[t]here is no authority that would . . . authorize present parties who are who are unaffected by the

proposed amendment to assert claims of futility on behalf of the proposed new defendant."[15] Here, the situation is similar to *Silva v. Ekis*, in which a plaintiff asserting constitutional claims against police officers concerning his arrest sought to name "John Does" in an amended pleading. The existing defendant argued that the claims against these other officers were untimely and did not relate back. The Court held that the existing defendant "lacks standing to assert a futility argument on behalf of the proposed defendants" and found that "the court cannot bar the proposed amended pleading on this basis."[16] The same is true here.

2. Arguments as to Existing Defendants

If any existing Defendants argue that the amendments would not withstand a motion to dismiss as to them, the better approach is to allow amended pleading and test its merits on a motion to dismiss. As explained by a federal district court in *TESCO Props., Inc. v. Mulroy*, "[u]nless an amendment is plainly futile, arguments going towards the sufficiency of the claim are better addressed in the context of a motion to dismiss the amended complaint."[17]

Here, this concern is especially important because some Defendants will object to the proposed amendment under the Rule 12(b)(6) standard. Under normal Rule 12(b)(6) practice, each defendant (or defendant group) would file its own Rule 12 motion laying out its arguments and legal authority, Plaintiffs would be on full notice of those arguments and have the opportunity to

---

[15] *See also Chandler v. Huddleston*, 2015 WL 5680344, at *4 (E.D. Ky. Sept. 25, 2015) ("Alleged futility of claims against individuals who are not yet parties to the suit is not a proper basis for denying leave to amend."); *Chesler v. City of Jersey City*, 2019 WL 6318301, at *3-4 (D.N.J. Nov. 26, 2019) (agreeing with *Clark* and holding that proposed new defendant and existing defendants "may challenge the sufficiency of the pleading by way of a dispositive motion once [new defendant] has been named as a party, if appropriate").
[16] 2017 WL 5465531, at *1 (D. Kan. Nov. 14, 2017).
[17] *TESCO Props, Inc. v. Mul*roy, 2022 WL 4389710, at *2 (W.D. Tenn. Sept. 22, 2022), (quoting *Ori Capital Advisors, LLC v. Borror Constr. Co., LLC*, 2022 WL 3026862, at *10 (S.D. Ohio Aug. 1, 2022)).

file a full response to each motion, and the defendant could file a Reply. Here, in contrast, treating each defendant's response here as a *de facto* Rule 12 motion would effectively force Plaintiffs to respond to multiple motions to dismiss via a single Rule 15 reply brief. This would not serve the parties or the Court well. Plaintiffs have substantial grounds for amending the existing claims and adding new Defendants. Defendants certainly have a procedural right to challenge those claims, but the best course here would be to do that through post-amendment Rule 12 practice.[18]

## CONCLUSION

For these reasons, Plaintiffs respectfully request leave to file the attached amended pleading. To the extent that the existing Defendants challenge any claims against them, those are better addressed at the Rule 12 stage. And to the extent that the existing Defendants seek to assert futility changes on behalf of non-parties, they lack standing to do so.

---

[18] *See Apex Energy Grp, LLC v. Apex Energy Sols. of Cincinnati LLC*, 2012 WL 1299886, at *3 (S.D. Ohio Nov. 30, 2012) ("Although Plaintiffs contend that the amendment would be futile, the Court finds the better avenue for addressing the merits of the notice issue is through a formalized motion to dismiss or motion for summary judgment."); *see also McElvy v. Sw. Corr., LLC,* 2020 WL 13882825, at *1 (N.D. Tex. Jan. 9, 2020) ("Here, the contentions Defendants raise regarding the sufficiency of the second amended complaint pleadings are complex and would benefit from more detailed briefing by both parties in a Rule 12(b) motion. The Court thus rejects this basis for denying Rule 15 leave to amend here.").

DATED:  January 13, 2025                Respectfully submitted,

<u>/s/ *Anthony A. Orlandi*</u>
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com

Abby R. Rubenfeld
**Rubenfeld Law Office, PC**
810 Dominican Drive, Ste. 215
Nashville, TN 37228
Telephone: (615) 386-9077
arubenfeld@rubenfeldlaw.com

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served via electronic mail on this 13th day of January 2025:

| | |
|---|---|
| Jeffrey R Thompson<br>Gina Sarli Vogel<br>Grant A. Carringer<br>**Lewis Thomason, P.C.**<br>900 South Gay St., Ste. 300<br>P.O. Box 2425<br>Knoxville, TN 37901<br>865-546-4646<br>Fax: 865-523-6529<br>jrthompson@lewisthomason.com<br>gvogel@lewisthomason.com<br>gcarringer@lewisthomason.com<br><br>***Attorneys for Coffee County Tennessee and Officer Crabtree*** | Jordan Crews<br>Katherine P. Adams<br>**Office of the Tennessee Attorney General**<br>P.O. Box 20207<br>Nashville, Tennessee 37202<br>(615) 532-7913 phone<br>(615) 532-5683 fax<br>jordan.crews@ag.tn.gov<br>Katherine.adams@ag.tn.gov<br><br>***Attorneys for Erica Wright-Gilliam, Katlyn Taylor and Montana Medina*** |
| Meghan Murphy<br>Peako Jenkins<br>**Office of the Tennessee Attorney General**<br>P.O. Box 20207<br>Nashville, Tennessee 37202<br>Phone (615) 253-3890<br>meghan.murphy@ag.tn.gov<br>Peako.Jenkins@ag.tn.gov<br><br>W. Adam Izell<br>**Law Office of W. Adam Izell, PLLC**<br>P.O. Box 4386<br>Chattanooga, TN 37405<br>Telephone: (423) 888-3022<br>adam@chattlawyer.com<br><br>***Attorneys for Ruben Basaldua, Donnie Clark, Douglas Foster, and James Thompson*** | Daniel J. Ripper<br>P.O. Box 151<br>Chattanooga, Tennessee 37402<br>(423) 756-5034<br>(423) 265-9903(fax)<br>dan@lutheranderson.com<br><br>***Attorney for Katlyn Pelham*** |

                                                  */s/ Anthony A. Orlandi*
                                                  Anthony A. Orlandi