# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT WINCHESTER

BIANCA CLAYBORNE, individually )
and as parent and next friend of minors )
J.C., D.W., L.W., A.C., and P.C., )
                                            )   **Case No.: 4:24-cv-00012**
    Plaintiff, )
                                             )   **Judge Clifton L. Corker**
v. )
                                             )   **JURY DEMANDED**
RUBEN BASALDUA, et al., )
                                             )
    Defendants. )

## RESPONSE IN OPPOSITION TO THP DEFENDANTS' MOTION TO DISMISS

On February 17, 2023, four THP Troopers unlawfully detained Bianca Clayborne and her children at a gas station without probable cause after they should have been free to leave. Then, without cause, they unlawfully kept them in detention and delivered physical custody of them at the Coffee County jail to the Tennessee Department of Children's Services ("DCS") for a "welfare check" that the officers knew was not justified. This experience traumatized Ms. Clayborne and the children. And delivering the family to DCS had tragic results: DCS unlawfully searched and seized the family at the jail, unlawfully and invalidly separated the family, and kept the children separated from Ms. Clayborne for 55 days.

Ms. Clayborne and her children sued the Troopers for their part in this fiasco, asserting claims under federal and state law. Under Rule 8, all Plaintiffs were required to do is plead facts plausibly establishing these claims. There is no legitimate dispute that the Plaintiffs met their pleading burden. Indeed, the Troopers **answered** the original Complaint. (D.E. 31.)

But now, in response to a First Amended Complaint (D.E. 92) ("FAC") that did not materially change any allegations against them, the Troopers have moved to dismiss. The Troopers do not contest that the FAC allegations establish claims against them. Nor is their motion actually based on what Plaintiffs allege. Instead, the Troopers have introduced 6 videos and argue that these videos entitle them to judgment based on a factual counter-narrative. It is true that a court can consider videos at the motion to dismiss stage in the limited circumstances in which the video "utterly discredits" a particular allegation.[1] But a court cannot consider videos if they capture an incomplete account of events, where the facts are controverted, or where a jury reasonably could interpret the events in different ways.[2] All of these issues are present here. The Troopers have

---

[1] *See Osberry v. Slusher*, 750 F. App'x 385, 390-391 (6th Cir. 2018).
[2] *See, e.g.*, *Thomas v. Noder-Love*, 621 F. App'x 825, 829–30 (6th Cir. 2015); *Harcz v. Boucher*, 763 F. App'x 536, 544-45 (6th Cir. 2019).

introduced only a subset of 6 videos (there are actually 13 of them in total) that capture only a subset of what was said and done at the scene (including gaps where the officers intentionally turned off their audio at important junctures). The facts are vigorously controverted and, regardless, the video does not "blatantly contradict" any particular allegation in the FAC (let alone a material one). Nevertheless, through bare statements of counsel, Troopers purport to (re)characterize events that are, at a minimum, subject to different reasonable interpretations or that the video itself refutes. And to make matters worse, the Troopers do not show that all the referenced statements would even be admissible (such as self-serving hearsay statements by the officers themselves).

The Troopers do all this without regard for the Rule 12 standard (which, among other things, requires them to draw all reasonable inferences in Plaintiffs' favor) or for the procedural protections of Rule 56. The Motion is procedurally improper.

Plaintiffs respectfully urge the Court to deny the Motion. If the THP Troopers want to move for summary judgment, they can do that separately at an appropriate time.

## BACKGROUND

### I. Factual Allegations

The FAC contains nearly two-hundred paragraphs of specific, detailed factual allegations about the circumstances of the of the February 17, 2023, traffic stop, the Troopers' involvement in it, and the Troopers' decision to keep the family in custody for DCS. (*See* FAC ¶¶ 55-260.)[3]

In most relevant part, Plaintiffs alleged that (after about 90 minutes of questioning and searching), the Troopers elected to issue Ms. Clayborne a citation in lieu of arrest for misdemeanor possession of a small amount of presumed marijuana, determined that there was no probable cause

---

[3] Unless otherwise noted, all "¶" references are to the First Amended Complaint.

to believe that she had committed any other crimes, and decided that she was a good mother, the children were safe with her, and there was no indication of abuse or neglect of the children (*see* ¶¶ 152, 158, 161, 166-167). Accordingly, by about 11:42 a.m., Basaldua and Clark stated that their plan was to "let her go" (meaning not custodially arrest Ms. Clayborne) so that she and the children could stay together – and so that DCS would ***not*** be involved. (¶¶ 162 and 165.) Indeed, once the Troopers cited Clayborne and chose not to arrest her, she and her children should have been free to leave per T.C.A. § 40-7-118(e)(1)(C) ("In issuing a citation, the officer shall . . . (C) Release the cited person from custody.").) (¶ 169.)

However, even though the purpose of the stop had concluded and the family should have been free to leave, the Troopers kept the family in custody anyway. They did so for two reasons. First, Trooper Clark mistakenly believed that Clayborne had not yet received a citation. (¶ 172.) Second, the Troopers concluded (incorrectly) that they had to bring Clayborne to the jail for DCS to determine if the five small children should be taken from their mother and placed into DCS custody. (¶ 180.) In light of those (incorrect) determinations, Clark said "then let's get her down to the jail" (¶ 188), told Basaldua that Clayborne had to follow the Troopers to the jail because of DCS (¶ 190), told Basaldua "I'll have her follow me" (¶ 191), approached Clayborne (who was sitting in the vehicle with her children) and told her "Just follow me down to the jail" (¶ 192), told her that she had to complete additional paperwork at the jail (including the citation that Clark did not realize she had already received) (¶ 193), and then told Trooper Thompson that "we're moving down to the jail." (¶ 196.) During this time, there were four patrol vehicles within feet of Clayborne's car (¶ 194), four Troopers present in full uniform (including a weapon, baton, handcuffs, and pepper spray) (¶¶ 194-195), and at least one vehicle that kept its lights flashing the entire time. (¶ 197.) At no point did anyone tell Clayborne that she and her children were free to

leave. (¶ 198.) Trooper Clark left and Clayborne followed him – while at least one patrol vehicle still had its lights flashing. (¶¶ 201-202).[4] Foster and Thompson then left as well, traveling in their patrol SUVs behind Clayborne's vehicle. (¶ 203.)

At the jail, Trooper Clark parked just across the entrance to the jail, Clayborne drove up behind him as instructed, and Clark directed her to park in a handicap spot next to his car just across from the entrance to the jail (which she did) (¶¶ 208-209). Clark told her to keep the car running (which she did) (¶¶ 210-211) and began taking pictures of the vehicle while she and the children remained inside the parked vehicle across from the jail entrance (¶ 215).

Clark then spoke with two DCS workers who approached him, telling them (in substance) that Ms. Clayborne was a good mother, the family should stay together, and he saw no reason for DCS to be involved at all (¶¶ 216-229). But after the DCS workers insisted that they had to speak with Clayborne and the children, Clark yielded and said that it would be best to do that questioning in the car. (¶ 229.) Clark approached the car to ask whether Clayborne had received the citation and she said yes. (¶ 236). He then told her that a DCS worker was going to have a chat with her "because we're [the THP Troopers] required to call them" (¶¶ 237-238), and reiterated that "she [the DCS worker] is going to talk to you." (¶ 239.) Clark then asked if Clayborne had any issue with someone from DCS sitting in her to do the questioning. Clayborne responded that there was nowhere to sit (*i.e.*, she resisted the request to have DCS interrogate her in the vehicle). Then (overriding that resistance) Clark stated that "[w]e'll move stuff around," directed Clayborne to

---

[4] In the midst of this, Mr. Williams (the children's father) complained (correctly) to Basaldua about the unfairness of his arrest and Ms. Clayborne's continued detention. In response, Basaldua retaliated, telling Williams: "Man, you want to be quiet? Because ***I could take her to jail and get the kids in DCS*** . . . So you need to be quiet, okay? Because you want her to go to jail too, if you keep your mouth up, all right?" (FAC ¶¶ 173-178 (emphasis added).)

unlock her door (which she did), manipulated items in the front seat to clear it out so that the DCS worker could conduct the interrogation in the car, and left the door open (in the freezing cold) to speak with the DCS worker. (¶¶ 240-248). During this entire encounter, Clayborne and her children were boxed in on all sides: a cement pole (where Clark had directed her to park) blocked the front of the car; Clark's marked patrol vehicle was parked on the driver's side; a UPS truck was parked the passenger side; and just a few feet behind the car in the middle of the driving lane, Foster and Thompson were standing in full uniform with Thompson's hand resting on the top of his holstered gun. (¶ 250.) Under the circumstances, Clayborne reasonably believed that she and her children were not free to leave. (¶ 251.)

Clark then returned to Clayborne's car (where the door was still wide open as Clark had left it) and told her that a DCS worker would be back out in a minute. (¶ 252.) Clark closed the passenger door and pivoted back to the jail, from which a DCS case worker (Taylor) was approaching. (¶ 253.) At this point, Troopers Foster and Thompson were still standing behind Clayborne's car – and Thompson still had his hand resting on his holstered gun. (¶ 254.) A DCS worker (Taylor) approached Clark and told him that "I'll talk to mom," at which point Taylor approached the car to begin the interrogation, and Foster, Clark, and Thompson convened (all in full uniform and with Thompson's hand still resting on his gun) while Taylor entered the car and began questioning the family. (¶¶ 255-258).

## II. The Family's Claims

Ms. Clayborne and her children have asserted claims against the Troopers for (1) unlawful search and seizure under the Fourth Amendment (Count I) and corollary state law claims for false imprisonment (Count II); and (2) violation of the family's right to substantive due process (Count VI). In substance, the unlawful search and seizure claims are based on the Troopers continuing to

5

detain Ms. Clayborne and the children after they should have been free to leave at the gas station. The substantive due process claims are based on the Troopers taking actions (and, in Basaldua's case, making an express statement to one of the parents) directed at separating the family unit.

## PLAINTIFFS PLEAD VIABLE CLAIMS

Fed. R. Civ. P. 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face.[5] A motion to dismiss under Rule 12(b)(6) requires the Court to construe the complaint in the light most favorable to the plaintiff, accept its well-pleaded allegations as true, and draw all reasonable inferences in favor of the plaintiff.[6]

**I.**     **Plaintiffs Have Pleaded Fourth Amendment Claims Against the THP Troopers**

### A. The Fourth Amendment Standard

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. A violation occurs where (1) a person is seized; and (2) the seizure is unreasonable.[7]

**Seizure**: A seizure can take the form of physical force or a show of authority that in some way restrains the liberty of the person.[8] Additionally, the person must actually yield to the show

---

[5] *Penney v. Heatec, Inc.*, 2024 WL 4350786, at *2 (E.D. Tenn. Sept. 24, 2024) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[6] *Penney*, 2024 WL 4350786, at *2 (citing *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016)).

[7] *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989) ("'Seizure' alone is not enough for § 1983 liability; the seizure must also be 'unreasonable'.").

[8] *Torres v. Madrid*, 592 U.S. 989, 995 (2021); *see also United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004); *see also L.V. by and through Vanderhoef v. City of Maryville*, 2017 WL 5490917, at *5 (E.D. Tenn. Nov. 15, 2017) ("Generally, a seizure occurs in one of two ways: (1) through the use of physical force by the officer; or (2) through a show of authority by the officer, in which the subject actually submits.").

of authority to be seized within the meaning of the Fourth Amendment.[9]

A person has been seized if, in view of the all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.[10] "Examples of circumstances that might indicate a seizure by a show of authority would be the threatening presence of several officers, the display of a weapon by the officer, . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."[11] Flashing blue lights alone can constitute a seizure.[12] Also, as explained in *United States v. Richardson*, 385 F.3d 625, 629-630 (6th Cir. 2004), "words alone may be enough to make a reasonable person feel that he would not be free to leave." For example, in *Richardson*, a traffic stop concluded when the officer handed the defendant a citation and shook his hand, but then the officer said to the defendant: "Okay, just hang out right here for me, okay?"[13] The Sixth Circuit held that, even though the officer did not exhibit an "intimidating demeanor or use coercive language," "his words alone were enough to make a reasonable person in Collier's shoes feel that he would not be free to walk away and ignore [the officer's] request."[14] The Sixth Circuit also found that the passengers in the car were also seized through these words, because "[w]hen the driver is not free to leave, neither are his passengers; instead, the passengers are at the mercy of any police officer who is withholding the return of their driver."[15]

---

[9] *United States v. Johnson*, 620 F.3d 685, 690-691 (6th Cir. 2010).

[10] *Wilson v. Wilkins*, 362 F. App'x 440, 444 (6th Cir. 2010) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (2010)).

[11] *Mendenhall*, 446 U.S. at 544.

[12] *See State v. Williams*, 185 S.W.3d 311, 316-18 (Tenn. 2006) ("Few, if any, reasonable citizens, while parked, would simply drive away and assume that the police, in turning on the emergency flashers, would be communicating something than for them to remain.") (quoting *Hammons v. State*, 940 S.W.2d 424, 428 (Ark. 1997)).

[13] *Richardson*, 385 F.3d at 630.

[14] 385 F.3d at 630.

[15] *Id.* (citing *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990)).

7

***Reasonableness for an Extended Stop***: "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot."[16] The duration of the stop "is determined by the seizure's mission – which should be to address the traffic violation that warranted the stop and to attend to safety related concerns."[17] Accordingly, "[t]he law is clear: to detain a motorist any longer than is reasonably necessary to issue a citation, the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct; without that, all of the officers' actions must be reasonably related to circumstances justifying the original interference."[18] Holding a person past that point is unlawful.[19]

### B. Plaintiffs Sufficiently Plead the Elements of a Fourth Amendment Violation

Plaintiffs have adequately pleaded a Fourth Amendment violation. Count I of the FAC alleges the elements of a Fourth Amendment claim and how they are satisfied here (¶¶ 630-648).

Specifically, Plaintiffs plead (with ample supporting facts) that the Troopers continued to detain Ms. Clayborne and her children even after the purpose of the stop had been completed – and even after Trooper Clark specifically intended for the stop to end and the family be "let go." Plaintiffs plead that the Troopers detained the family after that point through shows of authority at the gas station and at the jail. At this stage, drawing all inferences in Plaintiffs' favor and

---

[16] *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).

[17] *United States v. Arrington*, 440 F. Supp. 3d 719, 726–27 (E.D. Mich. 2020) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

[18] *Arrington*, 440 F. Supp. 3d at 726-27 (citing *Hill*, 195 F.3d at 264, and *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002)); *see also United States v. Page*, 154 F. Supp. 2d 1320, 1328 (M.D. Tenn. 2001) (finding that, "because the purposes of the initial stop were concluded, and the officers lacked any reasonable suspicion of criminal activity at the time of the drug sniff, defendant's continued detention and drug sniff were unreasonable for purposes of the Fourth Amendment").

[19] *United States v. Stepp*, 680 F.3d 651, 662-64 (6th Cir. 2012).

construing all facts in the light most favorable to Plaintiffs, Plaintiffs have pleaded facts from which it was objectively reasonable for Ms. Clayborne to believe that she and her family were not free to leave (and therefore seized). Plaintiffs also plead facts that, construed in the light most favorable to them, indicate the Troopers' continued detention was unreasonable because the purpose of stop was over and all safety concerns had been resolved. This more than satisfies Plaintiffs' pleading burden.

At Page 14, the Troopers assert that the children were not seized because there was "no reasonable alternative to the children remaining with their parents." (D.E. 130 at 14.) They provide no legal authority for this conclusory assertion. To the contrary, as explained in *Richardson*, when someone seizes a driver (here, Clayborne) the passengers are also seized.[20] Other than that, the THP Defendants do not dispute that the face of the FAC alleges a viable Fourth Amendment claim.[21]

## II. Plaintiffs Have Pleaded Viable False Arrest and False Imprisonment Claims

The parties here agree that, to show a Tennessee law claim for false imprisonment,

---

[20] *Richardson*, 385 F.3d at 630.

[21] The THP Defendants also reference THP General Order 524-1 (D.E. 129-1) for the proposition that the Troopers were required to do a welfare check at the time that they initially chose (in violation of Tennessee law) to custodially arrest Ms. Clayborne in addition to arresting Mr. Williams. (D.E. 130 at 4.) This document is outside the pleadings and should not be considered. Regardless, it does not help the THP Defendants' case – it refutes it. Section V.I of the General Order contains provisions dealing with a situation in which, as a consequence of custodially arresting a parent, a minor would be left unaccompanied. In that circumstance, the Order directs a Trooper to evaluate whether the minor could care for themselves (say, 17 year old who could drive herself home) or not (like a three year old), and then to contact someone (a relative, a state agency, another law enforcement official, etc.) to check on the unaccompanied minor's welfare and look after them temporarily. It does not require anyone to call DCS specifically. And it expressly applies only where the child would not have a parent who could care for them. But that was not the case here. Once the Troopers decided only to cite Ms. Clayborne in lieu of arrest, there **was** a parent (Ms. Clayborne) who could continue to watch after her children – and the General Order did not apply. The General Order corroborates Plaintiffs' allegations.

Plaintiffs must prove (1) a detention or restraint against their will; and (2) the unlawfulness of such detention or restraint.[22] The FAC pleads both elements with supporting facts. (*See* ¶¶ 649-663; *see also* ¶¶ 55-260.) And these elements largely parallel the Fourth Amendment standard: a restraint includes an "assertion of authority,"[23] and "unlawfulness" includes a lack of probable cause.[24] Accordingly, for substantially the same reasons as the Fourth Amendment claim, Plaintiffs have met their pleading burden by alleging facts showing that the officers unlawfully continued to detain them after the purpose of the stop had ended and they should have been free to leave.[25]

THP Defendants assert that this claim fails because they had probable cause to arrest Ms. Clayborne for simple possession of marijuana. But even if true, that is beside the point. The question is whether, ***after*** citing her and addressing all safety issues, the THP Defendants had probable cause to keep detaining for ***some other crime***. They did not. The THP Defendants otherwise do not dispute that the FAC allegations are facially sufficient as to Count II.

### III.    Plaintiffs Have Pleaded Viable Substantive Due Process Claims

Parents and children have a constitutional right to family integrity and family association without interference from the state.[26] This includes the right to the "companionship, care, custody and nurture of [their] children.[27] The Sixth Circuit held in *Schulkers v. Kammer* that these rights are clearly established.[28] To be liable for violating these rights, the public official must have "acted

---

[22] *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990).

[23] *See v. Thalhimer Bros., Inc.*, 901 S.W.2d 365, 368 (Tenn. Ct. App. 1994); *see also Gordon v. Tractor Supply Co.*, 2016 WL 3349024, at *13 (Tenn. Ct. App. June 8, 2016).

[24] *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 54 (Tenn. Ct. App. 2013).

[25] Indeed, under T.C.A. § 40-7-118(e)(1)(C), the officers were ***required*** to release her from custody after issuing the citation. ("In issuing a citation, the officer shall . . . (C) Release the cited person from custody.").)

[26] *Peach v. Hagerman*, 675 F. Supp. 3d 755 (W.D. Ky. 2023)

[27] *Id.* (citing *Schulkers v. Kemmer*, 955 F.3d 520, 540 (6th Cir. 2020).

[28] *Schulkers*, 955 F.3d at 540.

with a culpable state of mind directed at the plaintiff's family relationship or a decision traditionally reserved within the ambit of the family.[29]

Here, Plaintiffs allege that, with a culpable state of mind, the Troopers took multiple actions that illegally would separate Clayborne from her children without probable cause, including arresting her for simple possession in retaliation for exercising her *Miranda* rights, using the threat of taking her children away to force her into allowing a further search of the car and answer additional questions, illegally continuing to detain her family to deliver them to DCS at the jail, and (as to Basaldua) expressly threatening Mr. Williams that if Williams did not "shut your mouth" the Trooper would make sure that DCS would take the children away from both parents. (¶ 742.)

The Troopers contend that allegations do not state a claim for a few reasons, none of which are valid. First, they assert that "the videos establish that Ms. Clayborne and her children were not kept in custody so they could be delivered to DCS." (D.E. 130 at 17.) But that assertion flatly contradicts Plaintiffs' well-pleaded allegations, which the Troopers (implicitly) acknowledge meets the Rule 8 pleading standard. And even if the videos were considered (which they should not be for the reasons explained below), the videos do not conclusively establish that the officers did not detain Ms. Clayborne and the children to meet with DCS. Instead, the show the exact opposite (*i.e.*, they corroborate Plaintiffs' allegations).

Second, the Troopers cite *Ivey v. Wilson* for the proposition that any verbal threats by the officers (including Basaldua's) are not actionable because "verbal harassment and threats are insufficient to state a civil rights claims under § 1983." But *Ivey* does not stand for that proposition. There, the sole finding was that the verbal abuse and harassment that a prisoner suffered was

---

[29] *Chambers v. Sanders*, 63 F.4th 1092, 1100 (6th Cir. 2023).

insufficient to constitute "cruel and unusual punishment" under the Eighth Amendment.[30] Here, because Plaintiffs are not alleging Eighth Amendment claims, *Ivey* has no application. Regardless, the substantive due process claims premised on verbal harassment standing alone. Instead, Plaintiffs allege that the officers took actions that (collectively) meet the substantive due process standard, including over-detaining the family, making illegal threats to coerce Ms. Clayborne, and expressly making a retaliatory threat about taking her children away that reflected unlawful animus directed at breaking up her family.

Third, THP Defendants assert that Plaintiffs' claims only can be asserted under the Fourth Amendment. But THP Defendants are trying to have it both ways, contending for Fourth Amendment purposes that there was no violation because Plaintiffs were ***not seized*** in the first place (*i.e.*, that the Fourth Amendment is not even implicated), but then simultaneously arguing that the substantive due process claim should be dismissed in favor of the Fourth Amendment. It is also premature: at the motion to dismiss stage, a court can permit constitutional claims to proceed together, reserving for a later stage (and a developed record) whether the claims should proceed concurrently to trial.[31] Regardless, the Fourth Amendment and substantive due process are analytically distinct and accordingly can proceed together at this stage.[32]

## IV.  Defendants Have Not Shown that Plaintiffs' Allegations Necessarily Entitle Defendants to Qualified Immunity.

"[I]t is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on

---

[30] 832 F.2d 950 at 953-56.

[31] *See, e.g.*, *Hagerman*, 675 F. Supp. 3d at 777 (denying motion to dismiss Fourth Amendment and substantive due process claims).

[32] *See Kanuszewski v. Mich. Dep't. of Health & Human Servs.*, 927 F.3d 396, 414 n.9 (6th Cir. 2019); *Barrett v. Outlet Broadcasting, Inc.*, 22 F. Supp. 2d 726, 744 (S.D. Ohio 1997) (finding that, where plaintiff alleged conduct distinct from the Fourth Amendment claim, the substantive due process claim was not "preempted" by the Fourth Amendment claim).

the basis of qualified immunity."[33] As explained by the Sixth Circuit in *Marvaso v. Sanchez*, a plaintiff's burden at the motion to dismiss stage to overcome a qualified immunity challenge "is a low bar, given that granting qualified immunity at the motion to dismiss stage is usually disfavored."[34] The Sixth Circuit therefore "generally denies qualified immunity at the motion to dismiss stage in order for the case to proceed to discovery, so long as the plaintiff states a plausible claim for relief."[35] Notwithstanding this standard, the THP Defendants assert that they are entitled to qualified immunity at the Rule 12 stage. They are not.

First, the THP Defendants assert that they did not violate Plaintiffs' rights in the first place. (D.E. 130 at 18.) To the contrary, as discussed above, Plaintiffs have pleaded constitutional violations. Second, the THP Defendants assert that "there was no clear legal precedent that would have put them on notice that their actions were unlawful." (D.E. 130 at 18.) They cite no legal authority for this assertion. Instead, their only support is a statement by Foster (captured on the video) that the incident involved a "different, unique situation." But there is nothing unique about the Fourth Amendment. As discussed above, once the purpose of a traffic stop ends and any attendant safety concerns are resolved, it is unlawful to keep detaining the person without

---

[33] *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015); *see also Hart v. Hillsdale Cnty., Mich.*, 973 F.3d 627, 635 (6th Cir. 2020) (same); *Marvaso v. Sanchez*, 971 F.3d 599, 605–06 (6th Cir. 2020) (same); *Courtright v. City of Battle Creek*, 839 F.3d 513 (6th Cir. 2016) (same); *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019); *see also Peach v. Hagerman*, 675 F. Supp. 3d 755, 768 (W.D. Ky. 2023) ("The Sixth Circuit has noted that it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity, because even though a an officer's or social worker's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, this is typically done at the summary judgment phase and not by dismissal under Rule 12.") (cleaned up).
[34] *Marvaso*, 971 F.3d at 605–06.
[35] *Id.* (emphasis added); *see also Colson v. City of Alcoa*, 2017 WL 3452353, at *5 (E.D. Tenn. Aug. 10, 2017) ("[T]he qualified immunity defense involves a fact-intensive analysis, and because of its fact-intensive nature, it is typically unsuitable for deliberation at the pleading stage.").

establishing further probable cause to do so.[36] At any rate, at this stage, the THP Defendants have not shown that they are entitled to qualified immunity at the pleading stage.

## THP'S MOTION IS PROCEDURALLY IMPROPER

The THP Defendants do not meaningfully contest that, applying the Rule 12 standard to the FAC, Plaintiffs allege viable claims. Instead, the THP Defendants seek dismissal based on materials outside the FAC, including supposed "facts" drawn from 7.5 hours of self-selected video from the traffic stop. The THP Defendants cherry pick items from these videos, characterize them, draw inferences in their own favor, and essentially urge the Court to disregard Plaintiffs' allegations wholesale. This violates the Rule 12 standard.

### I. Video Footage Can Be Considered at Rule 12 Only in the Very Narrow Circumstance that the Video "Blatantly Contradicts" or "Utterly Discredits" Plaintiff's Allegations.

Normally, at the Rule 12 stage, the Court does not consider materials outside the Complaint. However, the Sixth Circuit has articulated a limited exception to that rule for video testimony that shows a "visible fiction" in a plaintiff's complaint.[37] As recently explained by another Judge of this Court in *Hux v. Williams*:

> At the motion to dismiss stage, if there is a factual dispute between the parties, the Court can only rely on the video over the complaint to the degree the video is clear and ***blatantly contradicts or utterly discredits*** the plaintiff's version of events. ***Unless the video blatantly contradicts or utterly discredits Plaintiff's version of the events***, the Court must accept Plaintiff's version as true. The Court must view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff.[38]

Where this limited exception may be implicated, courts apply it carefully to specific challenged

---

[36] *United States v. Hill*, 195 F.3d at 264; *Arrington*, 440 F. Supp. 3d at 726-27; *Stepp*, 680 F.3d at 662-64.

[37] *See Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017); *see also Osberry v. Slusher*, 750 F. App'x 385, 390-391 (6th Cir. 2018).

[38] *Hux v. Williams*, 751 F. Supp. 3d 885, 890 (E.D. Tenn. 2024) (cleaned up) (emphases added).

allegations.[39] Accordingly, this limited exception does not swallow Rule 12. For example, it does not apply where (1) the evidence captures only part of the incident and would provide a distorted view of the events at issue,[40] or (2) a reasonable person could draw different conclusions from the footage.[41] In *Osberry v. Slusher*, the Sixth Circuit explained the limits:

> [T]he video can change our analysis but does not do so here. At the stage of the litigation, our decision rests primarily upon the allegations of the complaint. But we have allowed the use of a video when deciding a Rule 12 motion to dismiss if the video utterly discredits the plaintiff's version of events. If no reasonable jury could watch the video and agree with the plaintiff, the video allows us to ignore the visible fiction in his complaint. . . .
>
> Here, our review of the video tracks the district court's finding that the video does not so blatantly and conclusively contradict the allegations in the complaint that no reasonable jury could find in [plaintiff's'] favor. . . . In sum, at this stage, we can rely on the well-pleaded allegations in the complaint and leave further evaluation of the video to either the district court at summary judgment or a jury at trial. This is consistent with our previous warnings that it is generally inappropriate for a district court grant a Rule 12(b)(6) motion to dismiss on the basis of qualified immunity. Instead, we clarified that although an officer's earliest entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12. This is especially true where . . . the fact-intensive nature of applicable tests make it difficult for a defendant to claim qualified immunity on the pleadings before discovery.[42]

## II.    The 7.5 Hours of Footage Introduced by THP Defendants Goes Far Beyond What the Limited Exception Contemplates.

### A.  The Footage is Self-Selected and Incomplete

Four Troopers participated in the traffic stop on February 17, 2023. It began at about 9:38

---

[39] *See, e.g.*, *Hux*, 751 F. Supp. 3d at 893-894 (declining to rely on video where it did not "blatantly contradict" plaintiff's allegation that the purple color of his hair was visible to the defendant, but relying on the video where, contrary to plaintiff's allegation, it "clearly shows Plaintiff ran from Defendant after Defendant began running toward him").

[40] *Jones v. City of Cincinnati*, 521 F.3d 555, 561–62 (6th Cir. 2008).

[41] *Thomas v. Noder-Love*, 621 F. App'x 825, 829–30 (6th Cir. 2015) (finding that it was inappropriate for the trial court to determine a man on a video resembled a man in a booking photo because a "reasonable jury could find that the two men did not look similar"); *Harcz v. Boucher*, 763 F. App'x 536, 544-45 (6th Cir. 2019) (reversing district court dismissal of plaintiff's claims based on video footage that did not "conclusively rebut" the plaintiff's contention that he did not threaten violence or pose a risk of harm, because "[w]ith more than one reasonable determination possible, the probable cause finding should not occur at the pleading stage").

[42] *Id.* at 390-391 (cleaned up) (ellipses added).

a.m. The last interaction captured between the Troopers, DCS, and the family at the jail was at 12:14 p.m. In discovery, they produced 13 videos totaling about 17 hours of footage. Of the 13 videos, THP Defendants attached to their Motion only a subset of 6 videos totaling 7.5 hours of footage (without transcripts). The footage as a whole was materially incomplete – as is the footage THP filed here. This was because the officers on the scene selectively chose ***not*** to record certain things. For example, The Troopers produced five Foster bodycam videos totaling just 85 minutes of the 2.5-hour encounter (*i.e.*, about half). As captured on Foster Body Cam 3 (which THP chose not to include with their Motion), Foster's supervisor Sergeant Edgar Perry calls him at 10:45 a.m. to discuss what course of action to take. Just a few seconds into that discussion, the video cuts off mid-conversation. Everything they talked about after that is (intentionally) missing. Similarly, Basaldua's bodycam (which THP produced as Exhibit 2 to its Motion), Basaldua calls Sergeant Perry at 10:09 a.m. in Foster's presence to discuss what to do. Just as the call is made, Basaldua cuts off the audio for the next 13 minutes while he speaks to Perry on speakerphone, only to resume audio after that discussion concludes. (Ex. 2 at time stamp 30:15 to 43:43.)[43] Foster's video was off this whole time too.[44] These are just two examples of why the videos introduced by the THP Defendants do not contain a complete recording of everything that was said and done at the scene. Instead, they contain only the bodycam footage (and associated discussions) that the Troopers selectively chose to record and omit the portions that they purposely chose not to record. Under the circumstances, the THP Defendants cannot fairly use the videos to draw inferences in their

---

[43] At 43:42, the camera captures Basaldua pressing a button on his bodycam to resume the audio feed after the call concludes.

[44] THP Defendants introduced Foster Body Cam 1 as Exhibit 3 and Foster Body Cam 2 as Exhibit 7. Foster Body Cam 1 stops at about 10:00 am. Foster Body Cam 2 starts at about 10:22 a.m. (with Foster visibly touching the button to turn his camera back on). He intentionally did not record the entire 22 minutes in between – including the entire discussion with Basaldua and Perry on speakerphone.

own favor. To the contrary, even if the Court considers the videos, the Court must view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiffs.[45]

## B.  The THP Defendants' Reliance on these Videos is Improper

The presentation by the THP Defendants has all the hallmarks of a situation in which the video should not be considered. First, the subset of videos produced do not provide a complete picture of what happened and what was said. Second, the facts here (and what inferences to draw from them) are highly disputed. Third, regardless, the Motion does not establish that the videos "blatantly contradict" or "utterly discredit" *anything* in Plaintiffs' FAC (let alone anything material). Instead, the brief mischaracterizes what Plaintiffs allege, offers a wholesale counter-narrative that cherry picks portions of the videos (which do not capture everything that was said), characterizes events in ways that the videos do not support (or at most are susceptible to differing interpretations), and urges the Court to draw inferences in the THP Defendants' favor on highly disputed facts. At times, it is not even clear exactly which allegations the THP Defendants are asserting that the video conclusively shows are a "visible fiction." And in other instances, the THP Defendants seem to misapprehend the relevant Fourth Amendment standards. Moreover, it is unclear which asserted "facts" (including, for example, self-serving hearsay by the Troopers) would even be admissible.

To take just one example, at Page 11, the THP Defendants state as follows:

And the facts established by the video show that Ms. Clayborne's allegations are untrue. After telling Ms. Clayborne that she would be getting a citation instead of going to jail, the THP Defendants left her alone and unrestrained with her children. She had freedom of movement and drove her own car with only her children inside. No use or show of force was employed.

The brief does not identify which allegations the "facts" in the video establish are "untrue." And

---

[45] *Hux*, 751 F. Supp. 3d at 890.

the assertions that Ms. Clayborne had "freedom of movement" and was "unrestrained with her children" are, at best, entirely self-serving characterizations of counsel that do not "blatantly contradict" anything Ms. Clayborne alleges. Ultimately, the question is not whether Ms. Clayborne had been placed in physical restraints (she had not been) or whether it was physically possible (at least for a few seconds) for her to try to escape by speeding past four parked patrol cars (including one with its lights flashing) and four armed patrol officers who had been questioning her, searching her vehicle, and detaining her husband in the back of a patrol car for over two hours. The question is whether a reasonable person would, in view of all the circumstances, have believed that she was not free to leave.[46] Is THP really asking this Court to hold, as a matter of law, that Ms. Clayborne could not reasonably have concluded that she was not free to leave at the gas station? If anything, the videos demonstrate as a matter of law that Ms. Clayborne was ***not*** free to leave.

Similarly, the THP Defendants assert that they did not detain Ms. Clayborne after she left the gas station. They claim that all of Clayborne's allegations "attempt to paint the THP Defendants in the light of overbearing law enforcement officers controlling Ms. Clayborne's every move are discredited by the videos." They contend that Clayborne's vehicle was not "purposefully boxed in" by the Troopers, that the Troopers "cannot be accused of controlling" the UPS truck to the right of Ms. Clayborne's car, that "it is clear from the video that" Foster and Thompson were "just waiting for Trooper Clark to go lunch, not detaining Ms. Clayborne or her children," and that although Thompson's hand was resting on his gun right behind her car it does not matter because "there was no sign he was doing anything other than resting his arm." (D.E. 130 at 11-12.) None of this comports with the Rule 12 standard, the limited video exception, or the legal test. Plaintiffs

---

[46] *Wilson v. Wilkins*, 362 F. App'x 440, 444 (6th Cir. 2010) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (2010)).

do not need to prove that the THP Defendants "controlled her every move" or that every officer at the scene subjectively intended to keep detaining her there – assertions for which the THP Defendants provide no legal support. Instead, the question is simply whether, drawing all reasonable inferences in her favor (from the allegations and, if warranted, from the video footage) a reasonable person in her position would not have felt free to leave.[47] That standard is met here. And as with the continued detention at the gas station, if anything the video proves as a matter of law Clayborne was **not** free to leave at the jail either.

### III.      Considering the Videos Would be Unduly Prejudicial to Plaintiffs

The manner in which the THP Defendants have introduced this large volume of video material is also unduly prejudicial to Plaintiffs because it skirts all the procedural protections of Rule 56. In filing a Rule 56 motion in this Court, the moving party must include an accompanying statement of facts with specific citations to the record, substantiated by evidence that could be presented in admissible format at trial.[48] This gives the responding party the chance to (a) identify whether the fact is disputed and (if warranted) introduce evidence showing the genuine dispute; (b) state whether the fact is actually supported by the cited evidence; (c) challenge whether the fact is material; and (d) challenge whether the evidence could be presented in admissible form at trial (or not).[49] Here, by introducing 7.5 hours of self-selected, incomplete videos into the record and making various assertions in its brief about supposed "facts," THP Defendants have deprived Plaintiffs of any coherent way to challenge (or for the Court to evaluate) the assertions that the THP Defendants are making. Indeed, in addition to deficiencies in how the THP Defendants have

---

[47] *Id.*
[48] *See* Judicial Preferences for Judge Clifton L. Corker, No. 6 ("Special Instructions for Summary Judgment Motions"); Fed. R. Civ. P. 56(c).
[49] *Id.*

characterized the video evidence, there is also other evidence (including deposition testimony) that Plaintiffs would introduce to rebut what the THP Defendants are asserting here.[50]

This is all a bridge too far for a Rule 12 motion. Plaintiffs submit that the best approach would be to deny the THP Defendants' Rule 12 motion without prejudice to THP Defendants filing a Rule 56 motion at an appropriate stage.[51]

## **CONCLUSION**

Plaintiffs' FAC pleads viable claims against the THP Troopers. The Troopers do not dispute that. Instead, they argue that materials outside the FAC – including a THP General Order and a selected set of videos that already contain only self-selected portions of what happened – somehow entitle to them to dismissal at the pleading stage. Their introduction of this evidence far exceeds the narrowly drawn circumstances in which a court may consider materials outside the pleadings. Regardless, the videos do not "blatantly contradict" anything in Plaintiffs' FAC. Instead, they reinforce the allegations. The THP Defendants' attempt to create a factual counter-narrative – including by repeatedly attempting to draw inferences in its own favor – is not appropriate at this stage. Plaintiffs respectfully urge the Court to deny the Motion to Dismiss.

---

[50] For example, at his deposition, Foster admitted that, at the time the Troopers had decided to issue Ms. Clayborne a citation in lieu of arrest, THP General Order 524-1 did ***not*** (even on its terms) require the Troopers to involve DCS.

[51] A court can convert a Rule 12 motion into a Rule 56 motion. (Fed. R. Civ. 12(d).) However, here, discovery is still ongoing. Under the circumstances, Plaintiffs urge the Court to deny the Rule 12 and let THP Defendants file a Rule 56 motion at an appropriate time.

Dated: May 19, 2025                    Respectfully submitted,

                                       /s/ Tricia R. Herzfeld
                                       Tricia R. Herzfeld (#26014)
                                       Anthony A. Orlandi (#33988)
                                       Benjamin A. Gastel (#28699)
                                       Jeff Preptit (#38451)
                                       **HERZFELD SUETHOLZ GASTEL LENISKI
                                       AND WALL, PLLC**
                                       1920 Adelicia St., Suite 300
                                       Nashville, TN 37212
                                       Telephone: (615) 800-6225
                                       tricia@hsglawgroup.com
                                       tony@hsglawgroup.com
                                       ben@hsglawgroup.com
                                       jeff@hsglawgroup.com

                                       Abby R. Rubenfeld
                                       **Rubenfeld Law Office, PC**
                                       810 Dominican Drive, Ste. 215
                                       Nashville, TN 37228
                                       Telephone: (615) 386-9077
                                       arubenfeld@rubenfeldlaw.com

                                       *Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on this 19th day of May 2025 by the Court's CM/ECF system which electronically served a copy to all counsel of record:

| | |
|---|---|
| Jeffrey R Thompson<br>Gina Sarli Vogel<br>Grant A. Carringer<br>**Lewis Thomason, P.C.**<br>900 South Gay St., Ste. 300<br>P.O. Box 2425<br>Knoxville, TN 37901<br>865-546-4646<br>jrthompson@lewisthomason.com<br>gvogel@lewisthomason.com<br>GCarringer@LewisThomason.com<br><br>***Attorneys for Coffee County Tennessee and Officer Crabtree*** | Daniel J. Ripper<br>Chloe Kennedy<br>Isabella Bombassi<br>**Luther Anderson PLLP**<br>P.O. Box 151<br>Chattanooga, Tennessee 37402<br>(423) 756-5034<br>dan@lutheranderson.com<br>cek@lutheranderson.com<br>bib@lutheranderson.com<br><br>***Attorney for Katlyn Pelham*** |
| Meghan Murphy<br>Peako Jenkins<br>**Office of the Tennessee Attorney General**<br>P.O. Box 20207<br>Nashville, Tennessee 37202<br>Phone (615) 253-3890<br>meghan.murphy@ag.tn.gov<br>Peako.Jenkins@ag.tn.gov<br><br>W. Adam Izell<br>**Law Office of W. Adam Izell, PLLC**<br>P.O. Box 4386<br>Chattanooga, TN 37405<br>Telephone: (423) 888-3022<br>adam@chattlawyer.com<br><br>***Attorneys for Ruben Basaldua, Donnie Clark, Douglas Foster, and James Thompson*** | Kristin Ellis Berexa<br>Grace Patton<br>**Farrar\|Bates\|Berexa**<br>12 Cadillac Drive, Ste. 480<br>Brentwood, TN 37207<br>Telephone: (615) 254-3060<br>kberexa@fbb.law<br>gpatton@fbb.law<br><br>***Attorneys for Montana Medina*** |
| Arthur F. Knight III<br>**Law Office of Arthur F. Knight III**<br>3248 Tazewell Pike, Suite 103<br>Knoxville, TN 37918<br>P: (865) 252-0430<br>arthur@arthurfknightlaw.com | Thomas Hickey, Jr.<br>Rafael E. Camacho<br>Nicholas C. Stevens<br>**SPICER RUDSTROM PLLC**<br>537 Market St., Ste. 203<br>Chattanooga, TN 37402<br>P: 423-541-9809 |

| | |
|---|---|
| ***Attorney for Erica Wright-Gilliam*** | thickey@spicerfirm.com<br>rcamacho@spicerfirm.com<br>nstevens@spicerfirm.com<br><br>***Attorney for Kathleen Velez*** |
| E. Ashley Carter<br>Jeffrey B. Cadle<br>**Office of Tennessee Attorney General**<br>P.O. Box 20207<br>Nashville, Tennessee 37202<br>P. 615-741-7932<br>Ashley.Carter@ag.tn.gov<br>Jeffrey.cadle@ag.tn.gov<br><br>***Attorney for Dale Lynn*** | |

/s/ Tricia R. Herzfeld
Tricia R. Herzfeld