# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT WINCHESTER

| | | |
|---|---|---|
| **BIANCA CLAYBORNE, individually** | ) | |
| **and as parent and next friend of minors** | ) | |
| **J.C., D.W., L.W., A.C., and P.C.,** | ) | |
| | ) | **Case No.: 4:24-cv-00012** |
| **Plaintiff,** | ) | |
| | ) | **Judge Clifton L. Corker** |
| **v.** | ) | |
| | ) | **JURY DEMANDED** |
| **RUBEN BASALDUA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF
### MOTION FOR PARTIAL SUMMARY JUDGMENT ON FOURTH
### AMENDMENT LIABILITY AGAINST THP DEFENDANTS

On February 17, 2023, Tennessee Highway Patrol Troopers Ruben Basaldua, Donnie Clark, Douglas Foster, and James Thompson (the "THP Trooper Defendants") violated the Fourth Amendment rights of Bianca Clayborne and her five minor children. Trooper Basaldua initiated a traffic stop of Clayborne's vehicle at a gas station in Manchester, Tennessee. Troopers Clark, Foster, and Thompson responded to assist. The Troopers ultimately decided to issue a citation to Clayborne (in lieu of arrest) for misdemeanor possession of a small amount of marijuana. The purpose of the traffic stop was complete at that point. Nevertheless, without justification for any further detention, the Troopers unlawfully kept Clayborne and her children in custody anyway. They escorted Clayborne and her children over a mile from the gas station to the Coffee County Jail to have her meet with the Tennessee Department of Children's Services ("DCS"), then kept her in their custody in the jail parking lot until a DCS case worker began to interrogate her.

Under clearly established Fourth Amendment law (applied to the undisputed material facts), the THP Defendants had no lawful basis to do that. Plaintiffs respectfully seek summary judgment on liability against the THP Defendants on Plaintiffs' Fourth Amendment claim.

### FACTUAL OVERVIEW[1]

### I.    The Initial Traffic Stop on February 17, 2023

Ruben Basaldua, Donnie Clark, Douglas Foster, and James Thompson are Troopers with the Tennessee Highway Patrol ("THP") (collectively, the "THP Defendants"). (**SUMF 1**.) Plaintiffs' claims against the THP Defendants concern events on February 17, 2023. (**SUMF 2-10**.) At about 9:38 a.m. that day – while Clayborne, her five children, and their father Deonte Williams were traveling through Coffee County (with Williams driving) – Basaldua initiated a traffic stop for a potential slow poke and tint violations. (**SUMF 2-3**.) The family pulled over at a

---

[1] These facts are set forth in Plaintiffs' Statement of Undisputed Material Facts.

gas station at 9:39 a.m., then remained in the car and waited until Trooper Basaldua approached the driver's side window (**SUMF 4**.)[2] Clark and Foster responded to the scene in their patrol vehicles within two to three minutes (**SUMF 4, 6**), and Thompson also responded to the scene in his patrol vehicle at about 10:37 a.m. (**SUMF 8**.) From that point forward, there were four patrol vehicles present at the gas station along with the four Troopers (**SUMF 12**). Multiple vehicles had their lights flashing, including at least one that kept its lights flashing during the entire encounter. (**SUMF 14**.) Basaldua was in charge of the scene because he made the traffic stop (**SUMF 7**), but the Troopers worked collectively in making decisions (**SUMF 11**).

The Troopers searched Clayborne's vehicle and detained her. (**SUMF 9-10**.) They found a small amount of suspected marijuana in the car – less than 5 grams. (**SUMF 15**.) They only had probable cause to arrest or cite Clayborne for simple possession of marijuana (**SUMF 16**). They collectively chose to ***arrest*** both Willaims and Clayborne for that offense (**SUMF 18**.) They also chose to call DCS because both parents were being custodially arrested and (Clayborne and Williams were booked into the jail) neither parent would be able to care for the children (**SUMF 19-20**.) The Troopers accordingly informed Clayborne that because they were arresting her for simple possession, they would be calling DCS about her children. (**SUMF 21**). Despite Clayborne's pleas to keep her children, Foster walked away to call DCS (**SUMF 22-23**.).

## II.     <u>The Troopers Decide to Issue a Citation in Lieu of Arrest to Clayborne</u>

Foster, Clark, and Basaldua did not see any indications that Clayborne's children were suffering from abuse or neglect. (**SUMF 30-34**.) The Troopers decided to change course: in order to keep the children with Clayborne and not involve DCS, they would conduct a full search of Clayborne's car and simply issue her a citation in lieu of arrest if they did not find anything illegal

---

[2] The family made no effort to speed away, escape, or outrun Basaldua. (**SUMF 5**.)

in her car. (**SUMF 24-27**.)[3] While Clayborne and her children waited inside the gas station convenience store, the Troopers searched the car and found nothing illegal. (**SUMF 28-29**.)

Accordingly, at about 11:42 a.m., Basaldua and Clark spoke and agreed that Basaldua would write Clayborne a citation and that, once she received it, the Troopers would "let her go" with her children. (**SUMF 35-36**.)[4] At the gas station, Basaldua issued Clayborne the citation (in lieu of arrest) for simple possession of a small amount of marijuana. (**SUMF 38-39**.) At that point, the reason for the original stop concluded (**SUMF 41**) and (once their car was ready with the belongings restored) Clayborne should have been free to leave (**SUMF 40**.) At 11:59 a.m., Clark finished helping Clayborne load the children and car seats back into the family's car. (**SUMF 42**.)

### III. <u>Just as Clayborne is About to be Released, Foster Incorrectly Asserts that THP Policy Requires Clayborne to Meet with DCS.</u>

Just as it appeared that the Troopers were about to let Clayborne and her children go, things suddenly changed. Speaking just outside Clayborne's driver's side window, Foster and Clark began discussing whether Clayborne needed to talk to DCS at the jail. (**SUMF 43**.) Clark suggested that because Clayborne would be cited rather than arrested, the Troopers should not be involving DCS at that point. (**SUMF 46**.) However, Trooper Foster told Clark that he (Clark) was incorrect and that, to the contrary, a THP "General Order" required the Troopers to notify DCS and that Clayborne needed to speak with DCS. (**SUMF 47**.) Specifically, Foster told Clark that because the Troopers had issued Clayborne a citation for "charges like that" (referring to simple possession of marijuana) and "there were children in the car," a THP "General Order" required the Troopers to notify DCS and that Clayborne "still needs to talk to them" (referring to DCS). (**SUMF 47-48**.)

---

[3] Clark initially proposed this plan to his supervisor and then got assent from the other Troopers to implement it. (**SUMF 24-26**.)

[4] Clark (who had been interacting with and observing Clayborne and her children by about two hours at that point), believed it was best for the children to stay with their mother. (**SUMF 37**.)

Foster believed that DCS needed to communicate with Ms. Clayborne (**SUMF 49**.) Clark understood Foster to be saying that even Clayborne only been cited for simple possession (as opposed to being physically arrested and taken into custody to be booked at the jail), Clayborne and her family still had to speak with DCS at the jail. (**SUMF 50**.)

Foster was referring to THP General Order 524-1. (**SUMF 51**.) His statement about this internal THP guidance document was incorrect (**SUMF 58**).[5] Clark did not even know what order Foster was talking about (**SUMF 59**). Nevertheless, Clark and Foster did not review the document to see what it actually said, nor did they contact a supervisor to determine which one of them (Clark or Foster) was correct (**SUMF 60-62**).[6] Instead, in response to Foster's assertion that THP policy still required Clayborne to meet with DCS at the jail even though her children were ***not*** being left unattended, Clark stated: "Well, then let's just get her down to the jail" (referring to Clayborne). (**SUMF 48** and **63** (emphasis added).) At the time they were having this discussion, Clark and Foster were standing next to Clayborne's driver's side window, Clark's vehicle was parked just across the pump from Clayborne with its lights flashing, Foster's vehicle was parked perpendicular to Clark's front bumper with its lights flashing, and Basaldua's vehicle was parked angled towards the front of Clayborne's car with its lights flashing, as shown here:

---

[5] GO 524-1 applies when (a) a child will be left unattended due to the custodial arrest of a parent; and (b) the arresting Trooper determines that leaving the child unattended would put the child in danger (**SUMF 52-54**.) If both conditions are met (an unattended child + danger from being unattended), the Trooper must try to find someone to take care of the unattended child, such as another parent or guardian, relative, DCS, or another responsible person. (**SUMF 55-56**.) But because Clayborne was being issued a citation in lieu of being physically arrested, her children were ***not*** going to be left unattended (**SUMF 57**).

[6] Sergeant Edgar Perry was their supervisor that day. (**SUMF 13**.)



(**SUMF 45**.)

Clark then spoke to Basaldua at his vehicle (whose lights were still flashing). (**SUMF 64-65.**) Basaldua asked Clark if Clayborne would be free to leave after signing a property receipt form that Basaldua had written out. (**SUMF 66**.) Clark responded by stating that Clayborne had to follow the Troopers to the jail because of DCS, and Basaldua responded "Okay." (**SUMF 67-68**.)

After Clark had Clayborne (who was still seated in her car) sign the property receipt (**SUMF 69**), Clark went back to Basaldua's car and told Basaldua "I'll have her follow me." (**SUMF 70**.). The lights on Basaldua's patrol vehicle and Clark's patrol were both flashing at this point. (**SUMF 71**.) Clark then approached Clayborne's vehicle, and told her "Just follow me down to the jail and then you'll know where he's at [referring to Williams] and then we'll finish up the paperwork there." (**SUMF 72-73**.)[7] During this time (over two hours into the stop), there were

---

[7] In substance, Clark told Clayborne that there was additional paperwork she needed to finish at the jail, including the citation that Clark did not realize she had already received. (**SUMF 74**.)

four patrol vehicles parked within feet of Clayborne's car (including three with their lights flashing just feet from Clayborne's vehicle) and all four Troopers were present in full uniform (including a weapon, baton, handcuffs, and pepper spray). (**SUMF 45, 65, 71, 75-76**.)

Clark then told Thompson (who was seated in his patrol vehicle next to Clark's vehicle), "We're moving down to the jail." (**SUMF 77-78**.) No one told Clayborne that she was free to leave or that it was voluntary for her to speak with DCS. (**SUMF 79-80, 152**.)

### IV. <u>The Troopers Escort Clayborne to the Jail, Where They Continue to Hold Her</u>

At about 12:03 p.m., Basaldua drove out onto the road with Williams in the backseat (**SUMF 81**), Clark left next (about 20 seconds later) while another Trooper's vehicle still had its lights flashing at the gas station (**SUMF 83-84**). As Clark pulled out onto the road, Clayborne (in her vehicle) pulled out behind Clark (**SUMF 85**). Clayborne followed Clark to the jail in her vehicle (**SUMF 86**).[8] The jail was about 1 mile from the gas station. (**SUMF 88**.)[9]

At the jail, Clayborne drove right up behind Clark as he had instructed. (**SUMF 89**.) Clark said to Clayborne: "Just park on – You can park right here in this handicap zone" – referring to the handicap spot to the right of Clark's vehicle (and directly across from the entrance to the jail). (**SUMF 90**.) Clayborne complied. (**SUMF 91**.) Clark told Clayborne to keep her car running and that he was going to take pictures of her car. (**SUMF 92-93**.) Clark began taking those pictures while Clayborne stayed inside her car with her children, with the car running (as Clark had

---

[8] At that time, Foster did not have any concern that Clayborne was under the influence or a danger to the children. (**SUMF 87**.)

[9] The Court can take judicial notice of Google Maps to determine distances and locations. *See Ryan v. Tenn. Valley Auth.*, 2015 WL 1962173, at 1 n.1 (E.D. Tenn. Apr. 30, 2015); *Carpenter v. Norfolk and W. Railway Co.*, 145 F.3d 1330 (Table), 1998 WL 199723, at *4 (6th Cir. Apr. 16, 1998) ("Pursuant to Fed. R. Evid. 201, the trial court has the power to take judicial notice of general time/distance calculations."); *Livingston Christian Schs. v. Genoa Charter Twp.*, 858 F.3d 996, 1008 (6th Cir. 2017) (in reviewing summary judgment decision, stating that the court "may take judicial notice of maps showing the distances between these locations").

instructed). (**SUMF 94 & 100**.) This is reflected in this screenshot from Clark's Bodycam:



(**SUMF 95**.) As depicted here, while Clark was taking these pictures, there was a cement pole (with a handicapped sign) in front of Clayborne's vehicle, a UPS truck parked on the passenger side, Clark's vehicle parked on the driver's side, and the entrance to the jail behind the car across the driving lane. (**SUMF 95, 99-100**.) About three seconds after Clark said that he was going to take pictures of her car, Clayborne asked Clark if she was going to jail. (**SUMF 96-97**.) Clark replied that she was not going to jail and that "we're going to give you a ticket." (**SUMF 98** (emphasis added).) Also, while Clark was taking pictures, Thompson pulled around, parked his patrol vehicle facing just across from Clark's car (just a few feet from Clayborne), exited the vehicle, and left its headlights on. (**SUMF 101**.)

Clark then walked into the driving lane and (standing in the driving lane just outside the entrance to the and just a few feet from Clayborne's vehicle) spoke with two DCS case workers. (**SUMF 102-104**.) In substance, Clark told them that Clayborne was as good mother, that there

was no indication of abuse or neglect, the Troopers wanted to keep the family together, that "for everybody's best interest, she is just ***going to get*** a misdemeanor citation for marijuana, and ***let her go***," and that it "***would be*** best for everybody for her to . . . not be booked in." (**SUMF 105-108** & **114, 117** (emphases added).)[10] Clark did not see any need for DCS to intervene (**SUMF 111**). However, DCS insisted (multiple times) on speaking with Clayborne and the children (**SUMF 112-113, 119**). Clark then requested that the DCS workers do their questioning in the car to avoid further disruption to the children. (**SUMF 120**.)

In the meantime, at 12:10 p.m., Foster parked his patrol vehicle in the parking lot near Clayborne's car. (**SUMF 115**.) Clark's vehicle was still parked to Clayborne's left, Thompson's vehicle was parked across from Clark's (with its headlights on), and Clayborne remained parked in the handicapped spot with a cement pole in front of the vehicle:



(**SUMF 115-116**.)[11]

Foster walked over (past Clayborne's car) to join the discussion in the driving lane behind

---

[10] At this point, Clark still did not think that Clayborne had gotten a citation yet and believed that once she got the citation, she should be free to leave. (**SUMF 109-110**.)

[11] The image pasted here is cropped from the full screen shot from the underlying video (which is depicted in full in **SUMF 115**.)

Clayborne's car with Clark and the two DCS case workers. (**SUMF 121**.) At that point, Foster, Clark, and the DCS workers talked in the driving lane behind Clayborne's vehicle (**SUMF 122**). At about 12:12 p.m., one of the two DCS workers stated that she was leaving them to go into the jail to "go grab Erica" (referring to a third DCS case worker) and then walked into the jail. (**SUMF 123**.) At point, after Clark stated that he did not believe that Basaldua had issued Clayborne a citation yet (**SUMF 124**), Foster expressed that he thought Clayborne already had received the ticket (**SUMF 125**). Clark walked over to Clayborne's car, had Clayborne roll down her window, asked if she had received a ticket, and she said yes. (**SUMF 126-127**).[12]

But even then, Clark did not tell Clayborne that she was free to leave. Instead, talking through her partially rolled down window, Clark told Clayborne that a DCS worker was "going to have a chat with you." (**SUMF 128**.) He did not say this as a question. (**SUMF 129**.) He added this was "because we're [THP Troopers] required to call them" – referring to DCS. (**SUMF 130**.)

Clark then stated to Clayborne that the DCS workers asked to do their questioning inside the car because the children had been shuffled around so much (**SUMF 131**). He reiterated to Clayborne that "she" (referring to a DCS case worker) "is going to talk to you." (**SUMF 132**.) He did not say that as a question. (**SUMF 133**.) Clark then asked if Clayborne had any issue with someone from DCS sitting in her car to do the questioning, to which Clayborne responded that there was nowhere in her car for anyone at DCS to sit. (**SUMF 134-135**.) Despite that, Clark responded "Okay. Well, we'll move stuff around." (**SUMF 136**) He did not phrase that as a question either. (**SUMF 137**.) Clark directed Clayborne to unlock her door. (**SUMF 138**.) Clayborne complied. (**SUMF 139**.) Clark opened the door and manipulated various items in the

---

[12] Until he spoke to Clayborne in the parking lot of the jail, Clark did not know that Clayborne had already been issued a citation. (**SUMF 127**.)

front seat (including Clayborne's purse), while Clayborne stared straight ahead in silence. (**SUMF 140-141**.) After he finished clearing space on the front passenger seat, Clark left the door open and turned back towards the jail. (**SUMF 142**.) Foster and Thompson were standing in the middle of the driving lane just behind Clayborne's vehicle (with Foster's hand resting on his holstered gun):



(**SUMF 143-144**.)[13] At that same point in time, Clark was on the passenger side of Clayborne's car waiting for the DCS case workers to come out in order to question Clayborne. (**SUMF 145**.)

After approaching Foster and Thompson, at 12:14 p.m. Clark returned to Clayborne's car – where the door was still open as Clark had left it – and told Clayborne that a DCS worker would be back out in a minute. (**SUMF 146**.) Per Clark's bodycam, this is what the passenger side of Clayborne's vehicle looked like as he approached the car to tell her this:

---

[13] The image pasted here is cropped from the full screen shot from the underlying video (which is depicted in full in **SUMF 144**.)



(**SUMF 147**.) Clark then closed the passenger door and turned back to the jail, from which a DCS case worker was approaching. (**SUMF 148**). At this point, Foster and Thompson were still standing behind Clayborne's car – and Thompson still had his hand resting on his gun. (**SUMF 149**.) The DCS worker approached Clark and told him that, after speaking with a supervisor to figure out what to do, "I'll talk to mom." (**SUMF 150**.) The DCS worker then walked towards Clayborne's passenger door. (**SUMF 151**.) No Trooper ever told Clayborne she was free to leave. (**SUMF 152**.)

<u>**RELEVANT PROCEDURAL HISTORY**</u>

Plaintiffs' operative Complaint asserts claims against the four THP Troopers for violating Plaintiffs' Fourth Amendment rights (Count I), falsely imprisoning Plaintiffs under Tennessee (Count II), and violation of the family's right to substantive due process (Count VI). The THP Troopers have asserted the affirmative defense of qualified immunity to these claims. Plaintiffs' instant Motion seeks summary judgment on liability on Plaintiffs' Fourth Amendment claims.

## LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party.[14] As such, the moving party has the burden of conclusively showing the lack of any genuine issue of material fact.[15] To successfully oppose a motion for summary judgment, "the non-moving party ... must present sufficient evidence from which a jury could reasonably find for him."[16]

Where (as here) a defendant asserts the defense of qualified immunity, the plaintiff has the burden to show that it does not apply.[17] A defendant is not entitled to qualified immunity where (1) a violation of a constitutional right occurred; and (2) the constitutional right was clearly established at the time of the defendant's alleged misconduct.[18] As to the latter, the question is whether the law was "clear enough that every reasonable official would understand that what he is doing is unlawful under the circumstances."[19] Where (as here) a defendant's conduct violated clearly established Fourth Amendment law, a court can grant summary judgment to the plaintiff on a Fourth Amendment claim.[20]

---

[14] *Scott v. FL Transp., Inc.*, 2024 WL 4453283, at *1-2 (E.D. Tenn. Oct. 9, 2024) (citing *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000)).

[15] *Scott*, 2024 WL 4453283, at *1-2 (citing *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979)).

[16] *Scott*, 2024 WL 4453283, at *1-2 (citing *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010)).

[17] *Quigley v. Tuong Vinh Thai*, 707 f.3d 675, 681 (6th Cir. 2013).

[18] *Grawey v. Drury*, 567 F.3d 302, 308 (6th Cir. 2009).

[19] *Little v. City of Saginaw, Mich.*, 2025 WL 553008, at *2 (6th Cir. 2025) (citing *Ashcroft v. Kidd*, 563 U.S. 731, 741 (2011)); *see also Saucier v. Katz*, 533 U.S. 194, 292 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.").

[20] *See, e.g.*, *Little v. City of Saginaw*, 674 F. Supp. 3d 376, 391 (E.D. Mich. 2023) (giving liability judgment to plaintiffs by declaring that Defendants violated Plaintiff's Fourth Amendment rights

## SEARCH AND SEIZURE STANDARDS

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. A violation occurs where (1) a person is seized; and (2) the seizure is unreasonable.[21] Under clearly established law, the THP Defendants' conduct here violated Plaintiffs' Fourth Amendment rights.

## APPLICATION

### I. A Seizure Occurred Because No Reasonable Person in Clayborne's Position Would Have Felt Free to Leave

#### A. Standards for What Constitutes a Seizure

A seizure can take the form of physical force or a show of authority that in some way restrains the liberty of the person.[22] Additionally, the person must actually yield to the show of authority to be seized within the meaning of the Fourth Amendment.[23]

A person has been seized if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that she was not free to leave.[24] "Examples of

_____

by searching his apartment and arresting him), *aff'd* 2025 WL 553008 (6th Cir. Feb. 19, 2025); *see also Brizuela v. City of Sparks*, 2023 WL 5348815 (9th Cir. Aug. 21, 2023) (affirming grant of summary judgment to plaintiff on liability for Fourth Amendment violation); *Lee v. Macias*, 2012 WL 2126849, at *4 (D. Minn. June 12, 2012) (granting summary judgment to plaintiff, because "a reasonable officer would have known that seizing Plaintiff in the absence of a reasonable suspicion of criminal activity violated clearly established Fourth Amendment principles."); *Smith v. Kenny*, 678 F. Supp. 2d 1124, 1167–68 (D.N.M. 2009) (granting summary judgment to plaintiff on certain Fourth Amendment claims).

[21] *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989) ("'Seizure' alone is not enough for § 1983 liability; the seizure must also be 'unreasonable'.").

[22] *Torres v. Madrid*, 592 U.S. 989, 995 (2021); *see also United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004); *see also L.V. by and through Vanderhoef v. City of Maryville*, 2017 WL 5490917, at *5 (E.D. Tenn. Nov. 15, 2017) ("Generally, a seizure occurs in one of two ways: (1) through the use of physical force by the officer; or (2) through a show of authority by the officer, in which the subject actually submits.").

[23] *United States v. Johnson*, 620 F.3d 685, 690-691 (6th Cir. 2010).

[24] *Wilson v. Wilkins*, 362 F. App'x 440, 444 (6th Cir. 2010) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (2010)); *see also Warman v. Mt. St. Joseph Police Dep't*, -- F.4th -- , 2025 WL 2017233, at *4 (6th Cir. July 15, 2025) ("A consensual encounter becomes a seizure when in view

circumstances that might indicate a seizure by a show of authority would be the threatening presence of several officers, the display of a weapon by the officer, . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."[25] Flashing blue lights alone can constitute a seizure.[26] Also, impeding a vehicle's freedom of movement (whether using a vehicle, standing in the car's path, otherwise) constitutes a seizure – and simply complying by "staying inside" and "not getting up to run away" constitute submissions to such a show of authority.[27]

In addition, as explained in *United States v. Richardson*, 385 F.3d 625, 629-630 (6th Cir. 2004), "words alone may be enough to make a reasonable person feel that he would not be free to leave." For example, in *Richardson*, a traffic stop concluded when the officer handed the defendant a citation and shook his hand, but then the officer said to the defendant: "Okay, just hang out right here for me, okay?"[28] The Sixth Circuit held that, even though the officer did not exhibit an "intimidating demeanor or use coercive language," "his words alone were enough to make a reasonable person in Collier's shoes feel that he would not be free to walk away and ignore [the officer's] request."[29] The Sixth Circuit also found that the passengers in the car were also seized

---

of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.") (cleaned up).

[25] *Mendenhall*, 446 U.S. at 544.

[26] *See State v. Williams,* 185 S.W.3d 311, 316-18 (Tenn. 2006) ("Few, if any, reasonable citizens, while parked, would simply drive away and assume that the police, in turning on the emergency flashers, would be communicating something other than for them to remain.") (quoting *Hammons v. State*, 940 S.W.2d 424, 428 (Ark. 1997)).

[27] *See United States v. Delaney*, 955 F.3d 1077, 1082-1085 (D.C. Cir. 2020) (quoting *Brendlin v. California*, 551 U.S. 249, 262 (2007)); *United States v. Robinson*, 1999 WL 358742, at *3-4 (D. Kan. May 12, 1999) ("The court . . . has been unable to find any case in which officers were found to have physically blocked or impeded a person, yet still find that no seizure has occurred").

[28] *Richardson*, 385 F.3d at 630.

[29] 385 F.3d at 630.

through these words, because "[w]hen the driver is not free to leave, neither are his passengers; instead, the passengers are at the mercy of any police officer who is withholding the return of their driver."[30] This was consistent with U.S. Supreme Court precedent in *Brendlin v. California*, which held that a "traffic stop also subjects a passenger, as well as the driver, to Fourth Amendment seizure."[31]

### B. The Undisputed Facts Establish that No Reasonable Person in Clayborne's Position Would Have Felt Free to Leave.

The undisputed facts show that, as a matter of law, no reasonable person in Clayborne's position would have felt free to leave after receiving the citation at the gas station. The Troopers effectuated a seizure through a show of authority. Although the Troopers originally intended to let Clayborne go after issuing her the citation, they changed their minds because (a) Clark believed (incorrectly) that she hadn't received the citation yet; and (b) Foster convinced the other Troopers that they had to make Clayborne meet with DCS at the jail. After hearing Foster's position, Clark told Foster "***let's get her down to the jail,***" then Basaldua that the Troopers ***had to bring Clayborne to the jail because of DCS***, then told Clayborne "***just follow me to the jail,***" and then told Thompson "***we're moving down to the jail.***" No one gave Clayborne an option or told her she was free to leave. In context, this had all the hallmarks of a continued seizure at the gas station beyond when the purpose of the stop had ended: a directive by law enforcement (to which she submitted);[32]

---

[30] *Id.* (citing *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990)).

[31] *Brendlin v. California*, 551 U.S. 249, 254 (2007); *see also Brower v. City of Inyo*, 489 U.S. 593, 597 (1989) ("A seizure occurs even when an unintended person or thing is the object of the detention or taking . . . .").

[32] *Mendenhall*, 446 U.S. at 544 ("the use of language or tone of voice indicating that compliance with the officer's request might be compelled."); *Richardson*, 385 F.3d at 630 (even without an "intimidating demeanor or use coercive language," an officer's "words alone were enough to make a reasonable person in Collier's shoes feel that he would not be free to walk away and ignore [the officer's] request.").

the presence of multiple officers,[33] and the flashing of blue lights by three vehicles (which standing alone can constitute a seizure).[34]

The detention continued at least through the moment a DCS worker approached Clayborne's car at the jail.to interrogate her. The Troopers instructed Clayborne drive a mile to the jail (with Clark in front and at least one other Trooper behind her) and kept exhibiting shows of authority at the jail (with which she complied). This included directing her to park in an illegal handicap spot across from the jail, directing her to keep her car running, stating (without giving her an option) that Clark would take pictures of her car, telling her that she was "going" to get a ticket (future tense – indicating that she was still in custody), telling her that she had to speak with DCS because THP policy supposedly "required" the Troopers make her do that, overriding her objection to speaking with DCS (when she indicated that there was nowhere for them to sit in the car), opening her door and manipulating items in the front seat to clear it for DCS (without giving her an option), parking multiple patrol cars (one with its headlights on) next to/just across from her car, and having multiple officers standing in full uniform (one with his hand resting on his gun) behind her bumper in the driving lane just across from the jail entrance. Again, this has the hallmarks of a seizure: numerous directives by law enforcement about where to go and what to do (with which she complied)[35] and the presence of multiple officers.[36] And if that were not enough, Clark told DCS workers behind Clayborne's car that it "***would be*** better" (conditional tense) "not to book" Clayborne into the jail and that the Troopers were "***going to***" (future tense) issue her a

---

[33] *Mendenhall*, 446 U.S. at 544.
[34] *See. Williams,* 185 S.W.3d at 316-18 ("Few, if any, reasonable citizens, while parked, would simply drive away and assume that the police, in turning on the emergency flashers, would be communicating something than for them to remain.") (quoting *Hammons*, 940 S.W.2d at 428).
[35] *Mendenhall*, 446 U.S. at 544; *Richardson*, 385 F.3d at 630.
[36] *Mendenhall*, 446 U.S. at 544.

ticket and **then** "let her go." In other words, Clark himself stated (as captured on his bodycam) that the family had not yet been "let go." It is also clear that Clayborne herself believed that she was still custody because (after parking in the handicapped spot as directed by Clark) she asked Clark if she was going to jail.

Courts have held that where the undisputed facts are such that no reasonable person would have felt free to leave, the seizure element of a Fourth Amendment claim is established.[37] The same is true here: no reasonable person in Clayborne's position would have felt free to leave after receiving the citation at the gas station. And because Clayborne was seized, so were her children.[38]

## II.     Without Probable Cause, The Troopers Continued Detaining Clayborne

### A.  It is Clearly Established that an Officer Cannot Lawfully Continue to Detain A Person After Issuing a Citation and the Purpose of the Stop Has Ended

As the U.S. Supreme Court explained in *Illinois v. Caballes*, a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.[39] "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the

---

[37] *See, e.g.*, *Mills v. PPE Casino Resorts Maryland, LLC*, 2017 WL 2930460, at *4 (D. Md. July 10, 2017) ("With respect to defendants' argument regarding Mills' freedom to leave, the first security video reflects that Coulter and the other casino personnel did not permit Mills to walk away from them and their intended destination. Similarly, the second security video indicates that Mills was not free to leave the secured, back hallway. While Mills was not handcuffed, he was confronted by between two and eight casino employees, Bilter, and Shapelow, police officers working secondary employment for the casino. Casino security personnel stood between Mills and the doors leading out of the hallway. On the video, Mills stated to the officers that he told Coulter that he wanted to leave, but that Coulter would not permit him to do so. In view of these circumstances, no reasonable person could conclude that Mills was "free to leave."); *Smith v. Kenny*, 678 F. Supp. 2d 1124, 1167–68 (D.N.M. 2009) **(**"The Court has difficulty believing that any reasonable person would feel at liberty to deny the requests of a half-dozen armed police officers instructing him or her to turn around, kneel down, and be placed in handcuffs. The Court therefore concludes that the officers outside of the Smiths' residence, including Vocasek and Napoleone, seized L. Smith and M. Smith for the purposes of the Fourth Amendment.")
[38] *Richardson*, 395 F.3d at 630.
[39] *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

officer to have a reasonable and articulable suspicion that criminal activity was afoot."[40] The duration of the stop "is determined by the seizure's mission – which should be to address the traffic violation that warranted the stop and to attend to safety related concerns."[41] In other words, under Supreme Court precedent, it is clearly established that Defendants' detention of Plaintiffs was lawful "only to the extent that it was not 'prolonged beyond the time reasonably required to complete that mission."[42] Accordingly, "the law is clear: to detain a motorist any longer than is reasonably necessary to issue a citation, the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct; without that, all of the officers' actions must be reasonably related in scope to circumstances justifying the original interference."[43]

---

[40] *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999); *accord United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008) ("[Once the purpose of [a] traffic stop is completed,, a policy officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.") (internal quotations omitted); *United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008) ("To detain a motorist any longer than is reasonably necessary to issue a traffic citation, an officer must have a reasonable suspicion that the individual has engaged in more extensive criminal conduct. This Court has determined that once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot."); *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006).

[41] *United States v. Arrington*, 440 F. Supp. 3d 719, 726–27 (E.D. Mich. 2020) (citing *Caballes*, 543 U.S. at 407).

[42] *Caballes*, 543 U.S. at 407.

[43] *Arrington*, 440 F. Supp. 3d at 726-27 (citing *Hill*, 195 F.3d at 264, and *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002)); *see also United States v. Page*, 154 F. Supp. 2d 1320, 1328 (M.D. Tenn. 2001) (finding that, "because the purposes of the initial stop were concluded, and the officers lacked any reasonable suspicion of criminal activity at the time of the drug sniff, defendant's continued detention and drug sniff were unreasonable for purposes of the Fourth Amendment")*; Akridge v. Finnegan*, 2015 WL 5320554, at *4 (M.D. Tenn. Sept. 11, 2015) ("In the context of a lawful traffic stop, Defendant's detention of Plaintiff related to issuing a traffic ticket remained lawful only to the extent that it was not "prolonged beyond the time reasonably required to complete that mission. Defendant's authority to detain Plaintiff for the traffic stop thus ended when the tasks tied to the traffic infraction were —or reasonably should have been— completed.") (cleaned up).

Holding a person past that point is unlawful.[44] Any delay (even a *de minimis* one) is unconstitutional.[45] And as the Sixth Circuit has explained, safety measures taken to facilitate a different investigation are not tasks incident to the initial stop.[46] Per Supreme Court and Sixth Circuit precedent, this is all clearly established.[47]

Also, a traffic stop has been prolonged even when the civil traffic violation ticket has not yet been written, "[b]ecause a crafty officer . . . may simply delay writing a ticket for the initial traffic violation until after she has satisfied herself that all of her hunches were unfounded."[48]

### B. The Officers Admittedly Had No Additional Basis to Extend Clayborne's Detention After Issuing Her the Citation

It is undisputed that the Troopers only had probable cause to charge Clayborne with simple possession of a small amount of marijuana. It also undisputed that the purpose of the stop ended when Clayborne was issued a citation (in lieu of arrest) for that offense at the gas station. Accordingly, once Basaldua issued Clayborne the citation at the gas station, she should have been

---

[44] *United States v. Stepp*, 680 F.3d 651, 662-64 (6th Cir. 2012).

[45] *See U.S. v. Whitley*, 34 F.4th 522, 528-529 (6th Cir. 2022) (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)); *see also U.S. v. Cruz*, 2024 WL 5397200 (W.D. Tenn. May 7, 2024) ("The Supreme Court has expressly rejected the view that a *de minimis* intrusion or delay is permissible.") (referencing *Rodriguez*, 575 U.S. at 353); *United States v. Johnson*, 2024 WL 4612888, at *4 and *8 (E.D. Mich. Oct. 29, 2024) (finding that police officers violated Fourth Amendment rights of defendant by unlawfully prolonging stop).

[46] *Whitley*, 34 F.4th at 530; *see also Johnson*, 2024 WL 4612888, at *4 ("The Sixth Circuit has counseled that the relevant inquiry for determining when a traffic stop morphs into an independent investigation is 'what the police in fact did] and whether it related to the purpose of the traffic stop.").

[47] *See Akridge*, 2015 WL 5320554, at *7 ("The Court's recitation of the legal authorities above shows that the rights at issue, *i.e.*, the right to not have a traffic stop unlawfully prolonged and the right to not be detained for investigative purposes without a foundation of reasonable suspicion, were clearly established by the dates of the events at issue in this action. The contours of those Fourth Amendment rights were sufficiently clear that a reasonable officer in Defendant's position would have understand that the actions he is alleged to have taken violated those rights."); *Arrington*, 440 F. Supp. 3d at 726 ("[T]he law is clear.").

[48] *Stepp*, 680 F.3d at 662; *see also United States v. Bonilla*, 357 F. App'x 693, 697 (6th Cir. 2009).

free to leave because the purpose of the stop had ended.[49] The THP Troopers agree: in their Answer, in response to the Plaintiffs' allegations that Clayborne and her children should have been free leave once they receive a citation, the THP Troopers answered that "Clayborne and her children were free to leave after she received her citation." (Dkt. 31 at ¶ 82; Compl. ¶ 82.) However, as explained above, the Troopers kept her and her children in custody anyway – without probable cause (or even reasonable suspicion) that she had committed another crime. The continued detention was unjustified and, as a matter of law, violated Plaintiffs' Fourth Amendment rights.[50]

Finally, even viewing the facts in the light most favorable to the Troopers, they are not entitled to qualified immunity for over-detaining Clayborne and her children. As explained in the previous section, it was clearly established (under Supreme Court precedent and Sixth Circuit precedent) that the Plaintiffs had a constitutional right to be released once she received a citation.[51] That law was clear enough that any reasonable official would have understood that keeping her in custody past that point was unlawful. The Troopers have never disputed this.[52] Instead, the only issue they dispute is whether the Troopers seized Clayborne and her children after that moment –

---

[49] *Hill*, 195 F.3d at 264; *Torres-Ramos*, 536 F.3d at 550; *Urrieta*, 520 F.3d at 574; *v. Perez*, 440 F.3d at 370; *Arrington*, 440 F. Supp. 3d at 726-27; *Page*, 154 F. Supp. 2d at 1328; *Akridge*, 2015 WL 5320554, at *4.

[50] In their Rule 12 brief (Dkt. 130), the THP Troopers argued that "probable cause to legally detain her remained" even after she was issued a citation in lieu of arrest for simple possession because "probable cause . . . continue[d] to exist for the indefinite future[.]" (Dkt. 130 at 10-11.). The Troopers seem to be saying that their original probable cause to believe that she had illegally possessed a small amount of marijuana gave them authority to detain Clayborne *indefinitely* – even after issuing her a citation in lieu of arrest and the purpose of the stop was completed. But as set forth above, that is clearly not the law. To detain her and the children past that point required at least reasonable suspicion of a different offense.

[51] *Hill*, 195 F.3d at 264; *Torres-Ramos*, 536 F.3d at 550; *Urrieta*, 520 F.3d at 574; *v. Perez*, 440 F.3d 363, at 370; *Arrington*, 440 F. Supp. 3d at 726-27; *Page*, 154 F. Supp. 2d at 1328; *Akridge*, 2015 WL 5320554, at *7 (finding right clearly established).

[52] *See* THP Answer Dkt. 31 at ¶ 82.

which they deny.[53] Accordingly, once it is determined as a matter law (for the reasons outlined above) that Clayborne and her children remained seized after that point, the THP Defendants violated clearly established law by over-detaining her without any basis. The THP Defendants are not entitled to qualified immunity as a matter of law.[54]

## CONCLUSION

No trial is necessary on whether the four THP Troopers are liable to Plaintiffs for violating their Fourth Amendment rights. Clayborne and her family should have been free to leave at the gas station once Basaldua issued Clayborne a citation in lieu of arrest for misdemeanor possession of a small amount of marijuana. Nevertheless, without probable cause or reasonable suspicion (and after all safety concerns had been resolved), the Troopers kept her and her children in custody anyway. Accordingly, Plaintiffs are entitled to summary judgment on liability on the Fourth Amendment claim against the THP Defendants.

---

[53] THP Answer Dkt. 31 at ¶ 82; Dkt. 130 at 7-10 (asserting that Clayborne was not seized).

[54] *See Little*, 674 F. Supp. 3d at 391, *aff'd* 2025 WL 553008 (6th Cir. Feb. 19, 2025) (denying qualified immunity and granting declaratory judgment to plaintiff on Fourth Amendment claim); *see also Brizuela*, 2023 WL 5348815 (affirming grant of summary judgment to plaintiff on liability for Fourth Amendment violation); *Macias*, 2012 WL 2126849, at *4 (granting summary judgment to plaintiff on Fourth Amendment claim).

Dated: December 10, 2025          Respectfully submitted,

*/s/ Anthony A. Orlandi*

Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
Benjamin A. Gastel (#28699)
Jeff Preptit (#38451)
**HERZFELD SUETHOLZ GASTEL LENISKI
AND WALL, PLLC**
1920 Adelicia St., Suite 300
Nashville, TN 37212
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com
ben@hsglawgroup.com
jeff@hsglawgroup.com

Abby R. Rubenfeld
**Rubenfeld Law Office, PC**
810 Dominican Drive, Ste. 215
Nashville, TN 37228
Telephone: (615) 386-9077
arubenfeld@rubenfeldlaw.com

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on this 10th day of December 2025 by the Court's CM/ECF system which electronically served a copy to all counsel of record:

| | |
|---|---|
| Jeffrey R Thompson<br>Gina Sarli Vogel<br>Grant A. Carringer<br>**Lewis Thomason, P.C.**<br>900 South Gay St., Ste. 300<br>P.O. Box 2425<br>Knoxville, TN 37901<br>865-546-4646<br>jrthompson@lewisthomason.com<br>gvogel@lewisthomason.com<br>GCarringer@LewisThomason.com<br><br>***Attorneys for Coffee County Tennessee and Officer Crabtree*** | Daniel J. Ripper<br>Chloe Kennedy<br>Isabella Bombassi<br>**Luther Anderson PLLP**<br>P.O. Box 151<br>Chattanooga, Tennessee 37402<br>(423) 756-5034<br>dan@lutheranderson.com<br>cek@lutheranderson.com<br>bib@lutheranderson.com<br><br>***Attorney for Katlyn Pelham*** |
| Meghan Murphy<br>Peako Jenkins<br>**Office of the Tennessee Attorney General**<br>P.O. Box 20207<br>Nashville, Tennessee 37202<br>Phone (615) 253-3890<br>meghan.murphy@ag.tn.gov<br>Peako.Jenkins@ag.tn.gov<br><br>W. Adam Izell<br>**Law Office of W. Adam Izell, PLLC**<br>P.O. Box 4386<br>Chattanooga, TN 37405<br>Telephone: (423) 888-3022<br>adam@chattlawyer.com<br><br>***Attorneys for Ruben Basaldua, Donnie Clark, Douglas Foster, and James Thompson*** | Kristin Ellis Berexa<br>Grace Patton<br>**Farrar\|Bates\|Berexa**<br>12 Cadillac Drive, Ste. 480<br>Brentwood, TN 37207<br>Telephone: (615) 254-3060<br>kberexa@fbb.law<br>gpatton@fbb.law<br><br>***Attorneys for Montana Medina*** |
| Arthur F. Knight III<br>**Law Office of Arthur F. Knight III**<br>3248 Tazewell Pike, Suite 103<br>Knoxville, TN 37918<br>P: (865) 252-0430<br>arthur@arthurfknightlaw.com<br><br>***Attorney for Erica Wright-Gilliam*** | Thomas Hickey, Jr.<br>Rafael E. Camacho<br>Nicholas C. Stevens<br>**SPICER RUDSTROM PLLC**<br>537 Market St., Ste. 203<br>Chattanooga, TN 37402<br>P: 423-541-9809<br>thickey@spicerfirm.com<br>rcamacho@spicerfirm.com<br>nstevens@spicerfirm.com |

| | _Attorney for Kathleen Velez_ |
|---|---|
| E. Ashley Carter<br>Jeffrey B. Cadle<br>Jessica Davis<br>**Office of Tennessee Attorney General**<br>P.O. Box 20207<br>Nashville, Tennessee 37202<br>P. 615-741-7932<br>Ashley.Carter@ag.tn.gov<br>Jeffrey.cadle@ag.tn.gov<br>Jessica.davis@ag.tn.gov<br><br>_**Attorney for Dale Lynn**_ | |

/s/ Anthony A. Orlandi
Anthony A. Orlandi