# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT WINCHESTER

| | | |
|---|---|---|
| **BIANCA CLAYBORNE, individually** | ) | |
| **and as parent and next friend of minors** | ) | |
| **J.C., D.W., L.W., A.C., and P.C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:24-cv-00012-DCLC-MJD** |
| | ) | |
| **RUBEN BASALDUA, et al.,** | ) | |
| | ) | **Jury Demanded** |
| **Defendants.** | ) | |

---

## MEMORANDUM IN SUPPORT OF
## THP DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Defendants Ruben Basaldua, Donnie Clark, Douglas Foster, and James Thompson (collectively, the "THP Defendants" or "troopers") submit this Memorandum in support of their Motion for Summary Judgment under Fed. R. Civ. P. 56. These defendants are entitled to summary judgment because qualified immunity shields each of them from liability. There was no violation of the Fourth Amendment because probable cause existed for Bianca Clayborne's detention and arrest for simple possession of marijuana. For the same reason there was no false arrest or false imprisonment under Tennessee law. Nor was there any violation of the minor children's rights because their seizure was reasonable under the circumstances. And because Clayborne's claims are properly analyzed under the Fourth Amendment, there was no violation of substantive due process. There was also no clearly established law on the date of these events that would have instructed the THP Defendants that any of their actions violated Plaintiff's rights. Finally, Clayborne has alleged group conduct and cannot establish liability against each of the THP

Defendants individually. Summary judgment is therefore warranted, and Clayborne's claims, both individually and on behalf of her children, against all THP Defendants should be dismissed.

## STATEMENT OF RELEVANT FACTS

On February 17, 2023, Bianca Clayborne and Deonte Williams and their five children were traveling from Atlanta to Chicago through Tennessee. (First Amended Complaint ("FAC"), Dkt. 92 ¶¶ 59, 61, 62.) At about 9:38 a.m., they were pulled over by Trooper Ruben Basaldua for a slow poke and window tint violation. (*Id.* ¶¶ 65, 70.) Williams, the driver, pulled into a BP gas station and parked by a gas pump. (*Id.* ¶¶ 80, 82.) Trooper Donnie Clark and Trooper Douglas Foster arrived a few minutes later. (*Id.* ¶ 87.) It was a very cold and windy day. (*Id.* ¶ 86.)

### *Troopers Smell Marijuana and Begin Investigation*

While conducting a pat search of Williams, Trooper Clark told Williams that his car smells and Trooper Basaldua told him that it reeked of marijuana. (Statement of Undisputed Material Facts ("SUMF"), ¶ 1.) In response Williams told him, "We were smokin'." (*Id.* ¶ 2.) When asked if he smoked with the kids in the car, Williams stated, "We had pulled over and smoked." (*Id.* ¶ 3.) Trooper Clark stated, "That's green marijuana, like right out of the bag marijuana, not burnt marijuana, that's green." (*Id.* ¶ 4.) Trooper Clark asked if Wiliams had any objections to them looking inside his car for drugs, and Williams said, "Nah." (*Id.* ¶ 5.)

While Troopers Basaldua and Clark were speaking with Williams, Trooper Foster spoke with Clayborne. (*Id.* ¶ 6.) He asked her if there were any weapons in the car, and when she hesitated asked her, "Just be honest with me, where's the gun at?" (*Id.* ¶ 7.) Clayborne responded that she had a gun in her purse. (*Id.* ¶ 8.) During a pat search of Clayborne, Trooper Foster asked her how much marijuana was in the car, and she said, "Not a lot, a blunt, it's rolled up." (*Id.* ¶ 9.) The troopers then searched the car, except for the back seats where the children were. (*Id.* ¶ 10.)

2

After Clayborne got back into the front seat, Trooper Basaldua asked her to hand him the marijuana that was still inside the car and she handed him two containers. (*Id.* ¶¶ 11-12.) Trooper Foster explained to Clayborne that she was being detained because of the marijuana in the car, that a further investigation was going on, and the car required a further search. (*Id.* ¶ 13.) She never told the troopers that the marijuana in the car was legal to have. (*Id.* ¶ 14.)

Trooper Foster asked if she was willing to go to the sallyport at the jail to finish the search because it was too cold to get the kids out of the car. (*Id.* ¶ 15.) He told her that the car was coming with them, but they were giving her the option to go to the sallyport at the jail and get out in a warm environment. (*Id.* ¶ 16.) Rather than respond, Clayborne spoke with someone on her phone. (*Id.* ¶ 17.) Trooper Foster told her again that they were asking her to go to the jail, but telling her that they were taking the car to the jail to finish searching. (*Id.* ¶ 18.) Trooper Clark said that with her permission he could drive them the 2 miles to the sallyport of the jail, so they could do the search there where it was safe and warm. (*Id.* ¶ 19.)

Clayborne asked what they were searching for and told the troopers they had already searched the car. (*Id.* ¶ 20.) The troopers responded they had not yet searched the back because the children were there. (*Id.* ¶ 21.) Clayborne asked if they could just move the kids to the front because she did not want to take them to a jail. (*Id.* ¶ 22.) Trooper Clark explained that they would not be going into the jail; that the sallyport was like a garage. (*Id.* ¶ 23.) Clayborne did not answer the troopers but again talked to someone on her phone. (*Id.* ¶ 24.) Before walking away, Trooper Clark told Clayborne that this round and round wasn't going to work for them, and they would have to take a different approach if they could not get it worked out. (*Id.* ¶ 25.)

*Clayborne and Williams are Arrested*

After about 5 minutes, the troopers returned to Clayborne who was still on the phone. (*Id.*

3

¶ 26.) Trooper Foster told her to hang up the phone, she was under arrest for marijuana possession, she was going to jail with them, and they were calling DCS about her children. (*Id.* ¶ 27.) THP General Order No. 524-1 instructs troopers to coordinate a welfare check when children will be left unattended or endangered due to a person/parent's arrest. (*Id.* ¶ 28.) Trooper Basaldua arrested Williams. (Ex. 4, Basaldua Dashcam at 56:50-58:10.) Trooper Thompson arrived after Clayborne was told she was under arrest. (SUMF ¶ 29.)

Subsequently, Troopers Basaldua, Foster, and Clark formed a plan to search the car at the gas station, issue Clayborne a citation, and then let her go so she and her kids didn't have to have DCS involvement. (*Id.* ¶ 30.) Clayborne, with assistance from Trooper Foster, moved the children from the back of the car into the gas station so the troopers could complete the search. (*Id.* ¶ 31.) She was then left alone in the store with her children. (*Id.* ¶ 32.) Nothing other than approximately $9,000 in cash was found during the complete search. (*Id.* ¶ 33.)

*Troopers Decide to Cite Clayborne In Lieu of Arrest*

After the search, Trooper Clark explained to Clayborne he talked to his supervisors, and they were trying to handle the situation the best they could under the circumstances. (*Id.* ¶ 34.) The troopers then again left Clayborne alone in the store with her children. (*Id.* ¶ 32.) Approximately 7-10 minutes later, Trooper Clark came back and told Clayborne they could handle the situation without taking her to jail. (*Id.* ¶ 35.) They would write her a ticket for marijuana possession, take Williams to jail, and she was "welcome to get back in [her] car." (*Id.* ¶ 36.) When she asked where they were taking Williams and how long it would take, Trooper Clark told her they were taking him to the jail, and it would not take as long as if they had involved child services - which is what they trying to avoid. (*Id.* ¶ 37.) He then, again, left her inside the gas station with her children. (*Id.* ¶ 32.) Trooper Clark thought by citing rather than arresting her, it would ensure Clayborne

4

and her children would not be separated from a custody perspective. (*Id.* ¶ 38.)

Clayborne got her car and drove to the entrance of the gas station so the children could get inside. (*Id.* ¶ 39.) She then pulled back over to the gas pumps near where the car had been before, and where some of their possessions remained on the ground. (*Id.* ¶ 40.) There were no cars blocking her exit or boxing her in. (*Id.* ¶ 41.)

Clayborne was given her citation at the gas station by Trooper Basaldua. (*Id.* ¶¶ 47, 64; Dkt. 92 ¶¶ 168, 172.) Before he left with Williams, Trooper Basaldua – the citing officer – asked Trooper Clark to have Clayborne sign the property receipt for the gun, "so she can leave, or she can follow us to the jail." (SUMF ¶ 48.) Trooper Basaldua then took Williams to the Coffee County Jail with his flashing lights off. (*Id.* ¶ 49.)

As things were wrapping up, Trooper Foster told Trooper Clark that DCS was at the jail. (*Id.* ¶ 42.) Trooper Clark questioned whether there was still a need for that since Clayborne was only getting a ticket. (*Id.* ¶ 43.)

Clayborne was going to bond Mr. Williams out of jail, but she did not know what jail he was going to or where it was. (*Id.* ¶¶ 44-45.) Among themselves, Trooper Foster and Clark discussed whether Clayborne still needed to speak to DCS and what their General Order required. (*Id.* ¶ 46.)

### *Clayborne Follows Trooper Clark to the Coffee County Jail*

Of all the troopers, only Trooper Clark spoke to Ms. Clayborne after she received her citation. (*Id.* ¶ 53.) Trooper Clark, who did not realize Clayborne had already been given the citation, told Clayborne to "just follow me down to the jail and then you'll know where he's at and then we'll finish up the paperwork there, okay." (*Id.* ¶¶ 50-51.) He did not think she was in custody and was just trying to show her where the jail was. (*Id.* ¶ 52.) No THP vehicles were blocking

5

Clayborne's car and she was driving herself and her children as she followed Trooper Clark to the jail. (*Id*. ¶ 54.) If she had left, Trooper Clark would not have stopped her. (*Id*. ¶ 55.)

Clayborne does not know how far behind any trooper followed her to the jail; nor can she approximate the distance. (*Id*. ¶ 56.) She does not know if the fourth trooper followed her. (*Id*. ¶ 57.)

DCS workers were already at the jail when Clayborne arrived. (*Id*. ¶ 58.) Upon arriving at the jail, Trooper Clark told Clayborne, "You can just park right here in this handicapped zone" and told her to leave her car running because it was cold outside. (*Id.* ¶ 59.) Trooper Clark took two pictures of her car. (*Id*. ¶ 60.) Even though she had already received her citation, Clayborne asked Trooper Clark if she was going to jail, and he told her, "no." (*Id*. ¶ 61; Dkt. 92 ¶¶ 168, 172.)

Trooper Clark explained to the DCS workers at the jail that Clayborne was not under arrest, she was a good mom, there was no problem as far as neglect, the kids were fine, they were being cared for, and they should stay with Clayborne. (SUMF ¶ 62.) Trooper Foster told the DCS workers that they were sorry to bother them, but it was just a different, unique situation. (*Id*. ¶ 63.)

Trooper Clark confirmed with Clayborne that she had received her citation. (*Id*. ¶ 64.) He asked Clayborne if she would have a problem with a DCS worker speaking to her in her car and Clayborne told him there was nowhere for them to sit. (*Id*. ¶ 65.) In response, Trooper Clark said, "Okay, well we'll move stuff around, can you unlock this?" (*Id*. ¶ 66.) Clayborne unlocked the door, and he cleared off the passenger seat of her car. (*Id*.) Then Troopers Clark, Foster and Thompson left. (*Id*. ¶ 67). At that time, Clayborne was in her car with her children, who were still in her custody. (*Id*.) None of the THP Defendants were involved in physically removing Clayborne's children from her custody. (*Id*. ¶ 68.)

6

## STANDARD OF REVIEW

Summary judgment is appropriate if there is "no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. After sufficient time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the movant has satisfied his burden, "the non-moving party cannot rest on pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). To survive summary judgment, the non-moving party "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. In other words, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## ARGUMENT

A defendant in a § 1983 suit is entitled to qualified immunity "unless the evidence, viewed in the light most favorable to the plaintiff, 'would permit a reasonable juror to find that (1) the defendant violated a constitutional right; and (2) the right was clearly established.'" *Aldini v. Johnson*, 609 F.3d 858, 863 (6th Cir. 2010) (internal citations omitted). The burden of proving that the rights allegedly violated were clearly established falls upon the plaintiff. *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987). The plaintiff may not cite a general right; the right "must have been articulated with a significant degree of particularity," and "the contours of the right must be

7

sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Eugene D. v. Karman*, 889 F.2d 701, 706 (6th Cir. 1989).

The Supreme Court has repeatedly told courts "not to define clearly established law at a high level of generality, … since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard,* 572 U.S. 765, 779 (2014). The Supreme Court further clarified in *Plumhoff* that, to defeat qualified immunity, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." *Id.*

Thus, the test for determining whether qualified immunity applies to shield a government official from liability for civil damages, is whether the plaintiff's rights "were so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Telb,* 831 F.2d at 676. If reasonable officers could disagree on whether the government official could have reasonably believed that his conduct was lawful, qualified immunity applies. *Waters v. City of Morristown*, 242 F.3d 353, 361 (6th Cir. 2001). And it applies even if a government official made a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Thus, the defense of qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

## I.    The THP Defendants are Entitled to Qualified Immunity Because There Was No Statutory or Constitutional Violation.

There was no Fourth Amendment, wrongful arrest, or due process violation of Clayborne's rights, thus protecting the Troopers from liability under the shield of qualified immunity.

8

**A.     There was no Fourth Amendment violation.**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause. . ." U.S. Const. amend. IV.

Clayborne alleges that her and her children's Fourth Amendment rights were violated because under an unidentified State law the THP Defendants were only allowed to cite her for simple possession of marijuana and not arrest her (Dkt. 92, ¶ 635), and because once she was issued the citation in lieu of arrest she did not feel like she and her children were free to leave. (*Id.* ¶¶ 636, 641.) In support of these allegations, she claims that the Troopers told her that she and her children were not free to leave and instead had to remain in State custody and accompany them to jail (*Id.* ¶ 637). She also claims they illegally restrained her and her children against their will "pending transfer of physical custody" to DCS. (*Id.* ¶ 638.)

Clayborne is incorrect that a Fourth Amendment violation occurred, and her allegations are easily impugned by the THP Defendants' dashcam and bodycam video. No state law prevented her arrest, and no reasonable person would have felt restrained after receiving the citation at the gas station. Clayborne was free to leave, and did so, once cited. So, neither she nor her children were illegally seized by the troopers.

**1.  Clayborne was never illegally seized.**

Shortly after initiating the traffic stop, Troopers Basaldua and Clark commented on the smell of marijuana coming out of Clayborne's car. (SUMF ¶ 1.) And Williams told them that *they* had been smoking. (*Id.* ¶ 2.) When asked if he smoked with the kids in the car, Williams told them they had pulled over and smoked. (*Id.* ¶ 3.) Trooper Clark commented that he smelled "green marijuana, like right out of the bag marijuana, not burnt marijuana, that's green." (*Id.* ¶ 4.) And

9

during a pat search, Clayborne admitted that there was a rolled up blunt in the car. (*Id.* ¶ 9.)

The odor of marijuana coming from the car and Williams' and Clayborne's admissions supplied the THP Defendants with probable cause to believe that Clayborne's car contained illegal drugs. The "detection of a narcotic's odor, by itself, is sufficient to provide probable cause to conduct a lawful search of a vehicle." *United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008). And Williams gave the troopers consent to search the vehicle. (SUMF ¶ 5.) An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). When a person consents to the search of another's property, the consent is valid if a reasonable officer would believe, based on the facts available, that the consenting party had authority to provide consent. *Illinois v. Rodriguez*, 497 U.S. 177, 188, (1990) (citations omitted). So there was no Fourth Amendment violation related to the search of the vehicle.[1]

### a. Clayborne's arrest for simple possession of marijuana was not an illegal seizure.

A warrantless arrest does not violate the Fourth Amendment if the officer had probable cause to believe that an individual has or was committing an offense. *Criss v. Kent*, 867 F.2d 259, 262 (6th Cir. 1988). Probable cause is defined as the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." (*Id.*) (*quoting Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)).

There is no precise formula for determining the existence or nonexistence of probable

---

[1] While not specifically stated as a claim in the First Amended Complaint, the THP Defendants address the legality of the search in an abundance of caution.

cause; rather, a reviewing court considers the factual and practical considerations of everyday life that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred. *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998). The probable cause requirement does not require officers to possess sufficient evidence to establish a prima facie case at trial. (*Id.* at 416.)

Clayborne asserts the THP Defendants violated the Fourth Amendment when they arrested her for simple possession of marijuana, not because the troopers lacked probable cause, but because they were required to issue her a citation under an unidentified State law. (Dkt. 92, ¶¶ 634-635.) But an alleged violation of a State statute does not establish a claim under § 1983. *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482 (6th Cir. 2020). While States can regulate arrests however they choose, State restrictions do not alter the Fourth Amendment's protections, and warrantless arrests for crimes committed in the presence of arresting officers are reasonable under the Constitution. *Virginia v. Moore*, 553 U.S. 164, 176 (2008). The constitutional right that Clayborne has identified is the Fourth Amendment, and whether the troopers violated that right is determined by whether they had probable cause for the arrest. Clayborne has not alleged they lacked probable cause, and there cannot be any dispute that probable cause existed.

In the FAC Clayborne refers to the marijuana found in her car as "presumed marijuana," but she made no such claims during the stop. When Trooper Foster asked Clayborne how much marijuana was in the car, she told him, "not a lot, a blunt, it's rolled up." (SUMF ¶ 9.) And when Trooper Basaldua asked her to hand him the marijuana, she handed him two containers. (*Id.* ¶¶ 11-12.) Clayborne did not correct them, explain the substance was legal, or tell them that the substance was anything other than the illegal drug they believed it to be. (*Id.* ¶ 14.) Even when told she was under arrest, she did not give the troopers any reason to believe that she was in possession of

11

anything other than an illegal drug. (*Id.*) Any reasonable officer under the circumstances would have believed that Clayborne was in possession of a small amount of marijuana. And importantly, Trooper Thompson was not even present at the time that Clayborne was arrested. (*Id.* ¶ 29.) Since there was probable cause for her arrest, there was no Fourth Amendment violation and the THP Defendants are entitled to summary judgment on this claim.

### b. The troopers did not illegally seize Clayborne after she received her citation and remained at the gas station.

The bodycam video of the troopers at the gas station after Clayborne received her citation proves that none of the THP Defendants told Clayborne that she was not free to leave, had to remain in State custody, or accompany them to the jail as she alleges. (SUMF ¶ 53.) The evidence also disproves her allegation that she and the children were illegally restrained while troopers were "planning to transfer them to DCS custody." (*Id.* ¶ 30.)

Prior to Trooper Basaldua issuing Clayborne the citation, Trooper Clark told her they were trying to work with her and specifically trying to limit DCS involvement. (*Id.* ¶¶ 34-37.) After confirming with Clayborne that she would be getting a citation *rather than going to jail*, she was left alone and unrestrained with her children. (*Id.* ¶ 32.) She had freedom of movement and drove her own car with only her children inside. (*Id.* ¶¶ 32, 39-41, 54.) None of the THP Defendants were aggressive with her or *ordered* her to do anything. (*Id.* ¶¶ 34-40; 51.) And no use of force was employed or alleged. (*Id.* ¶ 69.)

After Clayborne drove her car to the store, got her kids back into the car, and then drove back to the gas pumps where her remaining bags were, Trooper Basaldua gave her the citation. (*Id.* ¶¶ 39-40, 47; Dkt. 92 ¶¶ 168, 172.) Trooper Basaldua then got back in his car, asked Trooper Clark to have Clayborne sign the property receipt for the gun, and left with Williams to the Coffee

12

County Jail with his flashing lights off. (*Id.* ¶¶ 48-49.)

Clayborne was going to bond Mr. Williams out of jail, but she did not know what jail he was going to or where it was. (*Id.* ¶¶ 44-45.) Trooper Clark got Clayborne to sign the property receipt and then told Ms. Clayborne to, "Just follow me down to the jail and then you'll know where he's at and then we'll finish up the paperwork there, okay." (*Id.* ¶ 51.)

Trooper Foster told Trooper Clark that DCS was at the jail. (*Id.* ¶ 42.) Trooper Clark questioned whether there was still a need for that since Clayborne was only getting a ticket. (*Id.* ¶ 43.) Among themselves, Troopers Foster and Clark discussed whether Clayborne still needed to speak to DCS and what their General Order required. (*Id.* ¶ 46.)

Thus, the video shows that Troopers Foster and Clark only discussed with each other, and not Clayborne, whether she should go to the jail to ***talk*** to DCS. None of this supports a "plan" to transfer "custody" of anyone to DCS. And none of the interaction with Clayborne suggests that she was seized after Trooper Basaldua gave her the citation and before she began to follow Trooper Clark to the jail. On the contrary, Clayborne had multiple conversations with Trooper Clark where he told her they were going to cite her to limit DCS involvement, she knew that she had already received the citation they discussed, and the arresting/citing trooper had left the scene. Clayborne was in control of herself, her children, and her car during this time. No reasonable person in her situation would have felt seized during this period of time, and the THP Defendants are entitled to summary judgment.

### c. The troopers did not illegally seize Clayborne on the way to or at the Coffee County Jail.

In the FAC, Clayborne suggests that she remained detained through a show of authority after receiving her citation because: the troopers were in full uniform which included a weapon,

baton, handcuffs, and pepper spray (Dkt. 92 ¶¶ 194-195); at least one of the troopers had his lights flashing (*id.* ¶ 202); two of the troopers headed to the jail behind her (*id.* ¶ 203); Trooper Clark told her to park in a handicapped zone at the jail and she did so (*id.* ¶¶ 208-209); Trooper Clark told her to keep her car running and she did so (*id.* ¶¶ 210-211); Trooper Clark told her again she was not going to jail and was only getting a ticket (*id.* ¶¶ 213); Trooper Clark took pictures of her car (*id.* ¶ 215), and her car was boxed in on all sides with Troopers Foster and Thompson behind the car in full uniform with Trooper Thompson's hand sitting on top of his holstered gun. (*Id.* ¶ 250.)

"The test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). A person has been "seized" within the meaning of the Fourth Amendment when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 544 (1980).

Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Id.*; *U.S. v. Beauchamp*, 659 F.3d 560, 566-567 (6th Cir. 2011). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person. *U.S. v. Mendenhall*, 446 U.S. at 544.

The bodycam videos show that only one of these factors existed after Clayborne received her citation and it does not weigh heavily in Clayborne's favor. Clayborne received her citation

from Trooper Basaldua at the gas station. (SUMF ¶ 47.) Clayborne tries to paint a picture that her car was boxed in by the THP Defendants at the gas station, but the videos undermine this allegation. After leaving the gas station store and driving her children from the store to the gas pumps to finish packing up, Clayborne chose where to park, and she chose a location where there were no cars blocking her exit or boxing her in. (SUMF ¶¶ 39-41.) Nor was Trooper Basaldua's car so close to her front bumper that she would be prevented from driving forward. (Ex. 4, Basaldua Dashcam at 2:15:00 – 2:25:35.)

And while there were four troopers present for a brief period of time after she received her citation, Trooper Basaldua – the citing trooper and the trooper in charge of the traffic stop – got in his vehicle and left Clayborne behind to drive Williams to the jail. (SUMF ¶ 48-49.) And Clayborne alleges no further interaction with either Troopers Foster or Thompson. Further, contrary to Clayborne's allegations, Trooper Clark was polite and accommodating to Clayborne during this time. (Ex. 6, Clark Bodycam #2 34:33 – 53:00.) And he never used language or a tone of voice indicating that compliance with his requests might be compelled. (*Id.*)

As to any allegation of being forced to go to the jail, Clayborne has testified that she planned to go to the jail to bond out Williams. (SUMF ¶ 44.) She also testified that she did not know what jail he was going to or where it was located. (*Id.* ¶ 44-45.) Trooper Clark who either knew or assumed she was going to the jail told her, "just follow me down to the jail and then you'll know where he's at and we can finish up the paperwork there." (*Id.* ¶ 51.)

Once at the jail, Trooper Clark told Clayborne she could just park in the handicapped zone and could leave [her car] running. (*Id.* ¶ 59.) Even though she knew that she had already received her citation, she asked Trooper Clark if she was going to jail, and he told her, "no." (*Id.* ¶ 61.) Then he *asked* her if the DCS workers could come in her car and speak with her. (*Id.* ¶ 65.) She did not

15

tell him no, but that there was no place for them to sit, so he helped make room. (*Id*. ¶¶ 65-66.) Throughout the whole process the videos show that Trooper Clark never raised his voice or spoke to Clayborne in an authoritative manner. (Ex. 6, Clark Bodycam #2 34:33 – 53:00.)

Clayborne also alleges the THP Defendants forced her and her children to go to the jail because one of the Troopers vehicles had its lights flashing when she left the gas station, and the Troopers escorted them to the jail in their marked vehicles as part of a caravan." (Dkt. 92 ¶¶ 202, 657.) The fact that one of the Troopers' vehicles had his lights flashing at the conclusion of a traffic stop should not be surprising and is only evidence that a traffic stop occurred. And since only one had his lights flashing, it indicates that three of the four THP Defendants turned their lights off. Additionally, Plaintiff's allegation of a "caravan" can be been proven false. First, Trooper Basaldua left the gas station with Mr. Williams well before Clayborne. (*Id*. ¶ 49.) Then Trooper Clark left before her believing that she was going to follow him so she would "know where he's at" meaning Williams. (*Id*. ¶¶ 51-52.)

While Troopers Foster and Thompson left for the jail after Clayborne, she does not know how far behind her one of them drove and cannot even guess the distance. (*Id*. ¶ 56.) And she is not even sure if the fourth trooper followed her. (*Id*. ¶ 57.) If they were so close behind her that she felt seized and unable to leave, she would certainly have some idea of where they were located. Had the THP Defendants been flashing their lights on the way to the jail and been in some formation that prevented, or even made it difficult, for Clayborne to drive away, her allegation that there was a show of authority might hold water; instead, the video and her own testimony establish that she simply followed Trooper Clark to the jail so she could find Williams and bond him out. And Troopers Foster and Thompson went to the jail to meet up with Trooper Clark to go to lunch. (Ex. 6, Clark Bodycam #2 52:00 – 53:00.)

16

The videos also establish that Clayborne's car was not boxed in at the jail. When they arrived at the jail, Trooper Clark may have parked next to Clayborne on one side, but no other troopers parked next to or behind her or tried to restrict her movement. (Ex. 6, Clark Bodycam #2 at 45:30 – 53:00.) While a UPS truck was briefly to the right of Clayborne's car, the THP Defendants cannot be accused of controlling that truck, and the truck left almost immediately after Clayborne's arrival at the jail. (*Id.* at 45:35 – 47:20.) And while Troopers Foster and Thompson were talking in the driveway behind Clayborne's car, it is clear they are not paying attention to her. (*Id.* at 49:42 – 53:15.) Trooper Thompson's hand was resting on his duty belt, but his gun was holstered and there was no sign that he was doing anything other than resting his arm. (*Id.*).

Finally, Clayborne does not allege that any of the THP Defendants ever displayed a weapon or touched her or her children in a way that would indicate a seizure. The fact that the troopers *had* weapons because they were in uniform is not enough to contribute to a show of authority. If it were, anyone in the presence of a trooper in uniform could argue they were subject to a seizure.

What the videos collectively show is that Trooper Basaldua was no longer present, Troopers Foster and Thompson were not interested in or paying attention to Clayborne, and Trooper Clark was talking with Clayborne and the DCS employees to assist her. (Ex. 6, Clark Bodycam #2 at 46:24 – 53:15.) Because there was no show of authority, Clayborne cannot establish that she continued to be detained after receiving her citation, and the THP Defendants are entitled to summary judgment.

### d. The troopers' unwavering efforts to avoid the children being placed in DCS custody undermine any claim of illegal seizure of the children.

Any allegation of the THP Defendants planning to transfer Plaintiff's children into DCS custody is undercut by the video and is contradicted by the FAC itself. Clayborne alleges that the

17

THP Defendants had a plan to force Clayborne and her children to the jail so that DCS could separate her from her children. (Dkt. 92 ¶¶ 180, 638, 742.) But the FAC goes on to allege that once they had accomplished their goal of getting Clayborne and her children to the jail, and in front of DCS, the THP Defendants then implored DCS **not** to separate her and her children. (*Id.* ¶¶ 221-224.) Clayborne's allegations that the troopers planned to transfer custody of anyone to DCS are discredited by the video, which establishes that the troopers consistently tried to work with Clayborne and never exhibited any desire to separate Clayborne from her children. They have also been discredited by deposition testimony which elicited that their plan was actually to search the car at the gas station, issue Clayborne a citation, and then let her go so she and her kids didn't have to have DCS involvement. (SUMF ¶ 30.)

And significantly, the THP Defendants never had any ability to transfer custody of the children into DCS custody, as the exclusive original jurisdiction to do so rests with the juvenile court. *See* Tenn. Code Ann. § 37-1-103. And any allegation that they were trying to transfer custody of Clayborne to DCS is preposterous. Apart from contacting DCS when both Clayborne and Williams were under arrest, as was required by THP General Order 524-1, and necessary for the safety of the children had both parents remained under arrest, Clayborne cannot show that the THP Defendants had any interest in DCS being involved.

All that she can establish is that Troopers Foster and Clark did not know what DCS's involvement needed to be after the decision was made to only cite Clayborne. After Trooper Clark told Clayborne that she was only getting a citation, Trooper Foster told Trooper Clark that DCS was at the jail. (SUMF ¶ 42.) Trooper Clark questioned whether there was still a need for that since Clayborne was only getting a ticket. (*Id.* ¶ 43.) Among themselves, they discussed that since she was going to the jail anyway, DCS could speak to her there. (Ex. 6, Clark Bodycam #2 at 37:35-

40:25.)

Then, Trooper Clark spoke with the DCS workers at the jail and told them that Clayborne was not under arrest, was a good mom, there was no problem as far as neglect, the kids were fine, they were being cared for, and they should stay with Clayborne. (SUMF ¶ 62.) Trooper Foster told the DCS employees they were sorry for bothering them; it was just a different, unique situation. (*Id*. ¶ 63.) The video establishes that the THP Defendants never restrained Clayborne after she received her citation, and their actions were unwaveringly aimed at helping the children avoid DCS custody. Since there was no illegal restraint, there was no Fourth Amendment violation and the THP Defendants are entitled to summary judgment.

### 2. The minor children were not illegally seized.

Although Clayborne's children were technically seized within the meaning of the Fourth Amendment, "not all seizures are tantamount to arrests sustainable only upon probable cause." *Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003). Because Clayborne's children were not detained on suspicion of criminal activity, it is inappropriate to apply the traditional false arrest inquiry to their civil rights claim. *See id.* (noting that the detention of a 2–year old with her mother who was arrested did not fit into the normal false arrest framework). In cases involving seizures short of a traditional arrest, the courts should be guided by "the ultimate standard of reasonableness embodied in the Fourth Amendment." (*Id.*) (*quoting Michigan v. Summers*, 452 U.S. 692, 699–700, (1981)); *see also Terry v. Ohio*, 392 U.S. 1, 19 (1968) (describing the "central inquiry under the Fourth Amendment" as "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security").

In this case, the only reason the children were seized was because their father admitted that both parents were smoking marijuana in the car with their children present, and then because of a

19

further investigation into criminal activity arising from the traffic stop. There was no way for the children to not be seized subject to the traffic stop and investigation. All five of Clayborne's children were between the ages of 4 months and 7 years old. (Dkt. 92 ¶ 24.) And the children were with both of their parents and not near their home. (*Id.* ¶¶ 59 – 62.) Since there was no reasonable alternative to the children remaining with their parents, their seizure was reasonable and the THP Defendants are entitled to summary judgment on this claim.

**B.  There was no false arrest/false imprisonment.**

To succeed on a claim for false arrest and imprisonment, a plaintiff must prove "(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint." *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990). Like the tort of malicious prosecution, false imprisonment requires that the defendant must have acted without probable cause. *Brown v. SCOA Indus., Inc.,* 741 S.W.2d 916, 919–20 (Tenn. Ct. App. 1987) (citations omitted).

Here, Clayborne cannot establish the unlawfulness of her detention or restraint. There was probable cause to arrest Clayborne for simple possession of marijuana. And as much as Clayborne repeatedly relies on an unidentified State law for her contention that she should have only been cited rather than arrested, that is precisely what happened. After the THP Defendants completed their search of Clayborne's car, she was issued a citation and she got back into her car with her children. She was never handcuffed, transported to a jail, or taken before a magistrate.

Since there was probable cause to arrest Plaintiff for simple possession of marijuana, and she was not illegally detained after receiving her citation, as analyzed above, Clayborne has failed to state a claim for false arrest and false imprisonment for herself and her children. The THP Defendants are entitled to summary judgment on these claims.

20

**C.    There was no Substantive Due Process violation.**

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall…deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, 1. "The due process clause has both procedural and substantive components." *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). "The touchstone of due process is protection of the individual against arbitrary action of government, [including] the exercise of power without any reasonable justification in the service of a legitimate government objective." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (internal quotation marks omitted). That is, the purpose of the Due Process Clause is "to protect the people from the State." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).

"Substantive due process is the doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Range*, 63 F.3d at 588 (citation omitted). Substantive due process protects "a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience'." (*Id.*) (citation omitted).

Given the narrow scope of protection it offers, the Supreme Court has "always been reluctant" to expand substantive due process rights "because the guideposts for responsible decision-making in this unchartered area are scarce and open-ended." *Albright v. Oliver*, 510 U.S. 266, 271-72 (1994)(citation omitted). Thus, the "protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, the right to bodily integrity." (*Id.* at 272.) Moreover, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that

21

Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims." (*Id.* at 273) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

Here, Clayborne asserts a substantive due process claim because the THP Defendants separated her from her children without probable cause by: (a) arresting her for simple possession because of her reticence to answer questions after being Mirandized, even though Tennessee law required them to only cite her; (b) threatening to take her children away to force a consensual search of the car and to answer additional questions; (c) after citing her for simple possession of marijuana instead of arresting her, they illegally continued to hold her and her children in custody to deliver them to DCS workers at the jail; and (d) Trooper Basaldua threatening Williams' that he needed to stop complaining about the Troopers' misconduct or they would make sure DCS took their children away. (Dkt. 92 ¶ 742.)

There is already a particular Amendment providing an explicit textual source of constitutional protection against Clayborne's claims for unlawful arrest, search, and continued illegal custody—the Fourth Amendment. Since an analysis under the Fourth Amendment, and not substantive due process, is appropriate here, Clayborne has failed to state a claim for a substantive due process violation and the THP Defendants are entitled to summary judgment.

## II. The THP Defendants are Entitled to Qualified Immunity Because They Did Not Violate Any Clearly Established Right.

Even assuming the THP Defendants somehow violated Clayborne's rights, which they did not, there was no clear legal precedent that would have put every reasonable officer on notice that the troopers' actions were unlawful. As Trooper Foster told the DCS employees at the Coffee County Jail, this was a "different, unique situation." It cannot be said that *any* officer in the defendants' position, measured objectively, would have known to refrain from the conduct taken

by any of the THP Defendants. Rather than being the actions of plainly incompetent troopers or troopers who were knowingly violating the law − which is required to remove qualified immunity − the actions of the THP Defendants were thoughtful and measured. Because there is no clear precedent indicating otherwise, the THP Defendants are entitled to qualified immunity.

## III. Clayborne Cannot Establish Individual Liability for Each of the THP Defendants.

A "plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). This is because, "[a] critical aspect of the § 1983 [] universe is that to be held liable, a plaintiff must demonstrate 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id*. Here, Clayborne regularly alleges group conduct by attributing actions to the "Troopers" or the "THP Trooper Defendants" – not to individuals, which is what forms the basis for liability for claims brought pursuant to 42 U.S.C. § 1983. *See Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 402-403 (6th Cir. 2015). Because Plaintiff has failed to sufficiently allege that each THP Defendant's own actions have violated her and her children's rights, each of the THP Defendants is entitled to summary judgment.

### A. Trooper James Thompson did not violate any rights.

Clayborne has alleged no actions by Trooper Thompson that violated her or her children's rights. The allegations against Trooper Thompson individually consist of the following: he arrived later than the other troopers and assisted with detaining Clayborne and her children and searching the car (Dkt. 92 ¶¶ 88, 92-93); he assisted Foster and Clark by keeping Clayborne in custody and preparing to have her transported to the jail (*id.* ¶ 128); he might have had his lights flashing when he left the gas station (*id.* ¶ 202); he left after Clayborne from the gas station (*id.* ¶ 203), and he stood behind Clayborne's car at the jail in full uniform with his arm resting on his holstered

23

weapon. (*Id.* ¶¶ 250, 254, 257-258.) As explained above, there was no illegal detention of Clayborne or her children because the video establishes clear probable cause to detain and arrest for possession of marijuana and search the car.

The video establishes that Trooper Thompson arrived after Clayborne had been told she was under arrest and Trooper Foster had left to contact DCS about the children. (SUMF ¶ 29.) And there is no dispute that he was present while she was detained before she was issued a citation and he participated in the search of her car. He also drove to the jail after Clayborne and stood with Trooper Foster behind her car. (Ex. 6, Clark Bodycam #2 at 52:43-53:25.) But that is the extent of his involvement. Having his car lights flashing, leaving after Clayborne from the gas station, and standing behind her car in uniform with his arm resting on his holstered weapon do not come close to violating Plaintiff or her children's rights. Because Clayborne cannot establish Trooper Thompson's individual actions violated any of her or her children's rights, he is entitled to summary judgment on all claims.

### B. Trooper Douglas Foster did not violate any rights.

Clayborne fares no better with Trooper Foster. She alleges that he: responded about three minutes after the stop (Dkt. 92 ¶ 87); detained Clayborne and her children and searched the car (*id.* ¶¶ 92-93); called DCS (*id.* ¶ 119); kept Clayborne in custody and prepared to transport her to the jail with her family (*id.* ¶ 128); told Clark THP's General Order required they bring Clayborne and the children to the jail for questioning by DCS and maintained that she had to speak with DCS (*id.* ¶¶ 182, 184); might have had his lights flashing when he left the gas station (*id.* ¶ 202); left after Clayborne from the gas station (*id.* ¶ 203); talked to the DCS workers and told them this was a different, unique situation (*id.* ¶¶ 230, 231); and stood in full uniform behind Clayborne's car with his weapon holstered (*Id.* ¶¶ 250, 254, 257, 258.) As with Trooper Thompson, these

allegations, even if true, do not establish a constitutional violation.

As with Trooper Thompson, there is no dispute that Trooper Foster was present while Clayborne was detained before she was issued a citation or that he participated in the search of her car. As to his communication with DCS, it was mandated by THP General Order 524-1 once she was arrested. (SUMF ¶ 28.) But the video establishes that Trooper Foster never told Trooper Clark that the General Order *required* that they *bring Clayborne and the children to the jail for questioning* by DCS. (Ex. 6, Clark Bodycam #2 at 52:43-53:25.) And his conversation with Trooper Clark about the General Order, whether expressed with complete accuracy or not, does not violate Clayborne's rights. Clayborne makes no additional allegations entailing any direct or even incidental interaction with Trooper Foster. And just like with Trooper Thompson, possibly having his car lights flashing, leaving after Clayborne from the gas station, and standing behind her car in uniform do not individually or collectively violate Clayborne or her children's rights. Accordingly, Trooper Foster is entitled to summary judgment as to all claims.

### C.  Trooper Ruben Basaldua did not violate any rights.

Plaintiff mentions a number of Basaldua's actions related to the initial traffic stop but does not allege that he lacked probable cause to make the stop. (Dkt. 92 ¶¶ 59-85.) She also alleges that Basaldua: detained Clayborne and the children (*id.* ¶ 92); searched the vehicle (*id.* ¶¶ 93, 98); told Williams they were both under arrest (*id.* ¶ 139); spoke with Clark and agreed that they were going to cite Clayborne and "let her go" so she and the children could stay together (*id.* ¶ 162), and left [the gas station] first with Williams (*Id.* ¶ 200.)

Even the Plaintiff's allegations in the FAC establish that Trooper Basaldua ended the stop when he issued Clayborne her citation at the gas station and then drove away with Williams. (SUMF ¶¶ 47-49.) He was not present in the parking lot when she arrived at the jail or when

25

Trooper Clark spoke to DCS. (Ex. 6, Clark Bodycam #2 at 45:30 – 53:00.) And none of the allegations listed above state any constitutional violation. Trooper Basaldua is entitled to summary judgment as to all claims.

### D. Trooper Donnie Clark did not violate any rights.

Remarkably, the trooper who did the most to intervene on Clayborne's behalf has been repaid as the recipient of the majority of Clayborne's allegations. Like the other troopers, Clayborne alleges that Trooper Clark detained her (Dkt. 92 ¶ 92), searched the car (*id*. ¶¶ 93, 98), and kept her in custody while prepping to have her transported to jail with her family (*Id.* ¶ 128.) She acknowledges that he was kind to her and told her she was being nice and respectful and even complimented her (*id*. ¶¶ 159, 160.) And she admits that the troopers discussed only giving her a citation, Trooper Clark told her that she was only getting a citation, and then Trooper Basaldua followed through by giving her the citation at the gas station. (*Id*. ¶¶ 162, 164.) So it is confusing why she alleges that she continued to be detained.

The crux of her theory seems to be that she remained detained because Trooper Clark was mistaken about when Trooper Basaldua issued her the citation (*id*. ¶¶ 171-172), he was unaware of the General Order that provides that DCS or another child welfare agency needs to be done in situations where both parents are under arrest (*id.* ¶ 185), and because the troopers had conversations among themselves about whether DCS still needed to speak with Clayborne when she was only being cited. (*Id*. ¶¶ 181, 187-188, 190.) But none of these actions amount to Trooper Clark illegally detaining Clayborne or her children.

Qualified immunity protects Trooper Clark for a reasonable mistake of fact, such as knowing when Trooper Basaldua issued the citation. *Pearson,* 555 U.S. at 231. It "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who

knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 343, (1986). If a reasonable officer could have believed the officer's actions to be lawful, considering clearly established law and the information he possessed, then qualified immunity applies. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). And even if Trooper Clark was mistaken, Clayborne knew she had already received the citation, and thus a reasonable person in her position would have felt free to leave.

And Clayborne fails to acknowledge that, no matter what the troopers said to each other, the DCS workers were already at the jail. (SUMF ¶¶ 42, 58.) And since Clayborne was going there to bond out Williams, whether she followed Trooper Clark to the jail or she found her own way there, DCS was going to speak to her when she arrived. All actions taken by Trooper Clark, far from violating her rights, were attempts to minimize DCS's contact with her once she got to the jail.

He told her she could park in the handicapped zone and leave the car running. (SUMF ¶ 59.) This indicates he thought Clayborne's interaction with DCS would be brief and thought her car would only be there for a short time. And he testified that he took pictures of her vehicle out of habit, not for any nefarious reason. (*Id*. ¶ 60.)

And while Clayborne has tried her best to make Trooper Clark's presence behind her vehicle a sign of a show of authority (Dkt. 92 ¶ 218), the video makes clear that Trooper Clark was speaking to the DCS workers behind Clayborne's vehicle to prevent or limit their need to interact with her. (*Id*. ¶¶ 220-222, 224, 226, 229; SUMF ¶ 62). After that, he asked her if she would have a problem with someone from DCS sitting in her car to talk to her, asked her to unlock her door, and moved things around when she said there was nowhere for her to sit. (SUMF ¶¶ 65-66.) He confirmed she had her citation and left with Troopers Foster and Thompson. (*Id. ¶¶* 64, 67.)

Trooper Clark thinking that some paperwork remained outstanding was not a civil rights

27

violation. Nor was any ignorance of what to tell DCS now that Clayborne had received a citation – a situation not discussed in the General Order or previously experienced by the troopers. And these mistakes do not preclude summary judgment. Nor did Trooper Clark's other alleged actions evince a show of authority. On the contrary, they show a law enforcement officer going out of his way to intervene on behalf of Clayborne and her children. Trooper Clark is entitled to summary judgment.

## CONCLUSION

The THP Defendants are entitled to summary judgment on all claims. Qualified immunity shields each of them from liability because none of them violated Plaintiff's rights. There was no Fourth Amendment violation because probable cause existed for Clayborne's detention and arrest. For the same reason there was no false arrest or false imprisonment under Tennessee law. There was no violation of the minor children's rights because their seizure was reasonable under the circumstances. And because Plaintiff's claims are properly analyzed under the Fourth Amendment, there was no violation of substantive due process. Further, there was no clearly established law on the date of these events that would have instructed the THP Defendants that any of their actions violated Plaintiff's rights. Finally, Plaintiff has alleged group conduct and cannot establish liability against each of the THP Defendants individually. Summary judgment is therefore warranted, and Plaintiff's claims against all THP Defendants should be dismissed.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

s/ Meghan Murphy
MEGHAN MURPHY, BPR #34061
Senior Assistant Attorney General
PEAKO JENKINS, BPR #32190
Assistant Attorney General
Law Enforcement and Special
Prosecutions Division
P.O. Box 20207
Nashville, Tennessee 37202-0207
Office: 615-741-8059
Fax: 615-253-2890
meghan.murphy@ag.tn.gov
peako.jenkins@ag.tn.gov
*Attorneys for THP Defendants*

## CERTIFICATE OF SERVICE

I certify a true and exact copy of the foregoing has been filed electronically and forwarded via the Court's electronic filing system on **January 5, 2026**, to the following:

TRICIA R. HERZFELD
ANTHONY A. ORLANDI
BENJAMIN A. GASTEL
JEFF PREPTIT
Herzfeld Suetholz Gastel Leniski and Wall, PLLC
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
tricia@hsglawgroup.com
tony@hsglawgroup.com
ben@hsglawgroup.com
jeff@hsglawgroup.com
*Attorneys for Plaintiff*

ABBY R. RUBENFELD
Rubenfeld Law Office, PC
202 South Eleventh Street
Nashville, TN 37206
arubenfeld@rubenfeldlaw.com
*Attorney for Plaintiff*

29

JEFFREY R. THOMPSON
GRANT A. CARRINGER
Lewis Thomason, P.C.
900 S. Gay Street, Suite 300
P.O. Box 2425
Knoxville, TN 37901-2425
jrthompson@lewisthomason.com
gcarringer@lewisthomason.com
*Attorneys for Coffee County Defendants*

DANIEL J. RIPPER
CHLOE KENNEDY
ISABELLA BOMBASSI
Luther Anderson PLLP
P.O. Box 151
Chattanooga, TN 37402
dan@lutheranderson.com
cek@lutheranderson.com
bib@lutheranderson.com
*Attorneys for Defendant Katlyn Pelham*

KRISTIN ELLIS BEREXA
GRACE PATTON
Farrar Bates Berexa
12 Cadillac Drive, Suite 480
Brentwood, TN 37207
kberexa@fbb.law
gpatton@fbb.law
*Attorneys for Defendant Montana Medina*

ARTHUR F. KNIGHT III
Law Office of Arthur F. Knight III
3248 Tazewell Pike, Suite 103
Knoxville, TN 37918
arthur@arthurfknightlaw.com
*Attorney for Defendant Erica Wright-Gilliam*

THOMAS HICKEY, JR.
RAFAEL E. CAMACHO
Spicer Rudstrom, PLLC
537 Market St., Ste. 203
Chattanooga, TN37402
thickey@spicerfirm.com
rcamacho@spicerfirm.com
*Attorneys for Defendant Kathleen Velez*

30

E. ASHLEY CARTER
JEFFREY B. CADLE
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
ashley.carter@ag.tn.gov
jeffrey.cadle@ag.tn.gov
*Attorneys for Defendant Dale Lynn*

s/ Meghan Murphy
MEGHAN MURPHY
Senior Assistant Attorney General