


UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT WINCHESTER

BIANCA CLAYBORNE, individually and as parent and next friend of minors J.C., D.W., L.W., A.C., and P.C.,

    Plaintiff,

v.                CASE NO. 4:24-cv-00012

RUBEN BASALDUA, in his individual capacity, DONNIE CLARK, in his individual capacity, DOUGLAS FOSTER, in his individual capacity, JAMES THOMPSON, in his individual capacity, KATLYN PELHAM, in her individual capacity, MONTANA MEDINA, in her individual capacity, ERICA WRIGHT-GILLIAM, in her individual capacity, COFFEE COUNTY, TENNESSEE, a political subdivision acting by and through the Coffee County Sheriff's Department, OFFICER CRABTREE F/N/U, in his individual capacity, and COFFEE COUNTY SHERIFF'S DEPARTMENT JOHN DOES 1-10, in their respective individual capacities,

    Defendants.

VIDEOTAPED DEPOSITION OF

BIANCA P. CLAYBORNE

TAKEN ON

TUESDAY, MARCH 18, 2025

9:40 A.M.

1201 WEST PEACHTREE STREET

ATLANTA, GEORGIA 30309

1  and Mr. Williams had any periods of separation when
2  --
3      A.  No.
4      Q.  -- you've been off?
5      A.  No.
6      Q.  Okay.  On the date of this incident --
7  which can we just agree that whenever I say the date
8  of this incident, we're agreeing it's February 17th
9  of 2023? That's when these events occurred, and
10 that's what we're here about to talk about today.
11 Can we agree on that?
12     A.  Say that again.
13     Q.  When I say the date of this incident, can
14 we agree that I'm talking about February 17th, 2023?
15     A.  Okay.
16     Q.  Just so that we don't have to say the date
17 over and over and over again.  On that date, the
18 date of this incident, what was the date of each of
19 your children?  I mean, what was the age of each of
20 your children?
21     A.  I had 7-year-old.
22     Q.  And the 7-year-old's name was what?
23     A.  Jayceon Clayborne.
24     Q.  Okay.
25     A.  Deonte Williams, Jr., was about 5.  Leilani

1  freezing cold for hours, saying you were slowpoking
2  with illegal tint, holding you for hours without
3  being arrested, traumatizing your children, and
4  never telling you, you were free to leave.
5          Can you think of any other claims that you
6  may have against the Tennessee Highway Patrol
7  defendants as you understand it?
8       A.  I don't have any at the moment.
9       Q.  Okay.  Is it your understanding that you
10 are bringing a claim related to the initial traffic
11 stop?
12      A.  Say that again.
13      Q.  Do you believe that you're bringing a claim
14 regarding the legality of being pulled over for the
15 window tint?
16      A.  I don't know.
17      Q.  You do not know?
18      A.  Huh-uh.
19      Q.  Do you know whether or not you are bringing
20 a claim related to the search of your vehicle?
21      A.  I don't know.
22      Q.  You might need to speak up.  I don't know -
23 -
24      A.  I -- I don't know.
25      Q.  Okay.  You do know that you were pulled

1  over and that the vehicle that you were in stopped
2  at a gas station, correct?
3      A.  Correct.
4      Q.  Okay.  And then the officer who pulled you
5  over approached the passenger side of your vehicle
6  initially.  Do you remember that?
7      A.  I do not remember that.
8      Q.  Okay.  We're going to pull up some video
9  and try to refresh your recollection about some
10 things that happened.  And bear with me.  I'm not
11 very technologically advanced.
12          Okay.  We're going to play portions of the
13 video, and I'm going to do my best to identify for
14 everybody what portions of the video we're playing.
15 This is going to be Exhibit 2 to your deposition.
16 And it is Trooper Basaldua's body cam video.  This
17 is THP Defendants 0000995.
18          (WHEREUPON, Exhibit 2 was marked for
19 identification.)
20 BY MS. MURPHY:
21     Q.  And we're going to play for you 2:20 into
22 the video through 3:55 into the video.
23          Make sure the volume is on.  All right.
24          (WHEREUPON, Exhibit 2 was played.)
25 BY MS. MURPHY:

1  BY MS. MURPHY:
2      Q.  Did you hear at that time?
3      A.  I hear radio over to him asking.  So no. I
4  don't hear the full question that he's asked that.
5      Q.  Okay.  You couldn't hear anything --
6      A.  No.
7      Q.  -- on that video.  Okay.
8          (WHEREUPON, Exhibit 2 was played.)
9  BY MS. MURPHY:
10     Q.  Did you hear that trooper say, "It reeks of
11 marijuana"?
12     A.  I heard that.
13     Q.  And what did Mr. Williams say?
14     A.  I don't --
15     Q.  Okay.  Play it again.
16         (WHEREUPON, Exhibit 2 was played.)
17 BY MS. MURPHY:
18     Q.  Hold on.  I'm getting to where it's --
19         (WHEREUPON, Exhibit 2 was played.)
20 BY MS. MURPHY:
21     Q.  Did you hear him that time?  What Mr.
22 Williams said after he said, "It reeks of
23 marijuana"?
24     A.  No.  Something about smoking.  I don't know
25 what the first part was --

1      Q.   Okay.

2      A.   -- smoking.

3      Q.   Okay.  I'm going to go to 4:52 into the

4   video through 4:58.

5           (WHEREUPON, Exhibit 2 was played.)

6   BY MS. MURPHY:

7      Q.   Did you hear what the trooper and Mr.

8   Williams are talking about in that clip?

9      A.   I do.

10     Q.   Did the troopers ask him if he smoked the

11  kids in the car?

12     A.   Uh-huh.

13     Q.   And what does --

14     A.   Yes.

15     Q.   -- Mr. Williams say?

16     A.   No.

17     Q.   Did he say anything else?

18     A.   It's kind of hard for me to hear what he

19  saying.

20     Q.   Did you hear him say that we weren't

21  smoking with them in the car.  We pulled over and

22  smoked?

23     A.   I didn't hear that.

24     Q.   Okay.  Let's play it again.

25          (WHEREUPON, Exhibit 2 was played.)

1           THE DEPONENT:  Uh-huh.
2    BY MS. MURPHY:
3        Q.  Did he say that you had pulled over to
4    smoke?
5           MS. HERZFELD:  Object to the form.
6           You can answer.
7           THE DEPONENT:  I pulled over to a rest area
8    for him -- or for me to get out and to take my
9    children, too.
10   BY MS. MURPHY:
11       Q.  And that's what you had done?
12       A.  Yes.
13       Q.  Okay.  And tell me what you had done.
14       A.  What I had done, I --
15       Q.  Yeah.
16       A.  -- got out of the vehicle from driving, and
17   I went to the rest area and took all my kids there
18   to use the bathroom.
19       Q.  And he had smoked?
20       A.  He had smoked.
21       Q.  Smoked what?
22       A.  Legal marijuana.  Legal weed.
23       Q.  What do you mean by "legal weed"?
24       A.  Legal weed.
25       Q.  Marijuana --

1  correct?

2       A.  Yes.

3           (WHEREUPON, Exhibit 3 was played.)

4  BY MS. MURPHY:

5       Q.  Okay.  He said, "Just be honest with me,"

6  correct?

7       A.  Uh-huh.  Correct.

8       Q.  Had you answered him at this point?

9       A.  I don't remember.

10      Q.  Okay.

11          (WHEREUPON, Exhibit 3 was played.)

12 BY MS. MURPHY:

13      Q.  Okay.  And he had asked you, "Where's the

14 gun at," correct?

15      A.  Correct.

16      Q.  And you said, "I have one," correct?

17      A.  Correct.

18      Q.  And he said, "Where's it at," correct?

19      A.  Correct.

20      Q.  You told him it's in your purse, correct?

21      A.  Correct.

22      Q.  Now, I'm going to go to 3:48, 3 minutes and

23 48 seconds into the video.

24          MS. HERZFELD:  Through three what?

25          MS. MURPHY:  I'm sorry.  Through -- through

1  BY MS. MURPHY:
2      Q.  Okay.  Did you hear the trooper ask you how
3  much marijuana was in the car?
4      A.  Yes.
5      Q.  And did you say, "Not a lot"?
6      A.  Yes.
7      Q.  You said, "A blunt"; is that correct?  Do
8  --
9      A.  Correct.
10     Q.  Okay.  And when he asked you the question,
11 you heard him say "marijuana," correct?
12     A.  Correct.
13     Q.  And so you told him how much marijuana was
14 in the car?
15     A.  Legal weed.  Correct.
16     Q.  Okay.  Did you tell him there is so much
17 legal weed in the car?
18     A.  Didn't tell him there was so much legal
19 weed.
20     Q.  Did you clarify what was in the car, or did
21 he ask -- he asked you how much marijuana is in the
22 car, correct?
23     A.  He he asked him how much legal weed was in
24 the car.
25     Q.  You heard him ask you how much legal weed

1        Q.   Okay.  And then you heard yourself say,
2   "Not a lot," correct?
3        A.   Correct.
4        Q.   You didn't say anything about legal
5   marijuana, did you?  You just answered his question?
6        A.   Correct.
7        Q.   Okay.  I'm going to go to 6:56 in the video
8   through 7:12 into the video.
9             MS. HERZFELD:  Could you repeat it for me,
10  please.
11            MS. MURPHY:  6:56 into the video through
12  7:12 into the video.
13            MS. HERZFELD:  Okay.
14            (WHEREUPON, Exhibit 3 was played.)
15  BY MS. MURPHY:
16       Q.   Okay.  Here in the video, you see that
17  there's a trooper on the driver's side, sort of
18  looking through things on the driver's side,
19  correct?
20       A.   Correct.
21       Q.   And you see another trooper is in the
22  passenger front of the vehicle looking through
23  things in that area of the vehicle, correct?
24       A.   Correct.
25       Q.   And he has a firearm in his hand, correct?

1      A.   Correct.

2      Q.   And he just said, "Dadgum, that's a five-
3  seven," correct?

4      A.   Correct.

5      Q.   Okay.

6           (WHEREUPON, Exhibit 3 was played.)

7  BY MS. MURPHY:

8      Q.   And he said, "These go through bulletproof
9  vests," correct?

10     A.   Correct.

11     Q.   On that date, on February 17th of 2023, how
12 familiar were you with the firearm that you owned?

13     A.   What do you mean?

14     Q.   Did you know that you owned a firearm that,
15 when the bullets were shot, could go through
16 bulletproof vests?

17     A.   No.

18     Q.   Okay.  We're going to be done with that
19 video. We're going to go to Exhibit 4, which is
20 going to be Trooper Basaldua's dashcam video, which
21 is THP Defendants 993.

22          (WHEREUPON, Exhibit 4 was marked for
23 identification.)

24 BY MS. MURPHY:

25     Q.   And I'm going to start at 6 minutes and 17

1  **they were standing around your vehicle after she got**
2  **out?**
3      A.  They were talking to her.
4      Q.  They were talking --
5      A.  And they knocked on my window and told me
6  that I have to get out of the vehicle.  And I asked
7  them why.  And they told me because your kids are
8  getting taken away from you.  We're going to do this
9  swiftly.
10          And that's when the big guy opened my --
11 opened the back door.  And I asked them not to touch
12 my children.  My kids didn't have on no shoes, no
13 socks. He then -- well, they then grabbed my kids
14 out of the car.  And that's when I seen black spikes
15 behind my car.
16          I walked in, and I had my baby.  One man
17 put my daughter by the restroom area, and I didn't
18 like that.  It -- very -- it made me very --
19 antennas was up.  Katlyn and her friends, employees,
20 whatever, was sitting on the bench on their
21 computer, typing up whatever.
22          I went to go grab my daughter.  And I brung
23 her over here by me.  All my kids was sitting next
24 to me.  I kept going up to the place and asking them
25 when is the bond.  When is the bond.  When is he

1  on?
2      A.  I don't know.
3      Q.  Okay.  And then Percy, he -- he's baby that
4  you said was taken from your arms, right?
5      A.  Correct.
6      Q.  Okay.  All right.  And then so they took
7  him, and did -- did let you hug them goodbye or
8  anything?
9      A.  They ripped them from me.  He didn't let me
10 say nothing.  They snuck my children from behind.  I
11 was sitting face forward.  They were behind me.  My
12 son who was right here.
13         D.J., who was easily persuaded by Katlyn
14 with the games, was walking out the door.  By the
15 time they were getting out of the door and taking
16 Jayceon, that's when they said Mom and I seen what
17 was going on.
18         So no, they did not let me hug my children,
19 they didn't let me kiss my kids, and they didn't let
20 me tell my kids that it would be okay, and
21 everything would be handled.
22     Q.  Okay.  And D.J. would be Deonte?
23     A.  Deonte.
24     Q.  Okay.  And so you -- you said that Katlyn
25 -- what was that about that -- I somehow I didn't

1    Q.  Okay.  So what did you tell her about what
2  really happened?
3           MS. HERZFELD:  Object to the form.
4  BY MR. RIPPER:
5    Q.  Well, I mean -- let me -- the reason I ask
6  it that way is, you said not listening to what
7  really happened.  And so I was thinking that maybe
8  what you're referring to is what you had told her
9  about what really happened.  That's why I asked the
10 question.
11   A.  About me not being arrested --
12   Q.  Okay.
13   A.  -- as far as not listening to what -- what
14 was really going on.
15   Q.  Okay.
16   A.  It was more so you came down here to do
17 your job, to take kids, and that was that.
18   Q.  Okay.  And you believe that was her job to
19 take kids?
20   A.  That's what CPS's job does.  They remove
21 children from homes that they believe or see --
22   Q.  And is that what you believed to be the
23 only purpose of -- and it's DCS in Tennessee, but I
24 understand in Georgia, it's CPS, Child Protective
25 Services.  So it's the same thing.  So you call

1  is that correct?
2              MS. HERZFELD:  Object to the form.
3              THE DEPONENT:  I don't know.
4  BY MR. CARRINGER:
5       Q.  You've discussed "nonuniform officers" and
6  men around a vehicle.  Other than the three DCS
7  employees we just discussed, do you understand those
8  to be Coffee County sheriff's officers?
9       A.  Other than the three.  I didn't know who
10 they were.
11      Q.  Didn't know who they were?
12      A.  I didn't know who they were.  They never
13 announced who they were to me.
14      Q.  Okay.  Now, when you -- at one point, you
15 stated that a man came and knocked on your door and
16 told you to come inside the jail?
17      A.  Correct.
18      Q.  Can you -- do you know who that individual
19 was that knocked on your door?
20      A.  I don't know.
21      Q.  Can you describe him?
22      A.  If you can put a picture in front of me, I
23 probably can.
24      Q.  From your memory, though, can you describe
25 him?

1   A.   I cannot.
2   Q.   Was he tall?  Short?
3   A.   Was a tall guy.
4   Q.   Overweight?  Skinny?
5   A.   I would say, like, buff.  I don't know.
6   Q.   And then whenever you stepped out of the
7  vehicle to go inside the jail lobby, did you have
8  any conversations with anyone on your walk into the
9  jail lobby?
10   A.   What do you mean?
11   Q.   Did you talk to anybody from the walk to --
12  from your vehicle to inside the jail lobby?
13   A.   I was trying to figure out why I had to
14  leave out of my vehicle and go into jail when I was
15  not arrested.  So yes.  I was talking to the
16  gentleman that called his self helping me when I
17  asked him not to help me with my kids.  I was asking
18  them questions, but they were not saying any answer
19  me.
20   Q.   Is that the gentleman that came and knocked
21  on your --
22   A.   Correct.
23   Q.   -- window or your door?
24   A.   Correct.
25   Q.   Anyone else you've had conversations with

```
 1  on your walk from the vehicle into the jail lobby?
 2       A.   I don't remember.
 3       Q.   Did you have any issues or problems walking
 4  from your vehicle into the jail lobby?
 5            MS. HERZFELD:  Object to the form.
 6            THE DEPONENT:  Besides having to scoot over
 7  -- my stroller over a black stripe, I don't know.
 8  BY MR. CARRINGER:
 9       Q.   And so you said you had to scoot the
10  stroller over a black stripe.  Can you describe that
11  --
12       A.   It was like a hump.  Rolling it over a hump
13  that I didn't know was there.
14       Q.   Like a speed bump; is that fair?
15            MS. HERZFELD:  Object to the form.
16            THE DEPONENT:  It is the black stripes.
17  Spike strip thing.
18  BY MR. CARRINGER:
19       Q.   Black spike strips.  Okay.  And can you
20  describe how you had issues with those spike strips?
21            MS. HERZFELD:  Object to the form.
22            THE DEPONENT:  The issues I had with the
23  black spike strips were, they placed illegally
24  behind me.  I did not know it.  And then my kids had
25  to look and see what it was.  They saw what it was.
```