# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT WINCHESTER

| | | |
|---|---|---|
| BIANCA CLAYBORNE, individually and as parent and next friend of minors J.C., D.W., L.W., A.C., and P.C., | ) ) ) | |
| | ) | **Case No.: 4:24-cv-00012** |
|    Plaintiff, | ) | |
| | ) | **District Judge Clifton L. Corker** |
| v. | ) | **Magistrate Judge Michael J. Dumitru** |
| | ) | |
| RUBEN BASALDUA, et al., | ) | **JURY DEMANDED** |
| | ) | |
|    Defendants. | ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION IN LIMINE #10 – TO EXCLUDE IRRELEVANT COMMENTS AND INFORMATION

Plaintiffs respectfully move the Court to exclude certain comments and information that is irrelevant and otherwise substantially more prejudicial than probative.

## ARGUMENT

**A.** **References to "Skinhead Troopers," Tennessee Being a "Piece of Sh\*t State," and Bianca Clayborne Being a Racist**

After the February 17, 2023 incident, Ms. Clayborne texted with her high school Spanish teacher, whom she regarded as a "mentor" and an "adoptive mom to me."[1] In the text string, Clayborne referred to "f\*cking skinhead troopers" who had searched her car. She also referred to Tennessee as a "piece of sh\*t state." THP Defendants' counsel asked Clayborne about these texts in Clayborne's deposition. In the course of that questioning, THP Defendants asked Clayborne multiple times whether referencing "skinhead troopers" was a racially motivated statement. Clayborne denied that, and the third time answered "How can I be a racist? I'm a[n] African American."

These statements are irrelevant. They are not probative of any material issues in the case, including whether on February 17, 2023 Clayborne objectively should have felt free to leave at the gas station or the jail, whether the officers acted lawfully and reasonably, whether it was appropriate to detain her and remove her children without process or a valid court order, and what damages Clayborne and the children suffered as a result. Moreover, any conceivable relevance of this information would be far outweighed by the danger of unfair prejudice. If Defendants were allowed to introduce this information, it would inflame the jury by suggesting that Clayborne is a racist or because she expressed that she did not like Tennessee. This would invite the jury to rule for Defendants on an improper basis that is unrelated to the underlying material facts. Accordingly,

---

[1] Clayborne Dep. at 120.

references to either statement in this text string or Clayborne's testimony about them, including her comment denying that she is racist because she is African-American, should be excluded as irrelevant under FRE 402 or as substantially more prejudicial than probative under FRE 403.

**B.      References to a Tint Violation or Slow Poke Violation**

On the date of the incident, Trooper Basaldua initiated the traffic stop at about 9:38 a.m. for a potential slow poke violation and potential window tint violation. He ultimately issued a warning ticket for both violations. After stopping the car, the Troopers custodially arrested Williams for misdemeanor possession of less than 5 grams of marijuana and cited Clayborne for misdemeanor possession of less than 5 grams of marijuana.

References to the alleged tint and slow poke violations should be excluded as irrelevant and as substantially more prejudicial than probative. Aside from being a predicate to the traffic stop and associated searches, the purported slow poke violation and window tint violations played no role whatsoever in the incident. Moreover, the fact of those alleged violations has no bearing on the material issues, including whether on February 17, 2023 Clayborne objectively should have felt free to leave at the gas station or the jail, whether the officers acted lawfully and reasonably, whether it was appropriate to detain her and remove her children without process or a valid court order, and what damages Clayborne and the children suffered as a result. Referencing the tint violation and slow poke violation would create a danger of unfair prejudice to Plaintiffs by seeking to paint them in a bad light for no valid reason. This would invite the jury to rule for Defendants on an improper basis that is unrelated to the underlying material facts. Accordingly, references to the alleged tint and slow poke violations should be excluded under Rules 402 and 403. Instead, in referencing the initial stop, the parties can simply say that the car was pulled over for a traffic offense, the Troopers issued a warning, and that offense was not charged.

### C. References to Williams' Trucking Company

In the deposition of Williams, Defendants questioned Williams about a trucking company that he operates. This included questioning Williams about who dispatches freight loads for the company to haul, how often the dispatcher contacts Williams to haul a load, what the Department of Transportation Number is for the business, what Williams' personal motor carrier number was, what dollar volume of hauling the company does, and which tax preparer Williams uses to file the company's tax returns.

Plaintiffs request that the Court exclude any references to Williams' trucking company or its business. That business and information about it is not relevant to any claim or defense – none of which turn in any way on Williams' private business. Furthermore, any reference to this business and its operations would be substantially more prejudicial than probative. The only reason that Defendants might seek to introduce information about the business would be to insinuate (as occurred during the deposition) that the business was not legitimate. There would be no valid foundation for such an insinuation, and it would invite the jury to rule against Plaintiffs on an improper basis that has nothing to do with what transpired on February 17, 2023 and what the officers and Defendant Lynn actually knew at the time. For these reasons, references to Williams' trucking company and its business should be excluded.

### D. References to the "Weed Man" and Anything Else the Children Supposedly Said to DCS Workers After Being Removed

On February 21, 2023, four days after the children were removed, DCS filed a petition that referenced certain statements that the children allegedly made to DCS workers on February 17, 2023. This included supposedly telling them that their father was the "weed man", showed one of them how to roll a joint, stated that their parents take the children with them to sell weed, that the children see guns daily, and that the parents have guns in the home. In discovery, relevant DCS

witnesses admitted that all of these statements by the "children" were made (1) by just one child (despite the petition saying it was more than one child); and (2) **after** the children had been removed from Clayborne into DCS custody.

Plaintiffs seek to exclude any reference to these statements. These statements by the children are irrelevant. The relevant question is what the Defendants knew and did **before** the children were removed – not what evidence DCS workers or others allegedly learned after the removal.[2] In other words, after-acquired evidence has no bearing on whether Clayborne or the children were detained, whether the officers or Lynn had a valid basis to detain them, or whether there was a valid basis to remove the children in the absence of valid order or process. Also, the statements themselves are hearsay statements by a small child that are uncorroborated, unrecorded, unreliable, and may never have been made in the first place. Furthermore, even if they might otherwise be relevant or potentially admissible, the prejudicial effect of introducing this information would be severe. The purpose of introducing these supposed statements would inflame the jury and invite the jury to rule for Defendants based on considerations divorced from what the Defendants actually knew at the time they seized and removed the children.

### E. References to Subsequent Drug Tests in the Juvenile Court Case

---

[2] *See Abriq v. Metro Gov't of Nashville & Davidson Cnty.*, 2018 WL 1907445, at *2 (M.D. Tenn. Apr. 23, 2018) (finding that plaintiff's immigration status or related information was "not probative of the facts Metro knew at the time of Plaintiff's custody and is therefore irrelevant to Plaintiff's Fourth Amendment claims); *see also Barrera v. Boughton,* 2010 WL 1240904, at *5 (D. Conn. March 19, 2010) (whether the defendants had a lawful basis for the detention and/or arrest of the plaintiffs depends on what the officers knew at the time, and plaintiffs' immigration status is not probative of facts the defendants knew); *De La O v. Arnold-Williams*, 2006 WL 6494873, at *2-3 (E.D. Wash. Oct. 20, 2006) (defendants in a civil rights case must show that a legitimate police concern existed at the time of the investigation not by evidence obtained through later discovery).

In the Juvenile Court proceedings after the children were removed, Williams and Clayborne each submitted to certain drug tests. For example, on February 24, 2023, Clayborne passed a urine screen, and (despite passing that screen) was also administered a "rapid hair follicle test." That rapid hair follicle test was administered by an official who later said that the test was not reliable, the test was never verified by a lab, the test results were destroyed before anyone could seek to verify them,[3] and multiple witnesses testified that they were unaware of a rapid hair follicle test ever being used before or since. The validity of those test results became the subject of vigorous dispute. Similarly, Williams also submitted to certain drug screens in the Juvenile Court proceeding.

These subsequent drug tests are irrelevant, their introduction would lack foundation and be based on hearsay, and would be substantially more prejudicial than probative. First, they are irrelevant for substantially the same reasons that the statement by the children after removal are irrelevant. The relevant question is what the Defendants knew and did ***before*** the children were removed – not what information DCS workers or others supposedly learned after the removal. Second, the only results in the record are from records in the Juvenile Court file that would constitute hearsay if offered for their truth, Defendants developed no foundation for relying on the test results, and there is substantial reason to doubt their accuracy and reliability – particularly as to the rapid hair follicle tests, which were never verified through a qualified laboratory professional, were destroyed despite a litigation hold, and whose use in the Clayborne family's case was anomalous. Third, the prejudice from introducing any evidence concerning these tests

---

[3] The same week that this test was administered, an attorney for Clayborne demanded that all materials related to the Juvenile Court proceedings be preserved. Days later, after repeated requests from Clayborne's counsel for a copy of the test results, the DCS attorney on the case stated that she had spoken *ex parte* with the Juvenile Court judge about this issue and that the Judge (in that *ex parte* communication) stated that the test results had already been destroyed.

would be severely prejudicial to Plaintiffs. If the jury were to see any positive test results – including false positives – it would create a serious risk that the jury will rule against Plaintiffs based on value judgments about Williams and Clayborne rather than facts as they were known on February 17, 2023. For all these reasons, Plaintiffs request exclusion of any references to the subsequent drug tests in the Juvenile Court case.

### F. Threatening Statements Allegedly Made to DCS Workers After the Children Were Removed.

After the children were removed, certain DCS workers claimed that Williams and Clayborne physically threatened them in some fashion. These claims were not only inflammatory, but false. For example, one DCS worker reported in an email that Williams had threatened that "we are going to take care of the people who did this." Through a game of telephone, this comment was interpreted and repeated up the chain as some type of physical threat. In fact, a recording of the incident showed that Williams had stated that, after observing injuries to the children sustained while they were in DCS foster care, he would ask his *lawyers* to take care of the issue. At the same time, the then-DCS attorney had *ex parte* communications with Juvenile Court chambers and asserted (without personal knowledge) that Williams and Clayborne had been threatening DCS workers and would create a dangerous situation at the courthouse requiring extra security.

Any suggestion that Williams and Clayborne threatened DCS workers after their children were taken is irrelevant, based on inadmissible and inaccurate hearsay, and would be severely prejudicial to Plaintiffs if introduced. First, for the reasons discussed above, statements and information that Defendants or anyone else learned after the children were removed is irrelevant to this case. The relevant questions concern what the Defendants knew at the time the children

6

were removed.[4] Accordingly, these characterizations of Williams and Clayborne are irrelevant. Second, the statements include inadmissible hearsay – and in some cases double or triple hearsay – by out-of-court declarants, statements by the then-DCS attorney and others without personal knowledge, and inaccurate characterizations (not facts). Third, introduction of this information would involve inflammatory assertions about Clayborne and Williams to paint them as dangerous, aggressive, threatening, or violent people. In other words, it would involve a character assassination using irrelevant, unfounded, and inflammatory assertions about who they are as people. This would create a serious risk that the jury would render a verdict based not on what everyone knew at the time, but rather based on value judgments drawn from unfair, inaccurate, after-the-fact information. Accordingly, this information should be excluded.

## **CONCLUSION**

For the reasons stated above, these categories of irrelevant information should be excluded from trial.

Dated: March 20, 2026

Respectfully submitted,

*/s/ Anthony A. Orlandi*
Tricia R. Herzfeld (#26014)
Anthony A. Orlandi (#33988)
Benjamin A. Gastel (#28699)
Jeff Preptit (#38451)
**HERZFELD SUETHOLZ GASTEL LENISKI
AND WALL, PLLC**
1920 Adelicia St., Suite 300
Nashville, TN 37212
Telephone: (615) 800-6225
tricia@hsglawgroup.com
tony@hsglawgroup.com
ben@hsglawgroup.com
jeff@hsglawgroup.com

---

[4] *See Abriq*, 2018 WL 1907445, at *2; *Barrera v. Boughton,* 2010 WL 1240904, at *5; *Arnold-Williams*, 2006 WL 6494873, at *2-3.

Abby R. Rubenfeld (#6645)
**Rubenfeld Law Office, PC**
810 Dominican Drive, Ste. 215
Nashville, TN 37228
Telephone: (615) 386-9077
arubenfeld@rubenfeldlaw.com

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on this 20th day of March 2026 by the Court's CM/ECF system which electronically served a copy to all counsel of record:

| | |
|---|---|
| Jeffrey R Thompson<br>Gina Sarli Vogel<br>Grant A. Carringer<br>**Lewis Thomason, P.C.**<br>900 South Gay St., Ste. 300<br>P.O. Box 2425<br>Knoxville, TN 37901<br>865-546-4646<br>jrthompson@lewisthomason.com<br>gvogel@lewisthomason.com<br>GCarringer@LewisThomason.com<br><br>***Attorneys for Coffee County Tennessee and Officer Crabtree*** | Daniel J. Ripper<br>Chloe Kennedy<br>Isabella Bombassi<br>**Luther Anderson PLLP**<br>P.O. Box 151<br>Chattanooga, Tennessee 37402<br>(423) 756-5034<br>dan@lutheranderson.com<br>cek@lutheranderson.com<br>bib@lutheranderson.com<br><br>***Attorney for Katlyn Pelham*** |
| Meghan Murphy<br>Peako Jenkins<br>Dawn Jordan<br>**Office of the Tennessee Attorney General**<br>P.O. Box 20207<br>Nashville, Tennessee 37202<br>Phone (615) 253-3890<br>meghan.murphy@ag.tn.gov<br>Peako.Jenkins@ag.tn.gov<br>Dawn.jordan@ag.tn.gov<br><br>W. Adam Izell<br>**Law Office of W. Adam Izell, PLLC**<br>P.O. Box 4386<br>Chattanooga, TN 37405<br>Telephone: (423) 888-3022<br>adam@chattlawyer.com<br><br>***Attorneys for Ruben Basaldua, Donnie Clark, Douglas Foster, and James Thompson*** | Kristin Ellis Berexa<br>Grace Patton<br>**Farrar\|Bates\|Berexa**<br>12 Cadillac Drive, Ste. 480<br>Brentwood, TN 37207<br>Telephone: (615) 254-3060<br>kberexa@fbb.law<br>gpatton@fbb.law<br><br>***Attorneys for Montana Medina*** |
| Arthur F. Knight III<br>**Law Office of Arthur F. Knight III**<br>3248 Tazewell Pike, Suite 103<br>Knoxville, TN 37918<br>P: (865) 252-0430 | Thomas Hickey, Jr.<br>Rafael E. Camacho<br>Nicholas C. Stevens<br>**SPICER RUDSTROM PLLC**<br>537 Market St., Ste. 203 |

| | |
|---|---|
| arthur@arthurfknightlaw.com<br><br>**Attorney for Erica Wright-Gilliam** | Chattanooga, TN 37402<br>P: 423-541-9809<br>thickey@spicerfirm.com<br>rcamacho@spicerfirm.com<br>nstevens@spicerfirm.com<br><br>**Attorney for Kathleen Velez** |
| E. Ashley Carter<br>Jeffrey B. Cadle<br>Jessica Davis<br>**Office of Tennessee Attorney General**<br>P.O. Box 20207<br>Nashville, Tennessee 37202<br>P. 615-741-7932<br>Ashley.Carter@ag.tn.gov<br>Jeffrey.cadle@ag.tn.gov<br>Jessica.davis@ag.tn.gov<br><br>**Attorney for Dale Lynn** | |

*/s/ Anthony A. Orlandi*
Anthony A. Orlandi