UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | | |
|---|---|---|
| BIANCA CLAYBORNE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | 4:24-CV-00012-DCLC-MJD |
| | ) | |
| v. | ) | |
| | ) | |
| RUBEN BASALDUA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Bianca Clayborne and her five minor children brought this 42 U.S.C. § 1983 suit against Tennessee Highway Patrol troopers Ruben Basaldua, Donnie Clark, Douglas Foster, and James Thompson (collectively, "THP Defendants"), Tennessee Department of Children's Services employees Katlyn Taylor, Montana Medina, Erica Wright-Gilliam, Kathleen Velez, and Dale Lynn (collectively, "DCS Defendants"), and Coffee County, Tennessee and Coffee County Sheriff's Department officers Alan Crabtree, James Sherrill, Frank Watkins, Stephen Sharketti, and Alex Bell (collectively, "Coffee County Defendants").

Plaintiffs allege that Defendants violated their federal constitutional rights during the events that occurred following a traffic stop that led to the removal of the children from their parents for fifty-five days. The Coffee County Defendants moved for summary judgment [Doc. 196], and Plaintiffs moved for partial summary judgment on their pre-call Fourth Amendment claims [Doc. 208]. These matters are fully briefed and are ripe for resolution. For the following reasons, Plaintiffs' motion is **DENIED**, and Defendants' motion is **GRANTED**.

## I.     BACKGROUND

### A.  Pre-Call Actions

On the morning of February 17, 2023, Tennessee Highway Patrol ("THP") troopers initiated a traffic stop for a slow poke violation and a possible window tint violation. [Doc. 175, ¶¶ 2-3]. Deonte Williams was the driver; Bianca Clayborne and their five young children were in the passenger seats.  When the troopers told Williams that the car smelled like marijuana, he responded, "We were smoking." [Doc. 193, ¶ 2, 5].  During a subsequent search of the vehicle, the troopers discovered a small amount of marijuana and a firearm that Clayborne claimed as hers. [*Id.* at ¶¶ 8-9; Doc. 175 at ¶ 15].  Williams was arrested, and after the 2.5-hour long traffic stop, the troopers had Clayborne follow them to the Coffee County Jail so that she could meet with the Tennessee Department of Children's Services ("DCS").

Shortly after arriving at the Jail, the THP troopers left and the family remained in their car in the parking lot.  DCS employee Katlyn Taylor entered Clayborne's vehicle and spoke with her while DCS employees Kathleen Velez and Erica Wright-Gilliam stood outside the car.  [Doc. 210, ¶¶ 16-18].  After some time, Clayborne told Taylor to exit the car, then shut the door and locked herself and her children in the car.  [*Id.* at ¶ 19].  Velez went inside the jail to get law enforcement assistance.  [*Id.* at ¶ 20].  At 12:59 p.m., a Coffee County employee at the jail contacted dispatch and reported that DCS workers sought law enforcement support to remove Clayborne's children. [*Id.* at ¶¶ 20-21].  Dispatch communicated this request to Officer Alan Crabtree, reporting, "I need you to 10-19. DCS is requesting mutual aid. Advised it's going to be in the parking lot. DCS is trying to remove the five children from a mother that state had brought in. Advised they need assistance." [*Id.* at ¶ 24]. After Crabtree asked whether DCS was requesting an emergency response, dispatch responded, "They didn't advise. 495 called it in, advised, I guess, the state

2

trooper advised they didn't arrest the female. But DCS is still trying to remove the children from the home." [*Id.* at ¶ 25]. Crabtree arrived at the jail at 1:10 p.m. [*Id.* at ¶ 27]. He attempted to talk to Clayborne at the driver's side window, but she did not roll down the window or initiate conversation with him. [Doc. 198, ¶¶ 32-35].

At 1:11 p.m., DCS employee Dale Lynn called County Investigator James Sherrill asking if County officers could assist with the removal. [Doc. 210, ¶ 31]. It is Coffee County standard practice that officers merely stand by for safety purposes during DCS removals, and they take no action unless required because of a safety issue. [Doc. 198, ¶ 26]. At the time, Sherrill was travelling with County Investigators Alex Bell and Stephen Sharketti. [Doc. 210, ¶ 32]. Sherrill advised Lynn that the officers could not do anything without a court order. [*Id.* at ¶ 35]. The parties dispute how Lynn responded. Plaintiffs claim Lynn stated he was working with Judge Perry to get the order together [Doc. 265, ¶ 24], whereas Defendants claim Lynn stated that Judge Perry had already issued the order of removal [Doc. 198, ¶ 24]. Shortly after the call ended, Sherrill, Bell, and Sharketti arrived at the jail. [Doc. 210, ¶ 37]. Sherrill approached Clayborne's driver's side window and spoke with her for several minutes while the other officers and DCS employees stood next to or behind the car. [*Id.* at ¶ 45]. At Sharketti's request, Crabtree retrieved a set of spike strips[1] and placed them behind Clayborne's back bumper. [*Id.* at ¶¶ 48-50]. No one informed Clayborne of the spike strips. [*Id.* at ¶ 52]. The investigators and Crabtree then entered the Jail, where Sherrill went to speak with Chief Frank Watkins about the matter. [Doc. 198, ¶ 43].

**B. Call with Judge Perry and Post-Call Actions**

At 1:36 p.m., Juvenile Court Judge Greg Perry called Sherrill, who answered on speakerphone with Chief Watkins. [*Id.* at ¶ 46-47]. During the recorded call, the officers

---

[1]     The parties also refer to these as stop sticks.

questioned their authority to step in:

> **Judge Perry:** Well, DCS has got the authority to ex parte (inaudible). I just got off the phone with them. They're going to go ahead and draft an order, and they -- they can do what they want to for 72 hours on their own. So go ahead and let DCS have them, and I'm going to be –
>
> **Sherrill:** Well, the problem is momma is not going to give them up without a fight. If we get in the middle of this, there's going to be a damn lawsuit for sure, and we ain't got no – I mean –
>
> **Judge Perry:** Arrest her for disorderly conduct.
>
> **Sherrill:** I mean, DCS is the one that's going to have to take the kids.
>
> **Judge Perry:** You won't get in a lawsuit – you won't get in a lawsuit because you've got – I've got judicial immunity (inaudible).
>
> **Watkins:** Verbal order good enough, Judge? It's Frank.
>
> **Judge Perry:** Do what?
>
> **Watkins:** Verbal order good enough?
>
> **Judge Perry:** Absolutely.

[Doc. 250, Ex. 9, 3:6-4:2].[2]  After this call, Sherrill told Clayborne that she and the children needed to come inside the jail so that the children could be removed into DCS custody.  [Doc. 210, ¶¶ 68-69]. Clayborne gathered her children and walked into the Jail lobby alongside the County officers. [*Id.* at ¶¶ 74-75].  The officers remained present in the lobby while DCS took custody of the children and departed in DCS vehicles with children.  [Doc. 198, ¶ 54].

---

[2]  There are two versions of this phone call transcript on the record.  In the version submitted with Defendants' motion, Chief Watkins is listed as the only officer speaking.  [Doc. 196, Ex. 11]. In the version filed by Plaintiffs, Sherrill and Chief Watkins both speak to Judge Perry. Additionally, later in the call, Defendants' transcript shows the officers speaking to a "Judge Johnson," whereas Plaintiffs' transcript (which is supported by deposition testimony) states that the officers spoke to District Attorney Craig Northcott. Because Plaintiffs' version appears to be the more accurate transcription, the Court cites to Plaintiffs' version.

### C. Procedural History

The Complaint asserts claims against the Coffee County Defendants for violating Plaintiffs' Fourth and Fourteenth Amendment rights and falsely imprisoning Plaintiffs in violation of Tennessee law. Additionally, Plaintiffs assert *Monell* liability against Coffee County, Tennessee. Defendants have raised the affirmative defenses of absolute quasi-judicial immunity and qualified immunity and seek summary judgment as to all claims. Plaintiffs' motion seeks summary judgment on liability on the pre-call Fourth Amendment claims.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it may affect the case's outcome under the applicable substantive law, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must prevail as a matter of law." *Id.* at 251–52. When ruling on a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

When evaluating a motion for summary judgment, the court must consider all facts in the light most favorable to the nonmoving party, and the nonmoving party should receive the benefits of every reasonable inference. *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 410 (6th Cir. 2024). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986). The movant discharges that burden by showing "an absence of evidence to support the nonmoving party's" claim or defense, at which point the nonmoving party, to survive summary judgment, must identify facts in the record that create a genuine issue of material fact. *Id.* at 324-25.

## III.    ANALYSIS

Plaintiffs allege two theories of liability against the Coffee County Defendants: pre-call liability, for the seizure that occurred prior to Sherill and Watkins' call with Judge Perry; and post-call liability, for the seizure that occurred after the call.  From these two theories, Plaintiffs assert § 1983 claims for pre- and post-call Fourth Amendment violations and Fourteenth Amendment substantive due process violations.  Plaintiffs also raise *Monell* claims against Coffee County for failure to train or supervise its officers.  Lastly, Plaintiffs assert false arrest and imprisonment claims pursuant to Tennessee law based on both the pre- and post-call seizures.  The Court will address each claim in turn.

### A.  42 U.S.C. § 1983 Claims

To succeed on a § 1983 claim, a plaintiff must establish (1) that the defendant was acting "under the color of state law," and (2) that the defendant's action deprived plaintiff of "rights secured by federal law." *League of Women Voters v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008) (internal citations omitted).

### 1.  Pre-Call Fourth Amendment Claim[3]

---

[3]    Plaintiffs also assert substantive due process violations for the officers' pre-call actions, namely by surrounding the family car and placing spike strips behind the wheels.  Plaintiffs allege that their right to maintain family integrity was violated when the children were removed in the absence of a valid court order.  The pre-call actions did not cause or lead to the family's separation, nor did it interfere with their family integrity.  Thus, although these actions are certainly relevant to determine whether there was a Fourth Amendment violation, no substantive due process claim may stem from those actions.

Plaintiffs allege that County officers illegally detained them without probable cause from 1:11 p.m. to 1:36 p.m.—before anyone at the County had spoken to a judge. Defendants assert that Plaintiffs were not seized as no physical force was used against them and they did not submit to a show of authority.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause. . ." U.S. Const. amend. IV. An unlawful seizure occurs when an officer, without reasonable suspicion, uses physical force or a show of authority to restrain the liberty of a citizen. *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004) (citation omitted). To determine if one's liberty is restrained, courts ask whether a reasonable person would not feel free to walk away and ignore the officer's requests. *Id.* (citing *United States v. Mendenhall,* 446 U.S. 544, 554 (1980)).

A showing of physical force requires actual physical contact with the individual being seized. *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 476 (6th Cir. 2022) (no seizure by means of physical force when an officer shot at but missed someone). Plaintiffs do not claim that the Coffee County Defendants made physical contact with them, thus the only means by which a seizure could occur was through a show of authority.

The existence of a show of authority is determined by an objective test: "not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). Examples of behavior that might constitute a show of authority include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that

compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In addition, an individual must "actually yield" to the show of authority to be seized. *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010).

Applying the law to the facts of this case, the officers did not engage in a show of authority and Plaintiffs did not submit to their actions. Though Clayborne may not have felt free to leave following the 2.5-hour traffic stop, being ordered to follow the THP troopers to the Jail, and the roughly hour-long interview in her car with DCS where they asked her for a urine sample, *the Coffee County officers'* actions did not create a show of authority. "Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior." *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012). When considered individually or collectively, the officers did not act unconstitutionally by seizing Plaintiffs pre-call.

Plaintiffs describe the presence of the four officers standing around her car, combined with the placement of the spike strips, as the complete show of authority. While the "threatening presence" of officers can support a finding that a show of authority occurred, here the facts do not describe the officers' presence as "threatening." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The mere fact that they were in uniform with holstered weapons did not make their presence threatening.[4] Nor did their words or actions, at least those known to Plaintiffs, render them threatening. Crabtree arrived first, and he motioned for Clayborne to roll down the driver's-side window after she looked over and made eye contact with him. She chose not to follow this nonverbal request and faced no repercussions for doing so. Crabtree made no further efforts to

---

[4] The "display of a weapon by an officer" may also constitute a show of authority; however, merely wearing a holstered weapon and not holding or otherwise brandishing it does not rise to the level of a display or show of authority. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

engage with her, and he walked away. When the other three officers arrived about a minute later, Bell approached Clayborne's passenger side window while Sherrill approached Clayborne's driver's side window and spoke to Clayborne for several minutes. The record is not clear what specifically was discussed, but Plaintiffs do not allege that they told Clayborne she was detained, could not leave, or that they gave her any orders or spoke in any kind of threatening manner. At this time, there were four officers surrounding her car, but after a few minutes they all left and went inside the jail, leaving the family alone with the DCS workers. Essentially, four officers showed up, briefly spoke to the driver of a car, and left. This was not 'threatening.'

The officers' placement of spike strips behind Clayborne's vehicle fares no better in the show of authority analysis. In *Torres v. Madrid*, the Supreme Court explained that a show-of-authority seizure "requires that 'a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.'" 592 U.S. 306, 322 (2021) (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989)). Clayborne was not aware of the spike strips until after the call, when the officers escorted the family into the jail. She could not have considered the spike strips in deciding to remain in the parking spot because she was unaware of their presence.

In the other district court cases cited by Plaintiff involving spike strips, courts have found that seizures occur when, and only when, a car is actually stopped as a result of the spike strips. *See Williams v. Anderson,* 2018 WL 4212410, at *3 (N.D. Miss. Sept. 4, 2018) (a seizure occurred when officers deployed spike strips that "did in fact stop the car by causing it to crash."); *Mathis v. Anderson Cnty.*, 2024 WL 4486601, at *7 (D.S.C. May 29, 2024), *report and recommendation adopted*, 2024 WL 4024019 (D.S.C. Sept. 3, 2024) ("The parties do not dispute that *if* Mr. Mathis struck the stop sticks, he was seized.") (emphasis added). As such, these cases seem to consider the use of spike strips as a physical force seizure rather than a show of authority. Clayborne's car

was not actually stopped by the spike strips, so there was no physical force seizure, and she was not aware of their presence, therefore they do not impact the show of authority analysis.

Even if a reasonable person in Clayborne's position would not have felt free to leave in light of the full circumstances of that day, for the officers to face liability for a Fourth Amendment violation, each officer's own words and actions must have conveyed that she was not free to leave. The officers' words certainly did not convey that. And their actions – the ones known to Clayborne – in simply showing up to the jail, talking to Clayborne briefly, and standing around before shortly leaving her alone would not convey to a reasonable person that she was not free to leave. The officers' actions did not amount to a show of authority necessary to establish an unlawful seizure under the Fourth Amendment.

Even if the collective presence of the four uniformed officers surrounding Clayborne's vehicle, combined with the placement of spike strips behind her bumper, constituted a show of authority, Plaintiffs' pre-call Fourth Amendment claim still fails because Clayborne did not submit to it. A show of authority alone is not a seizure — the individual must actually yield to the show of authority to be seized within the meaning of the Fourth Amendment. *Johnson*, 620 F.3d at 690 (citing *Hodari D.*, 499 U.S. at 626–28). In this case, Clayborne did not submit. She remained locked inside her vehicle, refused to roll down her window when Crabtree motioned for her to do so, and declined to engage with the officers who approached her car. The officers eventually abandoned their efforts and retreated inside the jail, leaving the family alone in the parking lot. At no point during the pre-call period did Clayborne comply with any officer's request or otherwise yield to their presence. Because there was no submission, there was no seizure, and the pre-call Fourth Amendment claim fails on this independent ground as well.

Accordingly, the Court finds the officers individually did not violate Plaintiffs' constitutional rights and this claim is **DISMISSED** without prejudice.

### 2. Post-Call Fourth and Fourteenth Amendment Claims

Defendants assert two defenses regarding their post-call liability: absolute quasi-judicial immunity, and qualified immunity. The Court finds that the officers were not acting pursuant to a facially valid court order, rendering them unable to enjoy absolute quasi-judicial immunity; however, they are entitled to qualified immunity as Bell, Crabtree, and Sharketti believed there was a valid court order, and Plaintiffs rights were not clearly established at the time of the incident.

### a. Absolute Quasi-Judicial Immunity

Judges enjoy absolute immunity from liability in damages for their judicial or adjudicatory acts. *Forrester v. White,* 484 U.S. 219, 225 (1988). Only when a judge acts in the complete absence of any jurisdiction does the doctrine of absolute judicial immunity not apply. *See Bush v. Rauch,* 38 F.3d 842, 847 (6th Cir. 1994). "[T]he commission of grave procedural errors, including those involving due process, does not constitute judicial action taken in the clear absence of all jurisdiction." *Sevier v. Turner*, 742 F.2d 262, 271 (6th Cir. 1984).

Just as judges acting in their judicial capacity are absolutely immune from liability, nonjudicial officials who perform tasks "so integral or intertwined with the judicial process" enjoy absolute quasi-judicial immunity. *Bush,* 38 F.3d at 847. The Supreme Court has endorsed a "functional" approach in determining whether an officer receives absolute quasi-judicial immunity. *Forrester v. White,* 484 U.S. 219, 224 (1988). Under this approach, courts look to the nature of the function performed, not the identity or title of the official who performed it. *Bush*, 38 F.3d at 847.

Law enforcement officials "enforcing or executing a court order" act intrinsic to a judicial proceeding, *Id.* at 847-848, but only law enforcement officials executing a *facially valid* court order are protected by absolute quasi-judicial immunity. *Rieves v. Town of Smyrna, Tennessee*, 959 F.3d 678, 697 (6th Cir. 2020). Facially valid, however, does not mean lawful. An erroneous order can be valid. *Shelton v. Wallace*, 886 F. Supp. 1365, 1371 (S.D. Ohio 1995), *aff'd*, 91 F.3d 144 (6th Cir. 1996).

Moreover, officers "must not be called upon to answer for the legality of decisions which they are powerless to control" or "be required to act as pseudo-appellate courts scrutinizing the orders of judges." *Valdez v. City & Cnty. of Denver*, 878 F.2d 1285, 1289 (10th Cir. 1989); *see Bush*, 38 F.3d at 848 (officials "must be permitted to rely upon a judge's findings and determinations to preserve the integrity of the court's authority and ability to function."). To hold otherwise would be "unfair to spare the judges who give orders while punishing the officers who obey them." *Roland v. Phillips*, 19 F.3d 552, 557 (11th Cir. 1994) (citing *Valdez*, 878 F.2d at 1289).

The quasi-judicial immunity doctrine protects officers who execute a court order that later proves erroneous or unlawful — it does not extend to officers who act in the absence of any order at all. *Rieves,* 959 F.3d at 697 (noting the protection is for officials "executing a court order" because that is "intrinsically associated with a judicial proceeding"). Here, the officers were not carrying out a defective or erroneous judicial directive; they were acting without one. Judge Perry issued no written removal order as required by T.C.A. § 37-1-171(a), and the conversation itself cannot be said to have been a judicial directive to the officers. Judge Perry only stated his approval of DCS exercising its own independent emergency authority. Because the officers had no court

order to execute, the immunity rationale that protects officers executing court orders simply has no application, and Defendants are not entitled to absolute quasi-judicial immunity.

### b. Qualified Immunity

Qualified immunity protects government officials from liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rieves*, 959 F.3d at 695 (citation omitted). This defense insulates officers "from undue interference with their duties," *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982), affording them "breathing room to make reasonable but mistaken judgments" and shielding "all but the plainly incompetent or those who knowingly violate the law," *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

When a defendant raises a qualified immunity defense, the plaintiff must satisfy a two-part inquiry to show that the defendant is not entitled to qualified immunity. *Thomas v. Plummer*, 489 F. App'x 116, 119 (6th Cir. 2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017) ("The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.") (citation omitted). Under this two-part inquiry, a defendant is entitled to qualified immunity unless the facts, viewed in a light most favorable to the plaintiffs, (1) show the officer's conduct violated a constitutional right, and (2) the right was "clearly established." *Morrison v. Bd. of Trs.*, 583 F.3d 394, 400 (6th Cir. 2009) (citation and footnote omitted). "An answer of 'yes' to both questions defeats qualified immunity, while an answer of 'no' to either question results in a grant of qualified immunity." *Haley v. Elsmere Police Dep't*, 452 F. App'x 623, 626 (6th Cir. 2011). The Court may determine which question to begin with. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Plaintiffs contend that the officers unlawfully seized the family post-call by ordering that the family enter and remain in the jail lobby until the children were placed into DCS custody. They argue that the officers did so without probable cause or a valid court order. They also contend that the removal without a valid court order violated their substantive due process right to family integrity. In this case, it is unnecessary to decide whether there is sufficient evidence for a jury to find the officers' actions violated the Fourth and Fourteenth Amendments. Even if the jury found their actions unconstitutional, the violations would not have been clearly established.

"A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 698 (6th Cir. 2013) (citation omitted); *see Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (Plaintiffs must show that the contours of that right were sufficiently clear so that a reasonable official would understand his conduct violated that right). Put differently, "[a] right is not clearly established if existing precedent does not place the constitutional question 'beyond debate.'" *Zorn v. Linton*, 146 S.Ct. 926, 930 (2026); *Mullenix v. Luna*, 577 U.S. 7, 13-14 (2015) ("The relevant inquiry is whether existing precedent placed the conclusion that" the officers "acted unreasonably in these circumstances 'beyond debate.'") (quoting *al-Kidd*, 563 U.S. at 741).

In a typical child removal case, "[d]ependency and neglect proceedings are conducted in several phases." *In re Spencer P.*, No. M2009–00019–COA–R3–JV, 2010 WL 2160694, at *3 (Tenn. Ct. App. May 27, 2010). The first phase is a preliminary hearing, where the juvenile court decides, based on a finding of probable cause, whether the child should be removed from the parent's custody pending an adjudicatory hearing. Tenn. Code Ann. § 37–1–117(b)(1); Tenn. R. Juv. Prac. & Proc. 302. The second phase is an adjudicatory hearing to determine "whether the

evidence supports a finding that the child is dependent and neglected." Tenn. Code Ann. § 37–1–129(b)(1); Tenn. R. Juv. Prac. & Proc. 307. "If the court determines the child to be dependent and neglected, it then proceeds to determine the proper placement for the child in the dispositional phase of the proceeding." *In re Ravyn R.*, No. E201701001COAR3JV, 2018 WL 1956488, at *2 (Tenn. Ct. App. Apr. 25, 2018); *see* Tenn. Code Ann. § 37–1–130; Tenn. R. Juv. Prac. & Proc. 307(e)(1)(B), 308.

In limited circumstances, a child may be removed from their parents prior to a preliminary hearing and without a court order. A law enforcement officer, social worker, or duly authorized officer of the court may take a child into custody prior to a hearing if there are reasonable grounds to believe that the child is "a neglected, dependent or abused child[.]" Tenn. Code Ann. §§ 37–1–113, 37–1–114(a)(2). To do so, there must be a finding that "the child's detention or shelter care is required because the child is subject to an immediate threat to the child's health or safety to the extent that delay for a hearing would be likely to result in severe or irreparable harm," and that "there is no less drastic alternative to removal of the child from the custody of the child's parent, guardian, legal custodian or the person who physically possesses or controls the child available that would reasonably and adequately protect the child's health or safety or prevent the child's removal from the jurisdiction of the court pending a hearing." Tenn. Code Ann. § 37–1–114(a)(2). The only procedural requirements in this type of removal action are conducted post-hoc: within 48 hours of removal, a magistrate must issue a written protective custody order for the removal of legal custody, containing the probable cause determination;[5] and, if the protective custody order

---

[5]    If the court denies the protective custody order, the child must be returned to the parent, guardian, or legal custodian.

is issued, a preliminary hearing must be held within 72 hours, excluding non-judicial days, of the child being taken into custody. Tenn. R. Juv. Prac. & Proc. 302(a).

Taking the facts in the light most favorable to Plaintiff, it does not appear that the Coffee County officers independently had reasonable grounds to believe Clayborne's children were neglected or abused. But must officers conduct their own investigation when social workers have already determined that the children were neglected or abused and should be removed prior to a hearing? In other words, was the law clearly established on February 17, 2023, that an officer, acting in reliance on another government official's decision to remove children from their mother, and a judge's verbal instruction to let them, could not: (1) seize a mother and her children; and (2) participate in the removal of the children? The Court finds that this was not clearly established, and that the officers are entitled to qualified immunity.

Before addressing the individual liability of the officers, the Court turns to the clearly established law question that applies across all these Defendants. The Sixth Circuit has addressed warrantless child removals. Those cases establish that parents have a clearly established substantive due process right to family integrity, and that removal of children without a court order or exigent circumstances can constitute a constitutional violation. *Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 699 (6th Cir. 2013) ("holding that it was clearly established that Fourth Amendment warrant requirements, including the exigent-circumstances exception, apply to the removal of children from their homes by social workers."); *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006). What was not clearly established on February 17, 2023, however, was whether an officer violates the Constitution by participating in the removal of a child by DCS in reasonable reliance on a juvenile court judge's verbal statements and a DCS worker's representations that a removal order either existed or was being obtained. No Supreme Court or

Sixth Circuit decision placed that specific question beyond debate. When one officer's claim to qualified immunity rests on his good faith reliance on the report of other government officials, a court must consider: "(1) what information was clear or should have been clear to the individual officer at the time of the incident; and (2) what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information." *Brown v. Lewis*, 779 F.3d 401, 413 (6th Cir. 2015). Because the officers here were not acting on their own initiative but in response to representations from a judge and DCS workers about their legal authority to act, the constitutional rights at issue were not sufficiently clear that a reasonable officer would have understood his actions to be unlawful. *See Zorn v. Linton*, 146 S. Ct. 926, 931 (2026) (asking whether "reasonable officer" would be on notice that his specific conduct was unlawful in addressing qualified immunity). Whether the officers are entitled to qualified immunity on these reports requires an individualized assessment.

*Chief Watkins*

Watkins had no independent knowledge of the facts of this case, only learning about it when Sherrill entered his office to discuss it. He relied entirely on Sherrill's reporting on the facts and Judge Perry's direction on how to proceed. After the call, he knew that DCS wanted to remove the children, they had the authority to do so, and Judge Perry agreed that DCS should take them. Even if Perry was incorrect, and DCS did not have authority due to a lack of probable cause, Watkins could still rely on his information. Although not in the context of family removals, the Sixth Circuit has said that "an officer is not subjected to liability if he, through no improper action or inaction on his part, conducts a stop that is unconstitutional due to the error of a generally trustworthy source." *Bey v. Falk*, 946 F.3d 304, 317 (6th Cir. 2019). A Juvenile Court Judge with jurisdiction over the matter is certainly a "generally trustworthy source." Further, it is not clearly

established that Watkins had a duty to independently investigate the facts of the case prior to seizing the children, especially on matters related to circumstances involving the imminent safety of a child. Plaintiffs do not cite any case establishing such a duty.

With no clearly established law to the contrary, Watkins' actions were a reasonable response to what he could have assumed to be an adequately supported child welfare investigation. Watkins was not "plainly incompetent." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Nor did he "knowingly violate the law." *Id.* Watkins, therefore, is entitled to qualified immunity.

### *Officer Sherrill*

Sherrill had the most information out of all the officers. Before arriving at the Jail, he received a call from Lynn who told him that there either was a court order in place, or that DCS was working to get one. Sherrill testified later that DCS told him that Clayborne was cited for marijuana, Williams was arrested, and there was a gun found in the vehicle. [Doc. 196, Ex. 7, at 70:14-16]. He also testified that he did not know any specific allegations about any of those kids and any abuse or neglect. [*Id.* at 85:22-25]. Upon arrival, he spoke directly to Clayborne at her car for a few minutes and discussed the situation before meeting Watkins in his office and receiving the call from Judge Perry.

Like Watkins, it was reasonable for Sherrill to rely on Judge Perry's statements. Although he incorrectly interpreted the conversation as a valid verbal court order, Sherrill knew that Lynn was working with the Judge to get an order in place and that the Judge knew the facts of the case. Even if Sherrill personally disagreed that there was a safety threat to the children, he was not required to second-guess the Judge's decision or statement that DCS had the authority to act at that time. Judge Perry was a trustworthy source of information, and Sherrill could rely on his word.

Therefore, Sherrill acted as a reasonable officer would in his position, and was not plainly incompetent, nor did he knowingly violate the law. Sherrill is entitled to qualified immunity.

### Officer Crabtree

Crabtree testified that when he arrived on scene and spoke to Taylor, she stated that DCS either was in the process of obtaining or had obtained a court order for them to remove the children. [Doc. 196, Ex. 8, at 14:6-11]. He also stated that when Sherrill arrived, he told Crabtree, "I'm on the phone with the judge, there is a court order." [*Id.* at 21:20]. Crabtree attempted to speak to Clayborne, but she did not engage with him, and he did not see the children or otherwise investigate the situation on his own. It is not clearly established that Crabtree had a duty to independently investigate when he believed there was a court order in place justifying removal. In light of the full circumstances known to Crabtree, it was reasonable for him to rely on both DCS and his fellow officers' statements that there was a court order in place to allow for removal of the children. As such, he is also entitled to qualified immunity.

### Officers Bell and Sharketti

Bell and Sharketti both appear to have had the same information during the incident, and even less than what Crabtree knew. They were both present in the truck when Sherrill received a call from Lynn asking for support to remove the children. It is unclear if Sherrill was on speakerphone or how much of the conversation they overheard, but they may have heard Sherrill state that the officers could not act without a court order. Upon arrival at the jail, Bell stood on the passenger side and Sharketti stood behind Clayborne's vehicle while Sherrill spoke to Clayborne. Neither Bell nor Sharketti spoke to Clayborne or her children themselves. They relied on Sherrill's knowledge after the Judge Perry call that there was a court order for removal.

This reliance was not unreasonable in light of the circumstances. Bell and Sharketti had

the least information of any officer present, arrived at the scene at Sherrill's direction, took no independent action toward Clayborne or her children, and relied on Sherrill's post-call representation that a court order authorized the removal. It is not clearly established that officers in their position—with no direct knowledge of the underlying facts and no independent interaction with the family—had a duty to investigate beyond what their supervising officer reported. Because their conduct was objectively reasonable under the circumstances known to them, Bell and Sharketti are entitled to qualified immunity.

### B. *Monell* Claim

Plaintiffs also sue Coffee County, Tennessee for inadequately training and failing to supervise its officers, and for having an unconstitutional custom, policy, or practice. As an initial matter, because the Court found that the officers did not commit a constitutional violation for their pre-call actions, the County cannot be liable either. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Because qualified immunity is a personal defense that does not foreclose municipal liability, the Court must determine whether the officers' post-call conduct constituted a constitutional violation, even though that determination was unnecessary to resolve the officers' individual qualified immunity defenses. *King v. City of Rockford, Michigan*, 97 F.4th 379, 399 (6th Cir. 2024).

The Court finds that it did. Taking the facts in the light most favorable to Plaintiffs, the officers ordered Clayborne and her children into the jail lobby and remained present while DCS took custody of the children, without a valid court order and without independently established exigent circumstances known to the officers at the time. A reasonable jury could find that this conduct constituted an unreasonable seizure under the Fourth Amendment and an interference with Plaintiffs' substantive due process right to family integrity. The officers' reasonable but mistaken

belief that a valid court order existed — which entitles them individually to qualified immunity— does not negate the constitutional violation for purposes of municipal liability. The Court therefore proceeds to assess whether that violation resulted from a Coffee County policy or custom.

To succeed on a claim of municipality liability under § 1983, a plaintiff must demonstrate that the alleged federal right violation occurred because of a municipal policy or custom. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978)); *see also Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) ("The plaintiff must 'demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (quoting *Bd. of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997))). To prove the existence of an illegal policy or custom, "[t]he plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). Where, as here, the plaintiff relies on a single incident to support a *Monell* claim, that claim may proceed under only the failure to train or supervise theory of liability. *See Oellien v. Knox Cnty., Tennessee*, No. 3:23-CV-319, 2025 WL 35969, at *3 (E.D. Tenn. Jan. 6, 2025).

Establishing a failure to train or supervise claim requires a plaintiff to prove: "(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the municipality's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused his injury." *Rayfield v. City of Grand Rapids*, 768 F. App'x 495, 511 (6th Cir. 2019) (cleaned up). Regarding the deliberate indifference requirement, the Sixth Circuit

noted in *Ouza v. City of Dearborn Heights, Michigan* that there are two situations where inadequate training could be found as the result of deliberate indifference:

> First, and most commonly, a plaintiff can demonstrate deliberate indifference by showing that the municipality has failed to act "in response to repeated complaints of constitutional violations by its officers." *Id.* (quoting *Shaner*, 172 F.3d at 931). Under this approach, a plaintiff must show that the defendant was aware of "prior instances of unconstitutional conduct" such that it "was clearly on notice that the training in this particular area was deficient and likely to cause injury" and yet "ignored a history of abuse." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005). This is the most common way of proving deliberate indifference.

> However, there is another way in which a plaintiff can show a genuine factual dispute regarding deliberate indifference. In a "narrow range of circumstances," a plaintiff can show that a municipality was deliberately indifferent by "fail[ing] to equip law enforcement officers with specific tools to handle recurring situations." *Brown*, 520 U.S. at 409, 117 S.Ct. 1382. As the Supreme Court explained in *City of Canton*, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390, 109 S.Ct. 1197.

969 F.3d 265, 287 (6th Cir. 2020).

Here, Plaintiffs premise their *Monell* claim on this latter type of deliberate indifference. They contend that despite its officers frequently being dispatched to assist DCS, Coffee County does not have written policies concerning assisting or standing by for DCS, the deployment of spike strips, probable cause and seizures, or the validity of verbal ex parte orders of removal. In addition, Plaintiffs point to the testimony of three of the officers, who stated that they believed verbal orders of removal from the juvenile court were valid.

To start, the lack of a written policy on a specific topic does not equate to a complete failure to train on that topic. Plaintiffs do not allege, for example, that Coffee County fails to train its officers entirely on the topics of probable cause and seizures. And Defendant Bell testified that he received on-the-job training regarding DCS removals. [Doc. 196, Ex. 14, at 62:13-25, 63:1-12].

Further, given that it was Coffee County policy to merely stand-by while DCS removes children, and to only get physically involved when there is a safety or security issue, it is not obvious that these largely passive interactions would lead to potential constitutional violations without specific training. [Doc. 196, Ex. 10, at 18:14-25]. An officer's general training on their law enforcement duties in addition to their on-the-job training could suffice to cover these removal interactions with DCS.

Additionally, Plaintiffs cannot establish that any failure to train was the moving force behind the officers' post-call conduct. Even assuming Coffee County inadequately trained its officers on the validity of verbal judicial orders, the record demonstrates that it was Judge Perry's explicit instruction—not any municipal policy or training deficiency—that caused the officers to act as they did. Prior to the call, the officers told DCS workers that they could not assist in the removal of the children without a court order, demonstrating that their position was consistent with constitutional requirements. It was only after Judge Perry told them his verbal order was "absolutely" sufficient that they proceeded. Where an intervening instruction from a judicial officer with jurisdiction over the matter directs officers away from their trained response and toward the conduct alleged to be unconstitutional, the municipality's training cannot be said to be the moving force behind any injury that may have occurred. *See Valdez v. City & Cnty. of Denver*, 878 F.2d 1285, 1289 (10th Cir. 1989) (law enforcement officers are not "required to act as pseudo-appellate courts scrutinizing the orders of judges.").

Coffee County's training, regardless of its adequacy, was not the proximate cause of the officers' post-call actions. Judge Perry's direction was. Plaintiffs have therefore failed to establish the causation element of their failure to train claim, and the *Monell* claim against Coffee County is **DISMISSED** without prejudice.

### C. False Arrest and False Imprisonment Claims

In light of the Court's ruling on Plaintiffs' federal claims under § 1983 as set forth above, the Court will decline to continue to exercise supplemental jurisdiction over Plaintiffs' state law causes of action. 28 U.S.C. § 1367(c). Accordingly, plaintiffs' claims for false arrest and false imprisonment under Tennessee law will be **DISMISSED** without prejudice.

### IV.  CONCLUSION

For the reasons set forth herein, Plaintiffs' motion for partial summary judgment [Doc. 208] is **DENIED**. Defendants' motion for summary judgment [Doc. 196] is **GRANTED**. As all claims against the Coffee County Defendants have been dismissed, their pending pretrial motions [Docs. 199, 279, 348] are **DENIED AS MOOT**. Plaintiffs' motion in limine number 13 [Doc. 280] is also **DENIED AS MOOT**.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge