UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | | |
|---|---|---|
| BIANCA CLAYBORNE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | 4:24-CV-00012-DCLC-MJD |
| | ) | |
| v. | ) | |
| | ) | |
| RUBEN BASALDUA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Bianca Clayborne and her five minor children brought this 42 U.S.C. § 1983 suit against Tennessee Highway Patrol troopers Ruben Basaldua, Donnie Clark, Douglas Foster, and James Thompson (collectively, "the troopers"), Tennessee Department of Children's Services employees Katlyn Taylor, Montana Medina, Erica Wright-Gilliam, Kathleen Velez, and Dale Lynn (collectively, "DCS Defendants"), and Coffee County, Tennessee and Coffee County Sheriff's Department officers Alan Crabtree, James Sherrill, Frank Watkins, Stephen Sharketti, and Alex Bell (collectively, "Coffee County Defendants").

Plaintiffs allege that Defendants violated their federal constitutional rights during the events that occurred following a traffic stop that led to the removal of the children from their parents' custody for fifty-five days. The troopers moved for summary judgment [Doc. 191], and Plaintiffs moved for partial summary judgment on their Fourth Amendment claims [Doc. 172]. These matters are fully briefed and are ripe for resolution. For the following reasons, Plaintiffs' motion is **DENIED**, and the troopers' motion is **GRANTED**.

## I.    BACKGROUND

### A.  The Traffic Stop

On February 17, 2023, at around 9:38 a.m., Tennessee Highway Patrol ("THP") Trooper Ruben Basaldua initiated a traffic stop for a slow poke violation and a possible window tint violation. [Plaintiff's Statement of Undisputed Material Facts, Doc. 175, ¶¶ 2-3]. Deonte Williams was the driver; Bianca Clayborne and their five young children were in the passenger seats. The family pulled over at a nearby gas station and waited for Trooper Basaldua to approach their vehicle. [*Id.* at ¶ 4]. Within two to three minutes, THP Troopers Donnie Clark and Douglas Foster responded to the gas station in their patrol vehicles. [*Id.* at ¶ 6]. One of their vehicles had its blue lights activated throughout the entirety of the following two-and-a-half-hour stop at the gas station. [*Id.* at ¶ 14].

Troopers Basaldua and Clark spoke to Williams and told him they smelled marijuana. [THP Defendants' Statement of Material Facts, Doc. 193, ¶ 1]. In response, Williams said, "We were smoking," and gave consent to search the vehicle. [*Id.* at ¶¶ 2, 5]. At the same time, Trooper Foster spoke to Clayborne, who told him there was a blunt in the car and a gun in her purse. [*Id.* at ¶¶ 8-9]. At some point during the encounter, the troopers seized Clayborne's gun.[1] [*See id.* at ¶ 48].

The troopers conducted a partial search of the vehicle, deciding not to search the back seats where the children were sitting. [*Id.* at ¶ 10]. They found a small amount of marijuana. [Doc. 175 at ¶ 15]. They decided to arrest Clayborne and Williams for simple possession of marijuana and advised them that they were contacting the Department of Children's Services ("DCS") to take custody of the children. [*Id.* at ¶¶ 18, 21]. The troopers believed they needed to involve DCS because both parents were being custodially arrested and would not be able to care for the

---

[1]     Williams is a convicted felon and could not legally possess the gun. The troopers took the gun for fingerprint testing. [Doc. 175, Exhibit 2, Clark Bodycam, at 2:40-44, 3:11-18].

children.[2]  [*Id.* at ¶ 20].   At 10:37 a.m., THP Trooper James Thompson reported to the scene.  [*Id.* at ¶ 8].

Roughly thirty minutes later the troopers changed course.  [*Id.* at ¶ 24].  Williams remained under arrest, but the troopers decided to issue Clayborne a citation rather than arrest her if, after a full search of the vehicle, they did not find any other illegal items.  [*Id.* at ¶ 26].  The troopers intended that, by only issuing a citation, Clayborne and her children would not be separated.  [*Id.* at ¶ 27].  Clayborne, with assistance from Troopers Foster and Clark, moved the children from the back of the vehicle into the gas station so the troopers could complete the search.  [Doc. 193 at ¶ 31].  No illegal items were found; however, the search did turn up several thousand dollars in cash in a diaper bag.  [*Id.* at ¶ 33].  At 11:54 a.m., Trooper Basaldua issued Clayborne the citation, and Trooper Clark helped Clayborne load the children and car seats back into the vehicle.  [*Id.* at ¶ 47; Doc. 173, pg. 4].

## B.  The Troopers' Post-Citation Discussions

At 11:59 a.m., when the family was ready to go, Troopers Clark and Foster stood next to the vehicle and discussed whether Clayborne needed to talk to DCS at the Coffee County Jail.  [Doc. 175 at ¶ 45].  Trooper Clark, who did not know that Clayborne had already received the citation, suggested that because Clayborne would be cited rather than arrested, she did not need to talk to DCS.  [*Id.* at ¶ 46].  Trooper Foster disagreed and insisted that a THP General Order required them to notify DCS and that Clayborne "still needs to talk to them."  [*Id.* at ¶ 48].  Trooper Clark responded, "She's not being arrested though, she's just getting a ticket. She can come down to the jail, she'll need to go there anyway and she can speak to them down there … Let's just get her

---

[2]    THP General Order No. 524-1 instructs troopers to coordinate a welfare check when children will be endangered by being left unattended due to a person's arrest. [Doc. 129-1].

down there to the jail." [Doc. 175, Ex. 4a at 1:33- 2:07].

Trooper Clark then walked over to Trooper Basaldua's vehicle. Trooper Basaldua asked him, "Can you have her sign this [property release for the gun] so she can leave? Or so she can follow us to the jail." [*Id.* at 2:53-2:57]. Trooper Clark responded, "She'll have to follow us down there because DCS." [*Id.* at 2:57-3:01]. Trooper Clark then walked back towards Clayborne's vehicle and had her sign the property release form. [Doc. 175 at ¶ 69]. As Trooper Basaldua left to take Williams to the Coffee County Jail, Trooper Clark said, "I'll have her follow me." [*Id.* at ¶ 70]. He walked over to Clayborne's vehicle and told her, "Just follow me down to the jail and then you'll know where he's at and then we'll finish up the paperwork there." [*Id.* at ¶ 73].

**C.  The Troopers and Clayborne Travel to the Coffee County Jail**

At 12:04 p.m., Trooper Clark drove to the jail with Clayborne and the children following. [*Id.* at ¶¶ 86, 101, 115]. Troopers Foster and Thompson trailed a few minutes behind them. Upon arrival, Trooper Clark directed Clayborne to park in a handicapped spot across from the entrance to the jail, next to his own vehicle. [*Id.* at ¶ 90]. He told Clayborne to keep her car running and that he was going to take pictures of her car. [*Id.* at ¶¶ 92-93]. Clayborne, sitting in her vehicle, asked Trooper Clark if she was going to jail. [Doc. 175, Ex. 4a, at 8:36-8:37]. He replied, "No, we're going to give you a ticket." [Doc. 175 at ¶¶ 96, 98]. Trooper Clark took pictures for a few seconds and then met with DCS employees Taylor and Velez a few feet behind Clayborne's vehicle. [*Id.* at ¶ 104]. Trooper Clark told them there was no indication of abuse or neglect, the troopers wanted to keep the family together, that "for everybody's best interest, she is just going to get a misdemeanor citation for marijuana, and let her go," and that it "would be best for everybody for her to … not be booked in." [*Id.* at ¶¶ 107, 114]. He then requested that the DCS workers do their questioning in the vehicle to avoid further disruption to the children. [*Id.* at ¶

120].

At about 12:12 p.m., Trooper Clark asked Clayborne if she had been issued a ticket, and she said yes. [*Id.* at ¶ 126]. He then told her that someone from DCS was going to chat with her because the troopers were "required to call them." [*Id.* at ¶ 128, 130]. Trooper Clark then asked if Clayborne had any issue with someone from DCS sitting in her vehicle to do the questioning, to which Clayborne responded that there was no room for them to sit. [*Id.* at ¶ 134-35]. He responded "Okay. Well, we'll move stuff around," and directed Clayborne to unlock the front passenger door. [*Id.* at ¶¶ 136, 138]. Clayborne complied, [*Id.* at ¶ 139]. Trooper Clark opened the door and moved items in the front seat to clear up space for the DCS worker. [*Id.* at ¶ 140]. While he was doing this, Troopers Foster and Thompson watched while standing a few feet behind Clayborne's vehicle. [*Id.* at ¶ 143]. At around 12:14 p.m., a DCS employee told Trooper Clark that she would talk to Clayborne, and the three troopers left. [*Id.* at ¶ 150].

### D. Procedural History

The Complaint asserts claims against the troopers for violating Plaintiffs' Fourth and Fourteenth Amendment rights and falsely imprisoning Plaintiffs in violation of Tennessee law. The troopers have asserted the affirmative defense of qualified immunity to these claims and seek summary judgment as to all claims. Plaintiffs' motion seeks summary judgment on liability on the Fourth Amendment claims.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it may affect the case's outcome under the applicable substantive law, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must prevail as a matter of law." *Id.* at 251–52. When ruling on a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

When evaluating a motion for summary judgment, the court must consider all facts in the light most favorable to the nonmoving party, and the nonmoving party should receive the benefits of every reasonable inference. *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 410 (6th Cir. 2024). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant discharges that burden by showing "an absence of evidence to support the nonmoving party's" claim or defense, at which point the nonmoving party, to survive summary judgment, must identify facts in the record that create a genuine issue of material fact. *Id.* at 324-25.

## III.    ANALYSIS

To succeed on a § 1983 claim, a plaintiff must establish (1) that the defendant was acting "under the color of state law," and (2) that the defendant's action deprived plaintiff of "rights secured by federal law." *League of Women Voters v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008) (internal citations omitted). Though violations of constitutional rights by government officials acting under color of state law are generally redressable under § 1983, the personal defense of qualified immunity protects government officials from liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *Rieves v. Town of Smyrna, Tennessee*, 959 F.3d 678, 695 (6th Cir. 2020) (citation omitted). This defense insulates officers "from undue interference with their duties," *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982), affording them "breathing room to make reasonable but mistaken judgments" and shielding "all but the plainly incompetent or those who knowingly violate the law," *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

When a defendant raises a qualified immunity defense, the plaintiff must satisfy a two-part inquiry to show that the defendant is not entitled to qualified immunity. *Thomas v. Plummer*, 489 F. App'x 116, 119 (6th Cir. 2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017) ("The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.") (citation omitted). Under this two-part inquiry, a defendant is entitled to qualified immunity unless the facts, viewed in a light most favorable to the plaintiffs, (1) show the officer's conduct violated a constitutional right, and (2) the right was "clearly established." *Morrison v. Bd. of Trs.*, 583 F.3d 394, 400 (6th Cir. 2009) (citation and footnote omitted). "An answer of 'yes' to both questions defeats qualified immunity, while an answer of 'no' to either question results in a grant of qualified immunity." *Haley v. Elsmere Police Dep't*, 452 F. App'x 623, 626 (6th Cir. 2011).

Under this analysis, the Court does not have to address the prongs sequentially; nor must the Court address both if the circumstances in the particular case at hand do not require it. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see District of Columbia v. Wesby*, 583 U.S. 48, 62 n.7 (2018) ("[L]ower courts 'should think hard, and then think hard again,'" before addressing both prongs of the qualified-immunity analysis) (citation omitted); *al-Kidd*, 563 U.S. at 735 (instructing courts to "think carefully before expending 'scarce judicial resources' to resolve difficult and novel

questions" under the two-part inquiry, particularly when those questions "will 'have no effect on the outcome of the case'") (citation omitted)).

Plaintiffs raise claims against the troopers actionable under § 1983 pursuant to the Fourth Amendment and the Fourteenth Amendment's substantive due process clause. Additionally, Plaintiffs raise state law claims for false arrest and false imprisonment. In defense, the troopers assert that they are entitled to qualified immunity. Both parties moved for summary judgment on the Fourth Amendment claims, and the Court will consider the arguments from both motions together. The Court will then address the false arrest and substantive due process claims.

Assuming that the troopers seized Plaintiffs in violation of the Fourth Amendment, the Court turns to whether "the law was clearly established at the time of the offensive conduct." *Hughes v. City of North Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996) (citation omitted). To show that the troopers violated a clearly established right, Plaintiffs may not cite a general right; rather, they must show "with a significant degree of particularity," *Eugene D. v. Karman*, 889 F.2d 701, 706 (6th Cir. 1989), that the "contours" of that right, at the time of the conduct in question, were "sufficiently clear" so that "a reasonable official" in his shoes "would understand what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Put differently, "[a] right is not clearly established if existing precedent does not place the constitutional question beyond debate." *Zorn v. Linton*, 146 S.Ct. 926, 930 (2026)(quotation and citation omitted); *Mullenix v. Luna*, 577 U.S. 7, 13-14 (2015) ("The relevant inquiry is whether existing precedent placed the conclusion that" the troopers "acted unreasonably in these circumstances 'beyond debate.'") (quoting *al-Kidd*, 563 U.S. at 741).

In the context of qualified immunity, "the sources of clearly established law to be considered are limited," *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir.

2013), and to decide whether a right is clearly established, the Court looks first to the Supreme Court's precedent, then to the Sixth Circuit's precedent and considers whether these precedents place the constitutional question at issue beyond debate. *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013). To the extent Plaintiffs rely on district court or other appellate court decisions to clearly establish a principle of law, "these decisions must both [1] point unmistakably to the unconstitutionality of the conduct complained of and [2] be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer" that his conduct was unlawful. *Ohio Civ. Serv. Emps. Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988).

Plaintiffs have failed to provide any case law that clearly establishes, beyond debate, that the troopers acted unreasonably in this situation. Rather, Plaintiffs first look to their general rights under the Fourth Amendment that once the purpose of a traffic stop is completed, officers may not further detain the occupants unless there is reasonable suspicion of additional criminal activity to justify a further detention. *See, e.g., United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). There are two reasons why reliance on such a general principle of law is inappropriate here. First, the Supreme Court has instructed courts "not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (cleaned up). Second, although a general principle can clearly establish a violation in "an obvious case" when every reasonable official would immediately recognize that a defendant's conduct violated the principle, *Williams v. City of Canton*, 168 F.4th 933, 942 (6th Cir. 2026) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021)), when a general principle does not "immediately resolve the constitutional question when applied to the particular circumstances that a state official faced, plaintiffs must point to cases with similar facts." *Lovell v. Cnty. of*

*Kalamazoo, Michigan*, No. 24-1876, 2026 WL 972660, at *7 (6th Cir. Apr. 10, 2026) (cleaned up).  Here, the general principle that defendants violate the Constitution if they prolong a traffic stop for reasons other than suspicion of additional criminal activities does not address whether the troopers' actions violated this principle when confronted with an apparent mandatory child welfare check arising from arrests made during the traffic stop.  The troopers faced a unique situation, not an 'obvious case.'  Not every reasonable officer in their shoes would have recognized that their conduct violated the Fourth Amendment.  Thus, case law that closely speaks to the circumstances faced by the troopers is necessary to demonstrate a clearly established right.

Plaintiffs next point to the clearly established law that "safety measures taken to facilitate a different investigation are not tasks incident to the initial stop," but all of the cases cited in support refer to *criminal* investigations, primarily where the prolonged stop was due to additional searches for contraband, police dog sniffs, and questioning over the presence of guns or drugs. *See, e.g., United States v. Whitley*, 34 F.4th 522 (6th Cir. 2022); *United States v. Cruz*, 2024 WL 5397200 (W.D. Tenn. May 7, 2024); *United States v. Johnson*, 2024 WL 4612888 (E.D. Mich. Oct. 29, 2024); *Akridge v. Finnegan*, No. 3:13-0588, 2015 WL 5320554 (M.D. Tenn. Sept. 11, 2015)*.*  These facts are far afield of the instant case.  Here, Clayborne does not allege, and the troopers do not argue that the continued detention was in furtherance of an additional criminal investigation.  Instead, the primary purpose of the continued detention was to facilitate a meeting with DCS for a welfare check.  Plaintiffs provide no case law involving continued detentions precipitated by the need for welfare checks or other non-criminal, family-related governmental

investigations.[3]  Plaintiffs' cited cases, therefore, do not show that the troopers conduct was a clear violation of the Constitution.

The troopers argue that there was no clear legal precedent that would have put a reasonable officer on notice that their actions were unlawful as no case law interprets the requirements of General Order 524-1 or concerns a similar situation in which law enforcement called DCS before a parent was issued a citation in lieu of arrest.  General Order 524-1 provides that:

> When a person is arrested and taken into custody, Members shall ask the person whether that person is the parent or legal custodian of any child or children that will be left unattended by the person's arrest. From this information, the Member shall determine whether the child or children will be endangered by the parent or legal custodian's absence following an arrest.

[Doc. 129-1].  Troopers then must determine whether the child will be endangered by considering the child's age, special needs, whether someone will be with the child soon, and if the child is normally left alone.  If the trooper determines a child will be endangered, they must engage Dispatch who contacts DCS or another agency to conduct a welfare check.

That leaves the question: was it objectively reasonable for the troopers to think that requiring Clayborne to meet with DCS for a welfare check was required under the General Order?  The answer is yes.

The General Order is clear: it only applies "[w]hen a person is arrested and taken into custody." [*Id.*].  Clayborne and Williams were arrested and taken into custody when the troopers contacted DCS.  The troopers did so recognizing that the minor children would be unattended.  This action was in full compliance with the General Order.  Once Clayborne was no longer under

---

[3]  These types of activities might fall within the troopers' community caretaking functions, which can serve as an exception to the Fourth Amendment. *See United States v. Johnson*, 166 F.4th 1116, 1119-20 (8th Cir. 2026) (considering whether the circumstances that justify prolonging a stop for community caretaking were present). Neither party addresses this exception in their briefing, so the Court will not analyze whether this exception in fact applies here.

arrest, the General Order provided no guidance on how to proceed as it does not contemplate such a change in circumstances. It only discusses the initial actions a trooper must make when confronted with children who will be left unattended, not when one parent is no longer under arrest and can resume custody of the children.

The troopers had probable cause to arrest both parents, and they held both under arrest for approximately two hours before deciding to only cite Clayborne. DCS was already contacted and stood by at the jail, ready to perform a welfare check. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (emphasis added). In this situation, requiring that the family meet with DCS for a welfare check was one of many possible reasonable courses of action. Moreover, if reasonable officers could disagree on whether the government official could have reasonably believed that his conduct was lawful, qualified immunity applies. *Waters v. City of Morristown*, 242 F.3d 353, 361 (6th Cir. 2001). Here, there was a disagreement between two reasonable officers over whether they needed to take Clayborne to meet with DCS. Trooper Foster believed it was necessary, and Trooper Clark did not. When Trooper Clark yielded to Trooper Foster's interpretation of the General Order, he did not violate a clearly established right.

Moreover, the troopers are entitled to qualified immunity even if they made a mistake of law or fact regarding the application of the General Order. Qualified immunity applies even if a government official made a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986). If a reasonable officer could

12

have believed the officer's actions to be lawful, considering clearly established law and the information he possessed, then qualified immunity applies. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

It is not clear that the troopers made a mistake in invoking the General Order. It certainly applied to the circumstances that unfolded over the first two hours of the traffic stop when both parents were under arrest, and when Clayborne was no longer under arrest, its wheels had already been set in motion. Even assuming, arguendo, that they did make a mistake by requiring that the family meet with DCS once Clayborne was no longer under arrest, it would not provide a basis for a constitutional violation. In light of the clearly established law and the circumstances before the troopers, a reasonable trooper in their positions could have believed they acted lawfully.

Plaintiffs have failed to meet their burden of showing that the troopers violated a clearly established right. As movants for summary judgment, the troopers are entitled to qualified immunity on Plaintiffs' Fourth Amendment claims. Therefore, Plaintiffs' motion for partial summary judgment is **DENIED**, and Defendants' motion for summary judgment is **GRANTED.**

### A. Fourteenth Amendment Claims

Under the Fourteenth Amendment, "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Substantive due process provides "heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997). The Supreme Court has consistently recognized that parental custody rights are subject to substantive due process protections. *See, e.g., Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Moore v. City of East Cleveland,* 431 U.S. 494, 499 (1977) (listing cases acknowledging due process protections over family life); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639 (1974) ("freedom of

personal choice in matters of ... family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.").

In many ways, the right to family integrity and association is "the paradigmatic example of a substantive due process guarantee." *Schulkers v. Kammer*, 955 F.3d 520, 540 (6th Cir. 2020). That right, however, is not "absolute nor unqualified." *Bambach v. Moegle*, 92 F.4th 615, 624 (6th Cir. 2024) (quoting *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006). It is limited by the governmental interest in the protection of children, although a removal from custody without due process—except in an emergency—is typically impermissible. *Kottmyer*, 436 F.3d at 690-91. Further, "substantive due process claims based on the right to family integrity require that the state official act with a culpable state of mind directed at the family relationship." *Chambers v. Sanders*, 63 F.4th 1092, 1100 (6th Cir. 2023)

Plaintiffs have alleged that, with a culpable state of mind, the troopers took multiple actions that ultimately resulted in the separation of Clayborne from her children, including: arresting her for simple possession, using the threat of taking her children away to force her into allowing a further search of the car, threatening Williams that if he kept talking, they would make sure that DCS would take the children away, and illegally continuing to detain her family to deliver them to DCS at the jail.

The troopers' actions in initially arresting Clayborne for simple possession of marijuana were lawful. They had probable cause to arrest her, and they did so in accordance with state law. The arrest was not unconstitutional, and Plaintiffs have not presented evidence to suggest that the arrest itself was made for the purpose of separating her from her children. The troopers' threats to take the children in an attempt to force Clayborne into allowing a search of the car may have affected the validity of her consent to conduct the search, but the threats did not result in the

family's separation.  Similarly, when Trooper Basaldua threatened Williams with taking away the children, it did not have the effect of interfering with the Plaintiffs' family integrity.  Trooper Basaldua did not determine that the children should be taken from their family; that was DCS' decision based on their independent evaluation of the family and circumstances.  The troopers' actions touched on Clayborne and Williams' roles as parents, but they did not affect the actual relationship between the parents and their children.  Therefore, those actions do not support a substantive due process claim.

Whether the troopers' continued detention of the family to escort them to DCS was a due process violation is a more complicated issue, though the claims ultimately must fail for two reasons.  First, the "right to familial association is not implicated merely by governmental investigation" into allegations concerning a child's welfare. *Kottmyer*, 436 F.3d at 690.  Rather, what matters is whether a government official actually deprived a parent of their constitutional right to custody and control over a child. *Id.* Absent bad faith, improper motive, or investigation tactics that shock the conscience, investigations do not infringe on a family's fundamental rights. *Teets v. Cuyahoga Cnty., Ohio*, 460 F. App'x 498, 502 (6th Cir. 2012).  The troopers had no role in DCS' decision to remove Clayborne from her children, nor did they participate in DCS' child welfare investigation.  The only involvement of the troopers was to initiate DCS' involvement when both parents were arrested, and to escort the family to the jail where DCS waited.  There is no evidence that the troopers acted in bad faith, with an improper motive, or engaged in tactics that shock the conscience in having Clayborne drive herself and her children to the jail and meet with DCS.

Second, to support a due process violation, the troopers must have acted with a culpable state of mind directed at the family relationship.  As evinced by their own words, the troopers did

not want to separate the children from Clayborne. Trooper Clark told the DCS workers at the jail that there was no indication of abuse or neglect and that the troopers wanted to keep the family together. They involved DCS to allow them to investigate and make their own determination whether to take further action. Once DCS met with Clayborne, the THP troopers all left. In fact, the troopers took some small measures to keep the children with their mother. They asked DCS to interview Clayborne in her car, so the children could stay with her and not be shuttled back and forth between the jail. They allowed Clayborne to drive herself and her children to the jail, and they never asked her to leave her children's side after she was given the citation. Even assuming the continued detention constituted a Fourth Amendment violation, for which the troopers are entitled to qualified immunity, this seizure did not affect the Plaintiffs' substantive due process rights to family association.

Because the troopers did not violate Plaintiffs' substantive due process rights, they are entitled to qualified immunity and summary judgment is **GRANTED**.

### B. False Imprisonment and False Arrest Claims

Because the Court has "dismissed all claims over which it has original jurisdiction," the Court will decline to continue to exercise supplemental jurisdiction over Plaintiffs' state law causes of action. 28 U.S.C. § 1367(c)(3). Accordingly, Plaintiffs' claims for false arrest and false imprisonment under Tennessee law will be **DISMISSED** without prejudice.

### IV. CONCLUSION

For the reasons set forth herein, Plaintiffs' motion for partial summary judgment [Doc. 172] is **DENIED**. Defendants' motion for summary judgment [Doc. 191] is **GRANTED**. As all claims against the THP Defendants have been dismissed, their pending pretrial motions [Docs. 214, 296, 298] are **DENIED AS MOOT**.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge

Case 4:24-cv-00012-DCLC-MJD    Document 355    Filed 04/22/26    Page 17 of 17
PageID #: 5490