UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | | |
|---|---|---|
| BIANCA CLAYBORNE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | 4:24-CV-00012-DCLC-MJD |
| | ) | |
| v. | ) | |
| | ) | |
| RUBEN BASALDUA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Bianca Clayborne and her five minor children brought this 42 U.S.C. § 1983 suit against Tennessee Highway Patrol troopers Ruben Basaldua, Donnie Clark, Douglas Foster, and James Thompson (collectively, "THP Defendants"), Tennessee Department of Children's Services employees Katlyn Taylor, Montana Medina, Erica Wright-Gilliam, Kathleen Velez, and Dale Lynn (collectively, "DCS Defendants"), and Coffee County, Tennessee and Coffee County Sheriff's Department officers Alan Crabtree, James Sherrill, Frank Watkins, Stephen Sharketti, and Alex Bell (collectively, "Coffee County Defendants").

This case arises from a traffic stop that culminated in the removal of five minor children from their mother's custody for fifty-five days. Plaintiffs allege that Defendants violated their constitutional rights under the Fourth and Fourteenth Amendments in connection with those events. Defendant Dale Lynn, a supervisory employee of the Tennessee Department of Children's Services, has moved for summary judgment on all claims asserted against him. [Doc. 201]. That motion has been fully briefed and is ripe for resolution. For the reasons that follow, Lynn's motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

### A. Factual Background

On the morning of February 17, 2023, Tennessee Department of Children's Services ("DCS") received a report on the Child Abuse Hotline concerning Bianca Clayborne and her children, who were traveling through Coffee County, Tennessee. [Doc. 203, ¶ 1]. The report alleged the children were drug exposed and requested immediate DCS assistance. [*Id.* ¶ 2]. The Coffee County Intake Analyst forwarded the matter to DCS Team Leaders Montana Medina and Dale Lynn, asking —which case manager should respond.[1] [Doc. 202, pg. 3]. Medina assigned the case to case managers Erica Wright-Gilliam and Katlyn Taylor, who traveled with Kathleen Velez to the Coffee County Jail. [*Id.* at 2-3; Doc. 203, ¶ 3].

Clayborne and her children arrived at the jail at 12:07 p.m. [Doc. 250, Ex. 3, #26]. Taylor sat in the passenger seat of Clayborne's car and interviewed her, while Wright-Gilliam and Velez stood near the open door. [Doc. 201, Ex. 3, at 84:1-17]. Throughout this encounter, Wright-Gilliam relayed information to her supervisor, Montana Medina. [*Id.* at 96:21-22]. At some point, DCS asked Clayborne to provide a urine sample for a drug screening, which Clayborne tried to do inside the vehicle because she was unwilling to leave her children alone with the DCS workers. [Doc. 250, Ex. 3, #26, #53]. Clayborne eventually refused to continue speaking with DCS, asked them to exit the vehicle, and she locked herself and the children inside.

Meanwhile, the DCS supervisors were evaluating the matter. Medina was in constant contact with her supervisor, Kellie Lusk, throughout the afternoon. [Doc. 250, Ex. 3, #27, #32, #45, #55]. Lusk was simultaneously updating DCS Regional Manager Jacquie Shultz, who

---

[1] Dale Lynn, Montana Medina, and Penny Hawk are Team Leaders at DCS who each report to Kellie Lusk. Lynn has no direct reports who are involved with this case, Medina supervises Erica Wright-Gilliam and Katlyn Taylor, and Hawk supervises Kathleen Velez. [Doc. 202, pg. 2].

ultimately made the decision to seek removal of the children based on information she received from Lusk, who had received it from Medina. [Doc. 201, Ex. 6, at 39:5-23].

Lynn's involvement began at 12:39 p.m., when Lusk first called him in a two-minute call. [Doc. 250, Ex. 3, #54]. Lusk called Lynn again at 12:44 p.m. for eighteen minutes, and a third time at 1:08 p.m. [*Id.* #59, 83]. Lynn testified that during these calls he and Lusk discussed the details of the case. [Doc. 201, Ex. 1, at 45:22-25, 46:1-16]. At 12:42 p.m., Wright-Gilliam sent a group text to multiple DCS employees, including Lynn, asking someone to run background checks on two women connected to the case. [Doc. 250, Ex. 3, #56]. Lynn responded that he would handle it and subsequently reported that the background checks were clean. [*Id.*, #57, #63]. At 12:56 p.m., Medina texted Lynn, "This is a shit show." Lynn replied, "I'm hearing about it..." [*Id.*, #66, #67].

At 1:09 p.m., immediately after his second call with Lusk ended, Lynn called Wright-Gilliam for approximately one minute. [*Id.* # 84]. Lynn then called Coffee County Investigator James Sherrill, asking him to assist with the situation at the jail. [*Id.* # 86, Doc. 201, Ex. 10, at 13:17-23]. Sherrill told Lynn that law enforcement could not act without a valid court order. [Doc. 201, Ex. 10, at 13:17-23]. Lynn told Sherrill he was working to obtain one. [*Id.*].

At 1:30 p.m., Sherrill called Lynn back in a one-minute call, followed immediately by Lynn placing a brief call to DCS attorney Sheila Younglove. [Doc. 250, Ex. 3, #98, #99]. At 1:31 p.m., Lynn called Juvenile Court Judge Gregory Perry in an unsworn, undocketed phone call lasting approximately four minutes. [*Id.*, #100]. Lynn relayed the situation as it had been described to him by Lusk, and Judge Perry determined that exigent circumstances existed and directed DCS to prepare an *ex parte* order and petition. [Doc. 201, Ex. 1, at 55:10-16]. Immediately after concluding the call with Judge Perry, Lynn called Younglove to convey the judge's request. [*Id.* at 121:13-17; Doc. 250, Ex. 3, #104]. When Younglove later contacted Lynn for information needed

to complete the *ex parte* order, Lynn directed her to Medina as the case handler. [*Id.*, #166].

Following his call with Lynn, Judge Perry contacted Sherrill and authorized the Coffee County Sheriff's Department to allow DCS to take the children. [Doc. 250, Ex. 9, at 3:10-11]. Sherrill asked Clayborne to bring the children inside the jail, advising her that they were being removed from her custody. [Doc. 203, ¶ 26]. Clayborne complied, and the DCS workers present transported the children away from the jail. [Id. ¶ 27]. The children remained separated from their parents for the next fifty-five days.

### B. Procedural History

The First Amended Complaint asserts claims against Lynn for unlawful search and seizures in violation of the Fourth Amendment, procedural and substantive due process violations under the Fourteenth Amendment, retaliation, and false arrest and imprisonment in violation of Tennessee law. Lynn has raised the affirmative defense of qualified immunity and seeks summary judgment as to all claims.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it may affect the case's outcome under the applicable substantive law, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must prevail as a matter of law." *Id.* at 251–52. When ruling on a motion for summary judgment, "the judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

When evaluating a motion for summary judgment, the court must consider all facts in the light most favorable to the nonmoving party, and the nonmoving party should receive the benefits of every reasonable inference. *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 410 (6th Cir. 2024). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant discharges that burden by showing "an absence of evidence to support the nonmoving party's" claim or defense, at which point the nonmoving party, to survive summary judgment, must identify facts in the record that create a genuine issue of material fact. *Id.* at 324-25; *Anderson*, 477 U.S. at 248 (plaintiffs must present more than a mere "scintilla" of evidence to support their position).

## III.     ANALYSIS

Most of Plaintiffs' claims arise under § 1983, though they also assert false arrest and false imprisonment claims under Tennessee law. The Court will address the § 1983 claims first, followed by the state-law claims.

Lynn's posture here is distinct from that of the other defendants. He was not present at the Coffee County Jail, he did not personally interact with Clayborne or her children, and he did not directly supervise any of the three DCS workers who conducted the encounter at the jail. His entire involvement in the events of February 17, 2023 consisted of a series of telephone calls and text messages—coordinating with supervisors and case managers who were receiving real-time reports from the scene, recruiting law enforcement assistance, and ultimately calling the juvenile court judge. Because Lynn's liability can arise only through the theory of supervisory acquiescence, the

5

Case 4:24-cv-00012-DCLC-MJD     Document 356     Filed 04/27/26     Page 5 of 19
PageID #: 5495

outcome of each claim turns on what Lynn knew, when he knew it, and whether his affirmative acts in furtherance of the removal constituted the requisite knowing participation in his subordinates' alleged constitutional violations.

## A.      42 U.S.C. § 1983 Claims

To succeed on a § 1983 claim, a plaintiff must establish (1) that the defendant was acting "under the color of state law," and (2) that the defendant's action deprived plaintiff of "rights secured by federal law." *League of Women Voters v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008) (internal citations omitted). Section 1983 liability extends only to a defendant who was personally involved in the unconstitutional action that caused the plaintiff's injury. *Pineda v. Hamilton Cnty.*, 997 F.3d 483, 491 (6th Cir. 2020). This can include supervisory personnel, where evidence establishes that they "at least implicitly authorized, approved, or knowingly acquiesced" in the unconstitutional conduct of their workers. *Essex v. Cnty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013); *see Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) ("Supervisors are often one step or more removed from the actual conduct of their subordinates; therefore, the law requires more than an attenuated connection between the injury and the supervisor's alleged wrongful conduct."); *Bass v. Robinson,* 167 F.3d 1041, 1048 (6th Cir. 1999) (supervisory liability requires "active unconstitutional behavior" by the supervisor). As part of this inquiry, courts consider whether there is a causal connection between the defendant's wrongful conduct and the violation alleged. *Peatross*, 818 F.3d at 242. "Accordingly, where an official's execution of his or her job function causes injury to the plaintiff, the official may be liable under the supervisory-liability theory." *Id.*

Plaintiffs allege that Lynn has supervisory liability for his actions. In response, Lynn asserts that he cannot be liable under this theory because he was not present at the jail, he did not

have supervisory authority over the officials who were present, and he directed no one at the jail to act. This defense relies on a series of disputed material facts, and as such the Court cannot resolve the seizure, due process, or retaliation claims on summary judgment.

### 1. Fourth Amendment Search

Plaintiffs allege that Lynn is liable for authorizing, approving, or knowingly acquiescing the DCS workers' decision to force Clayborne to provide a urine sample. This demand required Clayborne to remove her pants and underwear to provide the sample, which Plaintiffs contend constituted a search of Clayborne's person. Plaintiffs argue that the DCS workers did this without probable cause or any lawful basis to demand that Clayborne submit to a search.

This incident occurred at or just before 12:39 p.m., as evinced through Wright-Gilliam's text message to her supervisor Medina at 12:39 p.m. stating, "She is peeing in her car bc she is afraid to leave the kids in the car with us." [Doc. 250-3, pg. 8]. The decision to make Clayborne produce a urine sample and Clayborne's compliance with the order came at or before 12:39 p.m.

At that point in time, Lynn had essentially no involvement in this case. Earlier that day, he received an email from the Coffee County Intake Analyst who asked him and Medina which case manager should be assigned to the case. Medina responded, Lynn did not. Beyond that, he took no actions nor did he communicate with anyone regarding this case until, coincidentally, 12:39 p.m. [*See* Doc. 250-3 (timeline of electronic communications between the DCS employees, including phone calls)]. At about the same time as Wright-Gilliam texted about the ongoing urine sample collection, Lusk called Lynn, and the two spoke for about two minutes, purportedly about this case. Therefore, the search must have occurred before Lynn's knowledge of it, let alone his encouragement, authorization, or approval. Consequently, Lynn cannot be liable for the search, and this claim is **DISMISSED WITHOUT PREJUDICE.**

## 2. Fourth Amendment Seizure

Plaintiffs next allege that Lynn is liable for the DCS employees' illegal seizure of the family at the jail. Lynn does not contest that an illegal seizure occurred but argues that he cannot be liable for it as he either had no contact with or did not discuss the case with Taylor, Wright-Gilliam, and Velez—the three DCS workers who did seize the family. But Lynn exchanged phone calls or text messages with several people that day regarding this case, including Wright-Gilliam. [Doc. 250, Ex. 3]. Drawing all reasonable inferences in Plaintiffs' favor regarding these communications, the Court finds that there are genuine questions of material fact about Lynn's knowing acquiescence in the case, such that summary judgment is unwarranted.

For a supervisor-defendant to be liable for a violation of a plaintiff's constitutional rights, there needs to be "a causal connection between the defendant's wrongful conduct and the violation alleged." *Venema v. West*, 133 F.4th 625, 633 (6th Cir. 2025) (quoting *Peatross*, 818 F.3d at 242). "A causal connection is established when a supervisor's conduct, or lack thereof 'could be reasonably expected to give rise to just the sort of injuries' that a plaintiff alleges have occurred." *Id.* (quoting *Campbell v. City of Springboro*, 700 F.3d 779, 790 (6th Cir. 2012)). Here, a jury could make reasonable inferences to find a causal connection between Lynn's actions and the family's detention through his knowing acquiescence in the DCS workers' actions at the jail.

First, the most significant fact establishing causal connection is Lynn's recruitment of law enforcement before any exigency determination had been made. Immediately after calling Wright-Gilliam at 1:09 p.m., Lynn called Coffee County Investigator Sherrill to request law enforcement assistance with the removal of the children—a call that preceded his conversation with Judge Perry by more than twenty minutes. [Doc. 250, Ex. 3]. Sherrill told Lynn that law enforcement could not act without a valid court order. [Doc. 201, Ex. 10, at 13:17-23]. Lynn's response was not to stand

down but to tell Sherrill that a court order was being worked on. [*Id*.]. This exchange shows that Lynn was affirmatively facilitating the removal before any judicial sanction existed—not merely receiving reports and passing them along, but actively marshaling law enforcement resources toward a removal that had not yet been legally authorized. Even if Judge Perry ultimately determined that an exigency existed, that determination came after Lynn had set the removal machinery in motion. Lynn independently involved law enforcement to assist with removal before knowing whether exigent circumstances existed. [Doc. 250, Ex. 37, at 53:18-25, 54:1-5].

Second, a jury could reasonably infer that Lynn had sufficient knowledge of the DCS workers' unconstitutional conduct to make his facilitation constitute knowing acquiescence rather than innocent coordination. Lynn and his supervisor Lusk spoke three times between 12:39 and 1:08 p.m., including an 18-minute call, and Lynn testified that they discussed the details of the case during those calls. [Doc. 201, Ex. 1, at 45:22-25, 46:1-16]. Lusk was fully informed: she was in constant contact with Medina, who was in direct contact with the case workers at the jail. [Doc. 250, Ex. 3]. Lynn also had direct contact with Wright-Gilliam, calling her at 1:09 p.m. and again after his call with Sherrill, with the two speaking for about five more minutes. [*Id*. at 13]. While Wright-Gilliam testified she does not recall the content of these calls, the context—their timing immediately before and after other critical events, and the fact that Lynn had just spoken with Lusk about the case—permits a reasonable inference that these calls conveyed substantive information about the events unfolding at the jail. By 1:31 p.m., when Lynn called Judge Perry, he plainly had sufficient knowledge to describe the situation to a juvenile court judge and seek judicial authorization for removal. The record thus supports an inference that by the time Lynn began facilitating the removal, he knew that the DCS workers were detaining the family without lawful authority.

Together, these inferences establish a sufficient basis for a reasonable jury to find that Lynn knowingly acquiesced in the DCS workers' unconstitutional acts at the jail. Lynn was not a passive bystander who happened to receive reports—he participated in coordinating the removal. He spoke extensively with supervisors who had direct, real-time knowledge of the events at the jail; he called a caseworker on the scene; and—critically—he recruited law enforcement assistance before any exigency had been judicially determined. The frequency and duration of the calls, combined with the deposition testimony about their content and the logical sequence of events they preceded, permit a reasonable jury to find by a preponderance that Lynn both knew of the unconstitutional conduct and took affirmative steps to facilitate it. Summary judgment is unwarranted and as to this claim it is **DENIED.**

### 3. Procedural and Substantive Due Process Claims

On the due process claims, Lynn asserts that he is entitled to qualified immunity as the facts do not establish that Lynn's conduct violated Plaintiffs' due process rights, and Plaintiffs' rights were not clearly established.

Qualified immunity protects government officials from liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rieves v. Town of Smyrna, Tennessee*, 959 F.3d 678, 695 (6th Cir. 2020) (citation omitted). This defense insulates officers "from undue interference with their duties," *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982), affording them "breathing room to make reasonable but mistaken judgments" and shielding "all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

When a defendant raises a qualified immunity defense, the plaintiff must satisfy a two-part inquiry to show that the defendant is not entitled to qualified immunity. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). The plaintiff bears the burden of showing that the defendant is not entitled to qualified immunity. *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007). Under this two-part inquiry, a defendant is entitled to qualified immunity unless the facts, viewed in a light most favorable to the plaintiffs, (1) show the officer's conduct violated a constitutional right, and (2) the right was "clearly established." *Morrison v. Bd. of Trs.*, 583 F.3d 394, 400 (6th Cir. 2009) (citation and footnote omitted). "An answer of 'yes' to both questions defeats qualified immunity, while an answer of 'no' to either question results in a grant of qualified immunity." *Haley v. Elsmere Police Dep't*, 452 F. App'x 623, 626 (6th Cir. 2011).

The Court will address the substantive due process and procedural due process claims separately.

### a. Substantive Due Process

Under the Fourteenth Amendment, "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Substantive due process provides "heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997). The Supreme Court has consistently recognized that parental custody rights are subject to substantive due process protections. *See, e.g., Quilloin v. Walcott*, 434 U.S. 246, 255 (1978)("the relationship between parent and child is constitutionally protected"); *Moore v. City of East Cleveland,* 431 U.S. 494, 499 (1977) (listing cases acknowledging due process protections over family life); *Cleveland Bd. of Education v. LaFleur*, 414 U.S. 632, 639 (1974) ("freedom of personal choice in matters of ...

family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.").

In many ways, the right to family integrity and association is "the paradigmatic example of a substantive due process guarantee." *Schulkers v. Kammer*, 955 F.3d 520, 540 (6th Cir. 2020). That right, however, is not "absolute nor unqualified." *Bambach v. Moegle*, 92 F.4th 615, 624 (6th Cir. 2024) (quoting *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006). It is limited by the governmental interest in the protection of children, although a removal from custody without due process—except in an emergency—is typically impermissible. *Kottmyer*, 436 F.3d at 690-91. Further, "substantive due process claims based on the right to family integrity require that the state official act with a culpable state of mind directed at the family relationship." *Chambers v. Sanders*, 63 F.4th 1092, 1100 (6th Cir. 2023). This can include taking actions that shock the conscience. *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 765 (6th Cir. 2020) (quoting *Pittman v. Cuyahoga Cty. Dept. of Children and Family Servs.*, 640 F.3d 716, 728 (6th Cir. 2011)).

Plaintiffs have alleged that, with a culpable state of mind, Lynn took multiple actions that ultimately resulted in the separation of Clayborne from her children, by: retaliating against Clayborne for exercising her constitutional rights, recruiting County officials to restrain the family without any exigency, calling Judge Perry ex parte to get a court order in place, and authorizing, approving, or otherwise acquiescing in DCS officials separating the family before DCS had obtained a court order.

Lynn argues that he did not commit a constitutional violation because his only relevant action was his call to Judge Perry. In making this argument, Lynn again ignores his potential supervisory liability for knowingly acquiescing in his subordinates' constitutional violations. The question is not whether Lynn's call to Judge Perry was itself unconstitutional, but whether Lynn,

with a culpable state of mind directed at the family relationship, took actions that he knew would result in the unconstitutional separation of the children from their mother.[2] [*See* Doc. 248, ¶¶ 2]. A supervisor who knowingly facilitates the removal of children from their parent, while aware that no lawful basis for removal exists and that the removal is being pursued for retaliatory reasons, acts with a culpable state of mind directed at the family relationship. Such conduct—deliberately facilitating a baseless, punitive separation of a mother from her five children—would shock the conscience. If Lynn knew that there was not an emergency and nonetheless called law enforcement, called the judge, and coordinated the removal, a reasonable jury could find that his conduct satisfies the substantive due process standard. The genuine dispute over what Lynn knew, and when, is enough to preclude summary judgment on this claim.

Lynn next argues that Plaintiffs' rights were not clearly established. The clearly established inquiry must be framed with specificity: the question is not simply whether parents have a substantive due process right against the removal of their children without a court order absent exigency – that right is clearly established. *Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 700 (6th Cir. 2013) (citing *Doe v. Staples*, 706 F.2d 985, 990 (6th Cir. 1983). The harder question is whether it was clearly established, as of February 2023, that a non-

---

[2]    Lynn's claim to qualified immunity depends on the information he received from other DCS workers. When one officer's claim to qualified immunity rests on his good faith reliance on the report of other government officials, a court must consider: "(1) what information was clear or should have been clear to the individual officer at the time of the incident; and (2) what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information." *Brown v. Lewis*, 779 F.3d 401, 413 (6th Cir. 2015). Plaintiffs argue that Lynn was well-informed as to the events at the jail such that he could not have believed an exigency existed. It is largely unclear based on the deposition testimony what specifically Lynn knew and when. Additionally, Lynn's entire knowledge of the situation came second- or third-hand as he was not present at the jail and his main source of information, Lusk, was also not present. Thus, considering the facts in a light most favorable to Plaintiff, the Court will accept that this creates a genuine dispute of a material fact on the *Brown* inquiry.

present DCS supervisor who coordinated by telephone, contacted a juvenile court judge to seek an order, and recruited law enforcement assistance could be liable through his supervisory decisions touching on the unconstitutional removal. Lynn argues no case places that specific application of supervisory liability beyond debate.

His argument has some force. The cases clearly establishing liability in a child-removal context have generally involved the social workers who were physically present and directly conducted the removal, not their supervisors who worked through intermediaries. The Court concludes though that Lynn is not entitled to qualified immunity on the clearly established prong, for the following reason. The resolution of this prong turns on the same disputed facts that defeats prong one. The clearly established inquiry asks whether a reasonable officer in Lynn's position would have understood his conduct to be unconstitutional. If a jury finds that Lynn knew there was no exigency and still recruited law enforcement assistance to remove the children, called the judge, but knew he had no court order, and still coordinated the removal of the children – thus facilitating a baseless family separation – then no reasonable DCS supervisor could have believed that conduct was lawful.

The Sixth Circuit has long held that supervisory liability under § 1983 "requires some 'active unconstitutional behavior' on the part of the supervisor," and that a supervisor may be liable where he "authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Peatross v. City of Memphis*, 818 F.3d 233, 241–42 (6th Cir. 2016) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). A supervisor who knowingly facilitates or acquiesces in a subordinate's unconstitutional act cannot evade liability by claiming he did not realize that his own conduct in doing so was itself unconstitutional. That would the Sixth Circuit standard outlined in *Peatross*. 818 F.3d at 241–42. The clearly established inquiry

cannot be resolved in Lynn's favor without first resolving the factual dispute about what Lynn knew and whether he knowingly acquiesced in the removal. "[T]hroughout the qualified-immunity inquiry, 'courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.'" *Alford v. Deffendoll*, 165 F.4th 490, 496 (6th Cir. 2023) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)). At this stage, the Court must view the evidence in the light most favorable to Plaintiffs, and any genuine dispute about Lynn's knowledge and involvement must be left for the jury. *Tolan*, 572 U.S. at 657–60

The Court also considers whether Lynn's conduct in following Judge Perry's order may entitle him to quasi-judicial immunity. Officers who act pursuant to a valid court order are "protected by absolute quasi-judicial immunity" from suit for those actions. *Rieves v. Town of Smyrna, Tennessee*, 959 F.3d 678, 697 (6th Cir. 2020). That doctrine does not aid Lynn here. First, Lynn was not acting pursuant to a court order—he was the person seeking to obtain one. Quasi-judicial immunity protects officials who execute a judge's orders; not social workers performing investigatory or administrative functions. *See Bray v. Planned Parenthood Columbia Willamette, Inc.*, No. 2:10-CV-054, 2011 WL 1043940, at *2 (S.D. Ohio Mar. 17, 2011), *aff'd*, 746 F.3d 229 (6th Cir. 2014); *Achterhof v. Selvaggio*, 886 F.2d 826, 830 (6th Cir. 1989) (social worker acting in an investigative role not entitled to absolute immunity). As the Seventh Circuit has put it, "the law enforcement officer's fidelity to the specific orders of the judge marks the boundary for labeling the act 'quasi-judicial.'" *Richman v. Sheahan*, 270 F.3d 430, 436 (7th Cir.2001).

Second, no valid court order ever issued before the removal of the children. Tennessee law requires that removal orders be in writing. *See* Tenn. Code Ann. § 37-1-171(a). Judge Perry issued no written order. His statements on the recorded call with Sherrill—that DCS would draft an order and that DCS "can do what they want to for 72 hours on their own"—conveyed his understanding

of DCS's own independent authority to take children into custody without a prior order under Tenn. Code Ann. § 37-1-113, with a subsequent written order and preliminary hearing required with 48-72 hours. His statement was not a judicial order commanding Lynn or the officers to remove the children from Clayborne. Because no valid court order existed at the time of the removal, quasi-judicial immunity does not shield Lynn from liability for his role in initiating and carrying out the removal. The motion is **DENIED** as to this claim.

### b. Procedural Due Process

Plaintiffs' procedural due process claims challenge the way the childrens' removal took place here. In the Sixth Circuit, it is clearly established that "due process requires, among other things, that parents be given notice prior to the removal of the child stating the reasons for the removal and that the parents be given a full opportunity at the hearing to present witnesses and evidence on their behalf." *Id.* If there is an exigency involving an immediate danger to the child's safety, however, a child can be removed from a parent's custody if the parents are later provided a prompt post-deprivation hearing. *See id.* at 695.

Lynn is not entitled to qualified immunity on the procedural due process claim. The clearly established right—that parents must receive pre-deprivation notice and a hearing before their children are removed, except in a genuine emergency—was well-settled in this Circuit by February 2023. *Kovacic*, 724 F.3d at 695. As with the substantive due process claim, whether that clearly established right was violated by Lynn specifically—a non-present supervisor whose liability flows from his acquiescence in this subordinate's actions—cannot be resolved without first determining what Lynn knew about the absence of a court order and the absence of any genuine exigency. If a jury finds that Lynn knew the removal was proceeding without lawful authority and nonetheless took affirmative steps to facilitate it, the procedural due process violation he facilitated

16

was clearly established and no reasonable DCS supervisor could have believed otherwise. The qualified immunity defense on the procedural due process claim therefore rises and falls with the same disputed facts that preclude summary judgment on prong one, and summary judgment is **DENIED.**

### 4. Retaliation

A First Amendment retaliation claim under § 1983 requires a plaintiff to prove that:

(1) [she] engaged in protected conduct; (2) an adverse action was taken against plaintiff that would deter a person of ordinary firmness from continuing to engage in the conduct; and (3) there is a causal connection between elements one and two——that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Richards v. Perttu*, 96 F.4th 911, 917 (6th Cir. 2024) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)(Moore, J., plurality opinion).

The protected activity here is Clayborne's decision to stop answering DCS workers' questions, direct them to leave her vehicle, and secure herself and her children inside. The Constitution protects an individual's right to refuse to speak with government investigators, including DCS social workers, under both the First and Fifth Amendments. The Fifth Amendment "secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement — the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty … for such silence." *Malloy v. Hogan*, 378 U.S. 1, 8 (1964). This privilege applies to custodial questioning by government agents: once an individual "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966). And the Supreme Court has made clear that the right to remain silent must be "unambiguously" invoked, after which officers may not continue interrogation; Clayborne did exactly that when she

ordered the DCS workers out of her vehicle and locked her doors. *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010).

Lynn does not dispute that the DCS workers at the jail proceeded with the removal immediately after Clayborne refused to cooperate and terminated the interview. Nor does he dispute that removing her children is an adverse action that would deter a person of ordinary firmness from exercising her rights. *Richards*, 96 F.4th at 917. His argument is limited to supervisory liability: he was not physically present at the jail and did not directly communicate with Taylor, Wright-Gilliam, or Velez about the decision to remove this children. But summary judgment on this claim must be denied for the same reason it was denied on the seizure claim. Drawing all reasonable inferences in Plaintiffs' favor, a jury could infer from Lynn's repeated conversations with Lusk and Wright-Gilliam—during and immediately after the period when Clayborne was refusing to cooperate—that Lynn knew the DCS workers were removing the children because of her refusal to answer questions and knowingly acquiesced in that retaliatory motive. That inference is sufficient to create a triable issue on supervisory liability and to defeat summary judgment

**B.      False Arrest and False Imprisonment Claims**

Under Tennessee law, to succeed on a claim of false arrest or imprisonment a plaintiff must show that she was (1) detained against her will, and that (2) such detention was unlawful. *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990). This analysis "turns on whether a defendant restrained or detained the plaintiff against the plaintiff's will." *Doe v. Andrews*, 275 F. Supp. 3d 880, 885 (M.D. Tenn. 2017). Additionally, one who instigates the unlawful arrest of another may be held liable for false imprisonment. *Ross v. Gunter*, No. 86-162-II, 1986 WL 14224, at *2 (Tenn. Ct. App. Dec. 17, 1986).

Lynn was not present at the jail and did not personally detain the family, nor did he instigate their detention. To "instigate" means "[t]o goad or incite (someone) to take some action or course." Black's Law Dictionary (12th ed. 2024). Plaintiffs have produced no evidence that Lynn goaded or incited anyone to act, other than perhaps Sherrill, who knew that he could not act without a valid court order and in fact did not detain the family until he had verbal confirmation from Judge Perry to do so. Otherwise, all decisions related to the family's detention were made by the workers at the jail, Schultz, and possibly Medina and Lusk. Therefore, with no evidence that Lynn participated in the false arrest or imprisonment, this claim is **DISMISSED WITHOUT PREJUDICE.**

## IV. CONCLUSION

For all these reasons, Defendants' motion for summary judgment [Doc. 201] is **GRANTED IN PART** as to the search and false arrest and imprisonment claims and **DENIED IN PART** as to the seizure, retaliation, and due process claims.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge